# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR MENALDI, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff(s),<br><br>v.<br><br>OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, DANIEL S. OCH, JOEL M. FRANK, and MICHAEL COHEN,<br><br>                Defendants. | No.: 14-CV-03251-JPO<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

Lead Plaintiffs Ralph Langstadt and Julie Lemond ("Plaintiffs" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their consolidated amended class action complaint ("Complaint") against defendants, allege the following based upon their personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Och-Ziff Capital Management, LLC, ("Och-Ziff" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Och-Ziff securities between February 9, 2012 and August 22, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Och-Ziff is the largest publicly traded institutional asset management firm, managing assets of over $45.9 billion as of June 2014.  Throughout the Class Period, Och-Ziff held itself out to investors as a company with a firm commitment to integrity: "[our] reputation for integrity is [our] most important asset."  As part of that mantra, Och-Ziff acknowledged that its success depends heavily on the personal reputations of its key partners and claimed to actively manage reputational risk.  In public filings, Och-Ziff repeatedly lauded its "transparency" as a "differentiating competitive strength," claiming to provide its investors with "comprehensive reporting about each portfolio."  "Transparency" is "important to our ability to retain and attract new assets under management and, over time, increase our market share of new capital flows to the hedge fund industry."  Och-Ziff claims publicly to engage only in "disciplined investment" and to conduct "extensive" due diligence before any investment is made.  These and similar representations ensnared unsuspecting investors who relied on them to their detriment.

3.      Unbeknownst to investors, Och-Ziff did not practice what it preached.  Instead, Och-Ziff invested in a web of questionable deals in violation of the Foreign Corrupt Practices Act and U.S. sanctions prohibiting the Company from engaging in business with specifically identified foreign individuals and entities whose actions had undermined the democratic processes in their respective countries.  Motivated by greed, Och-Ziff threw transparency and integrity out the window.

4.      In connection with these deals, in 2011 Och-Ziff received subpoenas from the Securities and Exchange Commission ("SEC") and requests for information from the Department of Justice ("DOJ") probing Och-Ziff's transactions with the Government of Zimbabwe, Och-Ziff's involvement in Congolese oil and mine deals, and Och-Ziff's transactions with the Libyan Investment Authority in violation of the Foreign Corrupt Practices Act ("FCPA") and related laws.  Accordingly, as early as 2011, Defendant Daniel Och, the founder of the Company and its Chief Executive Officer, and Defendant Joel Frank, Och-Ziff's Chief Financial Officer and Senior Chief Operating Officer, were on notice and aware of the transactions that were the subject of the SEC and DOJ investigation.  The Complaint describes these transactions in detail.

5.      During the Class Period, Och-Ziff advanced a $100 million no-interest "loan" that permitted the Zimbabwean dictator Robert Mugabe to subvert the democratic process and secure another election.  Och-Ziff doled out the money despite the irrefutable fact that Mugabe's name was listed by the U.S. Office of Foreign Assets Control as a "special designated national" subject to U.S. sanctions.  The no-interest "loan" secured Och-Ziff's access to valuable platinum mining rights in Zimbabwe.

6.      Och-Ziff did not stop there.  The Company also financed two controversial oil and mining deals in Congo by advancing loans to an Israeli mining magnate, Daniel Gertler ("Gertler"), who had close ties with Congo's president.  Gertler used the money to acquire control of Congo's oil and mines at deeply discounted prices.  Och-Ziff negotiated significant control over the company used by Gertler to acquire control of the Congolese mine.  A panel headed by former U.N. Secretary General Kofi Annan found that Congo lost about $1.4 billion when its government underpriced assets sold to the tycoon.

7.      Och-Ziff also secured transactions with the Libyan Investment Authority through the use of a "fixer" who maintained a close relationship with the Libyan Intelligence Chief. Among other deals, through a company called Magna Holdings whose only three shareholders included Och-Ziff, Magna Holdings was able to win lucrative contracts to develop tourism along Libya's Mediterranean coastline.  Magna Holdings secured the contracts despite having no background in the tourism industry.

8.      Och-Ziff's investments raised the specter of Foreign Corrupt Practices Act violations and subjected Och-Ziff to the risk of regulatory scrutiny.  They also tarnished the Company's reputation and punished its stock price.  These illicit investments were made under the supervision and at the direction of Michael Cohen, one of Och-Ziff's most senior executives in charge of Och-Ziff's African investments.  Cohen was a personal protégé of Defendant Och. On March 18, 2013, Och-Ziff announced Cohen's departure after 15 years with the Company, without explanation.

9.      In March 2014, Och-Ziff disclosed for the very first time that the SEC and DOJ had been investigating the Company since 2011 for, among other things, "investments by some of our funds, both directly and indirectly, in a number of companies in Africa."  The probe involves the Foreign Corrupt Practices Act and "related laws," the Company said, without elaborating.

10.      As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities following a series of corrective disclosures, Plaintiffs and other Class members suffered significant damages.

**JURISDICTION AND VENUE**

11.      The claims asserted herein arise under and pursuant to Sections l0(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the

SEC, 17 C.F.R § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Och-Ziff securities are traded within this District and many of the acts and practices complained of occurred in substantial part herein.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Ralph Langstadt and Julie Lemond have been appointed Lead Plaintiffs.  As set forth in their previously filed certifications, Langstadt and Lemond purchased Och-Ziff securities at artificially inflated prices during the Class Period and were damaged upon the publication of the alleged corrective disclosures.

15.     Defendant Och-Ziff is a corporation organized under the laws of the state of Delaware, with its principal executive offices located at 9 West 57th Street, New York, New York, 10019.  All of Och-Ziff's executive directors have an ownership interest in the firm and receive distributions that are directly tied to the firm's profitability.

16.     Defendant Daniel S. Och ("Och") is the founder of the Company and has been its Chairman and Chief Executive Officer since its inception in 1994.  Och is also the Chairman of Och-Ziff's Partner Management Committee.

17.     Defendant Joel M. Frank ("Frank") is, and at all relevant times was, the Company's Chief Financial Officer and Senior Chief Operating Officer.  Frank is also a member of Och-Ziff's Partner Management Committee.

18.     Defendant Michael Cohen ("Cohen") was at all relevant times the Head of European Investing for Och-Ziff and a member of Och-Ziff's senior management team.  Cohen was also in charge of picking and running Och Ziff's African investments.

19.     The Defendants in paragraphs 16 to 18 above are referred to collectively as the "Individual Defendants."

20.     The Defendants in paragraphs 15 to 18 above are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**a)  Background**

21.     Och-Ziff is reported to be one of the largest institutional alternative asset managers in the world with approximately $46.2 billion assets under management as of October 1, 2014.  Och-Ziff was founded in 1994 by Defendant Och and became a public company in November 2007, trading on the New York Stock Exchange ("NYSE") under the ticker symbol ("OZM"). Through his Company, Defendant Och amassed a personal fortune estimated by Bloomberg to be about $3.7 billion.

