# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ARTHUR MENALDI, Individually and on Behalf of All Others Similarly Situated, | **:** | No.: 14-CV-03251-JPO |
| | **:** | |
| Plaintiff(s), | **:** | |
| v. | **:** | |
| OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, DANIEL S. OCH, JOEL M. FRANK, and MICHAEL COHEN, | **:** | |
| Defendants. | **:** | |

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Jeremy A. Lieberman
Marc I. Gross
Michele S. Carino
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

Patrick V. Dahlstrom
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184

Laurence Rosen
Sara Fuks
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. iii

Preliminary Statement ..............................................................................................1

Factual Background ...................................................................................................3

    Och-Ziff's Business ............................................................................................ 3

    The Regulatory Framework Applicable To Och-Ziff's Business...................... 5

    a.     The $100 Million Loan to Mugabe in Exchange for Platinum Mining Rights ..................................................................................................6

    b.     Och-Ziff's Financing of Controversial Congolese Deals .......................8

    c.     Och-Ziff Secures Business Advantages in Libya ..................................10

    Och-Ziff's Legal and Regulatory Failures are Exposed ................................ 12

    Defendants' False and Misleading Statements and Omissions........................ 14

Argument .................................................................................................................16

    I.     Legal Standard ......................................................................................16

    II.     The Complaint Adequately Alleges Materially False and Misleading Statements and Omissions ................................................17

        A.     The Complaint Sufficiently Alleges Violations of the FCPA ..................18

        B.     Defendants Were Obligated to Disclose Material Information Concerning Active Regulatory Investigations and Compliance with the FCPA.........................................................................................20

        C.     Defendants' Statements and Omissions Regarding Och-Ziff's "Transparency," "Integrity," and "Risk Management" Were False and Misleading...........................................................................24

        D.     The Complaint Adequately Pleads a Violation of Item 303 .....................26

    III.     The Complaint Adequately Alleges Scienter.........................................27

        A.     Repeated FCPA Violations and Ongoing SEC and DOJ Investigations Support an Inference of Scienter .......................................28

B.      Defendants' Scienter Can Be Inferred Because the Investigations
        and FCPA Violations Relate to the 'Core Operations' Of Och-
        Ziff's Business .........................................................................................31

C.      Cohen's Resignation Supports an Inference Of Scienter...........................32

D.      A Holistic Reading of the Complaint Supports an Inference of
        Scienter ...................................................................................................33

IV.     The Complaint Adequately Pleads Scheme Liability ............................................34

A.      The Complaint Adequately Pleads Scheme Liability as to
        Defendant Cohen ......................................................................................38

V.      Plaintiffs Have Stated a Section 20(a) Claim .......................................................40

VI.     In Lieu of Dismissal, Leave to Amend Should Be Granted ..................................40

Conclusion ...........................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>**Cases**</u>

*Acito v. IMCERA Group, Inc.,*
  47 F.3d 47 (2d Cir. 1995) ...................................................................... 40

*Affiliated Ute Citizens of Utah v. U.S.,*
  406 U.S. 127 (1972) ............................................................................... 38

*American Apparel S'holder Litig.,*
  No. CV 10-06352 MMM JCGX, 2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ................. 29, 30

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................... 17

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ..................................................................... 27

*Ballan v. Wilfred Am. Educ. Corp.,*
  720 F. Supp. 241 ..................................................................................... 23, 25

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................... 17, 19

*Caiola v. Citibank, N.A.,*
  295 F.3d 312 (2d Cir. 2002) ................................................................... 21

*Check Point Software Tech. Ltd. Sec. Litig.,*
  No. 03 Civ. 6594 (KMB), 2006 WL 1116699 (S.D.N.Y. Apr. 26, 2006) ................. 32

*Chevron Corp. v. Donziger,*
  974 F. Supp. 2d 362 (S.D.N.Y. 2014) ................................................... 18

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837, 104 S. Ct. 2778 , 81 L. Ed. 2d 694 (1984) ...................... 36

*City of Brockton Ret. Sys. v. Avon Products, Inc.,*
  No. 11 CIV. 4665 PGG, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ................. 28, 31

*City of Pontiac Gen. Emp. Ret. Sys. v. Wal-Mart Stores, Inc.,*
  2014 WL 4823876 (W.D. Ark. Sep. 26, 2014) ..................................... 29, 30

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.,*
  928 F. Supp.2d 705 (S.D.N.Y. 2013) ................................................... 26

*Decker v. Nw. Envtl. Def. Ctr.*,
   133 S. Ct. 1326, 185 L. Ed. 2d 447 (2013) ................................................................ 36

*ECA & Local 132 IBEW Joint Pension Trust of Chicago*,
   553 F.3d at 199 ............................................................................................................... 28

*Elliott Assocs., L.P. v. Hayes*,
   141 F. Supp. 2d 344(S.D.N.Y. 2000), ......................................................................... 40

*Freudenberg v. E\*Trade Financial Corp.*,
   712 F.Supp.2d 171 (S.D.N.Y.2010) ............................................................................ 35

*Ganino v. Citizens Util. Co.*,
   228 F.3d 154 (2d Cir. 2000) .......................................................................................... 27

*Hawaii Ironworkers Annuity Trust Fund v. Cole*,
   No. 3:10CV371, 2011 WL 1257756 (N.D. Ohio Mar. 31, 2011) ........................... 34

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................................... 32

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................................... 22

*In Flannery*,
   S.E.C. Release No. 3981,  2014 WL 7145625 (Dec. 15, 2014) ............................... 36

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F.Supp.2d 241 (S.D.N.Y. 2010) ..................................................................... 17, 21

*In re BioScrip, Inc. Sec. Litig.*,
   13-CV-6922 AJN, 2015 WL 1501620 (S.D.N.Y. Mar. 31, 2015) ................. 21, 22, 23, 29

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................ *passim*

*In re Cadence Design Sys. Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ....................................................................... 31

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ......................................................................... 17

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) ......................................................................... 23

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013)........................................................................... 28

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2014 WL 2815571(S.D.N.Y. June 23, 2014)................................................ 35

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  No. 12 Civ. 8557, 2013 WL 6233561 (S.D.N.Y. 2013) .................................... 31, 32

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................... 32

*In re Lehman Bros. Equity/Debt Securities Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y 2011)...................................................... 27

*In re Marsh & Mclennan Cos. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)...................................................... 21

*In re Micron Tech., Inc., Sec. Litig.*,
  No. CV-06-105-S-BLW, 2009 WL 453917 (D. Idaho Feb. 23, 2009) ..................... 34

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)...................................................... 34

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)................................................................. 17

*In re Scottish Re Group Sec. Litig.*,
  524 F.Supp.2d 370 ..................................................................... 31, 32

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014)...................................................... 33, 34

*In re Symbol Tech., Inc. Sec. Litig.*,
  No. 05-CV-3923 (DRH), 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ................... 29

*In re Southeby's Holdings, Inc.*,
  No. 00 Civ.1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)........... 23, 28

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)................................................ 22, 23, 26

*JHW v. Greentree Capital, L.P. v. Whitter Trust Co.*,
  2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005) ........................................... 35

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir.2001)................................................................ 28

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)............................................. 22, 25, 26

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) .................................................................. 17

*Litwin v. Blackstone Grp. L.P.*,
    634 F. 3d 706 (2d Cir. 2011) ................................................................. 24

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990) .................................................................. 24

*Medis Investor Grp. v. Medis Techs., Ltd.*,
    586 F. Supp. 2d 136 (S.D.N.Y. 2008) ................................................... 32

*Menkes v. Stolt-Nielsen S.A.*,
    No. 3:03CV409 (DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) .............................. 21, 22

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...................................................... 17, 28, 35

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................... 27

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .................................................................. 40

*S.E.C. v. China Ne. Petroleum Holdings Ltd.*,
    No. 12 CIV. 8696 NRB, 2014 WL 2767121 (S.D.N.Y. Mar. 27, 2014) ................................ 38

*S.E.C. v. Jackson*,
    908 F. Supp. 2d 834 (S.D. Tex. 2012) .................................................... 19

*S.E.C. v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ................................................... 24

*S.E.C. v. Zandford*,
    535 U.S. 813 (2002) ............................................................................. 34

*Sapssov v. Health Mgmt. Assoc., Inc.*,
    22 F. Supp. 3d 1210 (M.D. Fla. 2014) ................................................. 33

*Siemers v. Wells Fargo & Co.*, No. C,
    No. 05-04518 WHA, 2007 WL 1140660 (N.D. Cal. Apr. 17, 2007) ......................... 26

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .................................................................. 26

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008) .................................................................. 34, 37, 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 27

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ............................................................ 32

## <u>Statutes</u>

15 U.S.C. § 78dd-1 ............................................................................................... 5

15 U.S.C. § 78dd-1(a)(3) ..................................................................................... 18

15 U.S.C. § 78dd-2(g), 3(e) .................................................................................. 5

15 U.S.C. § 78ff(c) ............................................................................................... 5

15 U.S.C. § 78t(a) ............................................................................................... 40

15 U.S.C. § 78u ................................................................................................... 27

15 U.S.C. § 78u-4(b)(1) ....................................................................................... 18

15 U.S.C. §78u-4, et seq. ..................................................................................... 17

## <u>Rules</u>

Fed. R. Civ. P. 15(a) ........................................................................................... 40

Fed. R. Civ. P. 9(b) ........................................................................................ 17, 40

## <u>Other Authorities</u>

Staff Accounting Bulletin No. 99 ........................................................................ 24

Lead Plaintiffs Ralph Langstadt and Julie Lemond ("Plaintiffs"), individually and on behalf of all other persons similarly situated, respectfully submit this omnibus memorandum of law in opposition to Defendants'[1] motions[2] to dismiss the Complaint.

