UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ARTHUR MENALDI, individually and on            :
behalf of all others similarly situated,       :
                                               :
                            Plaintiff,         :
                                               :                    14-CV-3251 (JPO)
                                               :
                   -v-                         :                    OPINION AND ORDER
                                               :
OCH-ZIFF CAPITAL MANAGEMENT                    :
GROUP LLC, DANIEL S. OCH, JOEL M.              :
FRANK, and MICHAEL COHEN,                      :
                                               :
                            Defendants.        :
-------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

Lead Plaintiffs Ralph Langstadt and Julie Lemond ("Plaintiffs") bring this action on

behalf of a putative class of investors who purchased securities in Och-Ziff Capital Management

Group LLC ("Och-Ziff") between February 9, 2012, and August 22, 2014.  (Dkt. No. 17.)

Plaintiffs allege that Defendants violated the Securities Exchange Act of 1934 (the "Exchange

Act") by misleading investors about an investigation by the Securities and Exchange

Commission ("SEC") and the Department of Justice ("DOJ") into Och-Ziff's investments in

Africa.  Defendants Och-Ziff, Daniel Och, and Joel Frank have filed a joint motion to dismiss

(Dkt. No. 23) and Defendant Michael Cohen has filed a separate motion to dismiss.  (Dkt. No.

26.)  For the reasons that follow, the motion filed by Cohen is granted and the motion filed by

Och-Ziff, Och, and Frank is granted in part and denied in part.

**I.      Background**

The following facts are taken from the Consolidated Amended Class Action Complaint

(the "Complaint") and are assumed true for the purpose of this motion.  (*See* Dkt. No. 17

("Compl.").)

Och-Ziff is a publicly traded asset management firm.  (Compl. ¶ 22.)  It was founded in 1994 by Daniel Och, who currently serves as the company's Chief Executive Officer ("CEO"). (*Id.* ¶ 16.)  Joel Frank is Och-Ziff's Chief Financial Officer ("CFO").  (*Id.* ¶ 17.)  Michael Cohen is a former Och-Ziff employee.  (*Id.* ¶ 115.)  Prior to his resignation in 2013, Cohen managed Och-Ziff's African investments.  (*Id.*)

This dispute concerns investments Och-Ziff allegedly made in Zimbabwe, Libya, and the Democratic Republic of the Congo (the "Congo").  Plaintiffs contend that Defendants violated the Exchange Act both by misrepresenting an SEC and DOJ investigation into Och-Ziff and by failing to disclose that Och-Ziff's investments contravened the Foreign Corrupt Practices Act ("FCPA") and United States sanctions.

**A.      Och-Ziff's Investments in Africa**

Plaintiffs' allegations involve three deals: (1) a loan to secure platinum mining rights in Zimbabwe; (2) loans to acquire control of oil and mines in the Congo; and (3) transactions with Libya's sovereign wealth fund.  These deals (collectively, the "African Transactions") took place between 2008 and 2011.

**1.      Platinum Mining Rights in Zimbabwe**

According to Plaintiffs, Zimbabwean President Robert Mugabe financed his 2008 re-election by seizing and selling the rights to develop the country's richest platinum claims.  (*Id.* ¶¶ 44-45, 53.)  Plaintiffs contend that an Och-Ziff subsidiary provided a loan to the company that acquired the platinum rights and thus gave material support to the Mugabe regime.  (*Id.* ¶¶ 44, 51.)

The alleged loan deal involves three companies: the Central African Mining and Exploration Company ("CAMEC"); Todal Mining Ltd. ("Todal"); and Lefever Finance Ltd. ("Lefever").  CAMEC is a corporation that invests in African mining operations.  (*Id.* ¶ 45.)

Todal is a Zimbabwean company that held platinum mining rights prior to the alleged deal.  (*Id.* ¶ 46.)  Lefever is a corporation that owned sixty percent of Todal.  (*Id.*)  The other forty percent of Todal was held by the Zimbabwean Mining Development Corporation ("ZMDC"), an entity owned by the Zimbabwean government.  (*Id.*)

CAMEC acquired Lefever in April 2008, several months before the presidential runoff election in Zimbabwe.  (*Id.* ¶¶ 48, 52, 56 n.3.)  CAMEC paid for Lefever—and by extension a stake in Todal's platinum rights—with a combination of cash, stock, and a $100 million no-interest loan.  (*Id.* ¶ 48.)  Plaintiffs allege that an Och-Ziff subsidiary financed the loan.  (*Id.* ¶¶ 47-49.)  Specifically, they assert that an Och-Ziff subsidiary purchased 150 million shares in CAMEC for $100 million in March 2008, several weeks before CAMEC acquired Lefever.  (*Id.* ¶¶ 48-49.)  Plaintiffs appear to allege that Lefever gave the $100 million it received from CAMEC to the government of Zimbabwe, which "is synonymous with the Mugabe . . . regime."  (*Id.* ¶¶ 46, 51.)

### 2.  Oil and Mining Deals in the Congo

Plaintiffs' second set of allegations involves loans to "Israeli mining magnate" Daniel Gertler.  (*Id.* ¶¶ 6, 60-61.)  In "the spring of 2008," Och-Ziff and another company gave Gertler a $115 million loan, followed by an additional $9 million loan.  (*Id.* ¶ 61.)  Gertler allegedly used those loans to finance a deal for "a valuable copper and cobalt mine in southern Congo called Kalukundi."  (*Id.*)  Plaintiffs also allege that Och-Ziff made a $110 million loan to Gertler in November 2010.  (*Id.* ¶ 65.)  Gertler allegedly used the third loan "to start developing an oil concession . . . on Lake Albert between Congo and Uganda."  (*Id.*)

### 3.  Development Deals in Libya

The third set of allegations concerns transactions with the Libyan Investment Authority ("LIA"), a sovereign wealth fund controlled by the son of Colonel Moammar Gaddafi.  (*Id.* ¶

69.)  According to Plaintiffs, Och-Ziff "persuaded the LIA to invest hundreds of millions of dollars" in Och-Ziff funds.  (*Id.* ¶ 75.)  Plaintiffs also allege that, between 2008 and 2009, Och-Ziff secured a contract to build "an expensive luxury hotel in Tripoli" by using a "fixer" named Mohamad Ajami, who helped to broker the deal.  (*Id.* ¶ 72.)  Plaintiffs also allege that Magna Holdings, a corporation in which Och-Ziff owns shares, won contracts from the Libyan government "to build office blocks in Tripoli" at some unspecified date.  (*Id.* ¶ 74.)

