## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR MENALDI, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff(s),<br><br>          v.<br><br>OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, DANIEL S. OCH, JOEL M. FRANK, and MICHAEL COHEN,<br><br>                              Defendants. | **No.: 14-CV-03251-JPO** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

     A.   Och-Ziff's Controversial Business Dealings Exposed  The Company To
Increased Regulatory Risk ..............................................................................3

     B.   Och-Ziff's Stock Plummeted When The Truth Was Revealed .................................4

PROCEDURAL HISTORY..........................................................................................................5

ARGUMENT ..............................................................................................................................6

  I.   THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE
OF CIVIL PROCEDURE 23 .................................................................................6

     A.   The Rule 23(a) Requirements ..........................................................................7

         1.   The Proposed Class Is So Numerous That Joinder of All Members Is
Impracticable......................................................................................7

         2.   Questions of Law or Fact Are Common to the Class ..........................................8

         3.   Plaintiffs' Claims Are Typical of the Class ....................................................10

         4.   Plaintiffs Will Fairly and  Adequately Protect the Interests of the Class..........11

     B.   The Requirements of Rule 23(b)(3) Are Satisfied .................................................12

         1.   Common Questions of Law and Fact Predominate .........................................12

            a.   Reliance Is Presumed Under *Affiliated Ute* ...............................13

            b.   The Fraud-on-the-Market Presumption Applies to the Claims.................13

     C.   The Five *Cammer* Factors Unanimously Confirm Market Efficiency....................17

         1.   Damages for Purchases of Och-Ziff Stock During the Class Period Can
Be Calculated on a Class-Wide Basis ...........................................................21

         2.   A Class Action Is Superior to Other Available Methods for the Fair and
Efficient Adjudication of the Controversy .....................................................22

  II.   POMERANTZ AND ROSEN SATISFY THE RULE 23(g) PREREQUISITES
FOR APPOINTMENT AS CLASS COUNSEL ....................................................23

CONCLUSION ..........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*AAL High Yield Bond Fund v. Ruttenberg*,
 229 F.R.D. 676 (N.D. Ala. 2005) ........................................................................ 16

*Affiliated Ute Citizens of Utah v. United States*,
 92 S. Ct. 1456 (1972) ........................................................................................... 13

*Amchem Products, Inc., v. Windsor*,
 117 S. Ct. 2231 (1997) ............................................................................... 6, 11, 12

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
 133 S. Ct. 1184 (2013) ...................................................................................... 2, 7

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
 222 F.3d 52 (2d Cir. 2000) ................................................................................... 11

*Basic Inc. v. Levinson*,
 108 S. Ct. 978 (1988) ...................................................................................... 14, 15

*Blackie v. Barrack*,
 524 F.2d 891 (9th Cir. 1975) ...................................................................... 10, 12, 21

*Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
 269 F.R.D. 340 (S.D.N.Y. 2010) ............................................................................ 7

*Califano v. Yamasaki*,
 99 S. Ct. 2545 (1979) ............................................................................................. 2

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ................................................................... *passim*

*Castillo v. Envoy Corp.*,
 206 F.R.D. 464 (M.D. Tenn. 2002) ....................................................................... 18

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
 504 F.3d 229 (2d Cir. 2007) .................................................................................... 7

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
 502 F.3d 91 (2d Cir. 2007) .................................................................................... 22

*Cromer Fin. Ltd. v. Berger*,
 205 F.R.D. 113 (S.D.N.Y. 2001) .......................................................................... 14

*Darquea v. Jarden Corp.*,
   No. 06 Civ. 722, 2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) ................................................ 7

*Dietrich v. Bauer*,
   192 F.R.D. 119 (S.D.N.Y. 2000) ........................................................................................ 8

*Dirks v. Clayton Brokerage Co. of St. Louis Inc.*,
   105 F.R.D. 125 (D. Minn. 1985) ...................................................................................... 22

*Dura Pharmaceuticals, Inc. v. Broudo*,
   125 S. Ct. 1627 (2005) .................................................................................................... 14

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
   89 F.R.D. 87 (S.D.N.Y. 1981) .......................................................................................... 12

*Erica P. John Fund v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) ................................................................................................ 7, 14

*Fogarazzo v. Lehman Bros.*,
   263 F.R.D. 90 (S.D.N.Y. 2009) ........................................................................................ 13

*Gen. Tel. Co. of Southwest v. Falcon*,
   102 S. Ct. 2364 (1982) .................................................................................................... 10

*Haddock v. Nationwide Fin. Services, Inc.*,
   262 F.R.D. 97 (D. Conn. 2009) ......................................................................................... 9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) .............................................................................................. 15, 17

*In re Accredo Health, Inc. Sec. Litig.*,
   No. 03 Civ. 2216, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) .................................... 18

*In re Agent Orange Prod. Liab. Litig.*
   MDL No. 381,  818 F.2d 145 (2d Cir. 1987) ...................................................................... 9

*In re Baldwin-United Corp. Litig.*,
   122 F.R.D. 424 (S.D.N.Y. 1986) ...................................................................................... 10

*In re Beacon Assoc. Litig.*,
   282 F.R.D. 315 (S.D.N.Y. 2012) ...................................................................................... 14

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) . ........................................................................................ 8

*In re Countrywide Fin. Corp. Sec. Litig.*,
   273 F.R.D. 586 (C.D. Cal. 2009) ...................................................................................... 16

