## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR MENALDI, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff(s),<br><br>v.<br><br>OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, DANIEL S. OCH, JOEL M. FRANK, and MICHAEL COHEN,<br><br>                        Defendants. | No.: 14-CV-03251-JPO<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

### <u>CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT</u>

Lead Plaintiffs Ralph Langstadt and Julie Lemond ("Plaintiffs" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their consolidated amended class action complaint ("Complaint") against defendants, allege the following based upon their personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Och-Ziff Capital Management, LLC, ("Och-Ziff" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the internet, the SEC Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, and Section 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, Making Findings, Imposing Remedial Sanctions and a Cease and Desist

Order and Notice of Hearing (Release Nos. 78989, 4540) dated September 29, 2016 (the "SEC Order") (annexed hereto as Exhibit A and incorporated by reference herein), the Deferred Prosecution Agreement in *United States of America v. Och-Ziff Capital Management Group LLC*, (Cr. No. 16-516 (NGG) dated September 29, 2016 (the "Deferred Prosecution Agreement" or "DPA") (annexed hereto as Exhibit B and incorporated by reference herein) and documents produced by Defendants in this litigation.   Plaintiffs believe that additional substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Och-Ziff securities between November 18, 2011 and April 11, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").[1]

2.      Och-Ziff is the largest publicly traded institutional asset management firm, managing assets of over $45.9 billion as of June 2014.  Throughout the Class Period, Och-Ziff attributed its success to its conservative reputation and ability to deliver steady returns as a stable and safe steward for investors.  The Company repeatedly cited its "reputation for integrity," "transparency," " and "strong financial, operational and compliance-related controls" as key "differentiating competitive strengths," and assured investors that its books and records

---

[1]  Excluded from the Class are: Defendants, all current and former officers, directors and senior executives of Och-Ziff, members of the immediate family of any excluded person, any entity in which any excluded person has more than a 5% ownership interest, or which any excluded person controls, and the legal representatives, heirs, successors, or assigns of any such excluded person.

accurately reflected the Company's financial condition and results. Och-Ziff also claimed that it implemented a robust global compliance program to address the legal and regulatory requirements of its company-wide operations, which included, *inter alia*, "comprehensive policies and supervisory procedures," "mandatory training," and "strong relationships with a global network of local attorneys specializing in compliance matters…"

3.      However, unbeknownst to investors, beginning in or about 2008 and continuing through 2016, Defendants were engaged in a pervasive, illegal bribery scheme and cover-up, in which Defendants paid or facilitated the payment of bribes to foreign government officials in exchange for hundreds of million dollars of business in Africa in violation of the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-1, *et seq.* ("FCPA").  These illicit payments, as well as the ill-gotten investments derived therefrom, were disguised as legitimate transactions, which remained on the Company's books and continued to generate revenue throughout the Class Period.

4.      When, in 2011, the bribery scheme prompted a regulatory investigation by the U.S. Securities and Exchange Commission ("SEC") and the U.S. Department of Justice (the "DOJ"), the Company perpetuated its fraudulent and illegal conduct by attempting to withhold information from regulators and by omitting any mention of the ongoing, targeted investigation from its public disclosures, even though it was highly probable that the Company faced severe civil and criminal liability that would materially impact its business and operations.

5.      The truth only began to emerge after The Wall Street Journal published an expose regarding Och-Ziff's involvement in certain deals in Libya on February 3, 2014.  Following that publication, Och-Ziff was compelled to acknowledge for the very first time that the SEC and DOJ had been investigating the Company since 2011 for, among other things, "investments by some of our funds, both directly and indirectly, in a number of companies in Africa."  The

Company stated, without elaborating, that the probe involved the Foreign Corrupt Practices Act and related laws.

6.      Over the next several months, additional details concerning the SEC and DOJ investigation surfaced, with news articles revealing shocking details in connection with the African Transactions.

7.      But the full impact of the SEC and DOJ Investigation was not apparent until the Spring of 2016.  On April 11, 2016 the Wall Street Journal reported that the DOJ wanted Och-Ziff to plead guilty to criminal violations of the FCPA, and the SEC was seeking as much as $400 million in civil penalties based upon the Company's alleged profits from the illegal African Transactions.   On this news, Och-Ziff's stock price fell by approximately 13.2% on extraordinarily heavy trading volume.

8.      On May 3, 2016, in its 10-Q for the first quarter 2016, the Company confirmed the tremendous financial impact of the DOJ and SEC Investigations, announcing that it had accrued a $200 million liability in connection with the Investigation but that it "believes it is probable that the amount will be in excess of this $200 million, but [ ] is unable to estimate an amount at this time."  Thereafter, on August 2, 2016, in its 10-Q for the second quarter 2016, Och-Ziff disclosed that it recorded an additional charge of $214.3 million and that the probable estimated loss therefore totaled $414.3 million.

9.      Finally, on September 29, 2016, Defendant Och-Ziff entered into a Deferred Prosecution Agreement, wherein it admitted, accepted, and acknowledged responsibility for the bribery scheme and violations of the FCPA as described herein.  At the same time, Defendants Och-Ziff, Och, and Frank consented to entry of a Cease and Desist Order by the SEC (the "SEC Order"), in which among other things, Defendants were ordered to cease and desist violations of

the Exchange Act in connection with the same scheme and violations of law.  Specifically, as set forth in the Deferred Prosecution Agreement and SEC Order, Defendants now have admitted that, *inter alia*:

    a.    Between 2007 and 2015, Och-Ziff entered into multiple transactions with a business partner in the Democratic Republic of the Congo ("DRC") with knowledge that substantial sums of money would be paid to DRC officials in order to secure valuable mining rights and long-term deal flow for Och-Ziff in the DRC mining sector;

    b.    Och-Ziff used an intermediary to bribe Libyan officials in order to secure a $300 million investment in Och-Ziff hedge funds from the Libyan Investment Authority, from which Och-Ziff accrued fees and incentive income totaling over $100 million;

    c.    Och-Ziff categorized fraudulent and illegal transactions as investments or convertible loans in its financial records, despite its knowledge that these transactions included, in part, payments of bribes and self-dealing for the benefit of Defendants' business partners;

    d.    Despite its awareness of the high risk of corruption in African countries in which it did business, Och-Ziff knowingly failed to implement an adequate system of internal accounting controls, failed to enforce internal accounting controls it did have in place, failed to prevent bribe payments, and failed to take corrective measures when improper transactions were identified; and

e.      Och-Ziff knowingly failed to implement and maintain adequate controls to
ensure the effective enforcement of its internal policies and compliance
with applicable laws, including the FCPA, and failed to take corrective
measures when instances of misuse of funds were identified.

10.     As a result of this conduct, Defendant Och-Ziff has agreed to pay approximately
$213 million in criminal penalties and to disgorge $199 million to the SEC; Defendant Och has
agreed to disgorge $2.2 million reflecting his estimated share of Och-Ziff's illegal gains; and OZ
Africa Management GP LLC ("OZ Africa"), a wholly-owned subsidiary of Och-Ziff, entered a
guilty plea for conspiracy to violate the FCPA[2].  In addition, Och-Ziff is required to implement a
corporate compliance program and retain an independent compliance monitor to oversee Och-
Ziff's compliance program for a period of three years.  Defendant Cohen, the architect of Och-
Ziff's African transactions, still faces prosecution in connection with his role in the bribery
scheme.

11.     Based on Defendants' knowledge and participation in an ongoing bribery scheme
and active concealment of a targeted regulatory investigation, Defendants' financial statements
and public disclosures concerning Och-Ziff's operations and the adequacy of its internal
accounting and compliance-related controls were false and misleading throughout the Class
Period and its stock price remained artificially inflated.

12.     Specifically, Defendants knew but failed to disclose that:

(a)     Och-Ziff's revenues were derived, in part, from an ongoing bribery scheme and
violations of the FCPA;

---

[2] The OZ Africa Plea Agreement (Cr. No. 16-515 (NGG)) dated September 19, 2016 is
incorporated by reference herein.

(b)   Och-Ziff was subject to a targeted investigation related to the bribery scheme and violations of law, which was likely to have a material impact on the Company's business and financial condition;

(c)   Och Ziff's financial statements violated Generally Accepted Accounting Principles ("GAAP") for failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose that such loss was reasonably possible, its nature, and the amount or range of such loss, in the minimum amount of the profits earned from transactions entered into by means of the FCPA violations;

(d)   Och-Ziff did not maintain, implement, or enforce adequate internal controls to ensure compliance with the FCPA and related laws; and

(e)   Och-Ziff did not maintain, implement, or enforce adequate accounting controls to ensure the accuracy of Och-Ziff's books and records, including the fact that certain transactions were funneled to pay bribes to foreign government officials, and its financial statements therefore failed to comply with GAAP.


13.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities following a series of corrective disclosures, Plaintiffs and other Class members suffered significant damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Och-Ziff securities are traded within this District and many of the acts and practices complained of occurred in substantial part herein.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

17.     Ralph Langstadt and Julie Lemond have been appointed Lead Plaintiffs.  As set forth in their previously filed certifications, Langstadt and Lemond purchased Och-Ziff securities at artificially inflated prices during the Class Period and were damaged upon the publication of the alleged corrective disclosures.

18.     Defendant Och-Ziff is a corporation organized under the laws of the state of Delaware, with its principal executive offices located at 9 West 57th Street, New York, New York, 10019.  All of Och-Ziff's executive directors have an ownership interest in the firm and receive distributions that are directly tied to the firm's profitability.

19.     Defendant Daniel S. Och ("Och") is the founder of the Company and has been its Chairman and Chief Executive Officer since its inception in 1994.  Och is also the Chairman of Och-Ziff's Partner Management Committee.  Och agreed to pay nearly $2.2 million to settle the SEC's charges against him.  Och is the first sitting CEO to be found culpable for his company's foreign bribery violations.   Och is referred to as "Och-Ziff Employee 1" in the Deferred Prosecution Agreement. (DPA SOF ¶6).  The DPA describes "Och-Ziff Employee 1" as a high ranking officer of Och-Ziff based in New York.  *Id.* The DPA describes "Och-Ziff Employee 1"

as emailing "Och-Ziff Employee 3" (Michael Cohen) about the LIA's investment in Och-Ziff and providing approval for Cohen's pursuit of the LIA's investment. *Id.* at ¶71. The SEC Order states that Och was aware of the corruption risk in doing business with Gertler based on the due diligence report Defendants received but instructed Frank and Cohen to move forward nonetheless. (SEC Order at page 16). These facts concerning Och match the facts concerning "Och-Ziff Employee 1" set forth in the DPA.

20.     Defendant Joel M. Frank ("Frank") is, and at all relevant times was, the Company's Chief Financial Officer and Senior Chief Operating Officer. Frank is also a member of Och-Ziff's Partner Management Committee. Frank is referred to as "Och-Ziff Employee 2" in the Deferred Prosecution Agreement. (DPA SOF ¶7). The DPA describes "Och-Ziff Employee 2" as a high ranking officer of Och-Ziff based in Och-Ziff's New York office who was also an officer of OZ Africa and executed documents on its behalf. The SEC Order states that Frank approved the expenditure of Och-Ziff funds in transactions in which bribes were paid, and that Frank was aware of the high risk of corruption in transactions with Gertler, and reviewed the due diligence reports on the Libyan Intermediary. (SEC Order pages 5, 7). These facts concerning Frank match the facts concerning "Och-Ziff Employee 2" set forth in the DPA.

21.     Defendant Michael Cohen ("Cohen") was the Head of European Investing for Och-Ziff who headed Och-Ziff's London office. Cohen was a member of Och-Ziff's senior management team. Cohen was also in charge of picking and running Och Ziff's African investments. Cohen's scienter is imputed to Och-Ziff. Cohen is referred to as "Och-Ziff Employee 3" in the Deferred Prosecution Agreement (DPA SOF ¶8) The DPA describes "Och-Ziff Employee 3" as a "senior executive of Och-Ziff and a member of Och-Ziff's management committee who headed Och-Ziff's London office. *Id.* Cohen was aware that illegal bribes were

paid to various foreign officials in connection with Och-Ziff's transactions in several countries in Africa.  These facts concerning Cohen match the facts concerning "Och-Ziff Employee 3" set forth in the DPA.

22.     Och, Frank and Cohen are referred to collectively as the "Individual Defendants."

23.     Och-Ziff, Och, Frank and Cohen are referred to collectively as "Defendants."

## RELEVANT NON-PARTIES AND ENTITIES

24.     "DRC Partner" referenced in the Deferred Prosecution Agreement refers to Israeli mining magnate, Daniel Gertler. (DPA SOF ¶12).  The DPA describes "DRC Partner" as an Israeli businessman who had significant interests in the diamond and mineral mining industries in the DRC.  *Id*.  Dan Gertler is an Israeli mining magnate with close ties to Congo's president Joseph Kabila. The DPA details DRC Partner's relationship with DRC government officials and a joint venture with Och-Ziff which involved Och-Ziff purchasing $150 million of shares issued in a company controlled by DRC Partner.  *Id*. at ¶29.   Och-Ziff made two loans totaling $234 million to companies controlled by Gertler. The loans were made under the oversight of Michael Cohen.  Two months after going public on the New York Stock Exchange in November 2007, Och-Ziff launched a joint venture with South African partners to invest in African "natural resources and related businesses," according to an Och-Ziff news release.  The joint venture made a $115 million loan to Gertler in the spring of 2008, followed by an additional advance of $9 million, through a company registered in the British Virgin Islands.  That money was used by Gertler to finance a deal giving him control of a valuable copper and cobalt mine in southern Congo called Kalukundi.  At that time, the ownership of Kalakundi was in dispute in Congolese Courts.  These facts concerning Gertler match the facts concerning "DRC Partner" set forth in the DPA.  (*See* DPA SOF at ¶¶29-54).

25.     "Libya Intermediary" referenced in the Deferred Prosecution Agreement refers to Mohammed Ajami. (DPA SOF ¶13).  The DPA describes "Libya Intermediary" as a London-based middleman with connections to foreign officials in Libya who was retained by Och-Ziff to obtain a $300 million investment from the LIA.   Mohammed Ajami is a London-based middleman who maintains a close relationship with the Libyan Intelligence Chief.  Ajami helps companies looking for business in Libya.  Ajami co-founded a hotel company (the Magna Group) in Libya that Och-Ziff gave a $40 million loan to.  These facts concerning Ajami match the facts concerning "Libya Intermediary" set forth in the DPA. (*See*, DPA SOF ¶¶ 64-65; 77).

26.     "Libyan Official 1" referenced in the Deferred Prosecution Agreement refers to Saif al-Islam Gaddafi, the son of Muammar Gaddafi. (DPA SOF ¶17).  The DPA describes "Libyan Official 1" as a close relative of a high-ranking official in the Libyan government who did not hold a formal position but conducted "high profile foreign and domestic affairs on behalf of the Libyan government" and made investment decisions for the LIA and was a "foreign official" within the meaning of the FCPA.  *Id.*  Saif al-Islam did not hold an official position in the Libyan government but was seen as a highly influential figure in the Libyan government given that his father ruled Libya.   These facts concerning Saif al-Islam match the facts concerning "Libyan Official 1" in the DPA.

27.     "DRC Official 1" referenced in the Deferred Prosecution Agreement refers to Joseph Kabila. (DPA SOF ¶14).  The DPA describes "DRC Official 1" as a senior official in the DRC who "had the ability to take official action and exert influence over mining matters in the DRC."  *Id.*  The DPA describes Gertler as having a close relationship with "DRC Official 1" and describes Gertler as using "his significant political influence with DRC Official 1…and his clique to frustrate competitors." *Id.* at 25.  Joseph Kabila is the former army chief who later

became president of the DRC, and who allowed Gertler to secure valuable Congolese mines and extract them at deeply discounted prices.   These facts concerning Kabila match the facts concerning "DRC Official 1" in the DPA.