22.     Och-Ziff is one of the few publicly traded institutional asset management firms. Shortly after Och-Ziff went public, in an interview and article, Defendant Och stated that the Company's decision to go public would help provide it with additional capital to invest in unusual private financing structures and joint ventures, and provide companies around the world the capital that they are desperate for.

23.     Och-Ziff represents that it makes investments only after it conducts "extensive" due diligence.  That process requires the Company to evaluate when necessary "important and complex business, financial, tax, accounting, environmental and legal issues.  Outside

consultants, legal advisors, accountants and investment bankers may be involved in the due diligence process in varying degrees depending on the type of investment." Och-Ziff states that it "approach[es] investments in each of [its] strategies through *rigorous fundamental analysis of the drivers of potential investment risk and return.  [The Company] look[s] at both qualitative and quantitative factors* in assessing the risk/reward parameters and *perform[s] extensive due diligence*."

24.     Reputational risk is a significant consideration and is actively analyzed by Och-Ziff.  According to Och-Ziff's public filings, "risk management is…central to how [the Company] manage[s] the operations of [its] business.  [The Company] actively manage[s] the operational risks of [its] business, including liquidity, counterparty exposures, legal and reputational risks."  Och-Ziff acknowledges that reputational harm could materially damage its results of operations, financial condition and liquidity.

25.     The Company also admits that "[t]he success of [its] business depends on the efforts, judgment and *personal reputations* of [its] key partners, particularly [its] founder, Daniel S. Och, and other members of [its] senior management team, including Joel M. Frank…and Michael L. Cohen."  The personal reputation of these executives is a "critical element" in Och-Ziff's ability to operate and expand its business.  Och-Ziff's performance is "highly correlated to the performance" of these executives.

26.     With respect to the impact a regulatory investigation would have on its business, Och-Ziff is aware that "[e]ven if a [regulatory] investigation or proceeding [does] not result in a sanction or the sanction imposed against [it] or [its] personnel by a regulator were small in monetary amount, the adverse publicity relating to the investigation, proceeding or imposition of

these sanctions could harm [its] reputation and cause [it] to lose existing investors or to fail to gain new investors."

27.     Och-Ziff touts its "transparency" as a key element distinguishing the Company from its competitors.  The Company represents in its public filings that its "fund investors should be provided with qualitative and quantitative information about [its] investment process, operational procedures and portfolio exposures in order to understand and evaluate [the Company's] investment performance."  Accordingly, Och-Ziff claims to provide its fund investors "with comprehensive reporting about each portfolio on a regular basis, and [the Company's] senior management team and portfolio managers regularly meet with them to address their questions."

28.     Defendant Och is actively involved in Och-Ziff's business and has a hands-on approach.  Indeed, most of the Company's funds "have special withdrawal provisions pursuant to which the failure of Daniel S. Och to be actively involved in the business provides investors with the right to redeem from such funds."  Defendant Och is Och-Ziff's commander-in-chief with an "ability to elect all of the members of [Och-Ziff's] Board of Directors and thereby control [the Company's] management and affairs."  Moreover, Defendant Och "is able to determine the outcome of all matters requiring shareholder approval and…able to cause or prevent a change of control of [the Company] or a change in the composition of [the Company's] Board of Directors, and could preclude any unsolicited acquisition of [the] Company."

29.     In the spring of 2008, Defendant Och placed one of his trusted lieutenants, Michael Cohen, in charge of picking and running Och-Ziff's European and African investments. At that time, Cohen was the Head of European Investing for Och-Ziff and a member of Och-Ziff's senior management team.

30.     During his last six years at the firm, Cohen pocketed more than £400 million, making him one of the best-paid hedge fund executives in Europe.

**b)  The Relevant Regulatory Framework**

31.     Like any other U.S. company, Och-Ziff is subject to all applicable laws and regulations, including prohibitions against kick-backs in violation of the Foreign Corrupt Practices Act ("FCPA") and related laws.

32.     Och-Ziff represents that its "*reputation for integrity is its most important asset*." The Company "expects its directors, officers and employees and those of its subsidiaries and affiliates, to conduct themselves according to high ethical and professional standards of conduct. All decisions and actions taken on the Company's behalf must be in strict compliance with all applicable laws and regulations and shall adhere to the highest standards of integrity."

33.     Och-Ziff's Code of Business Conduct and Ethics specifically mandates that "[n]o one acting on behalf of the Company may use kickbacks, bribes or other corrupt practices in conducting the Company's business.  The U.S. Foreign Corrupt Practices Act of 1997 (the 'FCPA') makes it a criminal offense to make improper payment to non-U.S. governmental or political officials in order to obtain or retain business, such as payments in the nature of kickbacks and bribes.  The FCPA also requires that publicly held companies maintain and keep records and accounts that fairly and accurately present their activities and transactions."

34.     The FCPA was enacted in the wake of SEC investigations in the mid-1970's, when many U.S. companies admitted to making hundreds of millions of dollars in questionable or illegal payments to foreign government officials, politicians, and political parties.  The FCPA was the government's attempt to rein in this corrupt behavior and, in conjunction with other countries that were passing similar laws, level the playing field in international business.

35.    The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq., makes it unlawful to make payments to foreign government officials to assist in obtaining or retaining business.  Specifically, the anti-bribery provisions of the FCPA prohibit the use of the mails or any means of instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person.  The FCPA broadly applies to payments to "any" officer or employee of a foreign government and to those acting on the foreign government's behalf.  The FCPA thus covers payments to low-ranking employees and high-level officials alike.  The payor or offeror need not achieve his or her goal—the payment or promise to make a payment is all that is required to violate the FCPA.  Moreover, "anything of value" encompasses much more than cash payments and includes political contributions, charitable contributions, tangible gifts, and travel and entertainment expenses.

36.    The FCPA also has record-keeping provisions that require companies whose securities are listed in the U.S. to maintain accurate books and records, as well as to have a system of internal controls designed to make sure that their transactions are accurately recorded.

37.    Violators of the FCPA are subject to civil and criminal penalties, including prison time and fines that can amount to twice the gain that resulted from a corrupt payment.

38.    In addition to being subject to the FCPA, because Och-Ziff was conducting business in the African territories during the Class Period, it was also required to comply with

10

the U.S. sanctions program implemented by the Office of Foreign Assets Control ("OFAC") in response to executive orders ("E.O.") issued by the President.  In particular, Och-Ziff was subject to U.S. sanctions leveled against Zimbabwe.  Targeted U.S. financial sanctions against Zimbabwe were first imposed in 2003, renewed in 2005, and further extended in July 2008.