## PRELIMINARY STATEMENT

"Och-Ziff Platinum Deal Aided Despot In Time Of Need" was not the headline that investors ever expected from the hedge fund that cultivated an image as the more conservative alternative to other hedge funds and that traded on the personal reputations and expertise of its most senior executives in order to attract business.  However, during the Class Period, Och-Ziff, Daniel Ochs, and his high-flying protégé, Michael Cohen, surreptitiously joined the ignominious ranks of financiers who did business with dictators while professing to the market a commitment to transparency and integrity. Indeed, the illegal, dirty financing projects with the likes of Muammar Qaddafi, Joseph Kabila, and Robert Mugabe ultimately caught up with Defendants, as they were forced to acknowledge that Och-Ziff was not the company Defendants had represented to the market, but instead was accused of violations of the Federal Corrupt Practices Act ("FCPA") by the SEC and DOJ as reported in <u>The Wall Street Journal</u>.  Contrary to what Defendants had maintained throughout the Class Period, it was revealed that Defendants had engaged in several purportedly illegal transactions in Zimbabwe, the Congo, and Libya involving, among other things, a corrupt re-election campaign, confiscated assets, and payments to agents and foreign government officials in order to secure business.

The Complaint states with the requisite particularity and specificity the material misrepresentations made by each of the Defendants related to their dirty dealings, as well as the

---

[1] Capitalized terms used herein have the same meaning as defined in the Consolidated Amended Class Action Complaint (the "Complaint") (Dkt. 17).  Citations to "¶" refer to paragraphs in the Complaint.
[2] Separate motions to dismiss were filed by Defendants Och-Ziff Capital Management Group LLC, Daniel S. Och and Joel Frank (Dkt. 23) and Defendant Michael Cohen (Dkt. 26).

bases for inferring *scienter* as to each of the Defendants.  Defendants do not, because they cannot, challenge that they made the alleged omissions or that they understood that the deals alleged in the Complaint violated the FCPA.  Instead, Defendants' assertion that their omission of information from their public disclosures concerning their involvement in these high-risk deals and the resulting investigations is not actionable under the federal securities laws rests on two faulty premises: *first*, that Plaintiffs have not sufficiently alleged that Defendants violated the Foreign Corrupt Practices Act ("FCPA"), and *second*, that even though Defendants were aware of ongoing, targeted investigations by the SEC and DOJ related to those same FCPA violations *for three years*, they had no duty to disclose either the investigations or any of the underlying conduct.

Defendants' first contention misconstrues the requirements to state a claim under the FCPA.  As explained herein, the Complaint details the structure and purpose of each transaction, the transfers of value made to foreign officials, and the benefits sought to be obtained.  In every instance described in the Complaint, the transaction originates with Och-Ziff, and sources and documents verify Defendants' knowledge and participation, either directly or through the use of agents and intermediaries specifically chosen because of their connections to government officials.  At the pleading stage, this is sufficient to plead that Defendants were aware of or recklessly disregarded repeated FCPA violations.

Defendants' second contention similarly fails.  Contrary to their assertions, it does not matter that the FCPA violations remain uncharged or that the investigations are still ongoing. Defendants made disclosures concerning the Company's regulatory status, its risk management practices, and the significance of both the Company's and the Individual Defendants' reputations for transparency and integrity as contributing to the success of business, which put those topics

"at issue."  Defendants then deliberately withheld material information concerning targeted investigations that bear directly on those very same statements, instead opting for disclosures that created the impression that Och-Ziff's regulatory status remained unchanged. Once Defendants chose to speak on these issues, they were obligated to be truthful, accurate, and complete.

With respect to scienter, Defendants do not deny that they knew about the investigations and the underlying conduct at the time of their statements, but simply reiterate that they had no duty to disclose.  This claim is belied by the fact that after concealing their knowledge of the investigations for three years, Defendants made disclosure just one month after publication of The Wall Street Journal report, which they attempted to bury in a re-stated annual report. Viewed holistically, the FCPA violations, ongoing investigations, and timing of this disclosure, in conjunction with the Individual Defendants' prominent roles within the Company and Defendant Cohen's sudden and unexplained resignation, supports an inference of scienter.

Finally, the Complaint also sufficiently pleads scheme liability.  Defendants collectively orchestrated multiple, high-risk deals with dangerous counterparties and serious geopolitical implications, which violated the FCPA.  Defendant Cohen is at the center of this illegal activity. Meanwhile, Defendants remained silent about this conduct, even after the DOJ and SEC initiated investigations.  At a minimum, investors, attracted to Och-Ziff's conservative reputation, were prevented from accurately assessing the true extent of risk prior to making an investment decision.  The Complaint therefore sufficiently alleges claims for relief.

## FACTUAL BACKGROUND

### Och-Ziff's Business

Founded in 1994 by Defendant Och, Och-Ziff is one of the largest, publicly-traded, institutional alternative asset managers in the world, with approximately $46.2 billion in assets under management as of October 1, 2014.  ¶21.  According to the Company's website, Och-Ziff

3

has developed long-term relationships with a global base of institutional investors, who value the Company's "consistent performance history, [its] global investing expertise, and [its] diverse investment strategies," combined with a "strong focus on risk management" and "robust operational structure."[3]

In order to attract and retain these institutional clients, Och-Ziff has cultivated a more conservative reputation as compared to other hedge funds.   In its public disclosures, the Company has repeatedly emphasized its "focus on infrastructure," including "strong financial, operational and compliance-related controls." The Company's "transparency" in terms of "provid[ing] [investors] with qualitative and quantitative information about [Och-Ziff's] investment process, operational procedures and portfolio exposures" is also identified as a key competitive strength.  ¶2.  Likewise, Och-Ziff represents that its "reputation for integrity is its most important asset."  ¶32.

Similarly, Och-Ziff assures investors that it actively manages reputational risk.  As the Company has acknowledged, "[t]he success of [its] business depends on the efforts, judgment and personal reputations of [its] key partners, particularly [its] founder, Daniel S. Och, and other members of [its] senior management team, including Joel M. Frank …  and Michael L. Cohen." ¶25.  The personal reputations and day-to-day involvement of these executives are considered a "critical element" in Och-Ziff's ability to operate and expand its business.  *Id.*  Indeed, most of the Company's funds have special withdrawal provisions allowing investors to redeem their interests in the event Defendant Och is not actively involved in the Company.  ¶28.

Och-Ziff's efforts to distinguish itself from competitors based upon its self-proclaimed disciplined, careful approach appear to have paid off.  Since 2012, the start of the Class Period, Och-Ziff's assets under management have grown by approximately 30%, and the Company's

---

[3] *See* http://www.ozcap.com/our_firm/index.

commitment to high ethical and professional standards of conduct has provided peace of mind to its investors, including many U.S. pension funds, foundations, and endowments, which are entrusted with investing assets on behalf of others.  As one observer noted, Och-Ziff is considered the 'sleep at night' fund.  ¶118.

## The Regulatory Framework Applicable To Och-Ziff's Business

As a publicly-traded hedge fund, Och-Ziff is required to conduct its business in compliance with the FCPA and U.S. sanction programs applicable to certain foreign countries and individuals.  Specifically, the FCPA prohibits paying, offering to pay, promising to pay, or authorizing the payment of money or anything of value to any person, while knowing that all or a portion of such remuneration will be offered, given, or promised, directly or indirectly, to any foreign official in order to influence any act or decision of the foreign official in his or her official capacity or to secure any other improper advantage in order to obtain or retain business. *See* ¶35; *see also* 15 U.S.C. § 78dd-1.  The FCPA contains both criminal and civil provisions. *See*, *e.g.*, 15 U.S.C. § 78ff(c); 15 U.S.C. § 78dd-2(g), 3(e).  While criminal liability requires a "knowing" violation, the FCPA does not define that standard as "actual knowledge" of wrongdoing.  Rather, Congress intended to impose liability on anyone who "is aware of a high probability of the existence of such circumstances" that may constitute a violation of the FCPA or "who purposefully avoid[s] actual knowledge" that a violation may occur.[4]  Thus, for example, an executive who authorizes others to pay "whoever you need to" in a foreign government to obtain a business advantage has violated the FCPA, even if he or she is unaware of actual payments, and even if no payments ultimately are offered or paid.[5]

---

[4] *See A Resource Guide to the U.S. Foreign Corrupt Practices Act*, published November 14, 2012 by the U.S. Department of Justice and Enforcement Division of the U.S. Securities and Exchange Commission, at 22 ("FCPA Resource Guide").
[5] *Id.* at 14.

The FCPA also contains accounting provisions to ensure that companies maintain accurate books and records, as well as sufficient internal controls.  ¶36.  These internal controls must include an effective compliance program that "take[s] into account the operational realities and risks attendant to the company's business, such as … the extent of its government interaction and the degree to which it has operations in countries with a high risk of corruption."[6]

In addition, as explained in detail herein, the U.S. sanctions program implemented by the Office of Foreign Assets Control in response to executive orders first issued by President Bush in 2003 prohibited any transaction or dealings with certain individuals involved in undermining democratic processes or institutions in Zimbabwe.  ¶38.  Robert Mugabe, the President of Zimbabwe, was the first person identified as a "Special Designated National" ("SDN") in the Annex to this executive order.  ¶38.  These sanctions were renewed in 2005 and further extended in 2008 pursuant to additional executive orders.  ¶¶39-42.

As set forth in detail in the Complaint, beginning in 2008, Och-Ziff engaged in a series of transactions that violated U.S. law and exposed the Company to increased regulatory risk.  ¶¶44-75.  Och-Ziff cannot evade liability for its misconduct either by hiding behind complicated investment structures or feigning ignorance as to the use of the proceeds of its investments.  In each transaction described in the Complaint, the flow of funds to secure business or an improper advantage leads back to Och-Ziff, and in particular, the investment decisions made by Cohen.