### B.  SEC and DOJ Investigation

The SEC and DOJ began to investigate Och-Ziff's investments in Africa (the "SEC-DOJ Investigation" or "Investigation") in or before 2011.  (*Id.* ¶ 112.)  Beginning in 2011, Och-Ziff started to receive "subpoenas from the SEC" and "requests for information" from DOJ in connection with the Investigation.  (*Id.*)  According to Plaintiffs, the Investigation "prob[es] Och-Ziff's transactions with the Government of Zimbabwe, Och-Ziff's involvement in Congolese oil and mine deals, and Och-Ziff's transactions with the [LIA]."  (*Id.* ¶ 4.)  To date, the details of the Investigation are not public and neither agency has filed suit against Och-Ziff.  (Dkt. No. 24 ("First Def.'s Mem.") at 2.)

### C.  Och-Ziff's Statements to Investors

This action concerns four statements that Och-Ziff made in SEC filings.  The first statement appeared in Och-Ziff's annual Form 10-K filing on February 27, 2012:

> We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition. We may from time to time be involved in litigation and claims incidental to the conduct of our business. Like other businesses in our industry, we are subject to scrutiny by the regulatory agencies that have or may in the future have regulatory authority over us and our business activities, which results in regulatory agency investigations and litigation related to regulatory compliance matters.

(*Id.* ¶ 78.)  The February 2012 filing also included assertions about Och-Ziff's transparency and risk management practices.  Specifically, under the heading "competitive strengths," Och-Ziff listed "transparency" and reported that it "provide[s] [its] fund investors with comprehensive reporting about each portfolio on a regular basis."[1]  (*Id.* ¶¶ 80.)  The filing also stated: "Risk management is also central to how we manage the operations of our business. We actively manage the operational risks of our business, including liquidity, counterparty exposures, legal and reputational risks."  (Compl. ¶ 82.)

The second statement appeared in Och-Ziff's quarterly report on May 2, 2012.  That report contained a slightly different statement on pending investigations:

> The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements. From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by the regulatory agencies globally that have or may in the future have regulatory authority over the Company and its business activities. This has resulted or may in the future result in regulatory agency investigations, litigation and subpoenas.

(*Id.* ¶ 85.)  Och-Ziff repeated this statement in its February 2013 quarterly filing.[2]

The third statement appeared in Och-Ziff's quarterly report on August 2, 2012.  It read:

---

[1] All SEC filings discussed in this Opinion are incorporated into the complaint by reference and are, independently, public documents of which the Court may take judicial notice.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 382 (S.D.N.Y. 2007).

[2] The statement on pending investigations in Och-Ziff's May 2012 and February 2013 filings are nearly identical.  (*See id.* ¶¶ 93-94.)  The February 2013 statement differs in two respects: (1) it is written in the first person; and (2) it contains the phrases "like other businesses in our industry" and "subpoenas *and related costs.*"  (*Id.* ¶ 94 (emphasis added).)  The February 2013 filing also states that Och-Ziff provides "fund investors with comprehensive reporting about each portfolio on a regular basis."  (*Id.* ¶ 96.)

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have or may in the future have regulatory authority over the Company and its business activities. This has resulted or may in the future result in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

(*Id.* ¶ 88.)  Och-Ziff repeated this statement in four SEC filings between November 2012 and November 2013.[3]

Och-Ziff made the fourth statement after an article on its investments appeared in *Wall Street Journal*.  On February 2, 2014, the *Wall Street Journal* reported that DOJ was investigating Och-Ziff "regarding possible violations of the FCPA in connection with its dealings with the LIA."  (*Id.* ¶ 109.)  On March 14, 2014, Och-Ziff "filed a [F]orm 8-K with the SEC announcing that some of its previously issued financial statements should be restated and should not be relied upon."  (*Id.* ¶ 111.)  Four days later, Och-Ziff filed a restated Form 10-K amending its 2013 annual report.  It stated:

> Beginning in 2011, and from time to time thereafter, we have received subpoenas from the SEC and requests for information from the U.S. Department of Justice ("DOJ") in connection with an investigation involving the FCPA and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa. At this time, we are unable to determine how the investigation will be resolved and what impact, if any, it will have. An adverse outcome could have a material effect on our business, financial condition or results of operations.

(*Id.* ¶ 112.)

---

[3] Och-Ziff repeated the statement from its August 2012 filing in quarterly filings on November 5, 2012, May 2, 2013, August 2, 2013, and November 5, 2013.  (*Id.* ¶¶ 90-91, 100-101, 103-104, 106-107.)

## II.        Procedural History

This action was filed on May 5, 2014.  (Dkt. No. 2.)  The Court issued an Order

appointing Lead Plaintiffs on September 24, 2014, and Plaintiffs filed an Amended Complaint on

November 24, 2014.  (Dkt. Nos. 16-17.)  In two separate motions, Defendants moved to dismiss

on March 16, 2015.  (Dkt. Nos. 23, 27.)