*In re Fed. Home Loan Mtge. Corp. (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) ............................................................... 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007) ................................................................... 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F3d 29 (2d Cir 2009)............................................................................. 10

*In Re Groupon, Inc. Sec. Litig.*,
   No. 12 Civ. 2450, 2014 WL 5245387 (N.D. Ill. Sept. 23, 2014) ......................... 15

*In re Groupon, Inc. Sec. Litig.*,
   No. 12-cv-2450, 2015 WL 1043321 (N.D. Ill. March 5, 2015)............................ 15

*In re Ind. Energy Holdings PLC Sec. Litig.*,
   210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................... 2, 7

*In re Longtop Fin. Tech. Ltd. Sec. Litig., No. 11 Civ. 3658,*
   2013 WL 3486990 (S.D.N.Y. July 11, 2013) .................................................. 10

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.,*
   MDL No. 1658 (SRC), 2013 WL 396117 (D.N.J. Jan. 30, 2013) ......................... 14

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................. 12

*In re Oxford Health Plans, Inc.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ................................................................. 10

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ................................................................... 8

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F Supp. 2d 556 (S.D.N.Y. 2008)......................................................... 9, 23

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................... 13

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) ................................................................... 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)....................................................................... 12

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................... 8, 22

*In re Winstar Communications Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ...................................................................... 15

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................... *passim*

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005).............................................................. 16, 18

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
967 F.2d 742 (2d Cir. 1992)................................................................... 13

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997)...................................................................... 8

*Maywalt v. Parker & Parsley Petroleum Co.*,
147 F.R.D. 51 (S.D.N.Y. 1993) .................................................................. 2

*Menkes v. Stolt-Nielsen S.A.*,
270 F.R.D. 80 (D. Conn. 2010)............................................................. 8, 22

*Padilla v. Maersk Line, Ltd.*,
271 F.R.D. 444 (S.D.N.Y. 2010) ...................................................... 12, 21, 22

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006)..................................................... 14

*Phillips Petroleum Co. v. Shutts*,
105 S. Ct. 2965 (1985)....................................................................... 2, 6

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) .................................................................. 15

*Simpson v. Specialty Retail Concepts*,
823 F. Supp. 353 (M.D.N.C. 1993) ....................................................... 16

*Starr v. Georgeson S'holder, Inc.*,
412 F.3d 103 (2d Cir.2005).................................................................... 13

*Stengle v. American Italian Pasta Co.*,
No. 05 Civ. 0725, 2005 U.S. Dist. LEXIS 43816 (W.D. Mo. Dec. 19, 2005) ...... 24

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)........................................................ 6, 16, 17

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*,
Fed. Sec. L. Rep. P. 93,935 (S.D.N.Y. Aug. 1, 2006) ........................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499, (2007)........................................................................... 23

*UFCW Local 1776 v. Eli Lilly and Co.*,
  620 F.3d 121, 131 (2d Cir. 2010)............................................................12

*Wagner v. Barrick Gold Corp.*,
  251 F.R.D. 112 (S.D.N.Y. 2008) ......................................................... 8, 9

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)............................................................................ 7

## <u>STATUTES</u>

15 U.S.C. § 78dd-1 ...................................................................................... 3

15 USC § 78j(b) ........................................................................................... 5

15 USC § 78t(a) ........................................................................................... 5

## <u>RULES</u>

Federal Rules of Civil Procedure 23 ..................................................... *passim*

## <u>REGULATIONS</u>

17 CFR 240.10b-5.......................................................................................... 5

Lead Plaintiffs Ralph Langstadt and Julie Lemond (collectively, "Plaintiffs") submit this memorandum in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs seek certification of the following Class:

> All persons other than defendants who purchased Och-Ziff securities between February 9, 2012 and August 22, 2014, both dates inclusive (the "Class Period"), excluding Defendants, current and former officers and directors of Och-Ziff, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Plaintiffs also seek appointment as Class Representatives and the appointment of Pomerantz LLP ("Pomerantz") and the Rosen Law Firm, P.A. ("Rosen") as Class Counsel.  Lead Plaintiff Ralph Langstadt is a retired nurse anesthetist, who purchased shares of Och-Ziff securities for his own account during the Class Period.  Lead Plaintiff Julie Lemond is a manager for a consulting firm in North Carolina, who purchased shares for her own account during the Class Period.

## PRELIMINARY STATEMENT

This lawsuit is a textbook example of a case warranting class action treatment.  Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of knowingly false and misleading material statements and omissions by Och-Ziff Capital Management, LLC ("Och-Ziff" or the "Company") and the Individual Defendants[1] (collectively, "Defendants") during the Class Period (February 9, 2012 and August 22, 2014, inclusive), concerning the Company's controversial and illegal investments in Africa and Libya, which triggered an investigation (the "DOJ Investigation") by the Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ") and exposed the Company to prosecution for violations of the Foreign Corrupt Practices Act ("FCPA").  The questions of

---

[1] "Individual Defendants" refers collectively to remaining defendants Daniel S. Och and Joel M. Frank.

law and fact relevant to the merits—issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss—are identical for each and every member of the putative class.  Indeed, class action treatment is especially appropriate because many members of the putative class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.

The Supreme Court has also identified the suitability of class certification in private actions to enforce the securities laws *Califano v. Yamasaki*, 99 S. Ct. 2545, 2557 (1979); *see, e.g., Phillips Petroleum Co. v. Shutts,* 105 S. Ct. 2965, 2973 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *see also In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (Class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a class), and has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of *Amgen*, 133 S. Ct. at 1202 ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned.").  Indeed, "the Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity; commonality; typicality; and adequacy of representation.  This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication.  Thus, class certification is warranted.