28.     "DRC Official 2" referenced in the Deferred Prosecution Agreement refers to Katumba Mwanke.  (DPA SOF ¶15).  The DPA describes "DRC Official 2" as a senior official in the DRC and close advisor to DRC Official 1 and an "Ambassador-at-Large for the DRC government and also a national parliamentarian."  *Id*. at ¶15.  Further, the DPA shows that "DRC Official 2" is "DRC Official 1's" closest aide and former Katanga governor.  As set out in the DPA, DRC Official 2 died on February 12, 2012 and was described in  a Financial Times article as "member of parliament and former governor of Congo's copper heartlands province Katanga…Diplomats associate him with Congo's entrenched corruption and a series of secret investments."  (DPA SOF ¶¶25, 61).  Katumba Mwanke was the governor of Katanga under Laurent Kabila, where he got to know Joseph Kabila.  Mwanke was a senior figure in Joseph Kabila's inner circle.  Katumba Mwanke died in a plane crash in Bukavu on February 12, 2012.  Joseph Kabila and Dan Gertler are photographed together in news articles attending Mwanke's funeral.  These facts concerning Mwanke match the facts concerning "DRC Official 2" in the DPA.

29.     "Och-Ziff Employee 5" referenced in the Deferred Prosecution Agreement refers to Vanja Baros, an Och-Ziff employee in the Company's London office who oversaw certain investments in Africa.  (DPA SOF ¶10). The DPA describes "Och-Ziff Employee 5" as an Australian citizen and an employee of the London based subsidiary of OZ Management LP and a member of Och-Ziff's European private investment team which had responsibility for investments in Africa.  *Id*. "Och-Ziff Employee 5 was responsible for overseeing certain Och-

Ziff investments involving mineral extraction, oil and other natural resources in Africa. *Id*. The DPA details "Och-Ziff Employee 5's" discussions with Michael Cohen about the various bribery schemes. Vanja Baros is an Australian who was a director of African Management Limited, one of the joint ventures set up by Cohen. Baros worked closely with Cohen. Baros took a trip to Zimbabwe in 2008 and met with Billy Rautenbach, a Zimbabwean business man with close ties to dictator Robert Mugabe. Three weeks after Baros' trip to Zimbabwe a large portion of the proceeds from a $100 million loan made by Och-Ziff to a company controlled by Dan Gertler was channeled to the Mugabe government. Baros received a Wells Notice from the SEC in connection with his role in Och-Ziff's African Investments. Baros left Och-Ziff in 2013. These facts concerning Baros match the facts concerning "Och-Ziff Employee 5" in the DPA.

      30.     "Gabonese Consultant" referenced in the Deferred Prosecution Agreement refers to Samuel Mebiame. (DPA SOF ¶98). The DPA describes "Gabonese Consultant" as a Gabonese national who was paid funds provided by Och-Ziff in connection with uranium operations in Chad and Niger. *Id*. The DPA states that between mid-2007 and February 2009 "Gabonese Consultant" made $2 million in bribe payments to officials in Chad and Niger in connection with uranium concessions held by an Och-Ziff joint venture. *Id*. at 100. Samuel Mebiame is the son of a former prime minister of Gabon. Mebiame worked as a fixer for an Och-Ziff joint venture. Mebiame was arrested in August 2016, and a criminal complaint was filed against him on August 12, 2016 in the Eastern District of New York. Mebiame admitted that he acquired rights to uranium concessions by paying bribes to high ranking government officials in Niger, Guinea and Chad to obtain those uranium concessions on behalf of the Och-Ziff joint venture. These facts concerning Mebiame match the facts concerning "Gabonese Consultant" in the DPA.

## SUBSTANTIVE ALLEGATIONS

### A. Background

31.     Och-Ziff is reported to be one of the largest institutional alternative asset managers in the world with approximately $46.2 billion assets under management as of October 1, 2014.  Och-Ziff was founded in 1994 by Defendant Och and became a public company in November 2007, trading on the New York Stock Exchange ("NYSE") under the ticker symbol ("OZM").  Through his Company, Defendant Och amassed a personal fortune estimated by Bloomberg to be about $3.7 billion.

32.     Och-Ziff is one of the few publicly traded institutional asset management firms. Shortly after Och-Ziff went public, in an interview and article, Defendant Och stated that the Company's decision to go public would help provide additional capital to invest in unusual private financing structures and joint ventures, and allow the Company to provide much-needed capital to companies around the world.

33.     Och-Ziff represents that it makes investments only after it conducts "extensive" due diligence.  That process requires the Company to evaluate when necessary "important and complex business, financial, tax, accounting, environmental and legal issues.  Outside consultants, legal advisors, accountants and investment bankers may be involved in the due diligence process in varying degrees depending on the type of investment."  Och-Ziff states that it "approach[es] investments in each of [its] strategies through *rigorous fundamental analysis* of the drivers of potential investment risk and return.  [The Company] look[s] at *both qualitative and quantitative factors* in assessing the risk/reward parameters and *perform[s] extensive due diligence*."

34.    Reputational risk is a significant consideration and is actively analyzed by Och-Ziff.    According to Och-Ziff's public filings, "risk management is…central to how [the Company] manage[s] the operations of [its] business.  [The Company] actively manage[s] the operational risks of [its] business, including liquidity, counterparty exposures, legal and reputational risks."  Och-Ziff acknowledges that reputational harm could materially damage its results of operations, financial condition and liquidity.

35.    Och-Ziff also cites its "transparency" and "focus on infrastructure" as differentiating competitive strengths.  The Company represents in its public filings that "[s]ince our firm's inception, we have focused on building a robust infrastructure with an emphasis on strong financial, operational and compliance-related controls."  The Company also claims to have implemented a global compliance program, which is structured "to address the legal and regulatory requirements that apply to [its] company-wide operations" and "to support our global securities trading operations."  As described by the Company, the global compliance program includes "comprehensive policies and supervisory procedures," "mandatory compliance training," and "strong relationships with a global network of local attorneys specializing in compliance matters to help us quickly identify and address compliance issues as they arise."

36.    Defendant Och is actively involved in Och-Ziff's business and has far-reaching control.  For instance, Och has "ability to elect all of the members of [Och-Ziff's] Board of Directors and thereby control [the Company's] management and affairs" and "determine the outcome of all matters requiring shareholder approval."  Moreover, as set forth in the SEC Order, Och "[has] final authority to approve all private investments by Och-Ziff, including all transactions described [herein]."

37.     In the spring of 2008, Defendant Och placed his trusted protege, Michael Cohen, in charge of Och-Ziff's European office, including picking and running Och-Ziff's European and African investments.  At that time, Cohen was the Head of European Investing for Och-Ziff and a member of Och-Ziff's senior management team.

38.     During his last six years at the firm, Cohen pocketed more than £400 million, making him one of the highest-paid hedge fund executives in Europe.

**B.  Defendants' Fraudulent Scheme**

39.     Beginning in or about 2008 and throughout the Class Period, Defendants engaged in a fraudulent scheme that involved: (a) knowingly violating the FCPA and related laws; (b) concealing the existence of a targeted DOJ and SEC investigation related to this ongoing illegal conduct; (c) misstating the Company's financial statements by failing to maintain adequate internal accounting controls and comply with GAAP; and (d) failing to implement, maintain, and enforce adequate compliance measures to prevent and correct fraudulent and illegal conduct.

***Defendants' Bribery Of Foreign Officials In Exchange For Business***

a.   The Relevant Regulatory Framework

40.     Like any other U.S. company, Och-Ziff is subject to all applicable laws and regulations, including prohibitions against bribes and kick-backs in violation of the Foreign Corrupt Practices Act ("FCPA") and related laws.

41.     The FCPA was enacted in the wake of SEC investigations in the mid-1970's, when many U.S. companies admitted to making hundreds of millions of dollars in questionable or illegal payments to foreign government officials, politicians, and political parties.  The FCPA was the government's attempt to rein in this corrupt behavior and, in conjunction with other countries that were passing similar laws, level the playing field in international business.

42.     The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq., makes it unlawful to make payments to foreign government officials to assist in obtaining or retaining business.  Specifically, the anti-bribery provisions of the FCPA prohibit the use of the mails or any means of instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person.  The FCPA broadly applies to payments to "any" officer or employee of a foreign government and to those acting on the foreign government's behalf.  The FCPA thus covers payments to low-ranking employees and high-level officials alike.  The payor or offeror need not achieve his or her goal—the payment or promise to make a payment is all that is required to violate the FCPA.  Moreover, "anything of value" encompasses much more than cash payments and includes political contributions, charitable contributions, tangible gifts, and travel and entertainment expenses.

43.     The FCPA's accounting provisions, among other things, require that any issuer of publicly traded securities make and keep books, records and accounts that accurately and fairly reflect the transactions and disposition of the company's assets, and prohibit the knowing and willful falsification of an issuer's books, records, or accounts.  *See* 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), 78ff(a).

44.     The FCPA's accounting provisions also require that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurance that, *inter alia*: (i)

transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.  The FCPA prohibits the knowing and willful failure to implement a system of internal accounting controls.  *See* 15 U.S.C. § 78m(b)(5), 78ff(a).

45.     Violators of the FCPA are subject to civil and criminal penalties, including prison time and fines that can amount to twice the gain that resulted from a corrupt payment.

46.     Och-Ziff represents that its "*reputation for integrity is its most important asset*." The Company "expects its directors, officers and employees and those of its subsidiaries and affiliates, to conduct themselves according to high ethical and professional standards of conduct. All decisions and actions taken on the Company's behalf must be in strict compliance with all applicable laws and regulations and shall adhere to the highest standards of integrity."

47.     Och-Ziff's Code of Business Conduct and Ethics specifically mandates that "[n]o one acting on behalf of the Company may use kickbacks, bribes or other corrupt practices in conducting the Company's business.  The U.S. Foreign Corrupt Practices Act of 1997 (the 'FCPA') makes it a criminal offense to make improper payment to non-U.S. governmental or political officials in order to obtain or retain business, such as payments in the nature of kickbacks and bribes.  The FCPA also requires that publicly held companies maintain and keep records and accounts that fairly and accurately present their activities and transactions."

48.     Och-Ziff's SEC filings also contain risk disclosures about the DOJ and SEC's devotion of resources to FCPA enforcement.  For example, Och-Ziff's 2012 Form 10-K stated "we have developed and implemented policies and procedures designed to ensure strict compliance by us and our personnel with the FCPA…"

49.     As explained in detail below, Och-Ziff engaged in a widespread bribery scheme that violated the FCPA over the course of several years.  Defendants have admitted that they violated the law, and Och-Ziff's wholly-owned subsidiary has entered a plea of guilty to a criminal indictment for violation of the FCPA.  Defendants' illegal and corrupt practices and the SEC and DOJ investigation related thereto were material to investors and were required to be disclosed because, among other things, (i) Och-Ziff's success was due, in part, to the use of improper and illegal business practices; (ii) Och-Ziff's statements regarding the status of regulatory investigations could be understood, by a reasonable investor, to deny that any illegal conduct occurred or was occurring; (iii) Och-Ziff's financial statements  failed to comply with GAAP, which required, that Och-Ziff recognize a reasonably estimable probable loss from a loss contingency, or alternatively, at least disclose that such loss was reasonably possible and the amount or range of such loss, in the minimum amount of the profits earned from transactions entered into by means of the FCPA violations; and (iv) the FCPA violations and concealment of the SEC and DOJ investigation (the "Investigation") contradicted Defendants' statements that Och-Ziff maintained adequate internal accounting and compliance-related controls to detect and correct violations of law and ensure accuracy in financial reporting.

              b.      Overview of Defendants' Bribery Scheme

50.     Och-Ziff's agreement to pay a total of approximately $413 million to resolve the SEC and DOJ investigation and avoid criminal prosecution represents one of the largest settlements in the history of the FCPA.

51.     As set forth in the DPA and the SEC Order, from 2005 to 2015, in an effort procure business, Och-Ziff engaged in widespread bribery in the following countries in Africa: The Democratic Republic of the Congo ("DRC" or "Congo"), Libya, Guinea, Chad and Niger.

52.     In the DRC, Och-Ziff engaged the notorious Israeli mining magnate, Daniel Gertler ("Gertler") (referred to as "DRC Partner" in the DPA) to acquire and consolidate mining assets.   Defendants knew that Gertler had a very close relationship with DRC government officials and hired him, despite warnings by counsel, to "secure access to attractive investment opportunities in the DRC mining sector." (DPA SOF ¶24). Och and Frank knew about Gertler's reputation and went ahead to do business with him anyway.   Gertler used money provided by Och-Ziff to pay over $100 million in bribes to DRC government officials to obtain special access and preferred prices to do business in the DRC's government controlled mining sector.   The majority of the $100 million in bribe payments went to a high-level official in the DRC government who was empowered to take official action over mining issues in the DRC.   (DPA SOF ¶¶24-26; 20, 14).   ***Och-Ziff profited to the tune of $91 million from the illegal schemes in the DRC***.   (DPA SOF ¶63).

53.     The Libyan Investment Authority ("LIA") is a sovereign wealth fund.  The LIA was formed in 2004 and its assets were launched in the summer of 2007.  The LIA was originally controlled by Colonel Moammar Gaddafi, as well as his son Saif al-Islam Gaddafi, who served as its Chairman. The creation of the LIA was an effort by Gaddafi to open ties to the West in exchange for a pledge to abandon weapons of mass destruction and pay reparations to families of the airline bombing over Lockerbie, Scotland.  Libya had been isolated from the international community for more than a decade because of its suspected involvement in the 1988 bombing which brought down a Pan Am airliner over Lockerbie.  In 2004, the U.S. lifted commercial sanctions on Libya after Gaddafi agreed to hand over his weapons of mass destruction.  Libya, like other oil-rich nations, formed a sovereign wealth fund to invest its oil profits. Set up by

Gaddafi's son Saif al-Islam to exploit Libya's vast oil wealth as the country was emerging from 20 years of sanctions, the LIA started with $65 billion of assets.

54.     In Libya, from 2007 through 2010 Och-Ziff routed bribes through fixer Mohammed Ajami (referred to as "Libya Intermediary" in the DPA) to gain a $300 million investment from the LIA. Cohen engaged Ajami without conducting any due diligence on him, despite Ajami's known connections to government officials in Libya.  After the LIA agreed to make a $300 million investment in Och-Ziff, Och-Ziff and Ajami set up a complex web of companies to pay bribes to Libyan officials affiliated with the LIA.  To do this, Och-Ziff entered a "consultancy" agreement with a British Virgin Islands special purpose vehicle that Ajami controlled.  Using this consultancy agreement- which was a sham - Och-Ziff paid Ajami a $3.75 million "finder's fee" in exchange for his help in getting the LIA's $300 million investment in Och-Ziff.  Large portions of this finder's fee were then transferred to three Libyan governmental officials who influenced the LIA's investment decisions. ***Och-Ziff obtained approximately $100 million in profits from the LIA's illegally secured investment***.  (DPA SOF ¶¶69, 81-82, 86-92).