On March 6, 2003, President George W. Bush issued E.O. 13288, pursuant to, *inter alia*, the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq*.) ("IEEPA") and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq*.) ("NEA"), "blocking property of persons undermining democratic processes or institutions in Zimbabwe."  Section 2(a) of E.O. 13288 provides that "[a]ny transaction or dealing by a United States person or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of any person listed in the Annex to this order or who is the subject of a determination under subsection 1(b) of this order."  The E.O. included an annex designating approximately 80 individuals with whom dealings were prohibited.  Robert Mugabe, the President of Zimbabwe, was the first name on the Annex.

39.     On November 22, 2005, President Bush signed E.O. 13391 pursuant to, *inter alia*, IEEPA and the NEA to take additional steps with respect to the continued actions and policies of certain persons who were undermining the democratic process in Zimbabwe.  E.O. 13391 significantly expanded the designation criteria by adding approximately 80 new annex names. The new E.O. targets persons undermining Zimbabwe's democratic processes or institutions, as well as material supporters and immediate family members of Special Designated Nationals ("SDNs") under the Zimbabwe program.

40.     On July 25, 2008, President Bush issued E.O. 13469 pursuant to, *inter alia*, IEEPA and the NEA, in response to the undemocratic, sham election held on June 27, 2008, and acts of violence and other human rights abuses against political opponents of Robert Mugabe. E.O. 13469 added new designation criteria to target senior officials of the Government of Zimbabwe, entities owned or controlled by the Government of Zimbabwe, human rights abuses related to political repression and public corruption by senior officials of the government.

41.     The U.S. publishes a list of SDNs comprising individuals and companies targeted by sanctions.  The list is readily available and easily accessible on the website of the Office of Foreign Assets Control, at http://www.treasury.gov/sdn.  Zimbabwe's president, Robert Mugabe, was added to the SDN list at the outset of sanctions against Zimbabwe in March 2003 and has remained on the list ever since.

42.     Violators of the sanctions are subject to significant civil and criminal penalties. Civil monetary penalties of up to the greater of $250,000 or twice the amount of the underlying transaction may be imposed administratively against any person who violates, attempts to violate, conspires to violate, or causes a violation of E.O.s 13288, 13391, and 13469 or the Regulations.  Upon conviction, criminal penalties of up to $1,000,000, imprisonment for up to 20 years, or both, may be imposed on any person who willfully commits or attempts to commit, or willfully conspires to commit, or aids or abets in the commission of a violation of the E.O.s or the Regulations.

43.     As explained in detail below, Och-Ziff engaged in actions that violated not only the FCPA, but also the U.S. Zimbabwe sanctions.  Not only were its actions illegal, they were also unethical and jeopardized Och-Ziff's reputation for integrity.  Although the Company's

illicit dealings were material to investors, during the Class Period Och-Ziff failed to disclose them and repeatedly denied any involvement.

      **(c)**    **Och-Ziff Financed a $100 Million Lifeline to the Mugabe Regime in Return for Platinum Mining Rights**

44.    On or around March 2008, Och-Ziff provided a $100 million no-interest "loan" that was used by the cash-starved Mugabe dictatorship to brutally quash his democratic opponents and win another election. As detailed below, the Mugabe regime received the "loan" through a series of related transactions originating with Och-Ziff.

45.    While Zimbabwe had very few sources of foreign currency, in March 2008 the one valuable asset it did have, platinum, reached a record $2,301.50 an ounce, almost doubling in six months. Just a few short weeks before the 2008 presidential election in Zimbabwe, Mugabe's government seized control of undeveloped platinum claims along the Great Dyke (the richest in Zimbabwe) and immediately set out to sell those rights. Och-Ziff made it possible for a company called the Central African Mining and Exploration Company plc ("CAMEC"), owned 40% by Gertler, to immediately acquire these lucrative platinum rights.[1] CAMEC announced in March and April 2003 that it was privately raising about $200 million by selling ownership stakes, cash it said it would use to pursue "multiple investment opportunities available to the company in Africa," besides funding its existing Congo operations. Och-Ziff provided 75% of CAMEC's total fundraising effort, or $150 million. Cohen persuaded Och-Ziff to invest in

---

[1]  As explained elsewhere in this Complaint, Gertler forged a close relationship with Joseph Kabila, the former army chief and current president of the Republic of Congo, which permitted him to amass large stakes in that country's state-owned mining ventures. Congo lost about $1.4 billion when its government underpriced assets sold to Gertler. According to corporate records, not long after Gertler negotiated his stake in CAMEC, Defendants sought their own piece of the mining company. News reports say that while it is unclear what perked Och-Ziff's interest in CAMEC, a source familiar with Och-Ziff's investment decisions, speaking on the condition of anonymity, says that Och-Ziff was primarily interested in CAMEC because of the Congo assets it was developing with Gertler.

CAMEC and oversaw Och-Ziff's $150 million investment in the outfit.  Och-Ziff's shares in CAMEC were issued on April 7, 2008 and Och-Ziff became the mining company's fourth largest shareholder.

46.     CAMEC obtained the mining rights in Zimbabwe by acquiring 100% of Lefever Finance Ltd., a company registered in the British Virgin Islands.  Lefever owned 60% of Todal Mining (Private) Limited, a Zimbabwean company, which held the rights to platinum in the Zimbabwean city of Gweru.  The remaining 40% of Todal was held by the Zimbabwean Mining Development Corporation ("ZMDC"), an entity wholly owned by the Government of Zimbabwe. The Zimbabwean government gave Todal the right to export platinum from Zimbabwe and secured an agreement allowing it to expatriate the profits generated by its mining operations in the country.   The consideration paid for Lefever was a cash payment of $5 million and the issuance of 215,000,000 new CAMEC ordinary shares.  CAMEC also agreed to advance to Lefever a no-interest "loan" of $100 million supposedly to permit Lefever to comply with its contractual obligations to the Government of Zimbabwe.  A spokesman for the former CAMEC executive officer Andrew Stuart Groves claims that the $100 million went "to a series of international creditors for a variety of commodities, primarily for seeds, grain, fertilizer, and fuel" and that the company "undertook appropriate due diligence" when it paid out the money.

47.     There are no records that the no-interest $100 million "loan" was ever repaid.

48.     As indicated, it was Och-Ziff who provided the $100 million no-interest "loan" in return for 150 million CAMEC shares.  In the months preceding the Todal acquisition, CAMEC's accounts show that it did not have the cash reserves to fund the loan element of the deal.  In March 2008, CAMEC sought to raise capital in advance of both the Todal acquisition and to finance CAMEC's projects in the Republic of Congo ("Congo").  On or about March 28,

2008, CAMEC's chief executive represented that the fundraising "enables [CAMEC] to accelerate [its] well known development plans in [Congo] *and also take advantage of other opportunities elsewhere within our regions of operations*."   150,000,000 CAMEC shares had already been "placed firm" with a new unidentified investor.   Contrary to market listing rules, CAMEC failed to immediately disclose the identity of the new shareholder.   Alternative Investment Market rules require the disclosure of substantial shareholdings—more than 3% and then each 1% that follows.   Although the 150 million shares at the time represented about 10% of CAMEC, Och-Ziff's identity was concealed.   On April 4, 2008, one week before the Todal acquisition, CAMEC announced the completion of the placement.