### a.   The $100 Million Loan To Mugabe In Exchange For Platinum Mining Rights

In or about March 2008, the government of Zimbabwe was in a state of upheaval.  The country's long-time, notorious dictator, Robert Mugabe, faced serious opposition in upcoming elections, and his government was short on money.  ¶52.  In order to finance his campaign to

---

[6] *Id.* at 40.

literally eliminate the opposition, Mugabe's regime determined to confiscate extremely valuable, undeveloped platinum claims along the Grand Dyke in Zimbabwe and then re-sell them.  ¶53.

Och-Ziff made it possible for a company called the Central African Mining and Exploration Company plc ("CAMEC"), in which Daniel Gertler, and Israeli mining magnate, and Billy Rautenback, a Mugabe regime crony who has since pled guilty to 326 fraud charges, owned major interests, to immediately acquire these lucrative mining rights.  ¶45.  At the behest of Cohen, Defendants invested $150 million in exchange for shares in CAMEC.  The CAMEC shares were issued on April 7, 2008, and Och-Ziff became CAMEC's fourth largest shareholder.

According to a memorandum prepared by James McGee, former U.S. ambassador to Zimbabwe, CAMEC was at the center of a "swiftly concluded and murky deal" wherein the $100 million derived from Och-Ziff was paid to the Zimbabwean government by CAMEC in exchange for the platinum mining rights.  Specifically, CAMEC used Och-Ziff's investment to acquire Lefever Finance Ltd., a company registered in the British Virgin Islands, which, in turn, owned 60% of Todal Mining (Private) Limited ("Todal"), a Zimbabwean company that owned platinum mining rights in Gweru.  The remaining 40% of Todal was owned by the Zimbabwean Mining Development Corporation ("ZMDC"), an entity wholly owned by the Zimbabwean government.  CAMEC advanced Lefever a $100 million "loan" – money from the Och-Ziff investment, which was never repaid – so that Lefever could comply with purported contractual obligations to the Zimbabwean government.  As part of this series of inter-related transfers, the Zimbabwean government gave Todal the right to export platinum from Zimbabwe.  Ambassador McGee thereafter learned from a member of Mugabe's political party that Mugabe's government had landed critical funding, totaling $100 million, at the same time these transactions took place. ¶53.  None of these deals would have been possible without Och-Ziff's investment.

Defendants contend that Och-Ziff did not knowingly make any payment or loan to any Zimbabwean government official.  However, the Complaint alleges that, *inter alia*, (a) at or about the same time as the Zimbabwean elections and the consummation of the platinum rights deal, CAMEC issued a regulatory announcement indicating that it had discussions with potential investors about "multiple investment opportunities" in Africa outside of the Congo (¶56); (b) a spokesperson for the former CEO of CAMEC stated that Och-Ziff was "aware of the profile of assets being considered" when it made its $150 million investment in CAMEC (¶57); and (c) a valuation model of CAMEC prepared by Och-Ziff referenced platinum and Zimbabwean instrumentalities (¶58).  Moreover, even after the platinum deal and $100 million payment became public and Rautenbach was added as an SDN under the U.S. sanctions program, Och-Ziff held onto into investment in CAMEC.  At the pleading stage, these allegations are sufficient to establish Defendants were either "aware of a high probability of the existence of such circumstances" that may constitute a violation of the FCPA or "purposefully avoid[ed] actual knowledge" of the FCPA violation.  At a minimum, the timing of Och-Ziff's investment, its due diligence (or lack thereof), and the reputations of the participants, including Gertler and Rautenbach, create a plausible inference that contrary to their representations, Defendants violated the law and exposed Och-Ziff to an increased risk of regulatory scrutiny.

### b.  Och-Ziff's Financing of Controversial Congolese Deals

Using Gertler as middleman, Defendants also participated in controversial oil and mining deals in the Democratic Republic of Congo ("DRC").  At the direction of Cohen, Och-Ziff loaned Gertler a total of $234 million, routed through offshore companies.  ¶¶60-61.  Gertler used the proceeds of the Och-Ziff loans to finance the acquisition of valuable copper and cobalt mines and the development of an oil concession.  ¶¶61, 65.  Both of these deals occurred under questionable circumstances involving confiscation of property and mining rights from other

companies by the DRC.  ¶¶63, 65.  According to reports published by <u>The Wall Street Journal</u>, as well Global Witness, an anti-corruption organization, Defendants benefited from Gertler's ties to Congolese President Joseph Kabila and the Kabila family, which allowed Gertler to acquire these confiscated assets from the DRC at substantial discounts and then "flip" the assets at substantially higher prices.  ¶¶67-68.

The Complaint sufficiently alleges that Defendants' conduct in connection with the Congolese deals violated the FCPA and exposed Och-Ziff to increased regulatory risk.  Notably, Defendants do not contest that they knew how Gertler planned to use the proceeds of the loans or that they lacked knowledge of the questionable circumstances surrounding these deals.  Indeed, Och-Ziff had "a right to participate in the day-to-day management of" Gertler's company and visited one of the mines in March 2008.  ¶63.  Instead, Defendants contend that there is no proof of a direct payment to a Congolese government official.  Def. Br. at 6.  This misconstrues the law.  As stated above, violation of the FCPA is not contingent on a direct payment from Och-Ziff to the Congolese government.

Documents substantiate that Gertler is part of President Kabila's inner circle, lends Kabila his private jet for trips abroad, and invites Kabila's associates to visit him in Israel often.[7] The FCPA prohibits offering anything of value in exchange for a business advantage. Defendants neither deny knowledge of Gertler's relationship with President Kabila, his family, and associates, nor provide any explanation as to how Gertler could secure extremely valuable assets at fire-sale prices absent his close, personal ties to Kabila.  Thus, Plaintiffs have sufficiently alleged that Defendants knowingly profited, either by exploiting Gertler's provision of "perks" to Kabila or by turning a blind eye to the tactics Gertler employed to get the

---

[7] *See* "Sexwale 'caught up' in US probe of suspect DRC mining deal," <u>Mail&Guardian</u>, July 10, 2014, *available at*  http://mg.co.za/article/2014-07-10-sexwale-caught-up-in-us-probe-of-suspect-drc-mining-deal.

Congolese deals done. Once again, at a minimum, Defendants' conduct was contrary to Och-Ziff's self-proclaimed conservative image and raised the spectre of increased regulatory scrutiny.

### c. Och-Ziff Secures Business Advantages In Libya

Since approximately 2007, Och-Ziff has pursued several questionable investment opportunities in Libya, which sparked the attention of regulators. First, after the fallout from the financial crisis, many U.S. firms, including Och-Ziff, began courting the Libyan Investment Authority ("LIA"), a sovereign wealth fund created by Saif al-Islam, the son of former Libyan dictator Muammar Qaddafi, to invest the country's oil profits. ¶¶69-70. The LIA started with $65 billion of seed money. ¶70. With so much money at stake, and with record losses sustained in the crisis, competition among financial firms for the LIA's business was intense.

In 2011, following the collapse of Qaddafi's regime, the DOJ and SEC gained access to documents and information concerning the LIA's investment decisions, which prompted regulators to begin probing whether financial firms used improper methods to secure the LIA's business. The LIA's employees are considered "foreign officials" for purposes of the FCPA; thus, it is illegal to pay or offer to pay anything of value to an LIA employee, either directly or indirectly, in order to obtain business. Similarly, use of an intermediary, known as a "fixer," in order to gain access or any advantage, also violates the FCPA.

According to The Wall Street Journal, Och-Ziff paid a "placement fee" to a company owned by London-based, Lebanese businessman Mohamad Ali Ajami in order to secure the LIA's business.[8] Mr. Ajami and Defendant Cohen moved in the same circle of bankers in London. Mr. Ajami also had relationships with Libyan security officials, including former spy chief Moussa Koussa. ¶72. Mr. Ajami paid some of Och-Ziff's fee to another intermediary, a

---

[8] *See* "U.S. Probes Och-Ziff Fee Paid in Libyan Dealings," The Wall Street Journal, Dec. 4, 2014, *available at:* http://www.wsj.com/articles/u-s-probes-och-ziff-fee-paid-in-libyan-dealings-1417736545.

Tunisian named Salah Jnifen, who was close to Qaddafi's son, Seif al-Islam, and to Mustafa Zarti, who was then the deputy chief to the LIA.[9]  Ultimately, the pay-off worked -- Defendant Cohen, on Och-Ziff's behalf, secured an investment of over $300 million from the LIA.

Second, Defendant Cohen orchestrated a joint venture between Och-Ziff and Magna Holdings, a Bermuda-registered entity co-founded by Mr. Ajami and backed by British-based billionaire, Wafic Said, who has been linked to an arms-for-oil bribery scandal involving British arms supplier BAE Systems[10] and a Saudi prince.  ¶¶72-74.  Magna Holdings is chaired by Lord Powell, who has strong ties to the British government, including former prime minister Tony Blair.  Och-Ziff is also one of Magna Holdings primary shareholders.

Despite the fact that Magna Holdings had no public profile and no background in the tourism industry, the company won several valuable contracts to build hotels and office buildings and develop tourism along Libya's Mediterranean coastline.  In particular, Och-Ziff extended a $40 million convertible loan to Magna Holdings to build the $120 million Al-Ghazala Intercontinental Hotel on the Tripoli waterfront.   According to an article published by the Independent UK, Mr. Ajami was a key fixer in obtaining this development contract.   ¶72. Similarly, Magna Holdings obtained another contract to build a luxury, 50-story development known as the Qaddafi Tower.  The Qaddafi Tower is jointly owned by Magna Holdings and an organization run by Ayesha Qaddafi, the former dictator's daughter.  ¶73.