## III.       Legal Standards

Plaintiffs bring suit under the Exchange Act and SEC Rules promulgated thereunder.  15

U.S.C. § 78j(b); 15 U.S.C. § 78t(a); 17 C.F.R. § 240.10b-5.  They assert three claims: (1) a

securities fraud claim pursuant to Exchange Act § 10(b) and Rule 10b-5(b) against all

Defendants except Michael Cohen; (2) a scheme liability claim pursuant to Exchange Act

§ 10(b) and Rule 10b-5(a) and (c) against all Defendants; and (3) a control person claim pursuant

to Exchange Act § 20(a) against all Defendants except Och-Ziff.

Each of these claims is subject to a slightly different pleading standard.  In general, to

survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint

must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."

*Wilson v. Merrill Lynch & Co*, *Inc.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id*.  In assessing a motion to dismiss, courts assume that all "factual

allegations contained in the complaint" are true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572

(2007), and draw "all inferences in the light most favorable to the non-moving party[]," *In re

NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).

While Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement

showing that the pleader is entitled to relief," claims for securities fraud are subject to the

7

heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure Rule 9(b). Fed. R. Civ. P. 8(a), 9(b); 15 U.S.C. § 78u-4. Most securities fraud claims are brought under §10(b) and Rule 10b-5(b) for misleading statements or omissions. *See In re Glob. Crossings*, *Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 328 (S.D.N.Y. 2004). To state a claim under these provisions, a plaintiff must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citation omitted).

Under the PSLRA, securities fraud complainants must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (citing 15 U.S.C. § 78u-4(b)(1)-(2)). A complaint alleging securities fraud must also "specify each statement or omission alleged to have been misleading . . . [and] the reason or reasons why the statement or omission is misleading . . . ." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (Nathan, J.) (citing 15 U.S.C. § 78u-4(b)(1)) (alterations omitted). Rule 9(b) "imposes a comparable requirement" on securities fraud plaintiffs. *Id.* (citing Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

In this case, Plaintiffs allege liability not only under subsection (b) of Rule 10b-5, which prohibits material misrepresentations and omissions, but also under subsections (a) and (c), which prohibit schemes to defraud investors. *See* 17 C.F.R. § 240.10b-5. To state a claim for scheme liability, a plaintiff must present facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with

scienter, and (4) reliance." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005). Because scheme liability "does not require an allegation that the defendant made a statement," claims brought under Rule 10b-5(a) and (c) "need not comport with Subsection (b)(1) of the PSLRA, which requires that a plaintiff set forth each statement alleged to have been misleading, and facts giving rise to this belief." *Id.* at 474-75. Scheme liability claims are, however, subject to the PSLRA pleading standard with respect to scienter. *Id.* at 475. Thus, to state a scheme liability claim, a plaintiff must plead facts demonstrating "a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 321. Pursuant to Federal Rule of Civil Procedure 9(b), plaintiffs must also state with particularity "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005).

The final claim in this action arises under § 20(a) of the Exchange Act. Section 20(a) imposes liability on "every person who, directly or indirectly, controls any person liable" for securities fraud.[4] 15 U.S.C. § 78t(a). As a general rule, there can be no control person liability without a "primary violation" of the Exchange Act. *Wilson*, 671 F.3d at 139 (citation omitted). Plaintiffs' third claim thus derives from their first two.

## IV.   Discussion

Plaintiffs argue that Och-Ziff's SEC filings misled investors about the risks of the company's investment practices, and as a result, artificially inflated the value of Och-Ziff stock. Based on this allegation, Plaintiffs assert three separate claims, each against different sets of Defendants. The Court considers them in turn.

---

[4] While a defendant "ultimately may not be held liable as both a primary violator and a controlling person," a plaintiff may plead alternative theories of liability in the complaint. *In re Parmalat*, 375 F. Supp. 2d at 310; *see also In re BioScrip*, 95 F. Supp. 3d at 741 n.8.

### A.      Securities Fraud under Rule 10b-5(b)

The first—and core—claim in this suit is that all Defendants except Cohen (the "Management Defendants") violated § 10(b) and Rule 10b-5(b) by making material misstatements or omissions.  Plaintiffs contend that the Management Defendants are liable both for failing to disclose that the African Transactions were illegal and for failing to disclose that the SEC and DOJ were investigating those transactions.

The Management Defendants move to dismiss on several grounds.  With respect to nondisclosure of alleged legal violations, they argue that Plaintiffs have failed to plead facts showing that Och-Ziff engaged in any illegal conduct and that the company had no duty to accuse itself of wrongdoing.  (First Def.'s Mem. at 1, 12, 15, 17.)  With respect to nondisclosure of the SEC-DOJ Investigation, they argue that Och-Ziff had no duty to disclose an ongoing regulatory inquiry.  (*Id.* at 15.)  The Management Defendants also contend that Plaintiffs have failed to plead scienter on both versions of its securities fraud claim.  (*Id.* at 17.)

### 1.      Duty to Disclose Uncharged Illegal Conduct

The Court begins with allegation that the Management Defendants failed to disclose illegal conduct.  Plaintiffs contend that the African Transactions violated the anti-bribery provisions of the FCPA and United States sanctions, specifically, Executive Orders 13288, 13391, and 13469, which prohibit transactions with named "Specially Designated Nationals" ("SDNs").  *See* 15 U.S.C. §§ 78dd-1 et seq.; Exec. Order No. 13288, 68 Fed. Reg. 11457 (Mar. 6, 2003); Exec. Order 13391, 70 Fed. Reg. 71201 (Nov. 22, 2005); Exec. Order 13469, 73 Fed. Reg. 43841 (July 25, 2008); *see also Chevron Corp. v. Donzinger*, 974 F. Supp. 2d 362, 596 (S.D.N.Y. 2014) (stating the elements of the FCPA's anti-bribery provisions).  Plaintiffs' argument is, in essence, that Och-Ziff should have announced that it was violating the law.