## STATEMENT OF FACTS

A.     **Och-Ziff's Controversial Business Dealings Exposed
       The Company To Increased Regulatory Risk**

Founded in 1994 by Defendant Och, Och-Ziff is one of the largest, publicly-traded, hedge fund firms in the world, with approximately $46.2 billion in assets under management as of October 1, 2014.   ¶21.[2]   Its tremendous growth and success have been due, in part, to the Company's reputation as the "sleep at night fund," which promised to deliver more modest, but steady returns as a stable and safe steward for investors.

Despite this conservative reputation, in or about 2008, Och-Ziff engaged in a series of high-risk transactions in Africa and the Middle East that violated the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq.* ("FCPA"), and exposed the Company to increased regulatory risk.   ¶¶44-75.   As described in detail in the Complaint, Och-Ziff, among other things, (i) invested $150 million in an entity that ultimately funneled money to Zimbabwean dictator, Robert Mugabe, to finance his re-election campaign; (ii) loaned $234 million to finance the acquisition of valuable mining rights in the Democratic Republic of the Congo, which were obtained at substantial discounts as a result of ties to Congolese President Joseph Kabila; and (iii) utilized a "fixer" to secure business advantages in Libya, including a $300 million investment in Och-Ziff by the Libyan Investment Authority.  *Id.*

Not surprisingly, Och-Ziff's questionable business dealings with dangerous regimes and notorious, violent dictators who subverted U.S. foreign policy caught the attention of regulators. In 2011, both the Securities and Exchange Commission ("SEC") and U.S. Department of Justice ("DOJ") launched investigations into Och-Ziff's transactions in Africa and Libya in connection with potential violations of the FCPA (the "Investigations").   However, Och-Ziff ***never acknowledged that the Company was subject to ongoing, targeted, civil and criminal***

---

[2] Citations to "¶ __" refer to paragraphs in the Consolidated Amended Class Action Complaint (the "Complaint" or "CAC").  (Dkt. #17).

*Investigations at this time.*  Instead, Defendants falsely and misleadingly assured investors that, *inter alia*, "We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition.  We may from time to time be involved in litigation and claims incidental to the conduct of our business…" *See*, *e.g.*, ¶¶79, 85, 88, 91, 94, 101, 104, 107.

### B.     Och-Ziff's Stock Plummeted When The Truth Was Revealed

Significantly, it was the The Wall Street Journal, and not Och-Ziff, that first revealed Och-Ziff's serious FCPA compliance issues.  On February 3, 2014, **more than three years after the Investigations began**, The Wall Street Journal reported that the DOJ was investigating Och-Ziff in connection with its dealing with the Libyan Investment Authority ("LIA"), and that the DOJ's criminal probe was proceeding alongside a civil probe by the SEC, which began in 2011. ¶109.  The article explained that the Investigations concerned the use of "fixers," who funneled illegal payments to Libyan officials in the Qaddafi regime on behalf of financial firms, including Och-Ziff, in return for business.  *Id.*  On this news, Och-Ziff shares fell from $13.94 per share to close at $13.04, a decline of approximately 6.7%, on heavy trading volume.  ¶123.

Then, on March 18, 2014, buried in a restated 10-K for 2013 filed after the market close, Och-Ziff confirmed The Wall Street Journal report, disclosing for the very first time that the SEC and DOJ had issued subpoenas and requests for information concerning "an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa."  ¶112.  Defendants added that "[a]n adverse outcome could have a material effect on our business, financial condition or results of operations."  *Id.*  Following this news, Och-Ziff shares fell from $14.20 on March 18, 2014 to close at $13.71 on March 19, 2014, a decline of approximately 3.5% decline, on heavy trading volume.  ¶124.

Further details concerning Och-Ziff's dealings continue to surface.  On April 27, 2014, The Wall Street Journal reported that the DOJ and SEC were also investigating Och-Ziff's loans

to Daniel Gertler ("Gertler"), totaling $234 million, which financed the acquisition of two properties confiscated by President Kabila's government and then sold to Gertler, a friend of Kabila, at substantially-discounted prices.  ¶115.    Following this news, shares of Och-Ziff fell by 10%, the largest stock drop in five years.  ¶125.

Subsequently, on August 22, 2014, <u>Bloomberg Business Week</u> published an expose describing how Och-Ziff financed political intimidation and violence in the 2008 Zimbabwe election by investing in a mining company that secured valuable platinum mining rights from ZMDC, which was owned, in part, by the Zimbabwean government and the Mugabe regime. ¶117.  The reporting of Och-Ziff's connection to Mugabe's subversion of the 2008 election caused Och-Ziff shares to plunge approximately 7%.  ¶126.

On December 4, 2014, <u>The Wall Street Journal</u> published an update concerning the investigation of Och-Ziff's Libyan transactions, identifying the "fixer" as Mr. Ajami and thereby linking the LIA's $300 million Och-Ziff investment with the Magna Holdings real estate development projects.

On April 11, 2016, <u>The Wall Street Journal</u> published a further update, reporting that regulators were seeking as much as $400 million in civil sanctions and a guilty plea to criminal violations of the FCPA.  Thereafter, on May 3, 2016, Och-Ziff announced that the Company was reserving $200 million in connection with the widening Investigations, prompting still further declines in the Company's stock price.  Och-Ziff's shares are currently trading at approximately $3.35 per share.