55.     In Chad and Niger, between May 2007 and February 2009 Och-Ziff,  through a portfolio company of an Och-Ziff joint venture investment company, paid funds to consultants of the joint venture portfolio company, including a man named Samuel Mebiame ("Gabonese Consultant" in the DPA (DPA SOF at ¶98) in connection with valuable uranium concessions in Chad and Niger.  Och-Ziff knew that Mebiame's consultancy fees were suspiciously exorbitant and that other consultancy fee payments were used for personal expenses.  Och-Ziff funded over $20 million in payments via capital calls[3] to the joint venture that Mebiame used to pay bribes in Chad and Niger. Och-Ziff knew that these payments were not adequately justified and also knew that the results of its audit of the joint venture were "very weak with poor controls and

---

[3] A capital call is a call for an additional equity investment by shareholders are partners.

management" but ignored this, and also continued to do business with Mebiame after he refused to sign anticorruption warranties.  Between 2007 and 2009 Mebiame paid at least $2 million in bribes to government officials in Chad and Niger related to uranium concessions, which Och-Ziff continued to hold licenses for through 2012.  ***Och-Ziff profited $30 million from these investments.***  (DPA SOF ¶¶98-100).

56.     Investors in Och-Ziff's various hedge funds receive quarterly reports concerning the respective funds' performance.  In order to apprise hedge fund investors of the performance of a given fund, Och-Ziff maintained detailed books and records on all fund activities and investments.  Accordingly, Defendants had complete visibility into and knowledge of the profits obtained from specific investments, including the profits reaped from each illegal African Transaction, at or before the time the profits were realized.

57.     The details of Defendants' illegal conduct set forth below are taken from the DPA's Statement of Facts.  As set forth in the DPA, Och-Ziff has agreed to and acknowledged the filing of the four-count criminal Information, charging the Company with: (1) two counts of conspiracy to commit offenses against the United States in violation of Title 18 of the United States Code, Section 371, that is, to violate the anti-bribery provisions of the FCPA; (2) one count of violating the books and records provisions of the FCPA; and (3) one count of violating the internal controls provisions of the FCPA.  (DPA, ¶1).  The Company also "admits, accepts and acknowledges that it is responsible under United States law for the acts of its officers, directors, and agents…and that the allegations describes in the Information and the facts described in the Statement of Facts are true and accurate." (DPA ¶2).[4]

c.     The Libyan Scheme

---

[4] According to the DPA, Ajami ("Libya Intermediary") and Gertler ("DRC Partner"), *inter alia*, are "agents" of Och-Ziff.  (DPA SOF ¶¶12-13).

58.     Och-Ziff sought investments from the LIA beginning in about 2007.   Och-Ziff arranged for Cohen to meet with Mohammed Ajami, who would act as an intermediary to obtain investments from the LIA on Och-Ziff's behalf.   Cohen knew, at the outset, that Ajami would make corrupt payments to Libyan government officials to obtain investments on Och-Ziff's behalf.   First, Cohen caused Och-Ziff to invest $40 million into Ajami's real estate development project in Libya.   In doing so Cohen was motivated to establish a relationship with Ajami.   Och-Ziff also paid a $400,000 "deal fee" to an entity Ajami controlled in connection with the investment in the real estate project which Cohen knew served as compensation to Ajami for bribes that he had to pay Libyan officials in connection with the real estate project (DPA SOF ¶¶64-65).

59.     From February 2007 onward, Ajami worked as Och-Ziff's "agent to obtain an asset placement from the LIA."   No due diligence was performed to investigate Ajami at the time he was first engaged.   (DPA SOF ¶66).

60.     In March 2007 Cohen went to Vienna to attend a meeting, arranged by Ajami, with three Libyan government officials who controlled investments by the LIA, to discuss the possibility of the LIA making an investment in Och-Ziff.   Cohen told Och about the meeting.   In emails to Och, Cohen wrote: "Meetings are amazing.   They have 77 billion, half in cash and no idea who to give it to."; "I haven't been this excited in a while." (DPA SOF ¶¶67-69).

61.     At the end of May 2007, Och emailed Cohen asking about the status of the potential investment from the LIA.   Cohen responded stating "I thought you were against it so I haven't [sic] pursued it.   The agent wants to come in and see me this week.   You OK with that."   Och responded indicating that Cohen should go forward:   "I will be ok. Will call you."     (DPA SOF ¶71).

62.     A due diligence report on Ajami and his business partners was sent to Och-Ziff employees on September 11, 2007 informing them that Ajami and his cohorts were "hard to pin down" because their investments have all been offshore, and that Ajami's company uses offshore special purpose vehicles which are established solely to facilitate a given transaction.  The due diligence report warned that because Ajami and his businesses act as "fixers" there "is little documented evidence of the company's activities either in the UK or internationally."[5] (DPA SOF ¶73).

63.     When Cohen and another Och-Ziff employee met with the LIA at is offices on September 20, 2007 Ajami did not accompany them, informing them that his role could *not* be publicly disclosed to the LIA.  Accordingly, Ajami was not mentioned at the meeting despite serving as Och-Ziff's introductory agent to the LIA.  (DPA SOF ¶¶74-75).

64.     Cohen and Ajami negotiated the amount of a fee that Ajami would receive if the LIA invested in Och-Ziff.  Cohen told Ajami that Och-Ziff would be limited in the amount of the fee it could pay him because it was a regulated entity in the U.S.  Ultimately, they agreed that a fee of $3.75 million would be paid to Ajami in two separate installments in exchange for the LIA's $300 million investment in Och-Ziff[6].  (DPA SOF ¶76).

65.     Four days before the LIA funded the $300 million investment in Och-Ziff, Cohen told Och that he had paid Ajami a fee in connection with the LIA's investment.  Och then forwarded Cohen an email from an Och-Ziff officer containing conditions for payment of the fee to Ajami.  Essentially, the payment to Ajami would have to be disclosed to the LIA.  Thereafter,

---

[5]  Dictionary.com defines a "fixer" as "a person who arranges matters in advance through bribery or influence."  http://www.dictionary.com/browse/fixer?s=t  11/12/2016.
[6] The LIA's investment went to various Och-Ziff controlled subsidiaries through which Och-Ziff operated and provided investment advisory and management services for individual hedge funds (referred to in the DPA as "Och-Ziff Hedge Funds" at SOF ¶2).

Cohen and Ajami discussed ways to "satisfy" this requirement without actually disclosing Ajami's role to the LIA.  For example, Cohen and Ajami discussed the possibility of Och-Ziff delivering the disclosure to the LIA through Ajami- which Ajami would fail to deliver.  They also discussed Ajami providing a false representation to Och-Ziff that he had disclosed to the LIA his role in arranging the investment.  (DPA SOF ¶¶77-79).

66.     On November 30, 2007 Och-Ziff received the wire transfers from the LIA for the $300 million investment.  (DPA SOF ¶80).

67.     A few days later, an Och-Ziff officer sent Cohen a consultancy agreement and an anti-corruption side letter between OZ Management LP and a British Virgin Islands special purpose vehicle which Ajami established solely to receive the $3.75 million fee from Och-Ziff. The consultancy agreement was materially false: it described the special purpose vehicle as having employees and expertise in Libya and it did not reflect the fact that Ajami had been working on Och-Ziff's behalf since February of 2007, instead making it looks like he was only now being engaged.  The anti-corruption letter falsely represented that the LIA was notified of the fees paid to Ajami through the special purpose vehicle.   Och-Ziff did not obtain a copy of the supposed written notification to the LIA and did not try to notify the LIA directly of its relationship with Ajami or the BVI special purpose vehicle.  The consultancy agreement and side letter were executed on January 15, 2008 but backdated to make it look like they were executed on December 5, 2007. (DPA SOF ¶¶81-84)

68.     Ajami paid bribes to various Libyan government officials as consideration for the $300 million LIA investment.  He made the payments through the BVI special purpose vehicle and an additional special purpose vehicle Ajami set up through a series of transfers in 2008.

69.     The $3.75 million fixer fee to Ajami was paid by Och-Ziff in two separate installments, the first for $2.25 million on January 16, 2008.  On January 29, 2008 Ajami (through the special purpose vehicle) wired $1,507,659.91 through an intermediary account which was then paid into an account for the benefit of Saif-al-Islam Gaddafi ("Libya Official 1").  On March 5, 2008 the BVI special purpose vehicle transferred $331,478.00 to an account for a company controlled by Ajami ("BVI SPV-2").  The next day, Ajami transferred €500,045 to a bank account in Malta controlled by a Libyan government official ("Libyan Official 2").  The same day, Ajami transferred $400,000 from a BVI SPV-2 account to an account controlled by Libyan Official 2 in Malta.  (DPA SOF ¶¶86-88).

70.     Ajami also provided payments to a third Libyan governmental official ("Libyan Official 3") to gain influence over him, including paying for his luxury hotel accommodations and jewelry as well as his brother's living expenses in London.  (DPA SOF ¶90).

71.     The second installment of the $3.75 million fixer fee was due to be paid on December 1, 2008.  On October 30, 2008 Ajami asked Cohen if it could be paid early.  Cohen agreed and then immediately directed Och-Ziff personnel to pay Ajami's invoice that day.  Then, on November 5, 2008 Ajami directed that the BVI special purpose vehicle to transfer $1,005,000.00 to an intermediary account, which was then paid to an account held for the benefit of Saif-al-Islam.  ***Och-Ziff obtained approximately $100 million in profits from the LIA's illegally secured investment***.  (DPA SOF ¶¶90-91).

      d.     The DRC Scheme

72.     Between December 2007 and March 2008, Och-Ziff, through Cohen and Baros, had discussions with Gertler about forming a joint venture to acquire and consolidate valuable mining assets in the DRC into one large mining company.  During these discussions Gertler told

Cohen and Baros that he would have to pay large sums of money to DRC Government officials to secure access to investment opportunities in the DRC mining sector.  Gertler specifically told Cohen and Baros that Och-Ziff would be expected to help fund these corrupt payments.  (DPA SOF ¶¶23-24).

73.     An employee in Och-Ziff's legal department emailed a due diligence firm to obtain a background check on Gertler, noting that information about Gertler "will be very easy to find, perhaps the impetus behind the movie 'Blood Diamonds.'" (DPA SOF ¶24).

74.     The initial findings from the due diligence report on Gertler were received by Och-Ziff's legal department on February  28, 2008 and stated: "[Gertler] has been willing to use his significant political influence with [Joseph Kabila] and his clique to facilitate acquisitions, settle disputes and frustrate competitors…[Gertler] was rumored to have used his influence with [Katumba Mwanke], [Joseph Kabila's] closest aide and former Katanga governor to settle a [commercial] dispute in his favor…Several compliance watch lists list [Gertler] as a political [sic] exposed individual as a result of his close ties with the DRC government.  He is known to enjoy an extremely close relationship with [Joseph Kabila]…He is happy to use his political influence against those with whom he is in dispute…Whether through good PR and legal advice or indeed innocence, no allegations against him have been proved.  That said, he has been named in a UN report [and] keeps what can only be described as unsavory business associates." (DPA SOF ¶25).

75.     Given this, various senior employees at Och-Ziff had concerns about doing business with Gertler, and Och-Ziff's legal department did not believe Och-Ziff should do business with him.  Frank also believed that Gertler's ability to acquire assets in the DRC was attributable to the fact that he paid bribes to government officials.  In late February 2008 several

members of Och-Ziff's senior management recommended to Och that the Company not undertake transactions with Gertler given that he was designated by the Office of Foreign Assets Control on a prohibited persons list.  Nevertheless, Och-Ziff went on to conduct a series of very large business transactions with Gertler in the DRC.  (DPA SOF ¶26).

76.     All of Och-Ziff's loans to Gertler gave him significant discretion over the use of proceeds of the loans, in direct contravention of the advice from the outside attorney representing Och-Ziff on anti-corruption issues, who stated that providing a convertible loan to Gertler would be high risk and that the only way to avoid anti-money laundering and corruption issues was if Gertler had no discretion on how to spend the proceeds of the loan.  (DPA SOF ¶27).

77.     Between March 2008 and February 2011 Och-Ziff entered into several DRC related transactions with Gertler: (1) an April 2008 purchase of $150 million worth of shares in a publicly traded mining company that Gertler controlled ("Company A"); (2) a $124 million convertible loan through a subsidiary company and African Global Capital ("ACG")[7] to Company B, (a shell entity controlled by Gertler) which was funded between April and October 2008 (the "Convertible Loan Agreement"); and 3) a $130 million margin loan to Company C, (also a shell entity controlled by Gertler) in November 2010 and February 2011 (the "Margin Loan Agreement").  Cohen and Baros knew about and participated in corrupt payments Gertler made to various DRC government officials to secure mining interests in the DRC utilizing the funds that Och-Ziff provided to Company B and Company C. (DPA SOF ¶28).

---

[7] ACG are investment funds that invest in African mining company and mineral assets and rights in the DRC.  Africa Management Limited ("AML") was a joint venture company started by Och-Ziff, OZ Africa and affiliated and subsidiary entities with South African business partners in 2007 (DPA SOF ¶5).  AML established multiple investment funds under the ACG name.  Och-Ziff owned a 40% interest in AML and its approval was required for all investments by ACG funds.  AML and ACG relied on Och-Ziff's legal and compliance to perform due diligence and legal advice as well as document transactions.  *Id.*

78.     Och-Ziff partnered with Gertler to consolidate a DRC copper mine whose ownership was in dispute pursuant to legal proceedings in DRC courts.  Och-Ziff, OZ Africa and ACG worked with Gertler to structure and fund simultaneous investments into Gertler's shell companies.  On March 7, 2008 Cohen emailed Och stating that there would be three upcoming transactions that required Och-Ziff funds.  First, Och-Ziff would buy $150 million of new shares issued by Company A, which Cohen described to Och as the "second biggest copper mine in the DRC".  Second, Gertler would offer ACG 50% of a DRC copper and cobalt mine "at a very attractive price," and ACG would invest up to $200 million in it.  Third, ACG and Gertler would buy 55% of a company called Africo Resources Limited ("Africo") which owned a copper asset "next door" to Gertler's copper and cobalt mine.  Cohen wrote to Och that the "game plan is to eventually merge [the copper and cobalt mine] and Africo into [Company A] for stock and control of the company jointly with Gertler (DPA SOF ¶29).

79.     Africo, a Canadian company, was engaged in a dispute over ownership in the DRC copper mine.  A Congolese company called Akam Mining SPRL ("Akam") had obtained an ex parte judgment against Africo after an employment dispute. Katumba Mwanke orchestrated the taking of Africo's interest in the mine and made it available to Gertler.  Africo sought to nullify the seizure of its interest in the mine in legal proceedings in DRC courts which were still pending in March 2008.  (DPA SOF ¶31).

80.     On March 16, 2008 Cohen received an email from Gertler bragging about his power to "shape the DRC landscape."  The email stated: "As you can see, our only real point is this flexibility.  The DRC landscape is in the making and I am shaping it- like no one else.  I would love to have you beside me as a long-term partner.  As 40% [Company A] shareholder, I facilitated your entry at an attractive time/price knowing that you see there is a bigger picture in

all of this.  What this bigger picture exactly looks like, is yet to be determined, but it is your partner who is holding the pen- I just need flexibility on the drawing board to create full value for our partnership."  (DPA SOF ¶31).

81.     On March 28, 2008 Och-Ziff entered into a supplemental subscription agreement with Company A to purchase 150 million shares for $150 million.  The stated purpose of the offering was to raise capital to fund the company's ongoing mining efforts in the DRC.  The same day, Gertler caused $11 million to be delivered to Katumbe Mwanke, as part of the plan to corruptly acquire Africo's interest in the copper mine for the benefit of Gertler and Och-Ziff. (DPA SOF ¶32).