49.    A paper trail leads to an Och-Ziff subsidiary that was used to make an investment in CAMEC.   A release by Och-Ziff issued months after the placement noted that "OZ Management LP…is now interested in 5.83% of the outstanding share capital of the Company." The release did not make any reference to the April 2008 placing, nor to the Zimbabwean platinum deal.   But a few days before the announcement was made, CAMEC had confirmed that the number of common shares outstanding was 2,572,806,383.   Therefore, the 5.83% ownership held by Och-Ziff in CAMEC equates to 150 million shares (representing 12% of CAMEC's shares), which is equal to the original payment, confirming that Och-Ziff was the original payor.

50.    Och-Ziff's no-interest "loan" was used by the Mugabe regime to undermine democracy, commit human rights abuses and retain power for its own benefit.   At the time Och-Ziff extended the "loan," Mugabe's name was unequivocally on the SDN list.   ZMDC, the partner in Todal, was added to the SDN list on July 25, 2008 "[i]n light of the continued intransigence of the brutal Mugabe regime."   Similarly, on November 25, 2008, Muller Conrad Rautenbach, an individual who has been associated with Meryweather Investments Ltd., the

company that sold Lefever to CAMEC, was designated by the U.S. Office of Foreign Assets Control as a "Mugabe regime crony," providing financial and logistical support for "large-scale mining projects in Zimbabwe that benefit a small number of corrupt senior officials" and that "has enabled Robert Mugabe to pursue policies that seriously undermine democratic processes and institutions in Zimbabwe."[2]   At that time, Rautenbach was also wanted on criminal charges in South Africa.   The following year, Rautenbach plead guilty, on behalf of one of his companies, to 326 fraud charges.   CAMEC's founder is reported to have been allied to Rautenbach.

51.     According to a recent report published by the Rights and Accountability in Development ("RAID"), a British human rights organization, "there is evidence that finance originating from Och-Ziff went to the government of Zimbabwe; and that the government of Zimbabwe is synonymous with the Mugabe/Zanu-PF regime—comprising sanctions targets— who used the finance to undermine democracy, commit human rights abuses and retain power for their own benefit."   The report found that "specifically designated nationals" named in the U.S. sanctions were "directly implicated in the planning and orchestration" of Operation Makavhoterapapi, the intimidation campaign in 2008.  And "not only did SDNs benefit from the loan, but certain designated entities were parties" to the platinum rights transaction for which Och-Ziff's money was used.  The report found "evidence…that Och-Ziff's investment in Camec was not so passive."

52.     As reported by BusinessWeek, James McGee, the former U.S. ambassador to Zimbabwe at the time, was "outraged" when told that CAMEC closed the funding transactions just nine days after Mugabe lost the first election and before the runoff that cemented his

---

[2] Upon completion of the transaction, Meryweather held a 13.07% interest in the share capital of CAMEC.

subsequent win: "That's how all the good work we do, or try to do, gets blown away in nine days." It was reported that McGee vividly recalled the platinum deal, which he said couldn't have come at a worse moment. McGee did not know that Och-Ziff supplied most of CAMEC's cash: "There's [sic] just so, so many behind-the-scenes deals in Africa that the typical American has no idea about."

53.    In March 2008, McGee met secretly with a member of Mugabe's political party, who tipped McGee that the dictator was about to lose the first round of elections, slated for March 29, 2008. Mugabe's party was in dire need of money, with election just a few days away. Mugabe lost that round and two weeks after the loss, the ambassador spoke to the insider again. "He told us the regime was preparing for war," with Mugabe's men setting up command centers for torture and killings in areas that voted for the opposition. McGee learned that Mugabe's government had landed critical funding, totaling $100 million, only days after the vote.

54.    The Och-Ziff no-interest "loan" made it possible for Och-Ziff to profit from the platinum claims under the control of the Mugabe regime, in violation of the FCPA. By doling out $100 million, Och-Ziff also flouted clear U.S. sanctions against Mugabe and his cronies. Apart from these legal violations, which exposed Och-Ziff to a high risk of regulatory investigations and significant civil and criminal penalties, Och-Ziff's conduct damaged Och-Ziff's reputation for integrity.

55.    In light of these palpable risks, throughout the Class Period, Och-Ziff vehemently denied that it was the silent financier of the $100 million that allowed Mugabe to cling to power. Instead, Och-Ziff maintained that it was merely a passive investor. According to an Och-Ziff spokesperson, "Och-Ziff has no connection to Zimbabwe politics whatsoever and made no loans to CAMEC. The firm was among many institutional investors who participated in a private

17

placement of shares in a London-listed public company [Camec], and as a passive investor had no role in the direction of the company."

56.     Despite these denials, it is inconceivable that Och-Ziff would have invested tens of millions of dollars in CAMEC without interrogating CAMEC and knowing more about it, the ownership, and its plans.  In addition, a CAMEC regulatory announcement in early March 2008 stated that the original purpose of the new share issue was to raise cash to develop CAMEC assets in Congo.  But on March 28, a day before the first round of elections in Zimbabwe, CAMEC put out another announcement saying that it had "further discussions with the placees [the would-be investors] regarding the multiple investment opportunities available to the company in Africa."   On April 11, 2008, as the Mugabe regime was resisting announcing election results showing that Zanu-PF had lost its parliamentary majority and Mugabe was trailing his democratic challenger, CAMEC announced the Zimbabwean platinum rights acquisition, to be paid in large part by providing the $100 million no-interest "loan" to the regime.  These statements reveal that CAMEC consulted Och-Ziff about using its money in Zimbabwe rather than in the Congo.  Och-Ziff's $100 million "loan" secured the rights to mine platinum, Zimbabwe's most valuable minerals, from the Mugabe government.[3]

57.     A spokesperson for the former CEO of CAMEC stated that Och-Ziff was "aware of the profile of assets being considered" when it bought the mining company.

58.     Moreover, evidence that recently came to light suggests that Och-Ziff, far from being a passive investor, knew about the Zimbabwe connection.  Och-Ziff has been subpoenaed in a case pending before the Southern District of New York, which claims compensation owed by the Republic of Zimbabwe to plaintiffs in that case, after an award by the International Center

---

[3] The presidential run-off was scheduled for June 27, 2008.

for Settlement of Investment Disputes.  According to a letter exchange in that action, by July 22, 2008, Och-Ziff had drawn up a valuation model of CAMEC that included a reference to Zimbabwean instrumentalities.  The spreadsheet refers to "Platinum (Zim)" and also to "Meryweather (BR)", an apparent reference to Billy Rautenbach, who has been associated with Meryweather.  The attribution of Meryweather to Billy Rautenbach demonstrates knowledge not available through public disclosures.  Additionally, just a few days before the spreadsheet was circulated, CAMEC's ZMDC partner in the platinum venture had been added to the U.S. sanctions list.  Three months later, at the end of November 2008, Rautenbach was placed on the sanctions list.  Despite these designations, Och-Ziff remained invested in CAMEC.