The Libyan Justice Department launched an investigation of Magna Holdings in 2009. Mr. Ajami's nephew, who was working on the development projects, was found guilty of corruption and sentenced to eight years in prison.  A Libyan court determined that he was

---

[9] *See id.*

[10] In 2010, BAE pled guilty to conspiring to defraud the U.S. and making false statements about its FCPA compliance program and was ordered to pay a $400 million criminal fine.  *See* DOJ News Release, March 1, 2010, *available at:* http://www.justice.gov/opa/pr/bae-systems-plc-pleads-guilty-and-ordered-pay-400-million-criminal-fine.

"conspiring with his uncle" to pay bribes and forge documents.  Mr. Ajami wrote to Seif Qaddafi seeking leniency for his nephew.

Although the Och-Ziff-Magna Holdings hotel deals were unfinished, The Wall Street Journal reported that according to LIA documents, the LIA's $300 million investment with Och-Ziff has been profitable.

Once again, at the pleading stage, these allegations are sufficient to establish Defendants were either "aware of a high probability of the existence of such circumstances" that may constitute a violation of the FCPA or "purposefully avoid[ed] actual knowledge" of an FCPA violation with respect to the Company's investments in Libya.  At a minimum, the payment of the placement fees to Mr. Ajami to gain access to the LIA and to secure development contracts, in conjunction with Och-Ziff's investment in a joint venture backed by Mr. Ajami and billionaire arms dealer, Mr. Said, and the Libyan court's findings of bribery and forgery related to Magna Holdings create a plausible inference that contrary to their representations, Defendants violated the law and exposed Och-Ziff to an increased risk of regulatory scrutiny.

**Och-Ziff's Legal and Regulatory Failures Are Exposed**

Despite their claims that "transparency" is a "competitive strength" and that the Company's reputation for integrity is "its most important asset," the truth regarding Och-Ziff's illegal conduct and regulatory failures only came to light after reports by outside sources prodded Defendants to confirm that the Company had been under investigation for some time in connection with its business dealings in Zimbabwe, the Congo, and Libya.  The first inkling of a problem was revealed on February 3, 2014, when The Wall Street Journal reported that the DOJ was investigating Och-Ziff in connection with its dealing with the LIA, and that the DOJ's

criminal probe was proceeding alongside a civil probe by the SEC, which began in 2011.[11]  ¶109.
The article explained that the Investigations concerned the use of "fixers," who funneled illegal
payments to Libyan officials in the Qaddafi regime on behalf of financial firms, including Och-
Ziff, in return for business.  *Id.*  The article further identified the $120 million Intercontinental
Hotel project as one of the deals that was a target of the Investigations.  On this news, shares in
Och-Ziff fell 6.7%, on heavy trading volume.  ¶123.

Then, on March 18, 2014, buried in a restated 10-K for 2013, Och-Ziff disclosed for the
very first time that the SEC and DOJ had issued subpoenas and requests for information ***nearly
three years earlier*** concerning "an investment by a foreign sovereign wealth fund in some of our
funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of
companies in Africa."  ¶112.  Defendants added that "[a]n adverse outcome could have a
material effect on our business, financial condition or results of operations."  *Id.*  This disclosure
triggered a 3.5% decline in the price of Och-Ziff's stock.  ¶124.

Further details concerning Och-Ziff's dealings in the DRC, excluded from the
Company's announcement, began to surface.  On April 27, 2014, The Wall Street Journal
reported that the DOJ and SEC were also investigating Och-Ziff's loans to Gertler, totaling $234
million, which financed the acquisition of two properties confiscated by President Kabila's
government and then sold to Gertler, a friend of Kabila, at substantially-discounted prices.  ¶115.
Defendant Cohen was identified as the Och-Ziff executive who oversaw the loans.  *Id.*
Following this news, shares of Och-Ziff fell by 10%, the largest stock drop in five years.  ¶125.

Subsequently, on August 22, 2014, Bloomberg Business Week published an expose
describing how Och-Ziff financed political intimidation and violence in the 2008 Zimbabwe
election by investing in a mining company that secured valuable platinum mining rights from

---

[11] The ongoing DOJ and SEC investigations are referred to as the "Investigations," collectively.

ZMDC, which was owned, in part, by the Zimbabwean government and the Mugabe regime. ¶117.  The reporting of Och-Ziff's connection to Mugabe's subversion of the 2008 election caused Och-Ziff shares to plunge approximately 7%.  ¶126.

Additional facts continue to be revealed.  On December 4, 2014, The Wall Street Journal published an update concerning the investigation of Och-Ziff's Libyan transactions, identifying the "fixer" as Mr. Ajami and thereby linking the LIA's $300 million Och-Ziff investment with the Magna Holdings real estate development projects.  According to the Company's public disclosures, the Investigations remain ongoing.

**Defendants' False and Misleading Statements and Omissions**

During the Class Period, Defendants made false and misleading statements and omitted material information concerning each of the following:

**(a) Compliance with FCPA and Regulatory Risk:**

Defendants repeatedly represented in their public disclosures that:

> We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition.  We may from time to time be involved in litigation and claims incidental to the conduct of our business.  Like other businesses in our industry, we are subject to scrutiny by the regulatory agencies that have or may in the future have regulatory authority over us and our business activities, which results in regulatory agency investigations and litigation related to regulatory compliance matters.

*See*, *e.g.*, ¶¶79, 85, 88, 91, 94, 101, 104, 107.  This sweeping disclosure obfuscated the true state of affairs.  While regulatory inquiries may happen in the normal course, Defendants knew at the time of this statement that Och-Ziff was subject to targeted investigations with respect to very specific activity in Zimbabwe, the DRC, and Libya, which, as described herein, violated the FCPA and related laws.  Thus, Och-Ziff was hardly "like other businesses in [its] industry" that "may" be investigated with respect to "regulatory compliance matters."   Similarly, statements

14

that the Company is "not currently subject to any pending judicial, administrative or arbitration proceedings" is deliberately misleading in light of Defendants' omission of information concerning an outstanding subpoena and ongoing DOJ and SEC investigations.

**(b) Och-Ziff's "Transparency" as a "Competitive Strength":**

For years, Och-Ziff attracted investors based on representations that "transparency" was a "competitive strength." ¶¶80, 96. Specifically, Defendants stated firmly: "We believe that our fund investors should be provided with qualitative and quantitative information about our investment process, operational procedures and portfolio exposures in order to understand and evaluate our investment performance." However, Defendants never disclosed that their investment returns were attributable, in part, to financing deals involving corrupt governments, confiscated assets, and known associates of dictators. At a minimum, the lack of transparency about the nature of the Company's involvement in the transactions described herein prevented investors from understanding and evaluating the true extent of regulatory risk and the degree to which it could impact their investments.

**(c) Risk Management and Reputation for Integrity:**

The Company's risk management and reputation for integrity were also distinguishing features used to attract conservative-minded investors, like pension funds and endowments, seeking stable investments with low headline risk.[12] For example, Defendants touted "risk management" as "central to the investment process for all portfolios." This risk management process was overseen by a specially-created "Risk Committee," which "meets regularly to

---

[12] Indeed, in September 2014, the $300-billion, California state pension fund ("CalPERS") announced its decision to withdraw from its hedge fund investments after the non-profit group, Rights and Accountability in Development ('RAID') questioned whether CalPERS's continued investment with Och-Ziff was consistent with its adherence to Global Principles in its investments, which include provisions on the elimination of human rights violations. *See Huge CalPERS pension fund to exit Och-Ziff and other hedge funds*, RAID, September 19, 2014, *available at*: http://www.raid-uk.org/blog/huge-calpers-pension-fund-exit-och-ziff-and-other-hedge-funds.

review, among other information, sophisticated risk analysis," as well as "general risks, including, but not limited to, global economic, geopolitical, counterparty and operational risks." *See*, *e.g.*, 2011 10-K at 6.

Furthermore, the reputations of key executives, especially Defendant Och, were also central to the Company's business.  In particular, Defendants knew and understood that an investment in Och-Ziff was tantamount to an investment in the "efforts, judgment and personal reputation[ ] of Defendant Och. ¶25; *see also* ¶28 (allowing redemption in the event Defendant Och ceases to be involved in the Company's business).  Thus, Defendants repeatedly assured investors that "[w]e actively manage the operational risk of our business, including liquidity, counterparty exposures, legal and reputational risk," (¶¶24, 82, 98) and that Och-Ziff's "reputation for integrity is its most important asset" (¶32).

However, a reasonable investor would never suspect that irrespective of this purported active risk management process, which considered, *inter alia*, geopolitical, counterparty, and reputational risk, Defendants engaged in unnecessarily-complicated deal structures involving counterparties accused of fraud with known connections to corrupt political regimes.  Nor would a reasonable investor expect that while touting integrity as the Company's "most important asset," Defendants were aware of ongoing Investigations related to this same conduct.  Defendants' statements and omissions regarding Och-Ziff's risk management process and reputation for integrity were therefore false and misleading.

## ARGUMENT

## I.   LEGAL STANDARD

To state a claim under Rule 10b-5, Plaintiff must allege that Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance

was the proximate cause of their injury.[13]  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161,

172 (2d Cir. 2005); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 263-64 (S.D.N.Y.

2010).  Although securities fraud actions are subject to the heightened pleading requirements of

the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and

Fed. R. Civ. P. 9(b), a plaintiff is not required to plead "detailed evidentiary matter," *In re

Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to

support a reasonable belief" that defendants' statements were materially false or misleading.

*Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).

In addition, the pleading standards established by *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) apply to claims for securities

fraud.  In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-

pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor.  *See

Twombly*, 550 U.S. at 555; *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 394

(S.D.N.Y. 2010) (internal citations omitted).  The court only "assess[es] the legal feasibility of

the complaint;" it does not "assay the weight of the evidence which might be offered in support

thereof."  *Fannie Mae*, 742 F. Supp. 2d at 394 (internal quotation omitted).  Thus, to survive a

Rule 12(b)(6) motion, the Complaint need only contain sufficient facts "to state a claim of relief

that is plausible on its face." *Iqbal*, 556 U.S. at 678.  The Complaint's allegations meet the

applicable pleading standards, including the requirements of the PSLRA and Rule 9(b).