When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred.[5]  *See In re Axis Capital Holdings, Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original); *In re Yukos Oil Co. Secs. Litig.*, No. 04-CV-5243, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006) ("[T]he Complaint fails to plead with particularity sufficient facts demonstrating that [Defendant's] tax strategy violated Article 40 of the Russian Federation Tax Code"); *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) ("Plaintiffs contend that [Defendant] made material omissions in failing to disclose its violations of 18 U.S.C. Sections 215 and 1005.  Plaintiffs have failed to allege with particularity that [Defendant] or its agents violated these statutes.").

Plaintiffs have not stated a plausible claim that Och-Ziff violated any law.  As to the alleged violation of U.S. sanctions, Plaintiffs have not explained how investing in CAMEC violated the Executive Orders they invoke.  The only individual subject to sanctions under an Executive Order at the time that Och-Ziff invested in CAMEC was Robert Mugabe.[6]  But the

---

[5] The parties dispute whether, in securities fraud actions premised on a failure to disclose underlying criminal conduct, the underlying conduct is subject to heightened pleading standards or plausibility pleading analysis.  The Court need not decide this issue because, in this case, Plaintiffs have failed to meet either standard.

[6] Robert Mugabe was designated an SDN in Executive Order 13288, which was issued in March 2003.  Exec. Order No. 13288, 68 Fed. Reg. 11457 (Mar. 6, 2003).  Plaintiffs contend that two other entities were subject to sanctions and involved in the alleged deal for Zimbabwean platinum rights: (1) ZMDC, a company that owned platinum rights in Todal; and (2) Billy Rautenbach, an individual "who has been associated with" Meryweather Investments Ltd., the company that sold Lefever to CAMEC.  (Compl. ¶¶ 50, 58.)  The Complaint does not explain what role Rautenbach played in the alleged deal, nor does it identify any business transactions with ZMDC.  In addition, even if it did contain such factual allegations, ZMDC was not added to the "SDN list" until July 25, 2008, and Rautenbach was not placed on the sanctions list until November 2008.  (*Id.*)  Both of those dates are after the allegedly unlawful deal.

Complaint does not allege any direct transactions with Mugabe; it simply states that Mugabe "received the [$100 million] 'loan' through a series of related transactions originating with Och-Ziff." (Compl. ¶ 44.)  Plaintiffs appear to assert that Mugabe sold platinum rights to Lefever, and that CAMEC's loan to Lefever—paid with money from Och-Ziff—went to the Mugabe regime.  This series of transactions may (or may not) violate an Executive Order.  To plead facts establishing that it does, Plaintiffs must present a plausible theory of how the Order applies to the facts of this case.

Plaintiffs' allegations of FCPA liability are also conclusory.  Plaintiffs contend that all three African Transactions violate the FCPA's anti-bribery provisions.  However, beyond stating that the FCPA is "deliberately broad in scope" and imposes liability in cases of "willful blindness," Plaintiffs do not explain how the FCPA prohibits Och-Ziff's conduct.  (Dkt. No. 32 ("Pl.'s Opp.") at 19.)  Plaintiffs do not, for instance, identify how investments by the LIA in Och-Ziff funds would violate the FCPA, nor do they allege bribes or other promises to any Libyan government officials.  The Complaint suggests that Och-Ziff's use of a "fixer" to broker the Libyan deals resulted in unlawful payments to Libya's Intelligence Chief.  But Plaintiffs do not allege such a payment; they simply state that the fixer in question "maintains a close relationship with the Libyan Intelligence Chief."  (Compl. ¶ 23.)  Similarly, the Complaint cites Daniel Gertler's "close relationship with Joseph Kabila," President of the Congo, but nowhere alleges that Gertler offered Kabila anything of value in exchange for access to Congolese oil and mines.  (Compl. ¶ 67.)  *See Chevron Corp*, 974 F. Supp. 2d at 597 (construing the term "anything of value" in the FCPA).  The same deficiencies exist with respect to Plaintiffs' allegations about how, when, and whether Och-Ziff's investments in CAMEC got from Och-Ziff to any Zimbabwean official.

In response to the assertion that their factual allegations are insufficient, Plaintiffs cite only one case, *S.E.C. v. Jackson*, 908 F. Supp. 2d 834 (S.D. Tex. 2012).  In that case, an SEC enforcement action, the factual assertions were much more comprehensive, and the SEC offered a detailed theory as to how defendants' conduct violated the FCPA.  The SEC alleged, for example, that defendants had "authorized a customs agent to pay bribes to Nigerian government officials in order to obtain false documentation [they] needed" to obtain permits to drill in Nigerian waters without paying import duties. *Jackson*, 908 F. Supp. 2d at 839.   The agency also alleged that defendants had approved specific payments to the Nigerian government in order to obtain false paperwork. *Id.* at 839-40.  As the *Jackson* court noted, "the SEC . . . pled pages upon pages of factual support for its allegations." *Id.* at 852.  No such support is present here.  Without additional factual allegations, and a theory connecting those allegations to the elements of an FCPA claim, Plaintiffs' repeated assertions that Och-Ziff violated the FCPA remain speculative.

Plaintiffs have also failed to plead facts establishing that Och-Ziff had a duty to disclose any uncharged illegal conduct.  As a general rule, omissions are actionable under § 10(b) only when a corporation has a duty to disclose. *In re BioScrip*, 95 F. Supp. 3d at 727 (citing *Stratte-McClure v. Morgan Stanley*, 776 F. Supp. 3d 94, 101 (2d Cir. 2015)).  Such a duty arises when (1) a statute or regulation requires disclosure or (2) disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts. *Id.* (citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 533, 572 (S.D.N.Y. 2014)); *see also Menkes v. Stolt-Nielsen, S.A.*, No. 3:03-CV-409, 2005 WL 3050970, at *6-7 (D. Conn. Nov. 10, 2005).  A fact is material when there is a substantial likelihood that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic. Inc. v.*

13

*Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted); *see also In re Morgan Stanley Info.
Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Plaintiffs contend that the Management Defendants incurred a duty to disclose the
"illegal conduct—even though uncharged—because such disclosure was necessary to prevent
statements the corporation did make from misleading the public."  (Dkt. No. 32 ("Pl.'s Opp.") at
21.)  They cite two different types of statements made by Och-Ziff: (1) assertions about integrity
and transparency in the company's February 27, 2012 SEC filing; and (2) statements about
regulatory investigations that appeared, in various forms, in Och-Ziff's SEC filings between
February 27, 2012 and February 2, 2014.  Plaintiffs argue that both types of statements were
materially misleading because, at the time they were made, Och-Ziff was engaged "in a web of
questionable deals in violation of the [FCPA] and U.S. sanctions."  (Compl. ¶ 3.)