According to the Company's public disclosures, the Investigations remain ongoing.

## PROCEDURAL HISTORY

This action was commenced with a complaint filed on May 5, 2014, asserting securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 USC § 78j(b), 15 USC § 78t(a), and Rule 10b-5 promulgated thereunder (17 CFR 240.10b-5).  (Dkt. #1)

On July 7, 2014 Ralph Langstadt and Julie Lemond moved to serve as Lead Plaintiff(s). (Dkts. #9-11).  On September 24, 2014, the Court appointed Langstadt and Lemond as Lead Plaintiffs.  (Dkt. #16)

Plaintiffs filed the Consolidated Amended Class Action Complaint (the "CAC") on November 24, 2014. (Dkt. # 17).  On March 16, 2015, Defendants moved to dismiss the CAC on the basis that it failed to adequately plead falsity and scienter. (Dkts. #23-27).  On February 17, 2016, the Court granted in part and denied in part Defendants' motion to dismiss.  (Dkt. #39). Specifically, the Court dismissed alleged misstatements and omissions related to Plaintiffs' claims that Defendants violated the FCPA.  However, the Court held that Och-Ziff made actionable misstatements about the existence and risks of regulatory proceedings.

Defendants moved for reconsideration of the February 17, 2016 Order on March 2, 2016. (Dkt. #40).  On May 27, 2015, the Court denied Defendants' motion for reconsideration.  (Dkt. #43).

## ARGUMENT

## I.     THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *Amchem Products, Inc.*, *v. Windsor*, 117 S. Ct. 2231, 2245 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3).  *Id.* at 614.  Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually.  [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 105 S. Ct. at 2973. "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

6

It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws."  Thus, Courts in the Second Circuit have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (citation omitted); *see also Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 345 (S.D.N.Y. 2010) (Scheindlin, J.) ("Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.") (citations omitted).  In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification.  *See In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. at 479.

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195.  Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality or loss causation.  *See, e.g.*,  *Halliburton I*, 131 S. Ct. at 2186; *see also Amgen*, 133 S. Ct. at 1193-94.

### A.     The Rule 23(a) Requirements

#### 1.     The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Impracticable does not mean impossible, but only that the difficulty of joining all class members make use of the class action appropriate. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir.

2007).  Further, a plaintiff need not allege the exact number or identity of class members.  *See In re Blech Sec. Litig.*, 187 F.R.D. 97 at 103 (S.D.N.Y. 1999).  "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010), *citing Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997).  "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

A review of publicly-available information reveals that during the Class Period, the number of Och-Ziff shares issued and outstanding ranged from approximately 139.8 million to 171.7 million shares.  *See* Expert Report of Zachary Nye, Ph.D., dated August 9, 2016,[3] at ¶ 20.  There were more than 641 million shares of Och-Ziff purchased and sold during the Class Period. *Id.* at ¶ 21.  Although Plaintiffs have not at this time ascertained the precise number of potential Class members, they believe that there are many hundreds, and likely thousands, of geographically dispersed members of the proposed Class.  The precise identity of the members can be readily identified from the Company's books and records.  Clearly, the proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable.  *See Menkes*, 270 F.R.D. at 90.

### 2.  Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted."  *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995).  *See also Dietrich v. Bauer*, 192

---

[3] The Expert Report of Zachary Nye, Ph.D., dated August 9, 2016 (the "Nye Report") is annexed as Exhibit A to the Declaration of Michele S. Carino in Support of Plaintiffs' Motion for Class Certification, dated August 9, 2016 ("Carino Decl.").

F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation").  Commonality "is established so long as the plaintiffs can identify some unifying thread among the [class] members' claims." *Haddock v. Nationwide Fin. Services, Inc.*, 262 F.R.D. 97, 116 (D. Conn. 2009), *vacated and remanded sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 Fed. Appx. 26 (2d Cir. 2012).  Even a single common legal or factual question will suffice.  *See In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 166-67 (2d Cir. 1987).

Common issues are prevalent in this case, including:

- whether Defendants violated the federal securities laws by their acts as alleged in the Complaint;
- whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and regulatory status;
- whether the Individual Defendants caused Och-Ziff to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Och-Ziff securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages for each share of stock purchased.

In comparable situations, courts have consistently found the commonality requirement to have been satisfied.  *See, e.g., In re SCOR Holding (Switzerland) AG Litig.*, 537 F Supp. 2d 556 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157-158 (S.D.N.Y. 2007), *order aff'd in part, vacated in part,* 574 F.3d 29 (2d Cir. 2009).  Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident:

Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by

slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (citations omitted).

### 3.   Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class.  The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 102 S. Ct. 2364, 2373 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998).

A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F3d 29, 35 (2d Cir 2009).  In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors' perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (citations omitted); *see also In re Longtop Fin. Tech. Ltd. Sec. Litig.*, No. 11 Civ. 3658, 2013 WL 3486990, at *2 (S.D.N.Y. July 11, 2013) (Scheindlin, J.) ("Lead Plaintiffs' claims are typical of the Class.  Lead Plaintiffs purchased Longtop ADSs during the Class Period at prices allegedly inflated by defendants' misrepresentations and omissions concerning Longtop's financial condition.  The arguments advanced by Lead Plaintiffs with respect to defendants' liability are the same arguments that other Class members would bring in support of their claims.").