82.     Och-Ziff and Gertler proceeded with a plan to obtain the disputed mining interest by acquiring Akam with Och-Ziff funds and then settling the legal dispute over the mine. Though AGC Och-Ziff gave Company B the "significant financing" through the Convertible Loan Agreement which allowed Company B to resolve the DRC legal dispute and gain control over Africo.  The Convertible Loan Agreement was originally intended to be funded in two tranches of $15 million and $100 million.  Baros emailed Cohen seeking approval to fund the first tranche on April 3, 2008.  On April 7, 2008 Gertler caused $2.2 million to be delivered to Katumbe Mwanke and caused another $2.8 million to be delivered to him on April 10, 2008. (DPA SOF ¶¶32-35).

83.     Och-Ziff funded the first tranche of the Convertible Loan Agreement through AGC on April 17, 2008.  This tranche ($15.750 million) was funded purportedly to acquire Akam, make a shareholder loan to Africo and pay legal expenses.  (DPA SOF ¶36)

84.     On April 21, 2008 Africo announced that it reached an agreement with Company B for a private placement of CAD $100 million, resulting in Company B owning approximately

60% of Africo.  However, the agreement required the approval of Africo's shareholders. (DPA SOF ¶36).

85.     Gertler resolved the Africo and Akam dispute by paying bribes to DRC government officials, including judges, and making sure that Africo received an unfavorable outcome in the case against Akam so that Africo's shareholders would be sure to approve private placement which would give Company B control of Africo.  (DPA SOF ¶37)

86.     On June 4, 2008 Gertler, with the assistance of his associate, arranged payment of $500,000 to DRC officials, including judges, who were involved in the court case.  Gertler's associate sent him a series of text messages over the next two days evidencing the bribes.  For example: "I'm with the main lawyer…in the africo story, he has to arrange with supreme court, attorney genral [sic] and magistrates, he wants 500 give to all the officials and 600 for 3 lawyer cabinets…the conversation is vey tough. (while talking i said to ask money to [one of Akam shareholders], [the Akam shareholder] said he cant because most of the money has to go to [Katumba Mwanke]…i don't know if he wants to provoke me or it was something [Akam shareholder] invented…) but they are not at 1,1 in total"; "…with 800 they guarantee the results and they want me to promise 100 after."  Gertler texted the associate stating "We can't accepts a mid result…Africo must be screwd and finished totally!!!!"  (DPA SOF ¶¶38-39)

87.     On June 5, 2008 a text message from Gertler's associate informed him that the bribes were successful: "[lawyer] has met attorney general and the magistrate[e] that has to write the opinion, he also had contact with the 3 judges of supreme court.  they got clear instructions to rewrite the opinion and to make sure akam wins.  they also agreed to do the lecture of opinion on JUNE 13!"  (DPA SOF ¶40).

88.     On June 12, 2008 Africo announced that its shareholders approved the $100 m CAD private placement by Gertler through Company B which gave Company B a 60% stake in Africo.  Then, on June 18, 2008 Gertler caused $2.5 million to be paid to Katumba Mwanke. (DPA SOF ¶¶41-42).

89.     Shortly after the announcement that Africo's shareholders had approved the private placement, Cohen and Baros learned that a large portion of the money Och-Ziff invested in Company A through the private placement had been diverted to Mugabe's political party in Zimbabwe.  On June 13, 2008 Cohen received a message which stated "[Company A] paid 4 arms into zim, and rented boat from china. Journo has bank transfers apparently."  (DPA SOF ¶43).  China is the main supplier of arms to Zimbabwe.  At the time, Robert Mugabe, who had ruled Zimbabwe since the 1980's looked like he was going to lose his bid for reelection. Company A[8] loaned the money from Och-Ziff's investment to its Zimbabwean subsidiary which the subsidiary in turn used to pay off obligations it had to Mugabe's government.  The $100 million loan went toward a state-sponsored campaign of violence where 200 people were killed, 5,000 were beaten and tortured, and 36,000 were displaced.  Mugabe then won the election.

90.     Despite this allegation of serious misconduct, neither Cohen nor Baros made an effort to determine whether the funds were paid to Mugabe's government or reported this to Och-Ziff's legal and compliance team.   Additionally, Och-Ziff continued funding the Convertible Loan Agreement, funding the second tranche on June 24, 2008 in the amount of $98.275 million.  The purpose of this second tranche was to allow Company B to acquire Africo shares and gain control of Africo.  (DPA SOF ¶¶43-45).

---

[8] "Company A" is CAMEC, (Central African Mining and Exploration Company)

91.     On July 10, 2008 Cohen emailed another Och-Ziff employee stating "U have [Baros's] mobile.  [Gertler] just got a big asset for us."  (DPA SOF ¶45).  Cohen's reference was to Gertler obtaining control of Africo.

92.     The Convertible Loan Agreement was amended by Och-Ziff, AGC, and Gertler on July 24, 2008 to provide for Och Ziff to invest $9 million in a third tranche to be used for "financing the working capital requirements…to the extent such requirements are in accordance with the Business Plan."  Cohen and Baros knew that the working capital requirements included paying bribes to high-level DRC officials.  On October 9, 2008 Och-Ziff funded the third tranche totaling $4.5 million and the joint venture partner of AGC contributed the other $4.5 million. (DPA SOF ¶¶46-47).

93.     In November 2008, an Och-Ziff audit uncovered bribery in Gertler's operations when AGC employees based on South Africa conducted an audit of Company B's expenses to make sure the third tranche of the Convertible Loan Agreement were properly spent.  A draft report was sent to Baros and another employee which stated "satisfactory answers could not be extracted during my discussion [with Gertler's employees] for some of these expenses and its leads one to believe that these are actually the costs of maintaining 'political' alignment' and for 'protocol' with authorities in the DRC- in other words senior Government officials . **This issue needs to be investigated at the highest level directly with [Gertler's company].  This issue should be flagged as a concern considering AGC's compliance requirements.** (emphasis in original)."   Baros instructed the employee who drafted the above that reference to payment of senior government officials be removed.  (DPA SOF ¶¶48-49).

94.     The repayment dates for the Convertible Loan Agreement were continually extended until a publicly traded mining company ("Mining Company 1") purchased Company B.

To attract a buyer for Company B Baros worked with Gertler to obtain assets to inject into or sell alongside Company B, including assets known as Kolwezi Tailings and SMKK.  Och-Ziff knew that Kolwezi Tailing had been stripped by the DRC government from a mining company right before a group of Gertler controlled companies and the DRC government obtained it.  Och-Ziff also knew that the SMKK asset sale was the subject of a back-to-back sale that let Gertler buy it for $15 million from a DRC owned mining company called Gecamines and then resell it to Mining Company 1 for $75 million even though Mining Company 1 actually had the right of first refusal to buy it directly from Gecamines in the first place.  Gertler continued to make corrupt payments to Katumba Mwanke during the period in which he acquired Kolwezi and SMKK.  (DPA SOF ¶¶50-52).

95.     On August 20, 2010 Mining Company 1 acquired 50.5% of Company B, agreeing to pay $575 million over two years, including $50 million in cash.  Cohen and Baros knew that the $50 million was to be used by Gertler to corruptly acquire Kolwezi Tailings.  As part of the deal, Mining Company 1 guaranteed repayment of the Convertible Loan Agreement through a novation of the loan.  Och-Ziff continued providing financing to Gertler in exchange for deal flow of investment opportunities in the DRC after novation of the Convertible Loan Agreement. (DPA SOF ¶¶53-54).

96.     Between November 2010 and February 2011 Och-Ziff provided Gertler with an additional $130 million, $20 million of which was used to make corrupt payments to Kabila and Mwanke.  On November 11, 2010 Cohen e-mailed an Och-Ziff employee asking him to handle a margin loan on Katanga shares.  After receiving a draft term sheet, Cohen and Gertler negotiated the terms of the loan, with Gertler's representatives emphasizing that the "use of proceeds" provision in the loan document would have to be generic so that intercompany loans could be

made.  Then, on November 18, 2010 Och-Ziff incorporated a Cayman Islands partnership called CML Investments Limited.  On November 24, 2010 Och-Ziff made two transfers extending a $110 margin loan through CML to a company called Lora, which Gertler controlled.  The use of proceeds provision was extremely broad, allowing for "funding existing activities of Affiliates of the Borrower and acquisitions of other business interest by its Affiliates and; (iii) other general purposes of the Borrower's Affiliates."   An additional $20 million was provided under an amended loan agreement on February 17, 2011.  (DPA SOF ¶¶55-59).

97.     Between November 2010 and February 2011, Gertler caused a total of $20 million in corrupt payments to be made to Kabila and Mwanke.  (DPA SOF ¶60).

98.     On February 12, 2012 Katumba Mwanke died.  The next day, Baros sent Cohen and email which stated "FYI, [Katumba Mwanke is] dead, [Gertler's] key guy in DRC.  The email included the text of a Financial Times article which stated "[Katumba Mwanke], member of parliament and a former governor of Congo's copper heartlands province, Katanga, cut a shadowy figure.  Diplomats associate him with Congo's entrenched corruption and a series of secret investments.  Congo is one of the world's poorest countries despite its mineral wealth, and ranks among the worst places to do business."   A couple of days later, Gertler sent a text message to Baros stating "I'm fine…sad but fine…I will have to help [Kabila] much more now…tomorrow the burial will take place."  (DPA SOF ¶¶61-62).

99.     Between August 2012 and January 2013, Och-Ziff received wire transfers of $342,091,110 from companies controlled by Gertler in satisfaction of Och-Ziff's agreements with Gertler.

100.     ***Och-Ziff earned profits of approximately $91.12 million from its illegal schemes in the DRC***.  (DPA SOF ¶63).

### *Defendants' Cover-up Of The SEC And DOJ Investigation*

101.     Defendants' illegal bribery scheme caught the attention of regulators in 2011, when the Company received subpoenas from the SEC and requests for information from the DOJ probing the Company's African transactions.  Rather than reveal the truth about its corrupt enterprise, Defendants perpetuated their fraud by stonewalling regulators and omitting any information concerning receipt of the SEC subpoenas and DOJ information requests from their public disclosures, thereby maintaining the artificial inflation in the price of Och-Ziff's stock.

102.     Even after the Company announced on March 18, 2013 that Defendant Cohen, the personal protégé of Defendant Och and head of Och-Ziff Europe, would resign after fifteen years, investors remained clueless that Defendant Cohen and Defendants were at the center of an international bribery scandal that rivaled the plot of any Hollywood movie.

103.     Investors only began to learn the truth when outside news outlets and international anti-corruption non-profit organizations exposed Defendants' corruption.  On March 18, 2014, ***nearly three years after the SEC and DOJ Investigation began***, following a report in The Wall Street Journal, Och-Ziff was forced to publicly disclose for the first time that it was the subject of an ongoing civil and criminal investigation into whether the Company violated antibribery laws in its dealings.  On that day, Och-Ziff also revealed that it began receiving subpoenas from the SEC and requests for information from the DOJ in 2011.  According to Och-Ziff, the investigation "concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa."  Och-Ziff made the disclosure in a laundry list of risk factors that could negatively affect the firm.

104.     The SEC and DOJ Investigation was material to investors and was required to be disclosed at the outset of the Class Period.  First, Defendants knew that the Investigation would

reveal that Och-Ziff's revenues were derived, in part, from the illegal bribery scheme.  Second, Defendants' boilerplate disclosures concerning regulatory investigations generally could be understood, by a reasonable investor, as a denial that Och-Ziff was then being actively investigated for violations of the FCPA in connection with specific African transactions.  Third, based on Defendants' knowing and willful violations of the FCPA, including but not limited to their failure to maintain adequate internal controls and accurate books and records, Defendants knew upon receipt of the subpoenas and information requests that it was probable, and undoubtedly reasonably possible, that the SEC and DOJ Investigation would result in the imposition of fines and penalties and would have a material impact on Och-Ziff's business, operations, and finances.

105.     According to the SEC Order "Och caused Och-Ziff's books and records violations in two DRC transactions, and Frank caused the company's books and records and internal controls violations in connection with the two DRC Partner transactions and the LIA fee payment."

106.     Likewise, Defendant Och, who had final authority to approve and did approve the African Transactions, despite knowledge and repeated warnings that the transactions posed a high risk of corruption, and Defendant Frank, who had ultimate responsibility for devising and maintaining Och-Ziff's internal controls, were also aware of the pervasive accounting and compliance failures, inaccuracies in the Company's financial reporting, and the extreme likelihood that the African Transactions violated the FCPA and related laws, all of which would materially impact Och-Ziff's business, operations, and finances.

**C.  Och-Ziff's Fraudulent Financial Reporting**

107.    GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

108.    GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

109.    SEC and NYSE rules and regulations require that publicly traded companies such as Och-Ziff include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.   See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

110.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R.  §  210.4-01(a)(1) (emphasis added).

***Accounting Principles Imposed a Duty to Disclose the Potential Financial Impact on Och-Ziff of the SEC and DOJ Investigation***

111.    A contingent liability or loss contingency is "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ¶ 1 (1975) (FAS 5); ASC 450-20-20. (FAS 5 was codified as ASC 450, Contingencies, in the FASB Accounting Standards Codification, which became the official single source of authoritative nongovernmental U.S. Generally Accepted Accounting Principles on July 1, 2009, and was

effective for interim and annual periods ending after September 15, 2009. Hereinafter, FAS 5 is referred to as ASC 450.)

112.     When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote.   ASC 450 "uses the terms probable, reasonably possible, and remote to identify three areas within that range, as follows:

      a.      Probable. The future event or events are likely to occur.

      b.      Reasonably possible. The chance of the future event or events occurring is more than remote but less than likely.

      c.      Remote. The chance of the future event or events occurring is slight.

ASC 450-20-20.

113.     Examples of loss contingencies include pending or threatened litigation, and actual or possible claims and assessments. ASC 450-20-05-10.   Actual or possible claims and assessments include those imposed by governmental entities.

114.     An estimated loss from a loss contingency must be accrued by a charge to income on a company's financial statements if: 1) before the financial statements are issued (or are available to be issued), there is available information indicating that the impairment of an asset or incurrence of liability is probable and 2) the amount of loss can be reasonably estimated.   ASC 450-20-25-2.

115.     Under ASC450, "if some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." Disclosure of an additional amount of exposure to loss is

required if there is a reasonable possibility that the additional loss will be incurred.  ASC 450-20-30-1; ASC 450-20-50-3b.

116.    Loss contingencies that do not meet both criteria for recognition (i.e., probable and estimable) still may need to be disclosed in the financial statements. ASC 450.

117.    ASC 450 requires the issuer to disclose a loss contingency if there is at least a reasonable possibility that a loss may have been incurred (i.e., the possibility of a loss is more than "remote").  ASC 450-20-50-3.

118.    Where the loss contingency is less than probable, but not remote, the disclosure shall include "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-4.

119.    "Disclosure is not required of a loss contingency involving an unasserted claim or assessment if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless both of the following conditions are met: a. It is considered probable that a claim will be asserted. b. There is a reasonable possibility that the outcome will be unfavorable." ASC 450-20-50-6.

120.    Consequently, where a governmental agency manifests an awareness of a reasonably possible and material claim against a company, that company must disclose in the financial statements "the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."   ASC450-20-50-6.