### (d)     Och-Ziff Financed Controversial Deals in Congo

59.     A Wall Street Journal article published on April 28, 2014, revealed how Och-Ziff, during the Class Period and under Cohen's supervision, financed two controversial oil and mining deals in Congo.

60.     Och-Ziff made two loans totaling $234 million to companies controlled by Gertler. According to the documents, both loans were routed through offshore companies.  The documents show that Och-Ziff's loans helped finance two of Gertler's ventures in Congo, where he has acknowledged developing close ties with President Joseph Kabila.  As previously discussed, Gertler invests in mines across Africa.  Some of his deals have been complicated by legal disputes and criticized for a lack of transparency.  Global Witness, an anticorruption organization, has accused Gertler of gaining control of his Congo assets under opaque circumstances and at steep discounts to their actual financial worth.  Gertler's Congo deals also have been criticized by Africa Progress Panel, an organization headed by former United Nations

Secretary-General Kofi Annan, which advocates equitable and sustainable development in Africa.

61.     The loans to Gertler's companies include one made in 2008 by an investment fund run jointly by Och-Ziff and South African partners and another that was made in 2010 by Och-Ziff itself, according to the documents, which include offshore corporate-registration filings, investment memos and emails.  The loans reportedly were made under the oversight of Michael Cohen, then the head of Och-Ziff's London office and one of its most senior executives. The deals began in early 2008.  Two months after going public on the New York Stock Exchange in November 2007, Och-Ziff launched a joint venture with South African partners to invest in African "natural resources and related businesses," according to an Och-Ziff news release.  Och-Ziff reportedly contributed all the investment funds to the joint venture, while the South African partners contributed some assets and expertise.  The joint venture made a $115 million loan to Gertler in the spring of 2008, followed by an additional advance of $9 million, through a company registered in the British Virgin Islands.  That money was used by Gertler to finance a deal giving him control of a valuable copper and cobalt mine in southern Congo called Kalukundi.

62.     Och-Ziff reportedly knew how Gertler planned to use the loan and in fact negotiated substantial control rights over the company Gertler used to acquire control of the mine.  Och-Ziff had "a right to participate in the day-to-day management of" the Gertler company and "visited" the Kalukundi mine in March 2008.

63.     At that time, the ownership of Kalukundi was in dispute.  A Congolese court had confiscated majority rights to the mine from Africo Resources Ltd., a publicly traded Canadian company, and awarded them to a Congolese company.  Africo said the proceedings that stripped

it of its ownership rights were fraudulent.  In an interview, Tony Harwood, Africo's then-chief executive, said Gertler approached him with a solution to the dispute: He offered to buy the Congolese company, return the rights to the Kalukundi mine to Africo and then buy majority control of Africo.  Africo accepted Gertler's offer. The owners of the Congolese company received $13.5 million as part of the deal.  Harwood realized that Och-Ziff financed the deal in early 2009 when Africo, now under Gertler's control, held a meeting about acquiring another mining company.  Och-Ziff representatives attended that meeting.

64.    According to the WSJ, the British Virgin Islands company Och-Ziff routed the loan through received $160 million in August 2012, which translated in to a return on its loan to Gertler of $36 million.

65.    In November 2010, Och-Ziff reportedly lent Gertler $110 million through a company registered in the Cayman Islands. The money was primarily used to start developing an oil concession that Gertler had obtained five months earlier.  That concession, which covered two oil blocks on Lake Albert between Congo and Uganda, also was controversial because the Congolese government had previously awarded it to a British oil company.

66.    Gertler reportedly repaid the second Och-Ziff loan in January 2013.  It was not reported how much interest Gertler paid.

67.    Gertler's close relationship with Joseph Kabila, the former army chief and later president of Congo, allowed Gertler not only to secure these valuable Congolese assets, but also to extract them at deeply discounted prices.

68.    A panel headed by former U.N. Secretary General Kofi Annan said that Congo, one of the poorest countries in the world, lost about $1.4 billion when its government

underpriced assets sold to Gertler.  That amount is almost twice the country's annual spending on health and education combined.

### (e)    Och-Ziff Secured Transactions With the Libyan Investment Authority Through Questionable Means

69.     The Libyan Investment Authority ("LIA") is a sovereign wealth fund.  The LIA was formed in 2004 and its assets were launched in the summer of 2007.  The LIA was originally controlled by Colonel Moammar Gaddafi, as well as his son Saif al-Islam Gaddafi, who served as its Chairman.  The creation of the LIA was an effort by Gaddafi to open ties to the West in exchange for a pledge to abandon weapons of mass destruction and pay reparations to families of the airline bombing over Lockerbie, Scotland.  Libya had been isolated from the international community for more than a decade because of its suspected involvement in the 1988 bombing which brought down a Pan Am airliner over Lockerbie, Scotland.  In 2004, the U.S. lifted commercial sanctions on Libya after Gaddafi agreed to hand over his weapons of mass destruction.  Libya, like other oil-rich nations, formed a sovereign wealth fund to invest its oil profits.

70.     Set up by Gaddafi's son Saif al-Islam to exploit Libya's vast oil wealth as the country was emerging from 20 years of sanctions, the LIA started with $65 billion of assets.  Western banks and hedge funds, including Goldman Sachs and Och-Ziff, began intensely courting the world's biggest sovereign wealth funds as a source of new capital in 2007, as they scrambled to replenish balance sheets battered by the global financial crisis.  At that time, the LIA board included Lord Jacob Rothschild, a British investment banker who was a member of the prominent Rothschild banking family, and Sir Howard Davies, the former regulator and director of the London School of Economics in 2011.  According to news articles, an independent report later found that £1.5 million in donations the university accepted might have

been the proceeds of bribes paid to the Gaddafi family by companies seeking "business favours" from the regime.  Davies had to resign as director of the London School of Economics.

71.     Financial transactions by American companies in Libya, such as Och-Ziff, depend largely on so-called "fixers."  Fixers act as placement agents in arranging deals between financial firms and Libyan officials.  Fees paid to the fixers, or "finders' fees" can be legal or can be considered bribes, depending upon their nature and amount, as well as the nature of the fixer's relationship with the parties or the transaction.  Because the FCPA's provisions prohibit not only direct payments to foreign officials but also indirect payments via third parties, the use of "fixers" is not a way to avoid the FCPA.