## II.   THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

Here, the Complaint meets the particularity requirements for pleading falsity and

materiality by "specify[ing] each statement alleged to have been misleading, the reason or

---

[13] Only prongs (1) and (2), *i.e.*, falsity and scienter, are at issue here.

reasons why the statement is misleading," and "all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1).

## A.   The Complaint Sufficiently Alleges Violations Of The FCPA

Defendants claim that the Complaint fails to identify violations of the FCPA, because the allegations concern "conduct by other parties" and do not demonstrate that "Och-Ziff participated in or was aware of any … payments or promises" with the requisite particularity. Def. Br. 10.  Defendants' attempts to distance themselves from these transactions are unavailing.

First, neither the language of the statute nor Congressional intent supports Defendants' overly-narrow view of the FCPA.  Recognizing that "[c]orporate bribery is bad business,"[14] Congress enacted the FCPA in 1977 "to halt corrupt practices, create a level playing field for honest business, and restore public confidence in the integrity of the marketplace."[15]  Thus, the FCPA is deliberately broad in scope and is not limited to direct payments from a covered party to a foreign official.  *See* 15 U.S.C. § 78dd-1(a)(3) (prohibiting transfers of anything of value to third parties, "while knowing that all or a portion of such money or thing of value will be offered, given, or promised ***directly or indirectly***, to any foreign official, to any foreign political party … or to any candidate for foreign political office") (emphasis added).  Likewise, "anything of value," as used in the FCPA, encompasses a broad range of unfair benefits, including, for example, employment offers, travel expenses, and charitable contributions.  *See*, *e.g. Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 597 (S.D.N.Y. 2014) (explaining that "anything of value," as used in the FCPA, is construed broadly) (internal citations omitted).

Second, Defendants misconstrue the level of awareness necessary to constitute a violation of the FCPA, which is distinctly different than pleading scienter under Section 10(b).

---

[14] *See* S. Rep. No. 95-114, at 4 (1977) *available at* http://www.justice.gov/criminal/fraud/fcpa/history/1977/senaterpt-95-114.pdf.
[15] *See* FCPA Resource Guide, at 2, fn. 2.

Anticipating that bribery schemes often involve complicated transactional structures and use of intermediaries, Congress explicitly intended to impose liability not only on those with actual knowledge of wrongdoing, but also on those who purposefully avoid actual knowledge:

> [T]he so-called "head-in-the-sand" problem – variously described in the pertinent authorities as "conscious disregard," "willful blindness" or "deliberate ignorance" – should be covered so that management officials could not take refuge from the Act's prohibitions by their unwarranted obliviousness to any action (or inaction), language or other "signaling device" that should reasonably alert them of the "high probability" of an FCPA violation.[16]

Consequently, individuals and businesses cannot use subsidiaries, off-shore entities, and/or other persons as shields to avoid "actual knowledge" of misconduct and therefore evade prosecution.

Third, unlike the PSLRA, the FCPA does not impose heightened pleading requirements to state a claim and survive dismissal.  *See*, *e.g.*, *S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 847 (S.D. Tex. 2012) (applying Rule 8 pleading requirements enunciated in *Iqbal* and *Twombly* to FCPA claims).  Consequently, it is not necessary to provide the granular level of detail regarding, *inter alia*, which government official was targeted, what benefit was conferred, or what action was taken in exchange for the bribe, as Defendants suggest.  *Id.* at 850 ("[I]t would be perverse to read into the [FCPA] a requirement that a defendant know precisely which government official … would be targeted by his agent; a defendant could simply avoid liability by ensuring that his agent never told him which official was being targeted and what precise action the official took in exchange for the bribe.").  It is enough at this stage of the pleading that "the factual allegations … when assumed to be true raise a right to relief above the speculative level."  *Id.* (citing *Twombly*, 550 U.S. at 556 n. 3).

Applying these standards, Plaintiffs have sufficiently pled violations of the FCPA, because with respect to each transaction alleged in the Complaint, the flow of funds to foreign

---

[16] *See* H.R. Rep. No. 100-576, at 920 (1988).

governments or officials in exchange for a business advantage originates with Och-Ziff.  *See*, *supra*, 6-12.  Furthermore, by their own admission, Defendants were sophisticated parties who conducted extensive due diligence prior to making investment decisions.  Thus, as set forth in the Complaint, in each instance, Defendants knew and understood the geopolitical realities of the countries in which they were operating, the reputations of the persons involved, the high risk of corruption, and the controversial nature of the proposed deals, *e.g.*, purchasing platinum mining rights confiscated by the Zimbabwean government in a deal that involved the ZMDC, an entity wholly-owned by the Zimbabwean government.  Moreover, Defendants, specifically Defendant Cohen, then deliberately paid agents and intermediaries, like Gertler (with respect to the Zimbabwe and DRC transactions), and Ajami (with respect to the Libyan investments), who possessed the proper government connections to get the deals done.  Defendants' "willful blindness" and "deliberate ignorance" is no excuse.  At this stage, the Complaint adequately pleads that Defendants financed high risk transactions involving payments to foreign officials in exchange for business in violation of the law.  These FCPA violations ultimately harmed shareholders when the truth concerning Och-Ziff's misconduct was exposed.

**B.      Defendants Were Obligated To Disclose Material Information Concerning Active Regulatory Investigations And Compliance With The FCPA**

Defendants do not deny that they waited three years – and not until reports surfaced in The Wall Street Journal – before finally disclosing that the Company was subject to a targeted investigation with respect to specific transactions that violated the FCPA and related laws.  Rather, Defendants contend that they had no duty to disclose violations of the FCPA or active government investigations, because they were not obligated "to accuse [themselves] of wrongdoing."  Def. Br. at 12.

Contrary to their assertions, Defendants were compelled to disclose the Investigations and illegal conduct – even though uncharged – because such disclosure "[was] necessary … in order to prevent statements the corporation [did] make from misleading the public." *See Menkes v. Stolt-Nielsen S.A.*, 3:03CV409(DJS), 2005 WL 3050970, *7 (D. Conn. Nov. 10, 2005) (finding that defendant was obligated to disclose uncharged, anti-competitive conduct in light of statements "convey[ing] the false impression to investors that [defendant] achieved success in a competitive pricing environment"); *see also In re BioScrip, Inc. Sec. Litig.*, 13-CV-6922 AJN, 2015 WL 1501620, *10 (S.D.N.Y. Mar. 31, 2015) (omission of information concerning receipt of civil investigative demand rendered statements regarding compliance false and misleading). Moreover, once Defendants chose to make statements that put the Company's regulatory status and purported competitive strengths for transparency and risk management at issue, "Rule 10b-5 mandates that [their] speech must be truthful, accurate, and complete." *See, e.g.*, *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008), *citing Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Upon choosing to speak, one must speak truthfully about material issues. Once [a company] chose to discuss its hedging strategy, it had a duty to be both accurate and complete." (citations omitted)); *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("When a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."); *In re BioScrip*, 2015 WL 1501620 at *9 (same).

Here, Defendants made statements concerning the Company's regulatory status, reputation, and legal compliance, and repeatedly touted "transparency," "risk management," and "integrity" as cornerstones of its business.  For example, as set forth in the Complaint, Defendants repeatedly represented that, *inter alia*, "[w]e are not *currently* subject to any pending

judicial, administrative, or arbitration proceeding," "[w]e are *from time to time* involved in litigation and claims incidental to the conduct of our business," and "*[l]ike other businesses in our industry*, we are subject to extensive scrutiny by regulatory agencies …," which "has resulted in, *or may in the future result in*, regulatory agency investigations, litigation and subpoenas and related costs." *See*, *e.g.*, ¶¶94, 101, 104.  These disclosures, couched in conjecture and ambiguity, deliberately obfuscated the truth, because Defendants were aware of actual, specific conduct that was being investigated by the SEC and DOJ at that time.  *See*, *e.g.*, *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.") (internal citation and quotation omitted); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements that that defendants issued "truly independent research" were misleading where defendants already knew that company's investment research was plagued by pervasive conflicts of interest); *In re BioScrip*, 2015 WL 1501620 at *9 (statements suggesting that defendants "routinely responded to investigatory requests from the Government" and that there was "no assurance that [they] will not receive subpoenas … from time to time" were misleading where company was already in receipt of an investigatory demand).

Furthermore, in contrast to the cases relied upon by Defendants,[17] the Complaint contains particularized allegations that supply the necessary connection between the undisclosed improper and illegal conduct and the statements at issue.  *See*, *e.g.*, *Menkes*, 2005 WL 3050970 at *7 (linking undisclosed anti-competitive conduct to statements regarding price competition and

---

[17] The cases relied upon by Defendants are distinguishable.  For instance, in *In re Axis Capital Holdings Ltd. Sec. Litig.*, the defendant company was not under investigation at all, and its statements were therefore not sufficiently connected to the allegations brought by the Attorney General involving anti-competitive conduct by other insurance companies.  *See* 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006).

renewal of major contract); *In re Southeby's Holdings, Inc.,* No. 00 Civ.1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (finding that defendants had a duty to disclose anti-competitive conduct because the corporation stated that competition was "intense" with its "primary auction competitor," which was a party to the anti-competitive agreement); *Ballan v. Wilfred Am. Educ. Corp.,* 720 F. Supp. 241, 249–50 (E.D.N.Y. 1989) (holding omission of information concerning the extent of defendant school's abuse of the federal higher education loan system actionable where defendants minimized the potential consequences of pending investigations in its public statements).   Just as in *Van der Moolen*, *Lapin*, *Southeby's*, and *BioScrip*, Defendants' statements that, *inter alia*, Och-Ziff was "like other businesses" and was "subject to extensive scrutiny by regulatory agencies" that "may in the future result in regulatory agency investigations, litigation and subpoenas" perpetuated the false impression that it was just "business as usual," which prevented investors from accurately assessing the Company's exposure to reputational harm and regulatory risk – risks that were no longer merely speculative but had already materialized.   *See*, *e.g.*, *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) (explaining that the "requisite connection between improper activity and affirmative statements" was established where "defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring."); *Van der Moolen*, 405 F. Supp. 2d at 400 (finding warnings about regulatory risks actionable where defendants knew or were recklessly ignorant of the fact that employees were violating NYSE rules); *In re BioScrip*, 2015 WL 1501620 at *9 (finding warning concerning regulatory risk actionable, because "the inference is available at this stage in the proceedings that it could also be reasonably read as assuring the investor that no such threat existed at that precise moment").