The first category of statements is inactionable as a matter of law.  In its February 2012
SEC filing, Och-Ziff stated that its "transparency" was a "competitive strength" and that it
actively managed "reputational risks."  (*Id*. ¶ 82.)  The filing made no more specific
representations or guarantees.  Under Second Circuit precedent, such statements constitute
inactionable "puffery." *City of Pontiac Policeman's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d
173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation,
integrity, and compliance with ethical norms are inactionable 'puffery'. . . ."); *Boca Raton
Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) ("The
'puffery' designation . . . stems from the generic, indefinite nature of the statements at issue, not
their scope. Otherwise, we would bring within the sweep of federal securities laws many routine
representations made by investment institutions.") (citation omitted)); *ECA, Local 143 IBEW
Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("The
statements highlighted by Plaintiffs are no more than 'puffery' . . . . [They] did not, and could

14

not amount to a guarantee that its choices would prevent failures in its risk management practices.") (citations omitted)).

Statements regarding compliance with regulatory investigations, in contrast, can give rise to liability. *See, e.g.*, *In re BioScrip*, 95 F. Supp. 3d at 732. But on the facts alleged, Och-Ziff had no duty to announce to investors that it was violating the law. Corporations do not, as a general matter, have a duty "to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac*, 752 F.3d at 184 (quoting *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd* 956 F.2d 1161 (2d Cir. 1992)); *see also Menkes*, 2005 WL 3050970, at *6 (D. Conn. Nov. 10, 2005) ("Rule 10b-5 generally does not require management to accuse itself of antisocial or illegal policies . . . .") (citations and internal quotation marks omitted)).

The Second Circuit has also explicitly rejected Plaintiffs' argument in the context of claims brought under § 11 of the Securities Act of 1933 (the "Securities Act").[7]  In *City of Pontiac*, plaintiffs alleged that the defendant, UBS, violated § 11 by failing to disclose uncharged criminal conduct that was being investigated by DOJ. 752 F.3d at 184. The *Pontiac* plaintiffs argued that, "in addition to disclosing the existence of an investigation, defendants were required to disclose that [they were], in fact, engaged in an ongoing tax evasion scheme." *Id.* The court declined to impose such an expansive duty to disclose. Instead, the Second Circuit held that "UBS [had] complied with its disclosure obligations" by making public statements about the substantial risks the investigation posed. *Id.*

---

[7] Section 11 imposes civil liability on issuers and signatories "of a registration statement that 'contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading.'" *Rombach*, 355 F.3d at 168 n.2 (citing 15 U.S.C. § 77k). Unlike claims brought under § 10(b) of the Exchange Act, Section 11 claims can be premised on allegations of negligence, *id.* at 170, and § 11 plaintiffs need not allege scienter, reliance, or loss causation, *id.* at 169 n.4; *see also In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F. 3d 347, 359-60 (2d Cir. 2010). Section 11 claims thus "give rise to liability more readily" than § 10(b) claims. *In re Morgan*, 592 F.3d at 360.

District court cases on § 10(b) liability are consistent with *Pontiac*.  A number of courts in this District have addressed when § 10(b) requires disclosure of uncharged criminal conduct. *See, e.g.*, *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-401 (S.D.N.Y. 2005); *In re Sotheby's Holdings, Inc.*, No. 00-CV-1041, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000).  Under this line of cases, a corporation may be compelled to disclose uncharged wrongdoing if its statements are or become materially misleading in the absence of disclosure.  *Menkes*, 2005 WL 3050970, at *6.  For such a duty to arise, however, there must be a connection between the illegal conduct and the misleading statements "beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." *In re FBR*, 544 F. Supp. 2d at 357 (citation omitted).

District courts have identified such a connection in three circumstances.  First, a duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but "fails to disclose that a material source of its success is the use of improper or illegal business practices."  *Id.* at 358; *see In re Van der Moolen*, 405 F. Supp. 2d at 401 (holding that a corporation subjected itself to liability when it discussed the sources of its revenue but allegedly failed to disclose that the "true source[]" of such revenue was illegal trading).  Second, a duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring.  *See In re FBR*, 544 F. Supp. 2d at 358 (collecting cases); *In re Sotheby's Holdings*, 2000 WL 1234601, at *4 (declining to dismiss a securities fraud claim where a corporation stated that competition with its "primary auction competitor" was "intense" when in fact the two corporations had entered into a price-fixing agreement).

16

Third, a duty to disclose can arise when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015) (holding that a statement of opinion is actionable when it omits material facts concerning the speaker's basis for the opinion, which, if disclosed, would "conflict with what a reasonable investor would take from the statement");[8] *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("[P]rojections of future performance may be actionable under Section 10(b) and Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them.") (citation omitted); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding that defendants exposed themselves to liability where they "stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew the contrary was true").