In this case, typicality is satisfied because:

1) Lead Plaintiff Ralph Langstadt purchased 2000 shares of Och-Ziff stock on March 11, 2014, which he held through the end of the Class Period. (Dkt. #11 Ex. B).  Lead Plaintiff Julie Lemond purchased a total 7,000 shares of Och-

Ziff between January 24, 2014 and April 11, 2014, 4,000 of which she held through the end of the Class Period.   (Dkt. #11, Ex. B).  Each Lead Plaintiff suffered damages when Och-Ziff's stock price declined upon disclosure of the facts related to Defendants' fraud.  Thus, Lead Plaintiffs are in the identical position as other Class Members vis-à-vis their purchases of Och-Ziff stock and their right to recover damages against Defendants.

2) Plaintiffs claim that Defendants knowingly issued false and misleading statements and omitted from disclosure material facts concerning the existense, nature and status of regulatory proceedings involving Och-Ziff.  Proof of these allegations is common to all Class Members, because Defendants' statements were uniformly made to all Class Members and the material misrepresentations and omissions equally affected all Class Members;

3) Defendants' state of mind when making the false and misleading statements (*i.e.*, scienter) is not a plaintiff-specific inquiry, but applies to all Class members equally; and

4) The question of whether the market price of the Company's stock was artificially inflated during the Class Period due to the alleged misstatements and omissions involves no individualized issues.

Plaintiffs' claims are typical of those of the Class.  The conduct that injured Plaintiffs also injured the other Class Members.  Similarly, the injury that Plaintiffs suffered is similar to that suffered by other Class Members.

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met.  The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 117 S. Ct. at 2250 (citation omitted).  It is important to emphasize that "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class

certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).  Here, Lead Plaintiff "possess[es] the same interest and suffer[ed] the same injury as the class members," *Amchem Products, Inc.*, 117 S. Ct. at 2250-51, and no actual or potential conflicts exist.  *See*, *e.g.*, Carino Decl. Exs. B and C.

Appointment of the Pomerantz and Rosen law firms as Class Counsel also militates in favor of Plaintiffs' adequacy to represent the Class.  Pomerantz and Rosen both have extensive experience in the field of securities litigation.  *See*, *e.g.* Carino Decl. Exs. D and E.  Moreover, Lead Counsel's vigorous pursuit of the Class' interests is well documented in their advancement of the Class' claims before this Court, including, *inter alia*, in their defeat of the Defendants' motion to dismiss and motion for reconsideration.

## B.      The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

### 1.      <u>Common Questions of Law and Fact Predominate</u>

"Predominance is a test readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem Products, Inc.*, 117 S. Ct. at 2250.  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("[T]o allow various secondary issues of plaintiff's claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").  For example, it is well-established that where liability can be proved class-wide, individualized proof of damages does not defeat predominance. *See, e.g., Blackie*, 524 F.2d at 905; *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 450 (S.D.N.Y. 2010); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 514

(S.D.N.Y. 1996).   Indeed, "[c]ourts routinely find the elements of scienter, materiality and causation to be common issues in federal securities cases." *In re Longtop*, at *2 (S.D.N.Y. July 11, 2013).

### a.   Reliance Is Presumed Under *Affiliated Ute*

In *Affiliated Ute Citizens of Utah v. United States*, 92 S. Ct. 1456 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992).   In such circumstances, individual reliance need not be proven.   Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131.   The crux of Plaintiffs' claims are that Defendants violated the securities laws by failing to disclose the existence and nature of the SEC and DOJ investigations concerning certain of Och-Ziff's African investments. The *Affiliated Ute* presumption applies only in connection with "claims 'involving primarily a failure to disclose[.]' " *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (citing *Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 109 n. 5 (2d Cir.2005) (quoting *Affiliated Ute,* 406 U.S. at 153, 92 S.Ct. 1456).   Here, reliance may be presumed under *Affiliated Ute* based on Defendants' omissions of material information including, *inter alia*, Och-Ziff's failure to disclose the existence and risks of ongoing regulatory proceedings, which were likely to have a material impact on its business. See also *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003) (reliance presumed where issuer omitted to disclose anaylst conflicts of interest); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009) (same).

### b.   The Fraud-on-the-Market Presumption Applies to the Claims

Plaintiffs will prove, on a common basis, the elements of their Sections 10(b)[4] and 20(a)

---

[4] The elements of a claim for securities fraud under Section 10(b) are: (1) a material omission or misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4)

claims.[5]  "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  *Halliburton I*, 131 S. Ct. at 2184.[6]  Here, reliance (or transaction causation) will be established on a common basis under the "fraud-on-the-market" theory.  As explained in *Basic Inc. v. Levinson*, 108 S. Ct. 978 (1988):

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Id.* at 989 (citation omitted, alterations in the original).  The Court further explained:

> An investor, who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id.* at 992.  Indeed, as the Supreme Court explained, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity.  Who would knowingly roll the dice in a

---

reliance; (5) economic loss; and (6) loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

[5] In addition to an underlying Section 10 violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) (Scheindlin, J.).  Control can be proved class-wide.  *See, e.g., In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[6] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence.  *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, MDL No. 1658 (SRC), 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information . . . In addition . . . loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures . . . "); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception, [reliance] there is no dispute that each element necessary to establish liability . . . is common to the class . . . The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct").

crooked crap game?" *Id*. at 991 (quotations omitted).   The Supreme Court recently reaffirmed that *Basic*'s ruling was based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410 (2014) ("*Halliburton II*").   Accordingly, "[i]n a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones." *In Re Groupon, Inc. Sec. Litig.*, No. 12 Civ. 2450, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) (citing *Basic*, 485 U.S. at 247 (1988) and *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010)).   The fraud-on-the-market presumption does not require a *perfectly* efficient market.   *In re Groupon, Inc. Sec. Litig.*, No. 12-cv-2450, 2015 WL 1043321, at *11 (N.D. Ill. March 5, 2015), citing *Halliburton II*, 134 S.Ct. at 2410 ("Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point.") (emphasis in original).