121.    The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements,

except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

122.    Because (i) Defendants were aware at all times that Och-Ziff had violated the FCPA, and (ii) it was probable that its violations would result in a material loss to Och-Ziff, and (iii) Defendants knew to the dollar the amount of profits Och-Ziff had earned by means of the FCPA violations, and (iv) could thus reasonably estimate the amount of that loss, then as soon as the SEC had manifested an awareness of a possible claim against Och-Ziff as part of its Formal Order of Investigation and related subpoenas (no later than August 1, 2011), Defendants were obligated under ASC 450 to record a contingent liability on Och Ziff's balance sheet, and a charge to income on the income statement, in the minimum amount of the profits earned from transactions entered into by means of the FCPA violations.

123.    Alternatively, for each quarterly and annual reporting period from November 18, 2011 up until March 18, 2014 if the loss wasn't probable, it was certainly reasonably possible, and thus Defendants violated GAAP by failing to disclose in its financial statements a loss contingency arising from the Government's having communicated to Defendants its awareness of possible material FCPA related claims against Och-Ziff.

124.    Alternatively, for each quarterly and annual reporting period from November 18, 2011 through May 2, 2016, if the loss was not probable, it was certainly reasonably possible, and thus Defendants also violated GAAP by failing to give an estimate of the amount of possible loss or range of loss in its financial statements thereby depriving investors of the material fact that should the loss occur, Och-Ziff would at a minimum pay hundreds of millions of dollars as a result of FCPA violations related to the Investigation.

i)    ***Defendants' Pecuniary Gain from the Illegal African Transactions***

125.    The DPA sets forth the pecuniary gain to Och-Ziff in connection with Och-Ziff's FCPA violations in each of the specific countries where illegal conduct took place.  Och-Ziff's total pecuniary gain in connection with its illegal dealings in Libya is $100,181,881 (DPA SOF 92 "Och-Ziff accrued fees and incentive income from the LIA fund investment totaling approximately $100,181,881).  Och-Ziff's total profit in connection with its illegal dealings in the DRC was $91,181,182. (DPA SOF 58).  In connection with its illegal dealings in Niger and Chad, Och-Ziff accrued $30 million in profits. (DPA SOF 100).

126.    Defendants were well aware of the pecuniary gains from the illegal transactions at the time the transactions took place given that Och-Ziff's primary source of revenues is the management fees it obtains from its various hedge funds.  The management fees derived from each of Och-Ziff's funds is in turn based on the assets under management in that fund and the investment performance of that fund.

127.    Pursuant to the Deferred Prosecution Agreement, Och-Ziff's base fine was determined under the United States Sentencing Guidelines 8C2.4(a)(2) to be $221,933,010 (the amount of pecuniary gain).  The DOJ determined that Och-Ziff's possible fine range was between $266,319,612 and $532,639,224. (DPA ¶7).  Thus, the base fine was an absolute minimum amount that Och-Ziff knew it would have to pay to the Government as a result of its FCPA violations in Africa.

128.    The FCPA provides for different criminal and civil penalties for companies and individuals.  The United States Sentencing Guidelines ("USSG") provide a very detailed and predictable structure for calculating penalties for violations of the FCPA.

129.    Pursuant to the 2015 USSG, the base fine of a given offense is *the greatest of:* (1) the amount from the table from subsection (d) corresponding to the offense level; or (2) the

pecuniary gain to the organization from the offense; or (3) the pecuniary loss from the offense caused by the organization, to the extent the loss was caused knowingly, intentionally or recklessly. *See* United States Sentencing Commission Guidelines Manual, Section 8C2.4 (page 516)availableat:http://www.ussc.gov/sites/default/files/pdf/guidelinesmanual/2015/GLMFull.pdf.

130.   Given the incontrovertible evidence set forth in the DPA's SOF, Defendants were at all times aware of the underlying wrongdoing, i.e. that: (1) beginning in 2007, Och-Ziff, through Cohen and Baros, formed a joint venture between Gertler and Och-Ziff to secure long-term deal flow for Och-Ziff in the DRC mining sector through the use of illegal bribes paid by Och-Ziff's funds in violation of the FCPA and related laws; (2) between 2007 and 2010 Och-Ziff engaged Mohammed Ajami to secure $300 million in investment from the LIA into Och-Ziff hedge funds through the use of illegal bribes and corrupt payments in violation of the FCPA and related laws; (3) Och-Ziff made investments in the mining and mineral sector in the DRC, Libya, Chad and Niger which were facilitated through the use of illegal bribery in violation of the FCPA; and (4) Och-Ziff knowingly failed to maintain an adequate system of internal accounting controls designed to prevent misappropriation of its assets by employees, agents and  business partners and did not appropriately respond to due diligence that was performed on proposed business transactions, agents, counterparties and business partners or controls for payments to third parties.  (DPA SOF ¶22).

131.   Defendants were also well aware of the pecuniary gain to Och-Ziff from the illegal schemes described in the DPA, and correspondingly, the range of the financial impact of the Investigation on the Company based upon the predictable structure for calculating the penalty it would incur under the USSG.



132.

133.

Consequently, Och-Ziff was required by ASC 450 to recognize a loss from a loss contingency by recording a liability in the amount of the profit it had earned by the business transactions obtained by means of the FCPA violations because that amount was the minimum statutory fine Och-Ziff would have to pay for its FCPA violations, (i.e. $100,181,881, the accrued fees and investment income Och-Ziff earned in connection with the LIA's investment).

134.    Alternatively, if it was not probable that Och-Ziff would suffer a loss from its FCPA violations, Och-Ziff was still required to disclose that it was reasonably possible that the Government investigation would result in a material loss to Och-Ziff in the amount of the minimum statutory fine Och-Ziff would have to pay for its FCPA violations, (i.e. $100,181,881, the accrued fees and investment income Och-Ziff earned in connection with the LIA's investment).



Consequently, at this point Och-Ziff was required to disclose the possibility that the Government investigation would result in a material loss to Och-Ziff in the amount of the minimum statutory fine, (Och-Ziff's LIA related profits of $100,181,881 plus Och-Ziff's $91,181,182 in profits in connection with its illegal dealings in the DRC plus Och-Ziff's $30 million in profits in connection with its illegal dealings in the DRC, i.e. $221,363,063.)

    ii)     ***The Government's Investigation***

    135.

---

[9] The SEC's request defined "Sovereign Wealth Funds" as "any foreign government-owned investment fund."  (OZMEN 00000004).



136.

137.

138.



139.

140.

141.

142.



143.

144.



145.

146.

147.

---

[10] Even before Defendants were aware that the Government had manifested an awareness of a potential claim against Och-Ziff, Defendants were required under ASC 450 to assess the probability that Och-Ziff would incur a material loss resulting from its illegal conduct.  ASC 450-20-50-6.



148.

149.

150.

151.



152.

153.

154.

---

[11] Magna Holdings is a company involved in a joint venture between Och-Ziff and the LIA to build a luxury hotel in Tripoli, Libya's capital. Mohammed Ajami was a key fixer in the hotel deal. The "Magna investment" refers to the $40 million in funds Och-Ziff invested into a real estate development which was founded and overseen by Ajami. DPA SOF ¶65.

155. 

156.

---

[12] As set forth herein, Och-Ziff through African Global Capital ("ACG") made a $124 million convertible loan to Gertler's company.  ACG are investment funds that invest in African mining company and mineral assets and rights in the DRC.  Africa Management Limited ("AML") was a joint venture company started by Och-Ziff, OZ Africa and affiliated and subsidiary entities with South African business partners in 2007 (DPA SOF ¶5).  AML established multiple investment funds under the ACG name.  Och-Ziff owned a 40% interest in AML and its approval was required for all investments by ACG funds.  AML and ACG relied on Och-Ziff's legal and compliance to perform due diligence and legal advice as well as document transactions.

[13] Mvelaphanda Holdings and Palladino Holdings are joint venture partners with Och-Ziff in Africa Management Limited ("AML") referenced herein and in the DPA (*See* DPA SOF ¶5). Walter Hennig is the founder of Palladino Holdings.  Tokyo Sexwale is the founder of Mvelaphanda Holdings.  Mark Willcox was the CEO of Mvelaphanda Holdings and the CEO of Africa Management (UK) Limited.

[14] Camec is a company called the Central African Mining and Exploration Company, plc. Camec is the publicly traded mining company controlled by Gertler that Och-Ziff purchased $150 million worth of shares in, referred to herein.  The reference in the DPA to "Company A" refers to Camec.

[15] Samuel Mebiame was arrested by federal agents on August 16, 2016 on a complaint with charged him for conspiring to bribe foreign officials.  (*See* August 16, 2016 letter to Honorable Steven L. Tiscione from the United States Attorney for the Eastern District of New York, Case No. 16-mj-00752-PK).  Mebiame is the son of at the former prime minister of Gabon and a fixer who paid bribes to high-ranking officials in Niger and Chad to obtain uranium concessions. Och-Ziff used Mebiame as a fixer or "consultant."  In order to get his proper cut on deals he reportedly threatened Och-Ziff that he would tell the news media about its "illegal procedures to secure assets in Africa" and "let the world know what kind of international crooks you are." (DealBook Article, August 16, 2016).



157.    Given Defendants' awareness of their FCPA violations in connection with the African Investments that the Government was investigating, Och Ziff was required by ASC 450 to recognize a loss from a loss contingency by recording a liability in the amount of the profit it had earned from these transactions obtained by means of the FCPA violations because that amount was the minimum statutory fine Och-Ziff would have to pay for its FCPA violations.

158.    Alternatively, if it was not probable that Och-Ziff would be liable for its FCPA violations in connection with its African Investments, Och-Ziff was still required to disclose that it was reasonably possible that the Government investigation would result in a material loss to Och-Ziff in the amount of the minimum statutory fine Och-Ziff would have to pay for its FCPA violations.

159.

[REDACTED]

160.     Defendants were also well aware at all times of the pecuniary gain to Och-Ziff from the illegal schemes described in the DPA, and correspondingly the range of the Government's likely fine under the USSG.

[REDACTED]

Accordingly, by at least October 21, 2013 Defendants were obligated to provide in their quarterly financial statements an estimate of the possible loss or range of loss pursuant to ASC 450.  Despite this, Defendants continued to state in their quarterly and annual financial that it was "unable to determine how the investigation will be resolved and what impact, if any, it will have."

## D.  Defendants' Failure To Maintain Compliance-Related Controls

161.     During the Class Period, Defendants claimed that Och-Ziff maintained strong financial, operational, and compliance-related controls to ensure regulatory compliance and accuracy in its financial reporting.  Specifically, the Company stated:

> We have implemented a global compliance program to address the legal and regulatory requirements that apply to our company-wide operations … We have structured our global compliance program to address the requirements of each of these regulators, as well as the requirements necessary to support our global securities trading operations.  Our compliance program includes comprehensive

policies and supervisory procedures that have been implemented to monitor compliance with these requirements. All employees attend mandatory compliance training to remain informed of our policies related to matters such as the handling of material non-public information and employee securities trading. In addition to a robust internal compliance framework, we have strong relationships with a global network of local attorneys specializing in compliance matters to help us quickly identify and address compliance issues as they arise.

162.    Contrary to their statements, in numerous instances, despite knowledge of high corruption risks in the countries in which Och-Ziff chose to conduct business, Defendants violated Och-Ziff's own policies and procedures, failed to conduct adequate due diligence, ignored numerous red flags and the advice of the Company's attorneys, and failed to take any corrective measures when improper transactions were identified. In short, Och-Ziff's internal controls were a sham.

163.    As set forth in the DPA and the Criminal Information filed by the DOJ, Defendants' policy, procedure, and control violations included the following:

e.    Failing to conduct due diligence on entities, deal fees, and payments in connection with projects in Libya, including failing to require contracts, proof of services, or legal pre-approval even where Defendant Cohen knew fees would be used to pay bribes;

f.    Proceeding with multiple transactions in the DRC over the objection of senior compliance and control personnel;

g.    Failing to conduct any review or audit even after Och-Ziff employees, including Cohen and Och, became aware that funds had been used improperly to secure business;

h.    Completely bypassing Och-Ziff's legal and compliance function where corrupt payments were expressly required, including a deal presented to

Och-Ziff and Defendant Cohen that included "$5 million for the ongoing Presidential campaign" in a Zimbabwe;

    i.    Funding loans and other payments absent verification as to how monies were spent by business partners in Africa;

    j.    Ignoring the results of audits identifying deficiencies in controls;

    k.    Failing to exercise contractual rights to terminate relationships with business partners where corruption was identified.

    l.    Och-Ziff's Internal Control Failures and Bribes Paid in Chad and Niger

164.    The following direct quotes from the DPA summarize Och-Ziff's knowing internal control and due diligence failures:

At all relevant times relevant, Och-Ziff sought business opportunities in countries with high corruption risks, including, among other places, the DRC, Libya, Chad and Niger. ***Despite understanding the nature of the corruption risks presented by doing business in those countries, Och-Ziff <u>knowingly</u> failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, which failed to prevent bribe payments from being made in DRC, Libya, Chad and Niger. Further, in instances where the potential improper use of proceeds was identified, Och-Ziff did not take corrective measures, obtain verification of payments or seek to exercise contractually available audit or cancellation rights.*** (DPA SOF 93) (emphasis added).

***Och-Ziff also <u>knowingly</u> failed to implement and maintain adequate controls for the approval of business transactions and consultancy agreements.*** With respect to [Ajami], although Och-Ziff had prior dealings with [Ajami] relating to obtaining a Kazakhstan oil field investment, it did not conduct due diligence on, and only obtained anti-corruption representations from, BVI SPV-1, a shell company that did not actually provide or support any of the services rendered. Och-Ziff further permitted [Cohen] to enter into arrangements for deal fees and payments without requiring contracts, poof of services or legal pre-approval, including for an earlier $400,000 deal fee to [Gertler] in connection with the Libya Real Estate Development Project where no agreement was in place and [Cohen] knew that the fee would be used for bribe payments. Och-Ziff approved the payment of the deal fee without conducting adequate due diligence on the offshore entity which received the funds and without restricting the funds' use.

(DPA SOF ¶94) (emphasis added).

Och-Ziff did not implement controls to ensure the effective enforcement of policies governing interaction by third parties with prospective clients, including requirements (a) that such arrangements were to be pre-cleared by legal or compliance and (b) that Och-Ziff provide prospective clients with a written disclosure of any agreements for a third-party to secure money from the prospective client on behalf of Och-Ziff.

(DPA SOF ¶95) (emphasis added).

***Och-Ziff also <u>knowingly</u> failed to implement and maintain controls to address <u>known</u> risks for corruption or misuse of company funds in connection with contractual agreements or investments. Och-Ziff proceeded to conduct multiple business transactions with [Gertler] and entities associated with him <u>despite objections from senior compliance and control personnel.</u>*** When [Cohen] and [Baros] learned of possible misuse of funds in connection with the Company A investment, Och-Ziff conducted no review or audit to confirm or rebut the allegations, and thereafter advanced more than $200 million for [Gertler] for additional transactions. ***Further, Och-Ziff continued to engage with business partners after those partners had presented deals where corrupt payments were expressly required.*** For example, a deal presented by Och-Ziff's partner in ACG to [Cohen] included "$5 million for the ongoing Presidential campaign" in a West African country…

(DPA SOF ¶96) (emphasis added).

In connection with AGC's first fund, Och-Ziff did not establish adequate internal controls over the use of proceeds provided by Och-Ziff to its future joint-venture partner. Prior to the formation of the first AC-branded investment fund, African Global Capital, LP ("AGC I"), Och-Ziff funded requests for loans that were convertible into equity in AGC I to its business partners on short notice and without completing adequate due diligence on the use of the proceeds…Despite repeatedly failing to conduct sufficient due diligence, Och-Ziff continued to fully fund the requests of its joint venture partners and never developed a systematic way to track the funds provided to the joint venture ***through 2012***.