72.     During the period 2008-2009, Och-Ziff sought and was able to secure a contract entitling it to build an expensive luxury hotel in Tripoli, the capital of Libya.  The deal involved a $120 million joint venture between Och-Ziff, LIA, and a company named Magna Holdings. The hotel was slated to be completed in 2010 but construction stalled as fighting broke out in the country and the project has still not been completed.  According to an article in the Independent UK, a man named Mohamad Ajami was a key "fixer" in the hotel deal.  Ajami maintains a close relationship with the Libyan Intelligence Chief, and helps companies looking for business in Libya.  At that time, Cohen was in charge of Och-Ziff's African investments and had direct knowledge of the deal.

73.     Magna Holdings, which is registered in Bermuda, has three main shareholders:  a financier by the name of Wafic Said, a middle-eastern property developer, and Och-Ziff.  In 2009, Magna Holdings constructed a 50 story development in Tripoli known as the "Gaddafi Tower," which is jointly owned by Magna Holdings and a Libyan charity run by Gaddafi's daughter.  One of Magna Holdings' major backers is Wafic Said, a British-based billionaire

linked to the BAE-Saudi bribery scandal, whereby BAE was alleged to have paid bribes to secure military contracts from Saudi Arabia.

74.     Apart from winning contracts to build luxury hotels, Magna Holdings also won contracts to build office blocks in Tripoli, and was further poised during the same period to win lucrative contracts developing tourism along Libya's 300-mile Mediterranean coastline. Although tourism was in its infancy, it was estimated that it could soon become a multi-billion-dollar industry. Magna Holdings was poised to become one of the major players in Libya's tourism business, despite having virtually no public profile and no background in the tourism industry.

75.     According to news articles, Cohen also persuaded the LIA to invest hundreds of millions of dollars of its oil money in Och-Ziff's funds. One LIA document obtained by a Non-Governmental Organization showed that in 2011, the LIA had invested $300 million in Och-Ziff.[4]

**f.     In 2014, Och-Ziff Discloses Government Subpoenas It Received in 2011**

76.     On March 18, 2014, for the first time Och-Ziff publicly disclosed that it was the subject of an ongoing civil and criminal investigation into whether the Company violated antibribery laws in its dealings. On that day, Och-Ziff also disclosed that it began receiving subpoenas from the SEC and requests for information from the Justice Department in 2011. According to Och-Ziff, the investigation "concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa." Och-Ziff made the disclosure in a laundry list of risk factors that could negatively affect the firm.

---

[4] "The London connection: Former UK boss of Wall Street hedge fund could be drawn into corruption investigation," Jim Armitage, the Independent, June 19, 2014.

**Materially False and Misleading Statements Issued During the Class Period**

77.     On February 27, 2012, the Company filed an annual report on Form 10-K with the SEC, which was signed by defendants Och and Frank.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

78.     The Form 10-K stated:

We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition. We may from time to time be involved in litigation and claims incidental to the conduct of our business. Like other businesses in our industry, we are subject to scrutiny by the regulatory agencies that have or may in the future have regulatory authority over us and our business activities, which results in regulatory agency investigations and litigation related to regulatory compliance matters.

79.      Defendants' statements in ¶ 78 above were materially false and misleading as incomplete for the following reasons:

(i)     Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)    Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)   Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)     Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

80.     The Form 10-K also stated that one of Och-Ziff's "competitive strengths" is its "transparency," as the Company "provide[s] [its] fund investors with comprehensive reporting about each portfolio on a regular basis."

81.     Defendants' statements in ¶ 80 above were materially false and misleading for the following reasons:

(i)      Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(ii)     Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iii)    Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

82.     The Form 10-K also stated that "[r]isk management is also central to how we manage the operations of our business…[w]e actively manage…reputational risks."

83.     Defendants' statements in ¶ 82 above were materially false and misleading for the following reasons:

(i)      Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant reputational risk (Compl. ¶¶ 44-58);

(ii)     Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant reputational risk (Compl. ¶¶ 59-68); and

     (iii)    Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant reputational risk (Compl. ¶¶ 69-75).

84.     On May 2, 2012, the Company field a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  In addition, the Form 10-Q contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

85.     The Form 10-Q stated:

The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements. From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by the regulatory agencies globally that have or may in the future have regulatory authority over the Company and its business activities. This has resulted or may in the future result in regulatory agency investigations, litigation and subpoenas.

86.     Defendants' statements in ¶ 85 above were materially false and misleading as incomplete for the following reasons:

     (i)    Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

     (ii)    Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

     (iii)    Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)   Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

87.   On August 2, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.   In addition, the Form 10-Q contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

88.   The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have or may in the future have regulatory authority over the Company and its business activities. This has resulted or may in the future result in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

89.   Defendants' statements in ¶ 88 above were materially false and misleading as incomplete for the following reasons:

(i)   Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)   Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)   Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)     Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

90.     On November 5, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  In addition, the Form 10-Q contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.     The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

92.     Defendants' statements in ¶ 91 above were materially false and misleading as incomplete for the following reasons:

(i)     Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)     Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)      Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)      Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

93.      On February 28, 2013, the Company filed an annual report on Form 10-K with the SEC, which was signed by defendants Och and Frank.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

94.      The Form 10-K stated:

We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our consolidated financial statements. We are from time to time involved in litigation and claims incidental to the conduct of our business. Like other businesses in our industry, we are subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over us and our business activities. This has resulted in, or may in the future result in, regulatory agency investigations, litigation and subpoenas and related costs.

95.      Defendants' statements in ¶ 94 above were materially false and misleading as incomplete for the following reasons:

(i)      Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)      Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and

U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)    Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)    Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

96.    The Form 10-K also stated that one of Och-Ziff's "competitive strengths" is its "transparency," as the Company "provide[s] [its] fund investors with comprehensive reporting about each portfolio on a regular basis."

97.    Defendants' statements in ¶ 96 above were materially false and misleading for the following reasons:

(i)    Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(ii)    Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iii)    Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

98.    The Form 10-K also stated that "[r]isk management is also central to how we manage the operations of our business…[w]e actively manage…reputational risks."

99.    Defendants' statements in ¶ 98 above were materially false and misleading for the following reasons:

(i)    Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and

U.S. sanctions, which exposed the Company to significant reputational risk (Compl. ¶¶ 44-58);

(ii)     Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant reputational risk (Compl. ¶¶ 59-68); and

(iii)    Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant reputational risk (Compl. ¶¶ 69-75).