Thus, Defendants were obligated to disclose information about the Investigations and FCPA violations, both because the information was connected to their affirmative representations and because, absent that disclosure, those statements were inaccurate and incomplete.  Defendants' statements and omissions are therefore actionable.

**C.**  **Defendants' Statements And Omissions Regarding Och-Ziff's "Transparency," "Integrity," And "Risk Management" Were False And Misleading**

Defendants repeatedly assured investors that "transparency" was a "competitive strength;" that risk management was "central to the investment process;" and that, in light of the significance of Defendant Och's role in the Company, Och-Ziff "actively manage[d] the operational risk of [its] business, including liquidity, counterparty exposures, legal and reputational risk," because its "reputation for integrity [was] its most important asset."  *See*, *e.g.*, ¶¶24, 32, 80, 82, 96, 98.  Defendants dismiss these statements as immaterial, claiming that no reasonable investor would have relied upon these representations.  Def. Br. at 14-15.  However, an assessment of materiality "should be undertaken in an integrative manner," that involves consideration of both quantitative and qualitative factors.  *See Litwin v. Blackstone Grp. L.P.*, 634 F. 3d 706, 717 (2d Cir. 2011) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB No. 99")).  Furthermore, "a complaint may not properly be dismissed…on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 630 (S.D.N.Y. 2013).  The test of materiality depends not on the literal truth of the statements, but upon the ability of investors to become accurately informed.  *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).  As explained, *supra*, Point II.A-B, the misstatements in the instant case are directly connected to concealment of unlawful transactions, compliance with regulatory

requirements, and ongoing Investigations, which in this context, a reasonable investor would view as "significantly altering the total mix of information made available to … making the investment decision."  *See* SAB No. 99 at 45152; *see also Lapin*, 506 F. Supp. 2d at 240 (same).

Moreover, where, as here, Defendants utilized qualitative assurances concerning transparency, risk management, and integrity as a way to indicate a competitive advantage over other firms and to attract a certain type of clientele, those statements are material and actionable. *See Lapin*, 506 F. Supp. 2d at 240 (holding that statements distinguishing defendant from competitors based upon "truly independent research" were actionable where its research reports were allegedly one of its "core competencies"); *see also Ballan v. Wilfred Amer. Educ. Corp.*, 720 F. Supp. 241, 245 (assurances that defendants "added additional, elaborate compliance and control steps which … are the best procedures in the industry" were misleading in light of ongoing government investigations concerning misuse of federal student financial aid programs). Specifically, Defendants touted Och-Ziff's transparency, risk management, and reputation for integrity as distinguishing competitive strengths, cultivating Och-Ziff's image as the "sleep at night fund."  These statements are misleading when Defendants are aware of but fail to disclose contradictory information, *i.e.*, ongoing investigations involving, *inter alia*, convoluted deal structures, payments to agents accused of fraud, and connections to corrupt political regimes, which bear directly on those same reputational qualities.

Likewise, because Defendants put the reputations of key executives, including Defendants Och and Cohen, at issue as the cause of the Company's financial success, Defendants were thereafter obligated to advise investors of circumstances that related to the integrity of management.  *See, e.g.*, *Lapin*, 506 F. Supp. 2d at 240 (finding that defendant's statements that it was "dedicated to complying fully" with the law and that integrity was "at the heart" of its

business "put[ ] the topic of the cause of its financial success at issue," such that it was "obligated to disclose information concerning the source of its success," since reasonable investors would find such information material), *citing Van der Moolen*, 405 F. Supp. 2d at 400-1; *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 1140660, at *8 (N.D. Cal. Apr. 17, 2007) ("The integrity of management is always of importance to investors.").  As in *Lapin*, the omission of material information related to Och-Ziff's "reputation for integrity," which the Company claimed was "its most important asset" (¶32), is therefore actionable.

**D.      The Complaint Adequately Pleads A Violation Of Item 303**

The Second Circuit's recent decision in *Stratte-McClure v. Morgan Stanley* confirms that the failure to make a required 303 disclosure constitutes an omission, which can serve as an independent basis for a Section 10(b) securities fraud claim.  776 F.3d 94, 102 (2d Cir. 2015) ("It follows that Item 303 imposes the type of duty to speak that can…give rise to liability under Section 10(b)") (citation omitted).

Defendants conflate their disclosure obligations under Item 303 with their obligations under Item 103.  However, in contrast to Item 103, which relates to disclosure of pending legal proceedings, Item 303 applies here, because Defendants should have expected that their multiple, illegal transactions in three African countries involving individuals on the U.S. government's SDN list would have triggered government investigations that could have uncertain financial consequences for the Company.  *See City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp.2d 705, 718 (S.D.N.Y. 2013) (Kaplan, J.) (finding that defendants were required to disclose state investigations under Item 303 where plaintiffs alleged that defendants reasonably should have expected state investigation would cause it to alter reserves and could result in imposition of undetermined fines).  Defendants' citation to cases stating that a company has no duty to disclose a regulatory investigation until it matures into litigation misses the mark,

because here, Plaintiffs allege that Defendants' prior statements concerning their transparency and integrity triggered a duty to disclose the investigations, as well as the underlying transactions (*see, supra,* Sections B and C).  This stands in stark contrast to cases like *Richman v. Goldman Sachs Grp., Inc.*, where the court found that "[p]laintiffs have not shown that [d]efendants were required to disclose their receipt of Wells Notice to prevent their prior disclosures from being inaccurate or incomplete."  868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012).

## III.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

Under the PSLRA, a securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).   The pleading standard is satisfied "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior."  *In re Lehman Bros. Equity/Debt Securities Litig.*, 799 F. Supp. 2d 258, 293 (S.D.N.Y 2011) (quoting *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  Plaintiffs need not plead scienter with "great specificity provided the plaintiff alleges enough facts to support a strong inference of scienter."  *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 169 (2d Cir. 2000) (internal quotations omitted).  An inference of scienter is strong "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (citations omitted).  In this regard, a court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). The requisite inference of scienter need not be the "most plausible of competing inferences," nor does it need to be "irrefutable, *i.e.*, of the 'smoking gun' genre." *Id.* at 324.

The Complaint sufficiently alleges evidence to establish a strong inference of scienter through conscious misbehavior or recklessness.  In the Second Circuit, conscious misbehavior or recklessness is defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *City of Brockton Ret. Sys. v. Avon Products, Inc.*, 11 CIV. 4665 PGG, 2014 WL 4832321, *18 (S.D.N.Y. Sept. 29, 2014), *quoting Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001).  A complaint based upon a conscious misbehavior theory gives rise to a strong inference of the requisite scienter where it is alleged that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Avon*, 2014 WL 4832321 at *18, *quoting ECA & Local 132 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 199 (internal quotations omitted).  The Complaint meets this standard.

### A.   Repeated FCPA Violations And Ongoing SEC And DOJ Investigations Support An Inference of Scienter

Notwithstanding Defendants' protestations of innocence, for the reasons set forth in Point II, *supra*, the Complaint adequately pleads that Defendants repeatedly violated the FCPA with respect to their dealings in Zimbabwe, the DRC, and Libya.  This deliberate illegal conduct, in and of itself, is sufficient to support an inference of scienter.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *see also Southeby's*, 2000 WL 1234601 at *6 ("A plaintiff may sufficiently plead conscious misbehavior through allegations of deliberate illegal conduct.").  Likewise, the Investigations further bolster the allegations of scienter, as they are "one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."  *In re Gentiva Sec.*

28

*Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (considering pending investigations as part of the scienter analysis even though regulators had not yet instituted any action or alleged any wrongdoing); *see also In re Bristol Myers*, 586 F. Supp. 2d at 168 (weighing interactions with regulators in scienter analysis).

Furthermore, where Defendants do not dispute that at the time of their statements, they knew about the Investigations, and were therefore also on notice of the underlying illegal conduct, but omitted that information from the Company's statements ***for three years***, the inference of scienter is even stronger and more compelling.  *See, e.g., In re Symbol Tech., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH), 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) (alleg[ations] that [defendants] had access to and reviewed inflated sales projections gave rise to strong inference of scienter); *City of Pontiac Gen. Emp. Ret. Sys. v. Wal-Mart Stores, Inc.*, 2014 WL 4823876, at *9 (W.D. Ark. Sep. 26, 2014) (finding scienter where defendants omitted information concerning internal investigation of alleged corruption for approximately five years); *American Apparel S'holder Litig.,* No. CV 10-06352 MMM JCGX, 2013 WL 174119, at *20-21 (C.D. Cal. Jan. 16, 2013) (finding scienter adequately pled where defendants touted the company's progressive labor policies at the same time it was subject to an ongoing investigation related to violations of U.S. immigration laws); *In re BioScrip*, 2015 WL 1501620 at *16 (holding that defendants "knew facts or had access to information suggesting their public statements [concerning regulatory compliance] were not accurate" based on company's receipt of subpoena and pendency of regulatory investigations at that time).