Here, the connection between Och-Ziff's public statements and the alleged criminal conduct is too tenuous to give rise to a duty to disclose criminal wrongdoing.  In SEC filings

---

[8] The Supreme Court's recent holding in *Omnicare* appears to extend securities fraud liability to statements of opinion that are subjectively believed when made, but nonetheless materially misleading.  As other courts in this District have noted, this holding conflicts with Second Circuit precedent under which defendants can be liable for securities fraud only to the extent that their statements of opinion are "both objectively false and disbelieved by the defendant at the time [they are] expressed."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (stating the standard for actionable statements of opinion); *In re BioScrip*, 95 F. Supp. 3d at 728-29 (noting that *Omnicare* may call *Fait* into question).  While *Omnicare* concerns § 11 of the Securities Act, courts have presumed that its holding also applies to claims brought under § 10(b) of the Exchange Act, *e.g. In re BioScrip*, 95 F. Supp. 3d at 725-29, and in *Fait*, the prevailing precedent before *Omnicare*, the Second Circuit articulated a standard that appeared to apply to both types of securities claims, *Fait*, 655 F.3d at 112 (discussing actionable statements of opinion under both the "the 1933 [and] 1934 Acts").  However, insofar as *Omnicare* supplants *Fait*, the distinction between the two standards may be less salient in § 10(b) cases, because in those cases—as opposed to § 11 cases—Plaintiffs must allege scienter.  Because pleading scienter requires plaintiffs to address a defendant's state of mind, eliminating the subjective prong of *Fait* may have less impact on analysis of whether a § 10(b) claim survives a motion to dismiss.

before February 2013, Och-Ziff stated that it was "subject to scrutiny by regulatory agencies" and that it did not expect "pending judicial, administrative or arbitration proceedings" to have "a material impact on the Company's consolidated financial statements." (Compl. ¶¶ 78, 85.) In February 2013 and thereafter, Och-Ziff reported that "extensive scrutiny by regulatory agencies . . . ha[d] resulted in, or may in the future result in, regulatory agency investigations, litigation, and subpoenas and related costs." (Compl. ¶¶ 94, 101, 104, 107.) These statements do not address the sources of Och-Ziff's success, nor do they deny illegal conduct that has been charged, admitted, or adequately pleaded. And while Och-Ziff made projections about the impact of pending regulatory proceedings, those projections required, at most, that Och-Ziff disclose material information about the investigation. To hold otherwise would be to subject corporations to a preemptive duty to "confess" as soon as a regulatory agency begins an investigation. *City of Pontiac*, 752 F.3d at 184 ("[D]isclosure is not a rite of confession . . . .").

Given the content of the statements at issue, the speculative nature of Plaintiffs' factual allegations as to the underlying criminal conduct, and precedents indicating a cabined duty to disclose uncharged wrongdoing, the Court concludes that the Complaint fails to state a claim based on Defendants' failure to disclose their alleged violations of the law.

### 2.      Duty to Disclose the SEC-DOJ Investigation

Plaintiffs also allege that the Management Defendants violated § 10(b) by misrepresenting the SEC-DOJ Investigation.[9] (Pl.'s Opp. at 21-22.) They argue that Och-Ziff incurred a duty to disclose the Investigation when it made misleading statements about pending regulatory proceedings. (*Id.*)

---

[9] Plaintiffs also argue that Och-Ziff had a duty to disclose the Investigation under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), and that failure to do so constitutes an actionable omission. (Pl.'s Opp. at 26.) Because Och-Ziff chose to discuss regulatory proceedings, and had a duty to speak truthfully once it made that choice, the Court need not decide whether the company had an independent duty to disclose the Investigation.

Like all companies subject to the securities laws, Och-Ziff had a duty to ensure that the statements it made to investors were "both accurate and complete." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)). "Even where there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* at 250; *see also Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund. Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers").

Plaintiffs allege that Och-Ziff made several different types of misleading statements. They allege § 10(b) liability based on: (1) statements about Och-Ziff's transparency and integrity; (2) statements of fact about pending regulatory proceedings; and (3) statements of opinion about the likely impact of those regulatory proceedings. For the reasons discussed above, the statements about transparency are inactionable "puffery." *City of Pontiac*, 752 F.3d at 183. The statements of fact are actionable if they are materially misleading. *Operating Local 649*, 595 F.3d at 91; *Rombach*, 355 F.3d at 172 n.7. The statements of opinion are actionable if they omit material facts about the basis for the speaker's opinion that, if disclosed, would likely "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S.Ct. at 1329.[10]

The statements of fact at issue in this case include: "Like other business in our industry, we are subject to scrutiny by regulatory agencies"; "From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business"; and "This

---

[10] For reasons already stated, the standard for actionable statements of opinion in *Omnicare* displaces the standard stated in *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). In this case, however, Plaintiffs' claim survives under either standard, because Plaintiffs have adequately alleged that Defendants knew at the time they made the relevant SEC filings that the SEC-DOJ Investigation could have a material impact on Och-Ziff's financial performance.

[scrutiny] has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas." (Compl. ¶¶ 78, 85, 88.) The statements of opinion include three slightly different versions of the sentence: "We are not currently subject to any pending regulatory, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition." (Compl. ¶ 78.) Plaintiffs contend that these statements, which were made after Och-Ziff had received subpoenas from the SEC and requests for information from DOJ, "deliberately obfuscated the truth" about the existence and scope of the SEC-DOJ Investigation. (Pl.'s Opp. at 22.) They argue that the Management Defendants downplayed the Investigation by presenting as boilerplate what was in fact a material risk of exposure to "reputational" harm and criminal liability. (*Id.* at 23.)

Reading Och-Ziff's statements in context, and construing all inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have adequately alleged that Och-Ziff made actionable misstatements about the existence and risks of regulatory proceedings. Plaintiffs have plausibly alleged that Och-Ziff misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation. In its early SEC filings, Och-Ziff presented its exposure to civil and criminal liability as routine and unlikely to affect the company's financial condition. When it filed its restated 10-K, in contrast, Och-Ziff stated that "an adverse outcome [of the SEC-DOJ Investigation] could have a material effect on our business, financial condition or results of our operations." (Compl. ¶ 112.) The restated 10-K also described the nature of the Investigation in some detail. (*Id.* ("The investigation concerns an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa.")).