To invoke the fraud-on-the market-presumption, "plaintiffs must demonstrate that (1) the alleged material misstatements were publicly known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed."  *In re Winstar Communications Sec. Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013).  Lead Plaintiff can demonstrate all three.

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), the court set forth certain factors to use to determine whether the market for any stock is open and efficient: (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption" (*Id.* at 1293); (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the company's stock "had numerous market makers";[7] (4) whether "the Company was entitled to file

_____

[7] A market maker is one who helps establish a market for securities by reporting bid-and-asked

an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id*. at 1284-87.  The *Cammer* factors, however, are not exclusive, and a plaintiff "is not required to show the existence of each of these factors" to establish market efficiency. *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted); *see also Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993).  "At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency.  If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, Fed. Sec. L. Rep. P. 93,935 (S.D.N.Y. Aug. 1, 2006), *aff'd sub nom. Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008).

The Second Circuit has held that "the most important *Cammer* factor is the 'cause and effect' factor—evidence that unexpected corporate events or releases caused an immediate response in the price of a security.  This is 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *In re Fed. Home Loan Mtge. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) , *quoting Teamsters Local 445 Frgt. Div. Pension Fund*, 546 F.3d at 207, *quoting Cammer*, 711 F. Supp. at 1287.  The *Teamsters* court stated:

> Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price. An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has

quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices. *In re Xcelera.com Sec. Litig*., 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig*., 273 F.R.D. 586, 613-614 (C.D. Cal. 2009).

been considered prima facie evidence of the existence of such a causal relationship.

*Teamsters Local 445*, 546 F.3d at 207-208.

In the wake of *Halliburton II*, however, courts have recognized that a finding of market efficiency does not "always require[] proof that the alleged misrepresentations had an immediate effect on the stock price." *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, No. 12 Civ. 14168, 2014 WL 3844070, at *5 (11th Cir. Aug. 6, 2014). This is particularly true in the case where the crux of the misrepresentation was a *failure* to disclose the SEC and DOJ investigations.

Even given the importance of the cause-and-effect analysis, a flexible approach to market efficiency must be maintained because "[e]ven the *Cammer* court itself did not establish such a strict evidentiary burden at the class certification stage." *Id.* Indeed, the greatest takeaway from *Halliburton II* is the Court's affirmance that there is no single "mandatory analytical framework" for analyzing market efficiency, and district courts have "flexibility to make the fact-intensive inquiry on a case-by-case basis." *Id.* at *3. The *Regions* court explained this flexible approach to market efficiency:

> [W]e have indeed defined some features of an efficient market: high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information. These are factors District Courts therefore know to look for when analyzing the markets for securities of established companies like Regions. However, even these general signs of an efficient market may not be required for a finding of an efficient market in every case. Stocks that trade on a smaller scale, or that are not widely followed, might trade on an efficient market. It is up to the District Courts to consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency.

*Id.* at *4.

C.     **The Five *Cammer* Factors Unanimously Confirm Market Efficiency**

Here, as set forth in Exhibits 3 to 13 to the Nye Report, the event study conducted by Dr. Nye demonstrates a cause and effect relationship between unexpected Company-specific news and the market price for Och-Ziff's stock, demonstrating that Och-Ziff's stock traded on an

17

efficient market during the Class Period.  *See, e.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512-514 (1st Cir. 2005); *In re Accredo Health, Inc. Sec. Litig.*, No. 03 Civ. 2216, 2006 WL 1716910, *5 (W.D. Tenn. Apr. 19, 2006); *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 470 (M.D. Tenn. 2002).

Dr. Nye's holistic analysis of the *Cammer* factors and other indicia of market efficiency demonstrate beyond dispute that Och-Ziff's stock traded in an efficient market during the Class Period.

***Factor One: Average Weekly Trading Volume and Annualized Turnover Ratio***:  "[A] large weekly volume of stock trades implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286.  On average, 4,855,290 shares of Och-Ziff stock were traded weekly during the Class Period.  Nye Report ¶ 20.  The average weekly trading volume for Och-Ziff's stock was 3.2% of shares outstanding.  *Id*.  Under *Cammer*, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293.  Accordingly, the average weekly reported trading volume for Och-Ziff stock exceeds the 2% "strong presumption" of market efficiency set out in *Cammer. Id*.

Dr. Nye also analyzed the annualized turnover ratios for Och-Ziff shares.  Och-Ziff's annualized share turover ratio during the Class Period was 147.7%. Nye Report ¶ 21. By comparison, the average annualized turnover ratio for all stocks listed on the NYSE in 2012, 2013, and 2014 was: 67%, 58%, and 56%, respectively.  *Id.* at ¶ 22.  Thus, the annualized turnover ratio for Och-Ziff securities was more than 2 times greater than the average for all stocks listed on the NYSE during the Class Period.  *Id*.  The high trading volumes and high annualized turnover ratios observed during the Class Period support a conclusion that Och-Ziff shares traded in an efficient market during that time.  *Id.* at ¶ 23.