(DPA SOF ¶97) (emphasis added).

165.   Additionally, between mid-2007 and February 2009 a Gabonese consultant that Och-Ziff employed (Samuel Mebiame) paid at least $2 million in bribes to government officials in Niger and the Republic of Chad in connection with uranium concessions for an Och-Ziff joint venture company, which Och-Ziff held and renewed licenses for through 2012.  Between May

2007 and February 2009 Och-Ziff provided funds which were used by an AGC portfolio company to pay Mebiame.  By October 2007 Och-Ziff knew that the payment to Mebiame in connection with operations in Chad and Niger were deal introduction fees which were two and a half times the salaries of the 19 other employees of the portfolio company combined.  Och-Ziff knew that the funds were being used for personal expenditures and personal travel of the joint venture partners.  Och-Ziff continued to fund payments between January and July 2008 despite knowing that there were not adequately justified.  Portions of these payments were to reimburse bribe payments Mebiame made in Chad and Niger.  On October 3, 2008 Cohen was informed that the results of an audit of the joint venture company were "very weak with poor controls and management…"  Despite this, Och-Ziff did not address the deficiencies identified in the audit and Cohen and senior employees at Och-Ziff did not enforce internal policies- such as the anti-corruption and anti-money laundering policy.  Och-Ziff also continued doing business with Mebiame in 2011, despite his refusal to sign anti-corruption warranties. (DPA SOF ¶¶98-99).

166.    Och-Ziff accrued $30 million in profits in connection with investments where it failed to implement or enforce effective controls. (DPA SOF ¶100).

167.    Based on the foregoing, Defendants had no basis for any of their statements that the Company maintained adequate controls throughout the Class Period.  Indeed, due to the overall ineffectiveness of Och-Ziff's internal controls and the extent of corruption that pervaded the Company's operations, the Company has now been forced by the DOJ to adopt a rigorous compliance program and retain an outside independent compliance monitor for three years to ensure that Defendants do not continue to violate the FCPA and related laws.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

## ISSUED DURING THE CLASS PERIOD

168.    On November 18, 2011 the Company filed a 424B-5 Final Prospectus Supplement with the SEC offering $250 million of Class A Shares of Och-Ziff stock to investors.   The November 18, 2011 Prospectus Supplement incorporated by reference Och-Ziff's 2010 annual report on Form 10-K filed with the SEC as well as Och-Ziff's quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2011, which was filed with the SEC on November 2, 2011 (the "2011 3Q 10-Q").  The 2011 3Q 10-Q was signed by Defendant Frank. In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."    With respect to the Company's regulatory status, the Form 10-Q stated:

> We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition. We may from time to time be involved in litigation and claims incidental to the conduct of our business. Like other businesses in our industry, we are subject to scrutiny by the regulatory agencies that have or may in the future have regulatory authority over us and our business activities, which results in regulatory agency investigations and litigation related to regulatory compliance matters.

169.    The Company's statement concerning its regulatory status was false and misleading, because: (i) Defendants knowingly and willfully violated the FCPA and related laws, which exposed the Company to a heightened risk of regulatory action;  and (ii) Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ Investigation that would materially impact the Company's business, operations, and finances

170.     In addition, the financial statements contained in the 2011 3Q 10-Q were false and misleading because: (i) Defendants were aware that the government had manifested an awareness of a potential material FCPA claim against Och-Ziff that would probably result in a material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by recording a liability on its balance sheet and a corresponding charge on its income statement in the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA Investigation would result in a material loss to Och-Ziff and therefore Defendants knowingly failed to disclose in the financial statements a loss contingency, including the nature of the possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

171.     The Form 10-Q also included the following representations about the Company's disclosure and internal controls and Defendants Och and Frank's certifications thereon:

1.     I [Defendants Och and Frank] have reviewed this Annual Report on Form 10-Q of Och-Ziff Capital Management Group, LLC;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the  period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as

defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

172.   These representations about the Company's internal and disclosure controls, and

Defendants Och's and Frank's certifications thereon, were repeated in all material respects in the

Forms 10-K and 10-Q that Och-Ziff subsequently filed with the SEC during the Class Period.

173.    Defendants' statements above were materially false and misleading as incomplete for the following reasons:

(i)    Defendants knowingly violated the FCPA and related laws, including certain books and records and internal control provisions, and therefore, Och-Ziff's financial statements did not accurately reflect the results of its operations or disclose that the Company's revenues were derived, in part, from illegal transactions;

(ii)    Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws;

(iii)    Defendants were aware since at least August 1, 2011 that the government had manifested an awareness of a potential  claim against Och-Ziff that was likely to result in a material loss as a result of the Government's Investigation, but knowingly failed to record, or alternatively at least disclose, in its financial statements a loss contingency in the amount of the minimum statutory fine for the FCPA violations under investigation, all in violation of ASC 450; and

(iv)    Defendants did not implement, maintain, or enforce a global compliance program or adequate internal controls, as evidenced by multiple instances where Defendants failed to conduct adequate due diligence, bypassed legal and compliance functions, allowed the payment of bribes, and continued business arrangements despite the high risk of corruption, as set forth in detail in the DPA.

174.    On February 27, 2012, the Company filed an annual report on Form 10-K with the SEC, which was signed by defendants Och and Frank.  In addition, the Form 10-K contained SOX certifications signed by defendants Och and Frank, certifying that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The Form 10-K stated:

We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition. We may from time to time be involved in litigation and claims incidental to the conduct of our business. Like other businesses in our industry, we are subject to scrutiny by the regulatory agencies that have or may in the future have regulatory authority over us and our business activities, which results in regulatory agency investigations and litigation related to regulatory compliance matters.

175.    The Company's statement concerning its regulatory status was false and misleading, because: (i) Defendants knowingly and willfully violated the FCPA and related laws, which exposed the Company to a heightened risk of regulatory action; and (ii) Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ Investigation that would materially impact the Company's business, operations, and finances..

176.    In addition, the financial statements contained in the above 10-K were false and misleading because: (i) Defendants were aware that the government had manifested an awareness of a potential material FCPA claim against Och-Ziff that would probably result in a material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by recording a liability on its balance sheet and a corresponding charge on its income statement in the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA Investigation would result in a material loss to Och-Ziff and therefore Defendants knowingly failed to disclose in the financial statements a loss contingency, including the nature of the possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

177.    The Form 10-K also stated:

> We have implemented a global compliance program to address the legal and regulatory requirements that apply to our company-wide operations. We registered as an investment adviser with the SEC in 1999. Since that time, our affiliated companies have registered with the U.K. Financial Services Authority, the Securities and Futures Commission in Hong Kong, the Securities and Exchange Board of India, as well as other regulatory bodies. We have

structured our global compliance program to address the requirements of each of these regulators, as well as the requirements necessary to support our global securities trading operations. Our compliance program includes comprehensive policies and supervisory procedures that have been implemented to monitor compliance with these requirements. All employees attend mandatory compliance training to remain informed of our policies related to matters such as the handling of material non-public information and employee securities trading. In addition to a robust internal compliance framework, we have strong relationships with a global network of local attorneys specializing in compliance matters to help us quickly identify and address compliance issues as they arise.

178.   Defendants' statements regarding the Company's internal controls and compliance programs above were materially false and misleading as incomplete for the following reasons:

(i)     Defendants knowingly violated the FCPA and related laws, including certain books and records and internal control provisions, and therefore, Och-Ziff's financial statements did not accurately reflect the results of its operations or disclose that the Company's revenues were derived, in part, from illegal transactions;

(ii)    Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws;

(v)     Defendants were aware since at least August 1, 2011 that the government had manifested an awareness of a potential claim against Och-Ziff that was likely to result in a material loss as a result of the Government's Investigation, but knowingly failed to record, or alternatively at least disclose, in its financial statements a loss contingency in the amount of the minimum statutory fine for the FCPA violations under investigation, all in violation of ASC 450; and

(iii)   Defendants did not implement, maintain, or enforce a global compliance program or adequate internal controls, as evidenced by multiple instances where Defendants failed to conduct adequate due diligence, bypassed legal and compliance functions, allowed the payment of bribes, and continued business arrangements despite the high risk of corruption, as set forth in detail in the DPA.

179.   On May 2, 2012, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank. The Form 10-Q stated:

The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements. From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by the regulatory agencies globally that have or may in the future have regulatory authority over the Company and its business activities. This has resulted or may in the future result in regulatory agency investigations, litigation and subpoenas.

180.     The Company's statement concerning its regulatory status above was false and misleading, because: (i) Defendants knowingly and willfully violated the FCPA and related laws, which exposed the Company to a heightened risk of regulatory action and (ii) Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ Investigation that would materially impact the Company's business, operations, and finances.

181.     In addition, the financial statements contained in the above 10-Q were false and misleading because: (i) Defendants were aware that the government had manifested an awareness of a potential material FCPA claim against Och-Ziff that would probably result in a material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by recording a liability on its balance sheet and a corresponding charge on its income statement in the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA Investigation would result in a material loss to Och-Ziff and therefore Defendants knowingly failed to disclose in the financial statements a loss contingency, including the nature of the possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

182.     On August 2, 2012, the Company filed a quarterly report on Form 10-Q with the

SEC, which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to
> the conduct of the Company's business. The Company is also subject to extensive
> scrutiny by regulatory agencies globally that have or may in the future have
> regulatory authority over the Company and its business activities. This has
> resulted or may in the future result in regulatory agency investigations, litigation
> and subpoenas and costs related to each. The Company is currently not subject to
> any pending judicial, administrative or arbitration proceedings that are expected
> to have a material impact on the Company's consolidated financial statements.

183.     The Company's statement concerning its regulatory status in above paragraph was

false and misleading, because (i) Defendants knowingly and willfully violated the FCPA and

related laws, which exposed the Company to a heightened risk of regulatory action; and (ii)

Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ

Investigation that would materially impact the Company's business, operations, and finances.

184.     In addition, the financial statements contained in the above 10-Q were false and

misleading because: (i) Defendants were aware that the government had manifested an

awareness of a potential material FCPA claim against Och-Ziff that would probably result in a

material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by

recording a liability on its balance sheet and a corresponding charge on its income statement in

the amount of the minimum statutory fine for the FCPA violations, which was easily

determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would

incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA

Investigation would result in a material loss to Och-Ziff and therefore Defendants knowingly

failed to disclose in the financial statements a loss contingency, including the nature of the

possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of

the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related

GAAP.

185.    On November 5, 2012, the Company filed a quarterly report on Form 10-Q with

the SEC, which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the
> conduct of the Company's business. The Company is also subject to extensive scrutiny
> by regulatory agencies globally that have, or may in the future have, regulatory authority
> over the Company and its business activities. This has resulted, or may in the future
> result, in regulatory agency investigations, litigation and subpoenas and costs related to
> each. The Company is currently not subject to any pending judicial, administrative or
> arbitration proceedings that are expected to have a material impact on the Company's
> consolidated financial statements

186.    The Company's statement concerning its regulatory status in the paragraph above

was false and misleading, because (i) Defendants knowingly and willfully violated the FCPA and

related laws, which exposed the Company to a heightened risk of regulatory action; and (ii)

Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ

Investigation that would materially impact the Company's business, operations, and finances.

187.    In addition, the financial statements contained in the above 10-Q were false and

misleading because: (i) Defendants were aware that the government had manifested an

awareness of a potential material FCPA claim against Och-Ziff that would probably result in a

material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by

recording a liability on its balance sheet and a corresponding charge on its income statement in

the amount of the minimum statutory fine for the FCPA violations, which was easily

determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would

incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA

Investigation would result in a material loss to Och-Ziff and therefore Defendants knowingly

failed to disclose in the financial statements a loss contingency, including the nature of the

possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

188.    On February 28, 2013, the Company filed an annual report on Form 10-K with the SEC, which was signed by defendants Och and Frank.  The Form 10-K stated:

> We are not currently subject to any pending judicial, administrative or arbitration proceedings that we expect to have a material impact on our consolidated financial statements. We are from time to time involved in litigation and claims incidental to the conduct of our business. Like other businesses in our industry, we are subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over us and our business activities. This has resulted in, or may in the future result in, regulatory agency investigations, litigation and subpoenas and related costs.

The Company's statement concerning its regulatory status in the above paragraph was false and misleading, because (i) Defendants knowingly and willfully violated the FCPA and related laws, which exposed the Company to a heightened risk of regulatory action; and (ii) Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ Investigation that would materially impact the Company's business, operations, and finances.

189.    In addition, the financial statements contained in the above 10-K were false and misleading because: (i) Defendants were aware that the government had manifested an awareness of a potential material FCPA claim against Och-Ziff that would probably result in a material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by recording a liability on its balance sheet and a corresponding charge on its income statement in the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA Investigation would result in a material loss to Och-Ziff, and therefore Defendants knowingly

failed to disclose in the financial statements a loss contingency, including the nature of the possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

190.    The Form 10-K also stated:

> In recent years, the U.S. Department of Justice (the "DOJ") and the SEC have devoted greater resources to enforcement of the FCPA. In addition, the United Kingdom has recently significantly expanded the reach of its anti-bribery laws. ***While we have developed and implemented policies and procedures designed to ensure strict compliance by us and our personnel with the FCPA, such policies and procedures may not be effective in all instances to prevent violations.*** Any determination that we have violated the FCPA or other applicable anti-bribery laws could subject us to, among other things, civil and criminal penalties, material fines, profit disgorgement, injunctions on future conduct, securities litigation and a general loss of investor confidence, any one of which could adversely affect our business prospects, financial position or the market value of our Class A Shares.

191.    Defendants' statements in the paragraph above were materially false and misleading because:

(i)     Defendants knowingly violated the FCPA and related laws, including certain books and records and internal control provisions, and therefore, Och-Ziff's financial statements did not accurately reflect the results of its operations or disclose that the Company's revenues were derived, in part, from illegal transactions;

(ii)    Defendants failed to disclose that since 2011, Och-Ziff has been under investigation by the DOJ and the SEC for violations of the FCPA and other related laws;

(iii)   Defendants were aware since at least August 1, 2011 that the government had manifested an awareness of a potential  claim against Och-Ziff that was likely to result in a material loss as a result of the Government's Investigation, but knowingly failed to record, or alternatively at least disclose, in its financial statements a loss contingency in the amount of the minimum statutory fine for the FCPA violations under investigation, all in violation of ASC 450; and

(iv)    Defendants did not implement, maintain, or enforce a global compliance program or adequate internal controls, as evidenced by multiple instances where Defendants

failed to conduct adequate due diligence, bypassed legal and compliance functions, allowed the payment of bribes, and continued business arrangements despite the high risk of corruption, as set forth in detail in the DPA.

192.    On May 2, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank. The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

193.    Defendants' statements in the paragraph above were materially false and misleading as incomplete for the following reasons because: (i) Defendants knowingly and willfully violated the FCPA and related laws, which exposed the Company to a heightened risk of regulatory action; and (ii) Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ Investigation that would materially impact the Company's business, operations, and finances.

194.    In addition, the financial statements contained in the above 10-Q were false and misleading because: (i) Defendants were aware that the government had manifested an awareness of a potential material FCPA claim against Och-Ziff that would probably result in a material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by recording a liability on its balance sheet and a corresponding charge on its income statement in the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA Investigation would result in a material loss to Och-Ziff, and therefore Defendants knowingly

failed to disclose in the financial statements a loss contingency, including the nature of the possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

195.    On August 2, 2013, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each. The Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements.