100.    On May 2, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  In addition, the Form 10-Q contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

101.    The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

102.    Defendants' statements in ¶ 101 above were materially false and misleading as incomplete for the following reasons:

(i)     Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)    Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and

U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)     Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)     Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

103.     On August 2, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  In addition, the Form 10-Q contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104.     The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

105.     Defendants' statements in ¶ 104 above were materially false and misleading as incomplete for the following reasons:

(i)     Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)     Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)    Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)    Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

106.    On November 5, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  In addition, the Form 10-Q contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

107.    The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

108.    Defendants' statements in ¶ 107 above were materially false and misleading as incomplete for the following reasons:

(i)      Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws as a result of, among other things, loans to the Mugabe regime, controversial deals in Congo, and transactions with the LIA that were secured through questionable means (Compl. ¶¶ 44-75);

(ii)     Defendants failed to disclose that Och-Ziff financed a $100 million lifeline to the Mugabe regime in return for platinum mining rights, in violation of FCPA and U.S. sanctions, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 44-58);

(iii)    Defendants failed to disclose that Och-Ziff financed deals in Congo, in violation of FCPA and related laws, which exposed the Company to significant financial and reputational risks (Compl. ¶¶ 59-68); and

(iv)     Defendants failed to disclose that Och-Ziff entered into transactions with the LIA that were secured through questionable means in violation of FCPA and related laws, exposing the Company to significant financial and reputational risks (Compl. ¶¶ 69-75).

**The Truth Is Revealed in a Series of Partial Disclosures**

109.    On February 3, 2014, the Wall Street Journal began to reveal some of the facts that Defendants had long concealed or denied.  On that day, the Wall Street Journal reported that the DOJ was investigating Och-Ziff regarding possible violations of the FCPA in connection with its dealing with the LIA, and that the DOJ's criminal probe was proceeding alongside a civil probe by the SEC which began in 2011.  The article reported that the center of the probe is a group of "fixers" who arranged deals between several financial firms, including Och-Ziff, and Libyan officials.  The fixers are investigated for funneling illegal payments to Libyan officials in the Gaddafi regime on behalf of financial firms in return for business.  The article stated that "among the deals being scrutinized is a $120 million hotel project in which Och-Ziff had a stake- a joint venture involving U.K.-based InterContinental Hotels Group as well as a Libyan developer and the Libyan Investment Authority to build a luxury hotel in Tripoli.  The hotel, which was slated to open in the Libyan capital in 2010, would have 351 rooms and 'stunning views across the city and waterfront,' according to a 2007 news release from InterContinental, but construction stalled as fighting broke out in the country.  It still hasn't been completed."

110.    On this news, shares of Och-Ziff stock fell $0.90 or 6.7%, to close at $13.04 on heavy volume.

111.    On March 14, 2014 Och-Ziff filed a form 8-K with the SEC announcing that some of its previously issued financial statements should be restated and should not be relied upon.  Specifically, the Company stated that it would restate its previously issued financial statements in its Annual Report on Form 10-K for the year ended December 31, 2013 ("2013 10-K").  The Company stated that none of the changes would have an impact on the Company's Economic Income, Distributable Earnings and Distributable Earnings per Adjusted Class A Share, as previously reported.

112.    On March 18, 2014 Och-Ziff filed a restated 2013 10-K.  For the first time, Och-Ziff disclosed that it had received subpoenas and requests for information from the SEC and DOJ as early as 2011 related to the Company's questionable dealings in Africa, in violation of the Foreign Corrupt Practices Act and other related laws.  This disclosure indicated that Och Ziff's questionable transactions involved not only a sovereign wealth fund, but also additional "investments by some of [Och-Ziff's] funds, both directly and indirectly, in a number of companies in Africa":

> Beginning in 2011, and from time to time thereafter, we have received subpoenas from the SEC and requests for information from the U.S. Department of Justice ("DOJ") in connection with an investigation involving the FCPA and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa.  At this time, we are unable to determine how the investigation will be resolved and what impact, if any, it will have.  An adverse outcome could have a material effect on our business, financial condition or results of operations.

113.    Och-Ziff did not disclose the identity of the "foreign sovereign wealth fund" mentioned, but widely published news sources indicated that it was the LIA.  An article by

Bloomberg News issued on March 19 stated: "The sovereign fund reference by Och-Ziff in its filing is the Libyan Investment Authority, according to a person with knowledge of the matter who asked not to be identified because they weren't authorized to speak publicly.  Regulators have been investigating how the LIA made investment decisions before the toppling of Muammar Gaddafi's regime in 2011."

114.    On this news, Och-Ziff's shares fell 3.5% or $0.49, on heavy trading volume, to close at $13.71 on March 19, 2014.

115.    But another shoe was yet to drop.  On April 27, 2014, the Wall Street Journal published an article revealing additional details concerning Och-Ziff's investments in Africa that were among the subjects of the investigation by the SEC and DOJ.  The article stated that the government probes involved two loans made by Och-Ziff, totaling $234 million, to companies controlled by controversial mining executive Dan Gertler.  These loans helped finance two ventures in Congo involving properties that were the subject of ownership disputes.  The article further revealed that:

> The loans to companies…include one made in 2008 by an investment fund run jointly by Och-Ziff and South African partners; another was made in 2010 by Och-Ziff itself, according to documents, which include offshore corporate-registration filings, investment memos and emails.  The loans were made under the oversight of Michael Cohen, then head of Och-Ziff's London office and one of its most senior executives, the documents show.  Mr. Cohen resigned last year after 15 years at the firm.

116.    On this news, shares in Och-Ziff fell by $1.28, almost 10% on heavy trading volume, to close at $11.65 on April 28, 2014.  This was the biggest daily drop in Och-Ziff's stock price in almost five years.

117.    Then, on August 22, 2014, Bloomberg Businessweek published a scathing story entitled the "Hedge Fund and the Despot," describing that Och-Ziff financed political

intimidation and violence in the 2008 Zimbabwe election by investing in a mining company that enabled Mugabe to violently crush opposition to his dictatorial regime.  On this news, Och-Ziff's stock fell nearly 7%, or $0.86 per share.

118.    In a CNBC article one observer who counsels institutional investors on hedge funds stated "'It doesn't get uglier than that in terms of a headline…[investors] hire a firm like Och-Ziff to be the 'sleep at night fund'…When the ballast underperforms and gives you headline risk, it begs the question as to why it's there in the first place.'"

119.    Morningstar analyst Stephen Ellis stated that clients are "rightly concerned about Och-Ziff's investment processes and may feel a bit more leery about putting more assets with Och-Ziff."

## CAUSATION AND ECONOMIC LOSS

120.    As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements and/or omitted material information about Och-Ziff's illicit investments and the investigations by the SEC and the DOJ. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Och-Ziff, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period were widely disseminated to the securities markets, investment analysts, and to the investing public, and resulted in Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices.  Moreover, upon the revelation to the market and the investing public of the truth concerning Och-Ziff's questionable African dealings and the related investigations, the market price of Och-Ziff's

shares declined substantially, resulting in significant damages to Plaintiffs and other shareholders.