The fact that Defendants did not reveal any information concerning the pending Investigations until ***after*** publication of the The Wall Street Journal article also belies their contention that they did not act with the requisite state of mind.  *See Wal-Mart*, 2014 WL

4823876 at *9 (holding that the failure to acknowledge suspected corruption until after publication of a New York Times article supported the inference that defendants "were concerned about exposure of their alleged mishandling of the suspected corruption" and "consciously chose to omit" that information from earlier disclosures).  Even then, Defendants' confirmation of The Wall Street Journal's report was buried in a re-stated annual report so as to mitigate the impact of the disclosure.  In light of the Complaint's allegations that Defendants pegged Och-Ziff's success to its reputation for transparency and integrity, it can be plausibly inferred that Defendants "consciously chose to omit" information concerning controversial transactions that violated the law and prompted the Investigations so as to mislead investors.  *See Wal-Mart*, 2014 WL 4823876, at *4; *see also In re Bristol Myers*, 586 F. Supp. 2d at 168 (finding innocent inference less compelling when defendants were aware of "how critical maintaining [drug] exclusivity was to the [c]ompany's profitability," but did not disclose a threat to that exclusivity).

Finally, contrary to Defendants' assertions, the Individual Defendants' conscious misbehavior and/or recklessness is predicated on more than just their titles and the Company's receipt of subpoenas.  Defendants promoted the reputations, expertise, and personal involvement of the Individual Defendants in order to attract investors, even granting redemption rights in the event Defendant Och ceased to be actively involved in the management of the Company. Having literally staked Och-Ziff's business on their own prominent roles within the Company, they cannot contend that they lacked knowledge of or access to documents and information evidencing Och-Ziff's active participation in suspect foreign transactions, including, as set forth in the Complaint, direct payments to agents and intermediaries to achieve desired results.  *See*, *e.g.*, *American Apparel S'holder Litig.*, 2013 WL 174119 at *20-21 ("[I]t strains credulity to

infer that the company's management remained completely ignorant of [the company's] immigration compliance problems during the *entire pendency* of the [Immigration and Customs Enforcement Division] investigation."); *In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 393–94 (S.D.N.Y.2007) (finding implausible an inference that sophisticated executives actively engaged in the planning of the transactions were ignorant of the transaction's tax consequences ). In particular, because Defendant Cohen oversaw these investments, is directly connected to Mr. Ajami, the "fixer" paid in connection with the Libyan transactions, and is himself a target of the Investigations, the suggestion that he lacked contemporaneous knowledge of illegal conduct borders on the illogical.  *See In re Cadence Design Sys. Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1191-92 (N.D. Cal. 2010) (holding that an executive officer "was at least deliberately reckless" because "[t]he competing inference, that he worked on these [important] deals and innocently missed the most important details, is less plausible.").  At a minimum, these allegations evince "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Avon*, 2014 WL 4832321 at *18.

### B.   Defendants' Scienter Can Be Inferred Because The Investigations And FCPA Violations Relate To The 'Core Operations' Of Och-Ziff's Business

Plaintiffs are also entitled to rely on the "core operations" doctrine to support a finding of scienter in these circumstances.  "To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 12 Civ. 8557, 2013 WL 6233561, at *26 (S.D.N.Y. 2013).[18]

---

[18] *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[T]he fact that [defendant's] statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made"); *In re*

"Core operations include matters 'critical to the long term viability' of the company and events affecting a 'significant source of income.'" *Id.* (citations omitted).   "[A] plaintiff need not identify specific reports or data containing contradictory information when the defendant's misstatements pertain to subject-matter critical to key corporate functions." *Medis Investor Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 145 (S.D.N.Y. 2008); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) ("When information is at the core of a company's business, it may be properly ascribable to senior officers."). Rather, knowledge of "contradictory facts of critical importance" can be attributed to "high-level officers … by virtue of their positions within the company." *Atlas Air*, 324 F. Supp. 2d at 489.

By its own admission, Och-Ziff's "reputation for integrity [was] its most important asset" and "risk management" was "central to the investment process for all portfolios."   Indeed, the withdrawal of investors subsequent to disclosure of this misconduct substantiates the critical importance of Och-Ziff's reputation and regulatory compliance.[19]   Thus, at the time of their statements, Defendants undoubtedly were already fully apprised of details concerning FCPA violations that threatened to harm Och-Ziff's business, either because that information was conveyed at the time the transactions occurred or in 2011, when the Investigations commenced.

## C.    Cohen's Resignation Supports An Inference Of Scienter

The "highly unusual and suspicious" resignation of Defendant Cohen also constitutes circumstantial evidence of fraud.  *See, e.g.*, *In re Scottish Re Group*, 524 F. Supp. 2d at 394 n.76; *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 603, 608 (S.D.N.Y. 2009).   Here, Defendant Cohen abruptly resigned in the midst of ongoing Investigations concerning transactions which he oversaw and approved before any details concerning either the

---

*Check Point Software Tech. Ltd. Sec. Litig.*, No. 03 Civ. 6594(KMB), 2006 WL 1116699, at *4 (S.D.N.Y. Apr. 26, 2006) (same).
[19] *See*, *supra*, fn. 12.

Investigations or the transactions were made public.  Only later was it revealed that Defendant Cohen was himself a target of those Investigations.   Under these circumstances, Cohen's resignation weighs in favor of a finding of scienter.

### D.    A Holistic Reading Of The Complaint Supports An Inference Of Scienter

Viewed holistically, the Complaint sufficiently alleges facts giving rise to a strong inference of Defendants' conscious misbehavior or recklessness.  The Complaint's extensive allegations detailing, *inter alia*, (i) violations of the FCPA, including multiple high-risk transactions involving investments of hundreds of millions of dollars and payments to agents and intermediaries in foreign countries by Defendants; (ii) knowledge and concealment of the ongoing Investigations related to those same transactions *for three years*; (iii) the abrupt and suspicious resignation of Cohen during the pendency of the Investigations but before the truth was publicly disclosed; (iv) the fact that Defendants only acknowledged the Investigations after publication in The Wall Street Journal; (v) Defendants' active involvement in the day-to-day affairs of the business, as well as Defendant Cohen's direct role in the transactions; and (vi) the fact that these transactions and the Investigations related to the "core operations" of the Company, all support a finding of scienter at this stage of the proceedings.  *See*, *e.g.*, *Sapssov v. Health Mgmt. Assoc., Inc.*, 22 F. Supp. 3d 1210, 1228 (M.D. Fla. 2014) (holding that viewed holistically, allegations that, *inter alia*, defendants implemented and oversaw a scheme to defraud Medicare, were heavily involved in daily operations, and were subject to a regulatory investigation created a strong inference of scienter).

Even if the Court determines that these allegations are insufficient as to the Individual Defendants, the Complaint more than adequately pleads scienter with respect to Och-Ziff.  *See*, *e.g.*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) ("The fact that Lead Plaintiff failed to allege scienter for the individual Defendants does not preclude a

finding of recklessness against [the company].... All that is required is that the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531, F.3d 190, 195 (2d Cir. 2008) ("It is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.") (citations omitted); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) (subsequent history omitted) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.").

## IV.   THE COMPLAINT ADEQUATELY PLEADS SCHEME LIABILITY

A defendant who uses a "device, scheme, or artifice to defraud," or engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit," can be liable by virtue of his conduct alone.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008) ("[t]o suggest there must be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b–5 [ ] would be erroneous. Conduct itself can be deceptive ....").  The Supreme Court has repeatedly recognized that defendants who engage in deceptive "acts" or "conduct" may be primarily liable under Rule 10b-5(a) and (c), so long as the other primary elements of Section 10(b) are adequately alleged.  *See, e.g.*, *S.E.C. v. Zandford*, 535 U.S. 813, 819-20 (2002); *Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 1257756, at *6 (N.D. Ohio Mar. 31, 2011) *on reconsideration in part,* No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011), *as amended* (Sept. 7, 2011) ("Conduct can be deceptive and provide a basis for primary liability.");   (*Stoneridge* inapplicable to "scheme liability" claims against primary actors).

Although the Complaint separately alleges that Och-Ziff, Frank and Och made material misstatements and omissions constituting violations of Section 10(b), Defendants argue that Plaintiffs are attempting to bootstrap a false statement claim into a fraudulent scheme.  However, in addition to failing to disclose the Investigations for over three years, the Complaint alleges that Defendants acted together to invest in a web of questionable deals in violation of the FCPA and U.S. sanctions.   The "core misconduct" at the heart of Plaintiffs' allegations is the FCPA violations themselves.  Defendants orchestrated a scheme that misled investors by concealing Och-Ziff's highly risky and illegal business dealings in Africa.[20]  Cohen handpicked Och-Ziff's African investments, which ran afoul of the FCPA, while at the same time Defendants assured investors that Och-Ziff was not the kind of company that would ever engage in such questionable and illegal conduct to generate profits – touting its "extensive" due diligence preceding all investments, its "transparency" as a "differentiating competitive strength," and its "reputation for integrity" as its most important asset.[21]  *See*, *e.g.*, ¶¶ 2-3.

Recent SEC interpretation underscores the fact that Defendants' line of reasoning fails to take into account the interplay of, on the one hand, subsections (a) and (c) of Rule 10b-5, and on

---

[20] *JHW v. Greentree Capital, L.P. v. Whitter Trust Co.*, 2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005) (Def. Mem. at 23) is nothing like this case.  There the plaintiffs did not allege that the defendant outside director had any personal role in the alleged scheme, indeed her only role was as an outside director, unlike here where Defendant Och chose his personal protégé Cohen to choose the investments at issue.