20

The Management Defendants argue that Och-Ziff's restated 10-K exceeded its disclosure duties, and that all earlier filings complied with legal obligations.  But the question here is not whether Och-Ziff had an independent duty to announce the SEC-DOJ Investigation; it is whether, in light of that Investigation, the statements Och-Ziff chose to make were materially misleading.  Given Och-Ziff's explicit acknowledgement that the Investigation "could have material effect" on its business, and the other facts alleged, Plaintiffs have plausibly pleaded that, in its earlier SEC filings, Och-Ziff opted to speak on the subject of investigations, but "did not speak in an accurate and complete manner."  *In re BioScrip*, 95 F. Supp. 3d at 727 (citing *Caiola*, 295 F.3d at 331) (internal quotation marks omitted).  For largely the same reasons, Plaintiffs have plausibly alleged that Och-Ziff's projections about the likely impact of regulatory proceedings were based on omitted facts that, if disclosed, would have conflicted with what a reasonable investor would have taken from Och-Ziff's statements themselves.  *Id.* at 730 (citing *Omnicare*, 135 S. Ct. at 1328-29.)

The Court thus determines that Och-Ziff's statements, excluding the puffery outlined above, are actionable under § 10(b).  This conclusion is consistent with precedent from other courts in this District.  *See, e.g.*, *In re BioScrip*, 95 F. Supp. 3d at 727 (holding that plaintiffs had plausibly alleged that boilerplate legal compliance statements were misleading where they suggested that the defendant "routinely responded to investigatory requests from the Government, but was not presently in the process of responding to such a request"); *City of Westland Police & Fire Ret. Sys.*, 928 F. Supp. 2d 705, 718-19 (S.D.N.Y. 2013) (holding that defendants' statements about, *inter alia*, "the strength of the life insurance business" were

actionable where defendants were under a nationwide investigation into whether its business practices violated state laws).[11]

The conclusion that Och-Ziff's statements are actionable is also consistent with Second Circuit precedent.  The Second Circuit has repeatedly stated that "materiality is a mixed question of law and fact," which should not be decided on a motion to dismiss unless the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *see also U.S. v. Litvak*, 808 F. 3d 160, 174 (2d. Cir. 2015) ("Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination.") (citation and internal quotation marks omitted).  Whether Och-Ziff's statements are actionable depends on whether those statements contained material misrepresentations or omitted material information about pending regulatory proceedings.  This is, at base, a question of materiality on which "reasonable minds" could disagree.  *ECA*, 553 F.3d at 197.  Accordingly, dismissal is inappropriate at this stage.

### 3.    Scienter

Having determined that Plaintiffs have plausibly alleged material misstatements and omissions about the SEC-DOJ Investigation, the Court turns to the question whether Plaintiffs

---

[11] The Management Defendants cite *Richman v. Goldman Sachs Grp.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012), in support of their argument that Och-Ziff's statements are inactionable.  In that case, the court held that defendant Goldman Sachs was not under a duty to disclose the receipt of "Wells Notices" indicating an SEC enforcement action.  *Id.* at 273.  But in *Richman*, the defendants had already disclosed that they were under investigation when they received the Wells Notices.  *Id.* at 270.  The *Richman* court concluded that disclosure of the notices would merely "indicate[] that the governmental investigations were indeed ongoing," and thus, was not required to prevent the earlier statements from being misleading. Id. at 274.  Here, in contrast, Och-Ziff made no earlier disclosure about a potentially material investigation into its business practices.  *Richman* also precedes relevant Second Circuit cases on materiality.  *See, e.g.*, *Jinkosolar*, 761 F.3d at 250-251 (defining material omissions).

have adequately pleaded scienter.  To plead scienter under § 10(b) and Rule 10b-5, Plaintiffs

must "state with particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind."  *Tellabs,* 551 U.S. at 321.  "A strong inference of fraudulent intent

may be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness."  *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F.

App'x 26, 27-28 (2d Cir. 2014) (citation and internal quotation marks omitted).

Construing all inferences in Plaintiff's favor, the Court concludes that Plaintiffs have

adequately alleged scienter as to Och-Ziff's statements of fact and opinion about pending

regulatory investigations.[12]  According to the Complaint, the Management Defendants knew

about the SEC-DOJ Investigation from 2011 onward, but waited to disclose its potential impact,

which Och-Ziff later described as material, until after the *Wall Street Journal* published an

article about the African Transactions.  (*See* Compl. ¶¶ 4, 77, 112, 144.)  With these allegations

assumed to be true, Plaintiffs have plausibly alleged that the Management Defendants were

reckless in opting to misrepresent their exposure to civil and criminal liability.  *See ECA*, 553

F.3d at 198 (circumstances that "may give rise to a strong inference of the requisite scienter"

include "where the complaint sufficiently alleges that the defendants . . . knew facts or had

access to information suggesting that their public statements were not accurate"); *In re BioScrip*,

95 F. Supp. 3d at 733 (plaintiffs adequately alleged that defendant "was reckless in electing to

withhold knowledge of [a civil investigative demand], despite its significant role in formulating a

basis of belief that [the company] was in legal compliance.").

---

[12] The Court need not consider whether Plaintiffs adequately allege scienter with respect to Och-Ziff's statements about transparency, which are inactionable, nor with respect to the omission of any facts concerning uncharged criminal conduct, which Defendants had no duty to disclose.

**B.     Scheme Liability**

The second claim in this suit arises under § 10(b) and subsections (a) and (c) of Rule 10b-5, which govern scheme liability.  Plaintiffs contend that all Defendants, including Cohen, are liable under these provisions because they engaged in a scheme to "portray[] Och-Ziff as a more conservative, compliant company" than it actually is.  (Pl.'s Opp. at 37.)  Plaintiffs also argue that Defendants participated in a "deceptive scheme of covering up the illegal investing activity that Cohen orchestrated and oversaw."  (*Id.* at 38.)