***Factor Two: Analyst Coverage***:  Analyst coverage on a stock implies that information

about the company is rapidly reflected in the stock price.  *Cammer*, 711 F. Supp. at 1286. During the Class Period, many renowned investment firms followed and published research reports on Och-Ziff, including: Citigroup (65 reports); Jefferies & Co. (46 reports); RBC Capital Markets (42 reports); J.P. Morgan (35 reports); and Barclays Capital (32 reports).  Nye Report ¶ 26.  A total of over 400 analyst reports for Och-Ziff were issued during the Class Period.  *Id*. In addition to these research reports, during the Class Period, financial and other information pertinent to Och-Ziff was further disseminated to investors via media coverage, investor conferences, trade magazines, public presentations by Och-Ziff, and SEC filings.  *Id*. at ¶ 27. Och-Ziff's coverage by securities analysts, the amount of reporting on Och-Ziff during the Class Period by securities analysts, and the amount of reporting on Och-Ziff indicate that Company-specific news was widely disseminated to investors, thereby facilitating the incorporation of such information into the market price of Och-Ziff shares.  Accordingly, this factor supports a conclusion that Och-Ziff shares traded in an efficient market throughout the Class Period.  *Id*. at ¶¶ 26-29.

   ***Factor 3: Number of Market Makers and Potential for Arbitrage***:  The listing of a security on a major stock exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency.  Nye Report ¶ 32.  During the Class Period, Och-Ziff common shares were listed and traded on the NYSE, which uses a single designated market-maker ("DMM") to maintain a competitive and efficient market for the securities assigned to them.  *Id.* at ¶ 31.

   The level of short interest, the high degree of institutional ownership and the tightness of bid/ask spreads for Och-Ziff shares also indicate that arbitrage activity was prevalent during the Class Period.  *Id.* at ¶¶ 34-40.  The existence of arbitrageurs, sophisticated investors who can act rapidly to take advantage of pricing discrepancies, ensuring that market prices reflect all public information, further indicates that Och-Ziff's shares traded in an efficient market. *Cammer*, 711 F. Supp. at 1286-7.  During the Class Period, arbitrageurs were not constrained in their ability to short shares of Och-Ziff shares.  Nye Report ¶ 36. Additionally, for the quarters ended in the

Class Period, institutional holdings of Och-Ziff shares ranged from 70.2% to 85.7% of shares available and over 100 institutional investors held Och-Ziff shares at the end of each quarter during the Class Period.  Nye Report ¶ 38.   The fact that the institutional holdings were on average 47 times the short interest in Och-Ziff stock implies that short selling was not constrained during the Class Period.  *Id.*

Moreover, during the Class Period, the bid/ask spreads on Och-Ziff shares were comparable to those of stocks listed on the NYSE and is further evidence that the market for Och-Ziff stock was efficient during that time.  *Id.* at ¶ 40.  The average/median bid/ask spread on Och-Ziff shares was $0.02/0.01; the NYSE sample average/median had a corresponding $0.02/0.01 bid/ask spread.  *Id.* at ¶ 39.

**Factor 4: Eligibility to File SEC Form S-3:**  The *Cammer* Court found that a Company's eligibility to file a short-form registration statement, *i.e.*, Form S-3, supports a finding of an efficient market.  *Cammer* 711 F. Supp. At 1285.  Here, Och-Ziff was eligible to and did file a form S-3 before the Class Period, on November 15, 2011.  Nye Report ¶ 44.  That Och-Ziff was eligible to file a Form S-3 throughout the Class Period further supports that the stock was efficient throughout the Class Period.  *Id.*

**Factor 5: Cause and Effect Relationship of Unexpected Material News and Stock Price:** this factor requires showing that there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price." *Cammer*, 711 F. Supp at 1287.  Dr. Nye employed an event study covering the Class Period to determine the impact of new material information on Och-Ziff's stock price.  Nye Report ¶ 47.  In an efficient market, it would be expected that the price of a stock would respond to news.  *Id.* at ¶¶ 45-46.  The event study is a multiple step process to test whether this is the case.  Those steps include: "the *a priori* definition and selection of events to study; identification of a study period; estimation of a regression model to remove non-company-specific effects from the security's return; testing for statistical significance; and interpretation of empirical results."  *Id.* at ¶ 46. To determine which events to study in his analysis, Dr. Nye relied

20

on a large body of event study literature that has evaluated what types of information affect stock prices.  Nye Report ¶ 48.  Based on this literature, Dr. Nye examined 17 events dates:  the dates on which Och-Ziff released quarterly or annual financial result examined the corrective disclosure dates examined in the complaint.  *Id.* at ¶¶ 48-49. Based on his analysis, Dr. Nye concluded that "it is clear that Och-Ziff's stock price typically reacted more strongly on the event dates than on non-event dates during the Class Period."  *Id.* at ¶ 49. He noted that 47.1% of the event dates examined during the Class Period demonstrated statistically significant residual returns, whereas ordinarily only 5% of dates are statistically significant in a random sample.  *Id.* at ¶ 49, fn 74.  Based on his analyses, Dr. Nye concluded "that Och-Ziff's stock price reflected the information disclosed to the market, and promptly responded to material, unexpected news, which supports [his] conclusion that the market for Och-Ziff stock was efficient during the Class Period." *Id.* at ¶ 50.