196.    Defendants' statements in the paragraph above were materially false and misleading as incomplete for the following reasons: (i) Defendants knowingly and willfully violated the FCPA and related laws, which exposed the Company to a heightened risk of regulatory action; and (ii) Defendants knew that the Company was then subject to an ongoing, targeted SEC and DOJ Investigation that would materially impact the Company's business, operations, and finances.

197.    In addition, the financial statements contained in the above 10-Q were false and misleading because: (i) Defendants were aware that the government had manifested an awareness of a potential material FCPA claim against Och-Ziff that would probably result in a material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by recording a liability on its balance sheet and a corresponding charge on its income statement in the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would

incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA

Investigation would result in a material loss to Och-Ziff, and therefore Defendants knowingly

failed to disclose in the financial statements a loss contingency, including the nature of the

possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of

the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related

GAAP.

198.    On November 5, 2013, the Company filed a quarterly report on Form 10-Q with

the SEC, which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to
> the conduct of the Company's business. The Company is also subject to extensive
> scrutiny by regulatory agencies globally that have, or may in the future have,
> regulatory authority over the Company and its business activities. This has
> resulted, or may in the future result, in regulatory agency investigations, litigation
> and subpoenas and costs related to each. The Company is currently not subject to
> any pending judicial, administrative or arbitration proceedings that are expected
> to have a material impact on the Company's consolidated financial statements.

199.    Defendants' statements in the paragraph above were materially false and

misleading as incomplete for the following reasons: (i) Defendants knowingly and willfully

violated the FCPA and related laws, which exposed the Company to a heightened risk of

regulatory action; and (ii) Defendants knew that the Company was then subject to an ongoing,

targeted SEC and DOJ Investigation that would materially impact the Company's business,

operations, and finances.

200.    In addition, the financial statements contained in the above 10-Q were false and

misleading because: (i) Defendants were aware that the government had manifested an

awareness of a potential material FCPA claim against Och-Ziff that would probably result in a

material loss, and, in violation of ASC 450, failed to recognize a loss from a loss contingency by

recording a liability on its balance sheet and a corresponding charge on its income statement in

the amount of the minimum statutory fine for the FCPA violations, which was easily determinable by Defendants, or (ii) in the alternative, if it was not probable that Och-Ziff would incur a loss as a result of its FCPA violations, it was certainly reasonably possible that the FCPA Investigation would result in a material loss to Och-Ziff, and therefore Defendants knowingly failed to disclose in the financial statements a loss contingency, including the nature of the possible loss, and an estimate of the amount of the possible loss or range of loss in the amount of the minimum statutory fine for the FCPA violations, all in violation of ASC 450 and related GAAP.

201.    On March 18, 2014 Och-Ziff filed a restated 2013 10-K.  The Form 10-K stated:

Beginning in 2011, and from time to time thereafter, we have received subpoenas from the SEC and requests for information from the U.S. Department of Justice ("DOJ") in connection with an investigation involving the FCPA and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa.  At this time, we are unable to determine how the investigation will be resolved and what impact, if any, it will have.  An adverse outcome could have a material effect on our business, financial condition or results of operations.

202.    Defendants' statements in the above paragraph were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency,

or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

203.     On May 2, 2014, the Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities.  Beginning in 2011, and from time to time thereafter, the Company has received subpoenas from the Securities and Exchange Commission and requests for information from the U.S. Department of Justice in connection with an investigation involving the Foreign Corrupt Practices Act and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. At this time, the Company is unable to determine how the investigation will be resolved ***and what impact, <u>if any</u>, it will have***. An adverse outcome could have a material effect on the Company's consolidated financial statements.

204.     Defendants' statements in the paragraph above were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its

pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

205.    On August 5, 2014 the Company filed a Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business.    The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities.  This has resulted, or may in the future result, in regulatory agency investigation, litigation and subpoenas and costs related to each.  Beginning in 2011, and from time to time thereafter, the Company has received subpoenas from the Securities and Exchange Commission and requests for information from the U.S. Department of Justice in connection with an investigation involving the Foreign Corrupt Practices Act and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. At this time, the Company is unable to determine how the investigation will be resolved ***and what impact, <u>if any</u>, it will have***. An adverse outcome could have a material effect on the Company's consolidated financial statements.

206.    Defendants' statements in the paragraph above were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its

pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

207.    On November 4, 2014 the Company filed a Company filed a quarterly report on Form 10-Q with the SEC, which was signed by Defendant Frank

The Form 10-Q stated:

From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities.  This has resulted, or may in the future result, in regulatory agency investigation, litigation and subpoenas and costs related to each.  Beginning in 2011, and from time to time thereafter, the Company has received subpoenas from the Securities and Exchange Commission and requests for information from the U.S. Department of Justice in connection with an investigation involving the Foreign Corrupt Practices Act and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. At this time, the Company is unable to determine how the investigation will be resolved *and what impact, **if any**, it will have*. An adverse outcome could have a material effect on the Company's consolidated financial statements.

208.    Defendants' statements in the paragraph above were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency,

or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its

pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's

financial statements were not fairly presented in conformity with ASC 450 and related GAAP

and were materially false and misleading.

209.    On February 24, 2015 the Company filed an annual report on Form 10-K with the

SEC which was signed by Defendants Och and Frank.  The Form 10-K stated:

> From time to time, the Company is involved in litigation and claims incidental to
> the conduct of the Company's business.    The Company is also subject to
> extensive scrutiny by regulatory agencies globally that have, or may in the future
> have, regulatory authority over the Company and its business activities.  This has
> resulted, or may in the future result, in regulatory agency investigation, litigation
> and subpoenas and costs related to each.  Beginning in 2011, and from time to
> time thereafter, the Company has received subpoenas from the Securities and
> Exchange Commission and requests for information from the U.S. Department of
> Justice in connection with an investigation involving the Foreign Corrupt
> Practices Act and related laws. The investigation concerns an investment by a
> foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and
> investments by some of the funds, both directly and indirectly, in a number of
> companies in Africa. At this time, the Company is unable to determine how the
> investigation will be resolved ***and what impact, <u>if any</u>, it will have***. An adverse
> outcome could have a material effect on the Company's consolidated financial
> statements.

210.    Defendants' statements in the paragraph above were materially false and

misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in

illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2)

Defendants knew that the government was aware of, or would very soon become aware of, Och-

Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the

Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the

pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4)

as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting

standards by failing to recognize a reasonably estimable probable loss from a loss contingency,

or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

211.    On May 5, 2015 the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each.
> Since 2011, the Company has been investigated by the Securities and Exchange Commission (the "SEC") and the U.S. Department of Justice (the "DOJ") concerning possible violations of the Foreign Corrupt Practices Act (the "FCPA") and other laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. While the Company is unable to predict the full scope, duration or outcome of the SEC and DOJ investigation, it believes that it is reasonably likely that the outcome would include the government pursuing remedies. The Company expects to enter into discussions to resolve any actions that may arise out of the investigation at the appropriate time in the future. The SEC and DOJ have a broad range of civil and criminal sanctions available to them under the FCPA and other laws. ***While the ultimate impact of any sanctions that may arise <u>cannot be estimated at this time</u>***, any such resolution could have a material adverse effect on the Company's business and its consolidated financial statements.

212.    Defendants' statements in the paragraph above were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4)

as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

213.    On August 5, 2015 the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each.
> Since 2011, the Company has been investigated by the Securities and Exchange Commission (the "SEC") and the U.S. Department of Justice (the "DOJ") concerning possible violations of the Foreign Corrupt Practices Act (the "FCPA") and other laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. While the Company is unable to predict the full scope, duration or outcome of the SEC and DOJ investigation, it believes that it is reasonably likely that the outcome would include the government pursuing remedies. The Company expects to enter into discussions to resolve any actions that may arise out of the investigation at the appropriate time in the future. The SEC and DOJ have a broad range of civil and criminal sanctions available to them under the FCPA and other laws. While the ultimate impact of any sanctions that may arise cannot be estimated at this time, any such resolution could have a material adverse effect on the Company's business and its consolidated financial statements.

214.    Defendants' statements in the paragraph above were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the

Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

215.    On November 3, 2015 the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendant Frank.  The Form 10-Q stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each.
>
> Since 2011, the Company has been investigated by the Securities and Exchange Commission (the "SEC") and the U.S. Department of Justice (the "DOJ") concerning possible violations of the Foreign Corrupt Practices Act (the "FCPA") and other laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. While the Company is unable to predict the full scope, duration or outcome of the SEC and DOJ investigation, it believes that it is reasonably likely that the outcome would include the government pursuing remedies. The Company expects to enter into discussions to resolve any actions that may arise out of the investigation at the appropriate time in the future. The SEC and DOJ have a broad range of civil and criminal sanctions available to them under the FCPA and other laws. While the ultimate impact of any sanctions that may arise cannot be estimated at this time, any such resolution could have a material adverse effect on the Company's business and its consolidated financial statements.

216.    Defendants' statements in the preceding paragraph were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in

illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

217.    On February 11, 2016 the Company filed an annual report on Form 10-K with the SEC which was signed by Defendants Och and Frank.  The Form 10-K stated:

> From time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business. The Company is also subject to extensive scrutiny by regulatory agencies globally that have, or may in the future have, regulatory authority over the Company and its business activities. This has resulted, or may in the future result, in regulatory agency investigations, litigation and subpoenas and costs related to each.
>
> Since 2011, the Company has been investigated by the Securities and Exchange Commission (the "SEC") and the U.S. Department of Justice (the "DOJ") concerning possible violations of the Foreign Corrupt Practices Act (the "FCPA") and other laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of the Och-Ziff funds in 2007 and investments by some of the funds, both directly and indirectly, in a number of companies in Africa. While the Company is unable to predict the full scope, duration or outcome of the SEC and DOJ investigation, it believes that it is reasonably likely that the outcome would include the government pursuing remedies. The Company expects to enter into discussions to resolve any actions that may arise out of the investigation at the appropriate time in the future. The SEC and DOJ have a broad range of civil and criminal sanctions available to them under the FCPA and other laws. While the ultimate impact of any sanctions that may arise cannot be estimated at this time, any

such resolution could have a material adverse effect on the Company's business and its consolidated financial statements.

218.    Defendants' statements in  the preceding paragraph were materially false and misleading and incomplete for the following reasons: 1) Och-Ziff obtained $221,933,010 in illegal pecuniary gains from Defendants' FCPA violations over a multi-year period; 2) Defendants knew that the government was aware of, or would very soon become aware of, Och-Ziff's illegal pecuniary gains given the scope of its Investigation; 3) the financial impact of the Investigation on Och-Ziff subjected the Company to a fine of at least the amount of the pecuniary gains from its illegal conduct, as set forth in the predictable structure of the USSG; 4) as a result of the foregoing circumstances, Och-Ziff violated ASC 450 and related accounting standards by failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose the amount or range of such loss, in a minimum amount of its pecuniary gain from transactions in which there were FCPA violations; and 5) the Company's financial statements were not fairly presented in conformity with ASC 450 and related GAAP and were materially false and misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

219.    At all relevant times throughout the Class Period, Defendants knew and/or recklessly disregarded that, *inter alia*, (i) the Company was engaged in an ongoing bribery scheme in violation of the FCPA; (ii) the Company was subject to a pending investigation in connection with the bribery scheme, which created a heightened regulatory risk and which would have a material impact on Och-Ziff's business, operations, and finances; (iii) the Company failed to implement, maintain, and enforce adequate internal accounting controls, rendering its financial statements and books and records inaccurate and misleading and non-compliant with GAAP; and (iv) the Company lacked sufficient compliance-related controls to prevent, detect, and correct

improper and illegal conduct in connection with the Company's business in Africa.    In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter:

### *Defendants' Knowledge of and Participation in the Bribery Scheme*

220.    As set forth in the Deferred Prosecution Agreement, Defendant Och-Ziff has admitted, accepted, and acknowledged responsibility for the acts of its officers, directors, employees, and agents, including, *inter alia*, Defendants Och, Frank, Cohen, as well as former employee Varos, in connection with the bribery scheme and violations of the FCPA as described herein and in the Statement of Facts filed with the DPA.  Additionally, Defendant Och-Ziff is also responsible for the conduct of OZ Africa, a wholly-owned subsidiary and agent of Och-Ziff, which pled guilty to violating the FCPA.  Defendants Och and Frank do not dispute the facts set forth in the DPA.

221.    Specifically, the DPA describes in detail a pervasive bribery scheme at the highest levels of the Company, which involved, among other things, payments to foreign government officials in order to secure business opportunities; improper recording of loans, payments, and other transactions in order to conceal the fact that business was secured through illegal means; failing to conduct adequate due diligence; ignoring multiple red flags indicative of a high risk of corruption; and failing to take any corrective measures when improper transactions were identified.

222.    Defendant Och also "had final authority to approval all private investments by Och-Ziff including all transactions [in Libya, the DRC, Chad and Niger]," and "personally approved the expenditure of funds in two transactions [with Gertler] in which bribes were paid." As described herein, Defendant Och also communicated with Defendant Cohen concerning the Libyan investments.

223.     Furthermore, Defendant Och deliberately and/or recklessly disregarded numerous red flags, including advice from legal and compliance personnel, and determined to proceed with multiple transactions irrespective of the high risk of corruption.  For example, Och was aware of the risk of corruption in the transactions with DRC Partner, and contrary to the recommendation of his legal and compliance team, he approved the use of Och-Ziff investor funds in those transactions.

224.     Defendant Och was also aware that these transactions, including illegal bribes paid with investor funds, were not properly recorded in Och-Ziff's books and records.

225.     Defendant Och has admitted that he caused Och-Ziff's violations of the books and records provision of the Foreign Corrupt Practices Act ("FCPA") and agreed to pay a $2.2 civil penalty, representing this personal gain from this illicit conduct.

226.     Defendant Frank had ultimate responsibility for maintaining Och-Ziff's and OZ Management's books and records and for authorizing all uses of Och-Ziff funds.  Under Och-Ziff's structure at the time, the head of legal and compliance reported to Frank as chief financial officer.  Frank was responsible for ensuring that all transactions were recorded accurately and in accordance with generally acceptable accounting procedures and was likewise responsible for devising and maintaining Och-Ziff's internal accounting controls.  Frank was also ultimately responsible for devising and maintaining Och-Ziff's internal accounting controls sufficient to provide reasonable assurances that transactions: (i) were executed in accordance with management's general or specific authorization; and (ii) were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

227.    Each transaction described above required Defendant Frank's authorization of the relevant disbursements.   In the two DRC transactions and the LIA fee payment involving bribery, failures of Och-Ziff's internal controls, and books and records violations, Defendant Frank failed to ensure that required information regarding transactions was documented accurately, that appropriate business partner information and due diligence was obtained, that transactions were structured properly to avoid corruption, and that ongoing due diligence and audits were performed to prevent or detect improper use of Och-Ziff investor funds.

228.    Defendant Frank approved Och-Ziff's payments in the transactions with DRC Partner in which he believed there was a high risk of corruption.   Despite his concerns, Frank deferred to Och as the final decision maker and executed payment on the 2008 convertible loan and 2010-2011 margin loan with DRC Partner per Och's approval.   As a consequence, Frank caused violations of the internal controls and books and records provisions of the FCPA by Och-Ziff in the transactions described herein.

### *Defendants' Scienter Regarding The Ongoing SEC And DOJ Investigation*

229.    Defendants had direct access to information concerning the SEC and DOJ Investigation and were aware that the Company received subpoenas and requests for information in 2011.