121.    Had the truth about Och-Ziff been revealed to the market earlier, Plaintiffs and the Class would not have purchased Och-Ziff's common stock or would have purchased stock only at dramatically lower prices.

122.    When the truth about Och-Ziff was finally revealed through a series of partial disclosures on February 3, 2014, March 18, 2014, April 27, 2014, and August 22, 2014, as detailed above, a significant portion of the artificial inflation that had been caused by Defendants' materially false and misleading statements and omissions was eliminated from the price of Och-Ziff's common stock, causing significant losses to Plaintiffs and the Class.

123.    On February 3, 2014, when the Wall Street Journal reported that Och-Ziff was the subject of a criminal investigation by the DOJ, proceeding alongside a civil probe by the SEC concerning possible violations by the Company of the FCPA in connection with its business deals with the LIA, Och-Ziff' stock fell $0.90, or 6.7% to close at $13.04 on heavy volume. Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

124.    Then, on March 18, 2014, after the close of trading, Och-Ziff filed an annual report on Form 10-K with the SEC ("2013 10-K") in which Och-Ziff disclosed that beginning in 2011 it had received subpoenas from the SEC and "requests for information" from the DOJ in connection with an investigation involving "the FCPA and related laws."  Och-Ziff reported that the investigation "concerns an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa."  A Bloomberg article disclosed that the foreign sovereign fund referenced

by Och-Ziff is the LIA.  Following this news, shares of Och-Ziff fell $0.49 or 3.5% on heavy trading volume to close at $13.71 on March 19, 2014.  Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

125.   On April 27, 2014, the Wall Street Journal published an article providing additional information on the investments under investigation by the SEC and the DOJ.  The article stated that the probe centered around two loans totaling $234 million to companies controlled by a controversial mining executive, Dan Gertler, which were used to help finance two ventures in Congo involving properties that were the subject of ownership disputes. Following this news, shares of Och-Ziff fell $1.28, or almost 10%, the largest drop in Och-Ziff stock in five years, on heavy trading volume, to close at $11.65 on April 28, 2014.  Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

126.   On August 22, 2014, Bloomberg Businessweek revealed that Och-Ziff financed Mugabe's political intimidation campaign that made it possible for the dictator to clinch another election.  On this news, Och-Ziff's stock plunged nearly 7%, or $0.86 per share.  Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

**EFFICIENT MARKET**

127.   The market for Och-Ziff securities was an efficient market during the Class Period for the following reasons, among others:

(a)   Och-Ziff's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient automated market;

(b)   As a regulated issuer, Och-Ziff filed period public reports with the SEC and/or NYSE;

(c)   Och-Ziff regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press

releases on the national circuits of major news wire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

(d)  Och-Ziff was followed by securities analysts including RBC Capital Markets, Barclays Capital, Jeffries & Co, Ticonderoga and William Blair, among other brokerage and research firms who wrote research reports about the Company, and these reports were distributed widely;

(e)  Och-Ziff met the SEC requirements to file an S-3 registration statement during the Class Period;

(f)  According to Och-Ziff's Form 10-K filed with the SEC on March 18, 2014 Och-Ziff had a total of 170,551,300 Class A shares outstanding as of March, 13, 2014;

(g)  On average, approximately 3% of Och-Ziff's 170,551,300 outstanding shares were traded on a weekly basis during the Class Period; and

(h)  Unexpected material news concerning was rapidly reflected in Och-Ziff's share price.

128.  Based upon the foregoing, the market for Och-Ziff securities promptly digested new information regarding Och-Ziff from all publicly available resources and reflected such information in Och-Ziff's share price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:  *AFFILIATED UTE*

129.  Neither Plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741; 1972 U.S. LEXIS 163; Fed. Sec. (1972).   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

130.  Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Och-Ziff securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

131.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Och-Ziff securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Och-Ziff or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

132.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

133.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

134.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Och-Ziff;

- whether the Individual Defendants caused Och-Ziff to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Och-Ziff securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

135.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

136.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Och-Ziff securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Och-Ziff securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

138.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

139.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.  Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud.  Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

140.   Plaintiffs assert Section 10(b) and Rule 10b-5(b) claims against Defendants Och-Ziff Capital Management Group LLC, Daniel S. Och, and Joel M. Frank; and Section 10(b) and Rule 10b-5(a) and (c) claims against Defendants Och-Ziff Capital Management Group LLC, Daniel S. Och, Joel M. Frank, and Michael Cohen.

141.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Och-Ziff securities; and (iii) cause Plaintiffs and other members of the Class to purchase Och-Ziff securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

142.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Och-Ziff securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Och-Ziff's investments.

143.    Further, Defendants were required to disclose the material negative trends that negatively affected the Company's operations in the Company's MD&A.  Item 303 of SEC Regulation S-K, 17 C.F.R.   §229.303(a)(3)(ii), required Och-Ziff to "[d]escribe any known trends or uncertainties" that Och-Ziff "reasonably expects will have a material…unfavorable impact on…revenues or income from continuing operations." Instruction 3 to paragraph 303(a) provides that Och-Ziff's "discussion and analysis shall focus specifically on material events and

uncertainties  known to management that would cause reported financial information not to be necessarily indicative of future operating results of future financial condition."   17 C.F.R. § 229.303(a) instruction 3.

144.    By virtue of their positions at Och-Ziff, the Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

145.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Och-Ziff, the Individual Defendants had knowledge of the details of Och-Ziff's internal affairs.

146.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Och-Ziff.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Och-Ziff's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and/or public

statements, the market price of Och-Ziff securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Och-Ziff's investments which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Och-Ziff securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the publication of the alleged corrective disclosures.

147.   During the Class Period, Och-Ziff securities were traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Och-Ziff securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.   At the time of the purchases by Plaintiffs and the Class, the true value of Och-Ziff securities were substantially lower than the prices paid by Plaintiffs and the other members of the Class.   The market price of Och-Ziff securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

148.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

150.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

151.   During the Class Period, the Individual Defendants participated in the operation and management of Och-Ziff, and conducted and participated, directly and indirectly, in the conduct of Och-Ziff's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Och-Ziff.

152.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Och-Ziff's investments, and to correct promptly any public statements issued by Och-Ziff which had become materially false or misleading.

153.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and/or public filings which Och-Ziff disseminated in the marketplace during the Class Period concerning Och-Ziff's investments.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Och-Ziff to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Och-Ziff within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Och-Ziff securities.

154.   Each of the Individual Defendants, therefore, acted as a controlling person of Och-Ziff.  By reason of their senior management positions and/or being directors of Och-Ziff, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Och-Ziff to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Och-Ziff and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

155.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Och-Ziff.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated:  November 24, 2014

**POMERANTZ LLP**


By: */s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip C. Kim
Sara Fuks
Kevin Koon-Pon Chan
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827


*Co-Lead Counsel for Plaintiffs and the Putative Class*