[21] As discussed, *infra*, such statements are false and misleading in light of the Africa investments and are actionable under the securities laws.  *See, e.g.*, *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5-6 (S.D.N.Y. June 23, 2014) *cert. of appeal. denied,* 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014) ("Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct … Goldman is alleged to have sold financial products to clients despite clear and egregious conflicts of interest."); *Freudenberg v. E\*Trade Financial Corp.,* 712 F.Supp.2d 171, 190 (S.D.N.Y.2010) (finding "statements touting risk management [that] were ... juxtaposed against detailed factual descriptions of the company's woefully inadequate or non-existent credit risk procedures" were actionable misstatements) (quoting *Novak,* 216 F.3d at 315).

the other, subsection (b).[22]  In *Flannery*, S.E.C. Release No. 3981,  2014 WL 7145625 (Dec. 15, 2014), the SEC rejected the narrow approach submitted by Defendants here – to wit, that where a defendant did not make a misstatement primary liability under Rule 10b-5(a) and (c) can only be established through "additional" deceptive conduct "apart from" the misstatements.  The SEC held that such a narrow reading of Rule 10b-5 could neither be reconciled with the actual text of the Rule nor the explicit directive that the subsections of the rule be read as "'mutually supportive rather than mutually exclusive.'"  The SEC stated, "manipulative device[s] or act[s]" include all "conduct that gives rise to a false appearance of fact." *Flannery*, 2014 WL 7145625, at *12 n.52. Thus, "[P]rimary liability under Rule 10b-5(a) and (c) extends to one who (with scienter, and in connection with the purchase or sale of securities) employs *any* manipulative or deceptive device or engages in *any* manipulative or deceptive act." *Id.* at *12. Furthermore, "[T]hose who engage in such conduct are independently liable for their own deceptive acts, even if a material misstatement by another person creates the nexus between the scheme and the securities market." *Id.* (internal quotations omitted).

In *Flannery*, the SEC thus rejected the approach adopted by *Kelly* and similar holdings, which Defendants assert apply here, as too narrow, stating that "primary liability under Rule 10b-5(a) and (c) extends even further than many of those courts have suggested:  "In particular, we conclude that primary liability under Rule 10b-5(a) and (c) *also* encompasses the 'making' of a fraudulent misstatement to investors, as well as the drafting or devising of such a misstatement.

---

[22] The SEC's interpretation of its own regulations is entitled to deference unless it is "plainly erroneous or inconsistent with the regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337, 185 L. Ed. 2d 447 (2013). Similarly, its interpretation of a statute it administers is entitled to deference unless it is an impermissible reading. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 845, 104 S. Ct. 2778, 2783, 81 L. Ed. 2d 694 (1984).

Such conduct, in our view, plainly constitutes employment of a deceptive 'device' or 'act.'" *Flannery*, at \*12 (Dec. 15, 2014) (emphasis in original).

Here, Defendants' scheme is clear.  Defendants portrayed Och-Ziff as a more conservative, compliant company with a valued and valuable reputation for integrity – indeed, the Company's greatest asset.  Meanwhile, Defendant Cohen, handpicked by his mentor, Defendant Och, led the Company in a series of investments that, as one article stated, violated the law "all over Africa."[23] Defendants' blatant disregard for the FCPA is underscored by the fact that the underlying FCPA violations were not isolated to one particular course of conduct but three wholly distinct series of nefarious investment activities:  the Zimbabwe transactions, the Libyan transactions and the Congo transactions.  All the while, the DOJ and the SEC were investigating these activities, yet Defendants remained silent not only about their risky and illegal business transactions in Africa (despite their commitment to "transparency") but about the fact that the government was on to them.  Taken together, this course of conduct constitutes a scheme under the legal framework and SEC guidance set forth above.

Defendants' argument that the Africa deals under investigation occurred before the Class Period is irrelevant, because they are not, as were the transactions cited in *Stoneridge*, "attenuated."  Def. Br. at 24.  Rather, as one <u>Wall Street Journal</u> article noted: "Newer investors do not have exposure to the deals under investigation…but many investors consider knowledge or regulatory probes important for fully vetting a money manager."[24]  Investors relied on the fact that Och-Ziff was a safe investment and was not mired in nefarious investment activities in violation of the FCPA.  Defendants also misunderstand the reliance requirement.  Def. Br. at 24.

---

[23] *See* "Och-Ziff May Have Been Breaking the Law All over Africa," Dealbreaker.com, Jon Shazar, Apr. 28, 2014, available at: http://dealbreaker.com/2014/04/och-ziff-may-have-been-breaking-the-law-all-over-africa/
[24] *See Och-Ziff Vexes Some of its Clients*, Wall Street Journal, Aug. 5, 2014, Juliet Chung, *available at*: http://www.wsj.com/articles/och-ziff-vexes-some-of-its-clients-1407283633

Under *Stoneridge*, primary scheme liability can attach where a defendant's conduct makes it "necessary or inevitable" that misrepresentations are made to investors on the basis of that conduct. *Stoneridge*, 552 U.S. at 161. *See also*, *In re Bristol Myers*, 586 F. Supp. 2d at 170 (distinguishing *Stoneridge* and permitting a § 10(b) conduct claim where an executive committed deceptive acts in connection with a major litigation settlement and failed to correct his company's material misstatements about the nature of the settlement).[25]

Any argument that the Individual Defendants were not aware that the transactions violated the FCPA, or at the very least, that the adverse publicity and regulatory probes resulting therefrom would harm the Company and its investors, defies common sense. *See, e.g.*, *S.E.C. v. China Ne. Petroleum Holdings Ltd.,* No. 12 CIV. 8696 NRB, 2014 WL 2767121 (S.D.N.Y. Mar. 27, 2014) (rejecting argument that individuals performed no role in scheme where CEO exerted actual control over company and the CFO "did more than perform ministerial actions while in the dark about the goals of the scheme; it has pled that he was an active, aware, and essential participant subject to scheme liability.").

### A.     The Complaint Adequately Pleads Scheme Liability As To Defendant Cohen

For the reasons stated above, Defendant Cohen's arguments in support of dismissal likewise fail. Defendants' misstatements and omissions, as discussed above, are inextricably linked to the deceptive scheme of covering up the illegal investing activity that Cohen orchestrated and oversaw. All of the illicit investments alleged in the Complaint which triggered the Investigations were made under the primary direction of Cohen. These transactions would

---

[25] Defendants incorrectly assert, in a footnote that the presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 127 (1972), does not apply because Defendants supposedly had no duty to disclose. However, as discussed *infra*, Defendants did have a duty to disclose, and the Complaint properly alleges that the *Affiliated Ute* presumption of reliance applies. ¶129.

not have taken place were it not for Cohen.  These illegal transactions took place as part of a scheme to enrich Och-Ziff, Cohen, and the Company's senior executives.

Cohen does not dispute that he was in charge of Och-Ziff's investments, and specifically, the transactions in Zimbabwe, the DRC, and Libya, underlying the FCPA violations described in the Complaint.  ¶8.  Instead, Cohen argues that Plaintiffs have not alleged facts supporting an inference that he was "aware of any facts suggesting these investments were improper or fraudulent."  Cohen Br. at 2.  As set forth in detail herein and in the Complaint, Cohen was a senior executive, the personal  protégé of Defendant Och, and specifically chosen by Och to run the Company's African investments.  ¶8.  Cohen also knew Mr. Ajami, the "fixer" in the Libyan transactions.  Cohen worked at Och-Ziff for 15 years, but then abruptly departed approximately one year before Och-Ziff disclosed the Investigations.  ¶28.  During Cohen's last six years at Och-Ziff, five of which were spent running the African investments that form the basis for the FCPA violations, Cohen made over £400 million, making him one of the highest paid hedge fund executives in Europe.[26]  ¶30.  Cohen participated in and directed the very activities that violated the FCPA and Executive Orders prohibiting transactions by U.S. entities with Mugabe and his regime in Zimbabwe and maintained close connections with the key players involved in the transactions. ¶¶35-58.  Additionally, Cohen was personally involved in persuading the LIA to invest hundreds of millions of dollars of its oil money in Och-Ziff's funds.  ¶75.  These facts provide an ample basis for establishing Cohen's liability under Sections 10b5 (a) and (c).

---

[26] The fact that Cohen did not himself make any of the false statements is of course irrelevant where Plaintiffs are alleging a violation of subsections (a) and (c) of Rule 10b-5.  As discussed herein, Cohen's underlying acts form the basis for Plaintiffs' claims.  *See  In re Bristol Myers*, 586 F. Supp. 2d at 170 ("Bodnar's behavior is at the heart of Bristol–Myers's false and misleading conduct…Bodnar made no public statements himself, but investors relied on his good faith in negotiating the Apotex settlement agreement and committing the Company to its terms.").

## V.       PLAINTIFFS HAVE STATED A SECTION 20(A) CLAIM

Because the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5 and that the Individual Defendants controlled Och-Ziff, Plaintiffs have adequately alleged a prima facie case under § 20(a).  *See* 15 U.S.C. § 78t(a); s*ee also Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004); *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 360-61 (S.D.N.Y. 2000), *aff'd*, 26 Fed. Appx. 83 (2d Cir. 2002).

## VI.      IN LIEU OF DISMISSAL, LEAVE TO AMEND SHOULD BE GRANTED

In the event that the Court were to find that any count of the Complaint fails to state a claim, Plaintiffs should be granted leave to file an amended complaint pursuant to Fed. R. Civ. P. 15(a).  Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  The Second Circuit has noted that courts should be especially liberal in granting leave to amend in cases of dismissed securities fraud claims. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *Luce*, 802 F.2d at 56 (noting with regard to dismissal of plaintiffs' 10b-5 claims that "[c]omplaints dismissed under Rule 9(b) [for failure to plead with particularity] are 'almost always' dismissed with leave to amend").

## <u>CONCLUSION</u>

For all the foregoing reasons, the Motions to Dismiss should be denied.  If the Court finds any portion of the Complaint inadequate, leave to replead is respectfully requested.

Dated: May 29, 2015

Respectfully Submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Marc I. Gross
Michele S. Carino
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827

***Attorneys for Lead Plaintiffs***