To the extent that Plaintiffs allege scheme liability based on underlying uncharged criminal conduct, Plaintiffs' claim fails because, for reasons already stated, that conduct has not been plausibly pleaded.  Moreover, even if Plaintiffs had plausibly alleged violations of the FCPA and U.S. sanctions, given the timeline alleged in the Complaint, those legal violations would have occurred years before the putative class period.  The Complaint thus fails to explain how the "proscribed schemes or acts [were] done in connection with the purchase or sale of any security."  *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

To the extent that Plaintiffs allege a scheme to misrepresent Och-Ziff in SEC filings, Plaintiffs' claim fails because they have not identified any "deceptive act" apart from the alleged misrepresentation.  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b–5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."); *see also Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[P]laintiffs cast their claims in terms of market manipulation, pursuant to Rule 10b–5(a) and (c). We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c) . . . ."); *In re Alstom*, 406 F. Supp. 2d at 475

24

("Courts have held that a plaintiff may not cast claims of misrepresentations as claims under Rule 10b–5(a) and (c) and thus evade the pleading requirements imposed in misrepresentation cases.").

Accordingly, on either theory of scheme liability, Plaintiffs' second claim fails. The Rule 10b-5(a) and (c) claim is therefore dismissed.

### C.    Control Person Liability

The third and final claim in this suit arises under § 20(a) of the Exchange Act. To state a § 20(a) claim, a plaintiff must allege facts showing "(1) an underlying primary violation of the securities laws by the controlled person; (2) control over the controlled person; and (3) that the controlling person was, in some meaningful sense, a culpable participant in the controlled person's primary violation." *In re Deutsche Telekom AG Sec. Litig.*, No 00-CV-9475, 2002 WL 244597, at *6 (S.D.N.Y Feb. 20, 2002) (citing *Ganino*, 228 F.3d at 170); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (stating the elements of a § 20(a) claim). Plaintiffs argue that all Defendants except Och-Ziff are control persons for purposes of § 20(a). 15 U.S.C. §78t(a).

This argument succeeds as to Defendants Och and Frank, but fails as to Defendant Cohen. To allege control person liability, plaintiffs must adequately plead a "primary violation" of the securities laws. *Wilson*, 671 F.3d at 139. Because Plaintiffs have not alleged facts sufficient to state a plausible scheme liability claim, and because scheme liability is the only primary claim asserted against Cohen, there is no plausible § 20(a) claim against Cohen in this case. Plaintiffs have, in contrast, plausibly alleged a primary violation of § 10(b) and Rule 10b-5(b) by Defendants Och and Frank. They have thus pleaded the first element of control person liability as to those two Defendants.

The question remains whether Plaintiffs have adequately pleaded the second and third elements of their control person claim. As a general rule, "[d]etermining an individual defendant's liability as a control person is a 'fact-intensive inquiry that . . . should not be resolved on a motion to dismiss.'" *In re BioScrip*, 95 F. Supp. 3d at 741 (quoting *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011). In this case, Defendants Och and Frank do not present objections to the second prong of control person liability, "control over the controlled person." *In re Deutsche Telekom*, 2002 WL 244597, at *6. Instead, they argue that Plaintiffs have failed to plead "culpable participation," the requirement for prong three. *Id.*

Courts in this District disagree about whether culpable participation must be pleaded with particularity, or instead, is an affirmative defense in which the burden to establish the absence of culpable conduct shifts to the defense. *See In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 449 n.32 (S.D.N.Y. 2009) (collecting cases); *see also In re BioScrip*, 95 F. Supp. 3d at 741 (describing the pleading standard with respect to the third prong of § 20(a) liability as "a matter of ongoing debate"). That debate need not be resolved here because Plaintiffs have plausibly alleged culpable participation by Defendants Och and Frank under either pleading standard.

Plaintiffs allege that Och, the founder and CEO of Och-Ziff, and Frank, the company's CFO, were aware of the existence and scope of the SEC-DOJ Investigation. (Compl. ¶ 4.) They also allege that one or both of these Defendants signed all of the relevant SEC filings, and as a general matter, that both corporate officers were responsible for the content of those filings. (Compl. ¶¶ 4, 77, 84, 87, 90, 93, 100, 103, 106.) At this stage of the litigation, these allegations are sufficient to sustain Plaintiffs' § 20(a) claim against Och and Frank. *See In re BioScrip*, 95 F. Supp. 3d at 741 (denying a motion to dismiss a § 20(a) claim where "each of the Defendants was responsible for reviewing [the company's] SEC filings"); *City of Westland*, 928 F. Supp. 2d

at 721 ("[W]here a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability").

## V.     Conclusion

For the foregoing reasons, Defendant Michael Cohen's motion to dismiss is GRANTED, and the remaining Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Plaintiffs' Rule 10b-5(b) claim against Defendant Cohen is dismissed in its entirety. Plaintiffs' Rule 10b-5(b) claim against Defendants Och-Ziff, Och, and Frank is dismissed insofar as it relies on a duty to disclose uncharged wrongdoing, but the motion to dismiss is denied insofar as Plaintiffs allege Rule 10b-5(b) violations with respect to statements about pending regulatory proceedings.

Plaintiffs' scheme liability claim is dismissed as to all Defendants.  Plaintiffs' control person liability claim is dismissed as to Defendant Cohen, but the motion to dismiss is denied as to alleged § 20(a) violations by Defendants Och and Frank.

Defendants are instructed to file responses to the claims that remain on or before March 9, 2016.  The Clerk of Court is directed to close the motions at docket numbers 23 and 26.


        SO ORDERED.


Dated: February 17, 2016
       New York, New York


_____
        J. PAUL OETKEN
     United States District Judge

27