These facts conclusively demonstrate that Och-Ziff's securities traded in an efficient market during the Class Period and that the alleged fraud impacted the price of Och-Ziff's securities.  Plaintiffs and the Class are therefore entitled to the presumption of reliance under the fraud-on-the-market doctrine.

### 1.    Damages for Purchases of Och-Ziff Stock During the Class Period Can Be Calculated on a Class-Wide Basis

As set forth *supra*, at page 12, individualized proof of damages does not defeat predominance. *See, e.g. Blackie*, 524 F.2d at 905; *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 450 (S.D.N.Y. 2010).  For this reason, courts do not require a formal damages model to demonstrate that damages can be determined on a classwide basis.  Instead, to the extent any evidence is required, an event study like that provided by Dr. Nye that quantifies Och-Ziff's per share price decline upon disclosure of the fraud will suffice.  Nye Report ¶ 54.   Here, Dr. Nye has determined that damages are capable of being calculated on a class-wide basis in this case. *Id*. at ¶ 55.

### 2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

"Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation." *Dirks v. Clayton Brokerage Co. of St. Louis Inc.*, 105 F.R.D. 125, 136 (D. Minn. 1985).  "Together with predominance, the superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).  Class treatment is often deemed superior in "negative value" cases, in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually.  *Menkes*, 270 F.R.D. at 100. Courts have universally recognized the superiority of class actions in cases alleging securities fraud.  *See supra* at 2.  The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3).  These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive.  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value); *In re Vivendi Universal, S.A.*, 242 F.R.D. at 92.  A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market.  *See Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 n.4, (2007) ("Nothing in the [PSLRA], we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses'—a matter crucial to the integrity of domestic capital markets.") (citations omitted).

Moreover, there are hundreds, if not thousands, of Class members.  "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources."  *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d at 579.  It would also "risk disparate results among those seeking redress." *Id.*  Finally, there is no reason to expect any difficulties in managing this case as a class action.  Indeed, class actions of this size and complexity are common.

## II.    **POMERANTZ AND ROSEN SATISFY THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL**

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Under these criteria, the Pomerantz and Rosen firms are eminently qualified.  *See*, *e.g.*, Carino Decl. Exs. D and E.

The Pomerantz firm was established in 1940 by the late Abraham L. Pomerantz, the recognized "Dean of the Class Action Bar" and a "pioneer in the class action/derivative field."[8] The firm has litigated securities fraud cases under federal and state laws for seventy-five years, on behalf of institutional and individual investors in both class and individual actions, and has set important precedents.  Courts have routinely acknowledged Pomerantz' securities litigation

---

[8] N.Y.L.J. (Aug. 1, 1983).  *See also* Robert J. Cole, *Class Action Dean*, NAT'L L.J. (Sept. 25, 1978).

strengths.   For example, in *Stengle v. American Italian Pasta Co.*, the court  appointed Pomerantz as Lead Counsel, remarking that the firm: "has significant experience (and has been extremely effective) litigating securities class actions, employs several highly qualified attorneys, and possesses ample resources to effectively manage the class litigation and protect the class's interests."  No. 05 Civ. 0725, 2005 U.S. Dist. LEXIS 43816, at *27 (W.D. Mo. Dec. 19. 2005). The National Law Journal ("NLJ") named Pomerantz to the Plaintiffs' Hot List Hall of Fame for 2013.  The Firm was recognized for its work representing plaintiffs in securities litigation and ERISA-related actions.[9]

Similarly, the Rosen firm is a leader in securities litigation and a pioneer in its field. Founding partner Laurence M. Rosen founded the Rosen Law Firm to represent investors exclusively in securities class actions and derivative litigation.  In 2015 Institutional Shareholder Services ranked the Rosen Law Firm number 2 in the nation for number of securities class action settlements in 2015.  Courts have frequently lauded the Rosen Law Firm for the work results they have achieved and their professionalism and dedication to the class.  For example, in *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 10-cv-2700 (S.D.N.Y. 2012 (Castel, J.), the Court, in approving the settlement achieved by the Rosen Law Firm stated "[T]he representation and the quality of the opposition and lead counsel, are both of very high order.  Plaintiffs' counsel is to be commended for bringing about this favorable result…Again I congratulate and thank counsel for the very professional work they have done in the case, and for the very fine job they achieved for the class.  Thank you."

Here, Lead Counsel have effectively used their experience to vigorously pursue the interests of all Class members, including filing a factually detailed Complaint, mounting a successful defense of the Complaint in response to the Defendants' motion to dismiss and motion for reconsideration, and conducting further proceedings following that denial.

---

[9] "The Plaintiffs' Hot List."  National Law Journal (Mar. 3, 2014).

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing the Proposed Class Representatives as the Class Representatives; (3) appointing Co-Lead Counsel as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated:  August 9, 2016

Respectfully submitted,

**POMERANTZ LLP**

_/s/ Jeremy A. Lieberman_
Jeremy A. Lieberman
Marc I. Gross
Michele S. Carino
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Sara Fuks
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

_Lead Counsel for Plaintiffs and the Class_

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


*/s/  Jeremy A. Lieberman*
Jeremy A. Lieberman

1