230.    As alleged herein, as a result of their knowledge and/or reckless disregard of rampant FCPA violations, Defendants also were aware that the Company faced a heightened regulatory risk, including imposition of fines and penalties and possible criminal prosecution, which would have a material impact on Och-Ziff's business operations and finance.

231.    As set forth in the SEC Order, Defendants also had direct knowledge that the Company continued to derive revenue from investments secured through improper and illegal

business practices, which made the Company's financial statements false and misleading and which creating an increasing contingent liability to the extent that the Company ultimately would be compelled to disgorge any ill-gotten returns.

232.    Defendants also acted with scienter in that they knew, or recklessly disregarded, that Och-Ziff's annual and quarterly reports filed with the SEC during the Class Period were materially false and misleading in the absence of disclosure required by ASC 450 and related GAAP.  The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

### *Defendant Cohen's Scienter*

233.    As set forth in the DPA and SEC Order, Defendant Cohen was the key architect of the bribery scheme.  Defendant Cohen also personally benefitted from the bribery scheme, as well as the concealment of the ongoing SEC and DOJ Investigation.  As set forth in the SEC Order, Defendant Cohen personally loaned funds to Libyan agent and then took security interests over several assets to secure the loan.  Defendant Cohen then utilized other entities and business partners to conceal his personal loan and to ensure that he would be repaid.

234.    In 2012, after the SEC and DOJ investigation commenced, Defendant Cohen and a Libyan agent created a false document regarding these transactions and Defendant Cohen's self-dealing in order to hinder the SEC and DOJ's investigation.

235.    Defendant Cohen's abrupt departure from the Company during the pendency of the SEC and DOJ Investigation is further evidence of his scienter.

### *Defendants' Knowledge of Deficient Internal Controls*

236.   Defendants' scienter is underscored by the Sarbanes-Oxley mandated certifications of Och and Frank, in which they acknowledged their responsibility to investors for maintaining controls to ensure that material information about Och-Ziff was made known to them and that Och-Ziff's disclosure related controls were operating efficiently.

237.   Defendants' scienter is further established by the reckless and/or conscious disregard of numerous red flags occurring before and during the Class Period that exposed key aspects of the fraudulent scheme to the Individual Defendants.   These red flags should have prompted an earlier effort to investigate and address the wrongdoing alleged herein and to make adequate disclosure to investors concerning the ramifications of the bribery schemes and their ramifications on Och-Ziff's business and operations.

238.   The glaring nature of these red flags and Defendants' utter disregard of them are detailed in the DPA's SOF and the SEC's Order.   As the SEC Order states:   "Och had final authority to approval all private investments by Och-Ziff including all transactions [in Libya, the DRC, Chad and Niger].   Och personally approved the expenditure of funds in two transactions [with Gertler] in which bribes were paid...Frank was responsible for maintaining the accuracy of Och-Ziff's books and records and for devising and maintaining Och-Ziff's system of internal accounting controls. Frank approved the expenditure of Och-Ziff funds in transactions in which bribes or improper payments were made*. **Both Och and Frank were aware of the high risk of corruption in transactions with [Gertler]** in light of his reputation and connections to high level DRC government officials. **Despite these risks, Och approved and Frank authorized Och-Ziff to enter into each of these transactions**.   (SEC Order ¶6) (emphasis added).

239.   Defendant Och's scienter is underscored by his alarming willingness to do business with Gertler despite him being fully warned of its probable illegality:   "Both Och and

Frank received due diligence on [Gertler]. ***The corruption risks identified during due diligence were <u>so significant</u> that Frank and a senior attorney went to Och and warned him that Och-Ziff should not do business with [Gertler] in any transactions.  Frank's concerns included the reputational and <u>legal risks inherent in dealing with [Gertler] including the risk of a government investigation</u> into Och-Ziff's dealings with [Gertler] should they come to light***. (SEC Order ¶14) (emphasis added).

240.    Defendants' failure to disclose the illegal conduct and lack of candor with the DOJ is further evidence of Defendants' scienter.  The DOJ noted that Och-Ziff failed to voluntarily self-disclose their illegal conduct, which under the FCPA Pilot Program led to a cap being placed on the cooperation credit the Company could receive.  The DOJ additionally chastised Och-Ziff for its delay in producing information during the Investigation, noting Och-Ziff's "failures to produce important, responsive documents on a timely basis, and in some instances producing documents only after the [DOJ] flagged for Och-Ziff that the documents existed and should be produced, and providing documents to other defense counsel prior to their production to the government." (DPA ¶4).

### THE TRUTH IS REVEALED IN A SERIES OF PARTIAL DISCLOSURES

241.    When the truth about Och-Ziff was finally revealed through a series of partial disclosures on February 3, 2014, March 18, 2014, April 27, 2014, August 22, 2014, and April 11, 2016, as detailed above, a significant portion of the artificial inflation that had been caused by Defendants' materially false and misleading statements and omissions was eliminated from the price of Och-Ziff's common stock, causing significant losses to Plaintiffs and the Class.

242.    On February 3, 2014, the Wall Street Journal began to reveal some of the facts that Defendants had long concealed or denied.  On that day, the Wall Street Journal reported that the DOJ was investigating Och-Ziff regarding possible violations of the FCPA in connection with its dealing with the LIA, and that the DOJ's criminal probe was proceeding alongside a civil probe by the SEC which began in 2011.  The article reported that the center of the probe is a group of "fixers" who arranged deals between several financial firms, including Och-Ziff, and Libyan officials.  The fixers are investigated for funneling illegal payments to Libyan officials in the Gaddafi regime on behalf of financial firms in return for business.  The article stated that "among the deals being scrutinized is a $120 million hotel project in which Och-Ziff had a stake- a joint venture involving U.K.-based InterContinental Hotels Group as well as a Libyan developer and the Libyan Investment Authority to build a luxury hotel in Tripoli.  The hotel, which was slated to open in the Libyan capital in 2010, would have 351 rooms and 'stunning views across the city and waterfront,' according to a 2007 news release from InterContinental, but construction stalled as fighting broke out in the country.  It still hasn't been completed."

243.    On this news, shares of Och-Ziff stock fell $0.90 or 6.7%, to close at $13.04 on heavy volume. Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

244.    On March 14, 2014 Och-Ziff filed a form 8-K with the SEC announcing that some of its previously issued financial statements should be restated and should not be relied upon.  Specifically, the Company stated that it would restate its previously issued financial statements in its Annual Report on Form 10-K for the year ended December 31, 2013 ("2013 10-K").  The Company stated that none of the changes would have an impact on the Company's

Economic Income, Distributable Earnings and Distributable Earnings per Adjusted Class A Share, as previously reported.

245.   On March 18, 2014 Och-Ziff filed a restated 2013 10-K.  For the first time, Och-Ziff disclosed that it had received subpoenas and requests for information from the SEC and DOJ as early as 2011 related to the Company's questionable dealings in Africa, in violation of the Foreign Corrupt Practices Act and other related laws.  This disclosure indicated that Och Ziff's questionable transactions involved not only a sovereign wealth fund, but also additional "investments by some of [Och-Ziff's] funds, both directly and indirectly, in a number of companies in Africa":

> Beginning in 2011, and from time to time thereafter, we have received subpoenas from the SEC and requests for information from the U.S. Department of Justice ("DOJ") in connection with an investigation involving the FCPA and related laws. The investigation concerns an investment by a foreign sovereign wealth fund in some of our funds in 2007 and investments by some of our funds, both directly and indirectly, in a number of companies in Africa.  At this time, we are unable to determine how the investigation will be resolved and what impact, if any, it will have.  An adverse outcome could have a material effect on our business, financial condition or results of operations.

246.   Och-Ziff did not disclose the identity of the "foreign sovereign wealth fund" mentioned, but widely published news sources indicated that it was the LIA.  An article by Bloomberg News issued on March 19 stated: "The sovereign fund reference by Och-Ziff in its filing is the Libyan Investment Authority, according to a person with knowledge of the matter who asked not to be identified because they weren't authorized to speak publicly.  Regulators have been investigating how the LIA made investment decisions before the toppling of Muammar Gaddafi's regime in 2011."

247.    On this news, Och-Ziff's shares fell 3.5% or $0.49, on heavy trading volume, to close at $13.71 on March 19, 2014.  Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

248.    But another shoe was yet to drop.  On April 27, 2014, the Wall Street Journal published an article revealing additional details concerning Och-Ziff's investments in Africa that were among the subjects of the investigation by the SEC and DOJ.  The article stated that the government probes involved two loans made by Och-Ziff, totaling $234 million, to companies controlled by controversial mining executive Dan Gertler.  These loans helped finance two ventures in Congo involving properties that were the subject of ownership disputes.  The article further revealed that:

> The loans to companies…include one made in 2008 by an investment fund run jointly by Och-Ziff and South African partners; another was made in 2010 by Och-Ziff itself, according to documents, which include offshore corporate-registration filings, investment memos and emails.  The loans were made under the oversight of Michael Cohen, then head of Och-Ziff's London office and one of its most senior executives, the documents show.  Mr. Cohen resigned last year after 15 years at the firm.

249.    On this news, shares in Och-Ziff fell by $1.28, almost 10% on heavy trading volume, to close at $11.65 on April 28, 2014.  This was the biggest daily drop in Och-Ziff's stock price in almost five years. Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

250.    On August 22, 2014, Bloomberg Businessweek published a scathing story entitled the "Hedge Fund and the Despot," describing that Och-Ziff financed political intimidation and violence in the 2008 Zimbabwe election by investing in a mining company that enabled Mugabe to violently crush opposition to his dictatorial regime.  On this news, Och-Ziff's stock fell nearly

7%, or $0.86 per share.  Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

251.    In a CNBC article one observer who counsels institutional investors on hedge funds stated "'It doesn't get uglier than that in terms of a headline…[investors] hire a firm like Och-Ziff to be the 'sleep at night fund'…When the ballast underperforms and gives you headline risk, it begs the question as to why it's there in the first place.'"

252.    Morningstar analyst Stephen Ellis stated that clients are "rightly concerned about Och-Ziff's investment processes and may feel a bit more leery about putting more assets with Och-Ziff."

253.    The gravity and implications of the Investigation was kept under wraps until the spring of 2016.  On April 11, 2016 the Wall Street Journal reported that the DOJ wanted Och-Ziff to plead guilty and that the SEC was seeking $400 million in civil penalties based upon what it believed were the company's profits from the illegal conduct. On this news, Och-Ziff stock fell by approximately 13.2% on extraordinarily heavy trading volume.  Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

254.    On May 3, 2016 the Company confirmed the tremendous financial impact of the Investigation in its 10-Q for the first quarter 2016 in which it announced that it had recorded a expected liability of $200 million in connection with the Investigation but that it "believes it is probably that the amount will be in excess of this $200 million, but [ ] is unable to estimate an amount at this time."  In its 10-Q for the second quarter 2016 filed with the SEC on August 2, 2016, Och-Ziff disclosed that it recorded an additional charge of $214.3 million and that the

probable estimated loss therefore totaled $414.3 million. Alternatively, the drop in Och-Ziff's share price constituted the materialization of the undisclosed risks concealed by the Company.

255.    Och-Ziff's stock is currently trading at approximately $2.90 per share.


## EFFICIENT MARKET

256.    The market for Och-Ziff securities was an efficient market during the Class Period for the following reasons, among others:

(a)    Och-Ziff's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient automated market;

(b)    As a regulated issuer, Och-Ziff filed period public reports with the SEC and/or NYSE;

(c)    Och-Ziff regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

(d)    Och-Ziff was followed by securities analysts including RBC Capital Markets, Barclays Capital, Jeffries & Co, Ticonderoga and William Blair, among other brokerage and research firms who wrote research reports about the Company, and these reports were distributed widely;

(e)    Och-Ziff met the SEC requirements to file an S-3 registration statement during the Class Period;

(f)    According to Och-Ziff's Form 10-K filed with the SEC on February 11, 2016 Och-Ziff had a total of 181,189,090 Class A shares outstanding as of February 5, 2016;

(g)    On average, approximately 2.9% of Och-Ziff's 181,189,090 outstanding shares were traded on a weekly basis during the Class Period; and

(h)    Unexpected material news concerning was rapidly reflected in Och-Ziff's share price.

257.    Based upon the foregoing, the market for Och-Ziff securities promptly digested new information regarding Och-Ziff from all publicly available resources and reflected such information in Och-Ziff's share price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:  *AFFILIATED UTE*

258.     Neither Plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741; 1972 U.S. LEXIS 163; Fed. Sec. (1972).   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

259.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Och-Ziff securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any of the excluded parties above have or had a controlling interest.

260.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Och-Ziff securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Och-Ziff or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

261.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

262.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

263.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Och-Ziff;

- whether the Individual Defendants caused Och-Ziff to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Och-Ziff securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

264.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

265.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Och-Ziff securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Och-Ziff securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

266.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

267.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.  Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme,

or artifice to defraud.  Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

269.    Plaintiffs assert Section 10(b) and Rule 10b-5(b) claims against Defendants Och-Ziff Capital Management Group LLC, Daniel S. Och, and Joel M. Frank; and Section 10(b) and Rule 10b-5(a) and (c) claims against Defendants Och-Ziff Capital Management Group LLC, Daniel S. Och, Joel M. Frank, and Michael Cohen.

270.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Och-Ziff securities; and (iii) cause Plaintiffs and other members of the Class to purchase Och-Ziff securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

271.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Och-Ziff securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Och-Ziff's investments.

272.     By virtue of their positions at Och-Ziff, the Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

273.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Och-Ziff, the Individual Defendants had knowledge of the details of Och-Ziff's internal affairs.

274.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Och-Ziff.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Och-Ziff's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and/or public statements, the market price of Och-Ziff securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Och-Ziff's investments which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Och-Ziff securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the publication of the alleged corrective disclosures.

275.   During the Class Period, Och-Ziff securities were traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Och-Ziff securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.   At the time of the purchases by Plaintiffs and the Class, the true value of Och-Ziff securities were substantially lower than the prices paid by Plaintiffs and the other members of the Class.   The market price of Och-Ziff securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

276.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements to the investing public.

278.    This action was filed within two years of discovery of Plaintiffs' claims and within five years of the purchases on which such claims are based.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

279.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

280.    During the Class Period, the Individual Defendants participated in the operation and management of Och-Ziff, and conducted and participated, directly and indirectly, in the conduct of Och-Ziff's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Och-Ziff.

281.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Och-Ziff's investments, and to correct promptly any public statements issued by Och-Ziff which had become materially false or misleading.

282.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and/or public filings which Och-Ziff disseminated in the marketplace during the Class Period concerning Och-Ziff's investments. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Och-Ziff to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Och-Ziff within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Och-Ziff securities.

283.    Each of the Individual Defendants, therefore, acted as a controlling person of Och-Ziff.  By reason of their senior management positions and/or being directors of Och-Ziff, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Och-Ziff to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Och-Ziff and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

284.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Och-Ziff.

285.    This action was filed within two years of discovery of Plaintiffs' claims and within five years of the purchases on which such claims are based.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.       Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.       Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their allowable costs; and

D.       Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated:  November 17, 2016

**THE ROSEN LAW FIRM, P.A.**

 _/s/ Sara Fuks_
Sara Fuks
Laurence M. Rosen
Phillip C. Kim
Kevin Chan
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827

**POMERANTZ LLP**
Jeremy A. Lieberman
Emma Gilmore
Michele S. Carino
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

***Co-Lead Counsel for Plaintiffs and the Putative Class***