UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ARTHUR MENALDI, individually and on :
behalf of all others similarly situated, :
:
:
Plaintiff, :
:
:
-v- :
:
OCH-ZIFF CAPITAL MANAGEMENT :
GROUP LLC, DANIEL S. OCH, JOEL M. :
FRANK, and MICHAEL COHEN, :
:
:
Defendants. :
-----------------------------------------------------------X

14-CV-3251 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

This is a sequel to this Court's opinion in *Menaldi v. Och-Ziff Capital Management Group LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016) ("*Menaldi I*"). And like many a sequel, we unravel old plots and rehash familiar themes, only to end up right back where we started. In *Menaldi I*, this Court dismissed some of Plaintiffs' claims of securities fraud, and dismissed all claims against Defendant Michael Cohen. Plaintiffs have now filed an amended complaint, seeking (1) to revive previously dismissed claims, (2) to revive claims against Cohen, and (3) to assert new claims. All three attempts fail, leaving Plaintiffs with the claims previously allowed to go forward in *Menaldi I*.

I.      **Background**

Lead Plaintiffs Ralph Langstadt and Julie Lemond bring this action on behalf of a putative class of investors who purchased securities in Och-Ziff Capital Management Group LLC ("Och-Ziff") between November 18, 2011, and April 11, 2016. The following facts are taken from the Consolidated Amended Class Action Complaint ("the Old Complaint") and the Consolidated Second Amended Class Action Complaint ("New Complaint" or "Compl."). (Dkt.

1

No. 17; Dkt. No. 76.) The New Complaint's allegations are assumed true for the purposes of this opinion.

Och-Ziff is a large publicly traded asset management firm. (Compl. ¶ 31.) Defendant Daniel Och is Och-Ziff's founder and Chief Executive Officer. (*Id.* ¶ 19.) Defendant Joel Frank was Och-Ziff's Chief Financial Officer and Senior Chief Operating Officer. (*Id.* ¶ 20.) Defendant Michael Cohen was an Och-Ziff employee who oversaw its investments in Africa. (*Id.* ¶ 21.)

### A. The Old Complaint

A full discussion of the Old Complaint is found in *Menaldi I*. Its allegations are summarized here insofar as they are relevant to the pending motions. The defendants in the Old Complaint were the same as in the New Complaint: Och-Ziff, Och, Frank, and Cohen.

#### 1. The African Transactions

The Old Complaint alleged various improprieties in connection with three Och-Ziff ventures in Africa: (1) a loan to secure platinum mining rights in Zimbabwe, in possible violation of sanctions imposed against the regime of its president, Robert Mugabe; (2) loans to acquire control of oil and mines in the Democratic Republic of the Congo, in which Och-Ziff lent money to an Israeli middleman who may have bribed government officials; and (3) transactions with Libya's sovereign wealth fund controlled by the son of Moammar Gaddafi, in which Och-Ziff used a "fixer" with close ties to the Libyan government. These deals took place between 2007 and 2011.

#### 2. The SEC-DOJ Investigations

The Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") began investigating Och-Ziff's investments in Africa in 2011. Specifically, Och-Ziff received subpoenas from the SEC and "requests for information" from DOJ in connection with

the investigation. The Old Complaint alleged that the investigation concerned the three African transactions. The details of the investigation were not public when the Old Complaint was filed.

### 3. The SEC Filings

The core of the Old Complaint's claims concerned Och-Ziff's statements made in SEC filings concerning ongoing regulatory proceedings and investigations. Between 2012 and 2014, Och-Ziff's public filings made several statements, which, though varying in wording, essentially stated that Och-Ziff was "not currently subject to any pending judicial, administrative or arbitration proceedings that [it] expect[s] to have a material impact on [its] results of operations or financial condition" and that it is "subject to scrutiny by the regulatory agencies that have or may in the future have regulatory authority over [Och-Ziff and its] business activities, which results in regulatory agency investigations and litigation related to regulatory compliance matters." *Menaldi I*, 164 F. Supp. 3d at 574–75.

Based on these filings, the Old Complaint alleged (1) that Och-Ziff should have disclosed that it was engaged in FCPA violations in Africa, and (2) that the statements about not being subject to pending proceedings with potential material impact were false because Defendants knew that Och-Ziff's African transactions were being scrutinized by federal authorities, knew that the company had committed FCPA violations, and thus knew that the consequences of the investigation could be severe.

The Old Complaint thus asserted three claims: (1) a securities fraud claim pursuant to Exchange Act § 10(b) and Rule 10b-5(b) against all Defendants except Cohen; (2) a scheme liability claim pursuant to Exchange Act § 10(b) and Rule 10b-5(a) and (c) against all Defendants; and (3) a control person claim pursuant to Exchange Act § 20(a) against all Defendants except Och-Ziff.

## B.    The *Menaldi I* Motion to Dismiss

Upon a motion to dismiss, this Court in *Menaldi I* dismissed some of the claims against some Defendants and dismissed all of the claims against Cohen.

First, the Court held that the Old Complaint failed to state a claim under Rule 10b-5(b) based on failure to disclose the then-uncharged FCPA and sanctions violations. The Court concluded that (1) the Old Complaint did not plausibly allege that any laws were actually broken, and (2) even if laws were broken, the Old Complaint failed to plead facts establishing that Och-Ziff had a duty to disclose the uncharged illegal conduct. *Menaldi I*, 164 F. Supp. 3d at 578. The Court noted that the Old Complaint's FCPA allegations were "conclusory" because they did not identify any actual bribes and only hinted at various improprieties. *Id.* Moreover, the Court held that even if FCPA violations had occurred, the connection between Och-Ziff's public statements and the alleged criminal conduct was too tenuous to give rise to a duty to disclose the criminal wrongdoing.

Second, the Court held that the Old Complaint *did* state a claim under Rule 10b-5(b) against Och-Ziff, Och, and Frank for misrepresenting the SEC-DOJ investigation in Och-Ziff's public filings. Specifically, the Court held that "Plaintiffs have plausibly alleged that Och-Ziff misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation." *Menaldi I*, 164 F. Supp. 3d at 584. The Court likewise held that the Old Complaint adequately alleged scienter, concluding that "Plaintiffs have plausibly alleged that [Och and Frank] were reckless in opting to misrepresent their exposure to civil and criminal liability." *Id.* at 585.

Third, the Court held that the Old Complaint failed to state a claim for scheme liability under subsections (a) and (c) of Rule 10b-5. *Id.* at 586. The Court rejected a claim of scheme

liability based on the then-uncharged FCPA violations because (1) that conduct had been inadequately pleaded, as discussed above, and (2) those violations took place before the class period. The Court also rejected a claim of scheme liability based on misrepresentations in the Och-Ziff filings concerning the SEC investigations, because the Old Complaint did not identify an additional "deceptive act" as required for scheme liability. *Id.*

Fourth, the Court held that the Old Complaint failed to state a control-person claim under § 20(a) against Cohen. Control person liability requires a predicate primary violation, and since the only other claim against Cohen—scheme liability—had been dismissed, the Court held that the control person claim must be dismissed as well. *Id.* at 587.

Finally, the Court held that the Old Complaint *did* state a control-person claim against Och and Frank because it alleged that both were aware of the existence and scope of the SEC-DOJ Investigation and were responsible for the allegedly misleading filings. *Id.*

In sum, *Menaldi I* left two claims standing: (1) a 10b-5(b) claim against Och-Ziff, Och, and Frank based on allegedly misleading statements regarding the SEC-DOJ investigation, and (2) a § 20(a) control person claim against Och and Frank, also based on the filings relating that investigation. As both claims against Cohen were dismissed, he was dismissed from the case completely.

### C.     The DOJ Deferred Prosecution Agreement

Five months after *Menaldi I*, Och-Ziff entered into a Deferred Prosecution Agreement with DOJ. (*See* Dkt No. 76, Ex. B ("DPA").) According to the terms of the DPA, Och-Ziff agreed to the filing of two counts of violating the FCPA's anti-bribery provisions, one count of violating the FCPA's books and records provisions, and one count of violating the FCPA's

internal controls provisions.  (DPA ¶ 1.)  Och-Ziff also agreed that it is responsible for the acts of

its employees and that the factual allegations in the DPA are true.  (DPA ¶ 2.)

### 1.    The DRC Scheme

The DPA alleges wide-ranging violations of the FCPA all over Africa.[1]  In the

Democratic Republic of the Congo ("DRC"), this involved working with Daniel Gertler, an

Israeli businessman who routinely bribed local officials to obtain special treatment in the

government-controlled mining sector.  (DPA Statement of Facts ("DPA SOF") ¶ 20.)  In 2007,

Cohen talked with Gertler about forming a joint venture to buy valuable mining assets in the

DRC.  (*Id.* ¶ 23.)  Gertler told Cohen that he would have to pay lots of money to government

officials—or "local partners"—to make it happen.  (*Id.*)  Gertler also told Cohen that he expected

Och-Ziff to fund those corrupt payments.  (*Id.*)  Cohen did not tell Och-Ziff's legal or

compliance departments about this arrangement.  (*Id.*)

In 2008, Och-Ziff conducted due diligence on Gertler before entering into the joint

venture.  (*Id.* ¶ 24–25.)  The due diligence report took a dim view of Gertler, to say the least.  It

noted, among other things, that Gertler "has been willing to use his significant political

influence" with a DRC official to "facilitate acquisitions, settle disputes and frustrate

competitors," and that he "keeps what can only be described as unsavory business associates."

(*Id.* at ¶ 25.)  It added that "[w]hether through good PR and legal advice or indeed innocence, no

allegations against [Gertler] have yet been proved."  (*Id.*)

In 2008, Frank and other members of Och-Ziff's senior management, believing that

bribery was part of Gertler's business model, advised Och against doing business with Gertler.

---

[1]    The DPA does not mention individual names.  According to the New Complaint,
"Och-Ziff Employee 1" is Ziff; "Och-Ziff Employee 2" is Frank; "Och-Ziff Employee 3" is
Cohen; "DRC Partner" is Gertler; and so on.  (*See* Compl. ¶¶ 17–30.)

(*Id.* ¶ 26.)  They added, however, that there was no strict legal prohibition on working with Gertler, as he was not on a government prohibited persons list.  (*Id.*)  Nevertheless, Och-Ziff went into business with Gertler.  (*Id.* ¶¶ 26–28.)

True to Gertler's form, bribery—and lots of it—ensued.  Between 2008 and 2011, Och-Ziff entered into a series of transactions with Gertler involving hundreds of millions of dollars in loans and stock purchases that funneled money to companies controlled by Gertler.  (*Id.* ¶¶ 29–63.)  Cohen was at the helm of these initiatives, though he had informed Och of the general business plan.  (*Id.* ¶ 29.)  Cohen and another Och-Ziff employee knew that some of Och-Ziff's money ended up as bribes to DRC officials, but did not tell Och-Ziff's legal or compliance departments.  (*Id.* ¶¶ 43–47.)  Millions in bribes were indeed paid, and the joint venture was successful—to the tune of a $91 million profit for Och-Ziff.  (*Id.* ¶¶ 60, 63.)

### 2.  The Libya Scheme

In 2007, Cohen engaged Mohammed Ajami—or "Libya Intermediary" in the parlance of the DPA—to secure investments from the Libyan Investment Authority ("LIA"), the sovereign wealth fund of the Libyan Government.  (*Id.* ¶¶ 17, 64.)  This involved paying bribes to various Libyan officials, including Saif al-Islam Gaddafi, the son of then-Libyan leader Muammar Gaddafi.  (*Id.*)  Cohen knew that bribes were necessary to grease the wheels, and he funneled millions to Ajami for that purpose.  (*Id.* ¶¶ 64–65.)  Och-Ziff did not conduct any due diligence on Ajami, and Och-Ziff never formally approved Ajami's work on its behalf.  (*Id.* ¶ 66.)

Also in 2007, Cohen met with the younger Gaddafi in Vienna at a meeting brokered by Ajami to discuss an LIA investment in Och-Ziff's hedge funds.  (*Id.* ¶¶ 67–68.)  Cohen did not tell Och-Ziff's legal or compliance departments about the meeting, but he did tell Och.  (*Id.* ¶ 69.)  Several months later, Och gave Cohen his blessing to pursue the Libyan deal.  (*Id.* ¶¶ 70–71.)  Cohen did so, but hid from the LIA the fact that Ajami was working as the intermediary.

(*Id.* ¶ 75.)  Cohen knew that the money funneled to Ajami would end up as bribes.  (*Id.* ¶¶ 64–65, 76.)

Cohen's efforts soon bore fruit, and the LIA invested $300 million with Och-Ziff.  To compensate Ajami for his services, Och-Ziff created a consultancy agreement under which an Och-Ziff subsidiary deposited millions of dollars into Ajami's account in the British Virgin Islands.  (*Id.* ¶¶ 81–85.)  Much of this money, routed through a web of banks in Malta, the United Kingdom, and Switzerland, ended up as bribes, including to the younger Gaddafi.  (*Id.* ¶¶ 86–91.)  All told, Och-Ziff made about $100 million from the LIA investment.  (*Id.* ¶ 92.)

### 3. The DPA Terms

The DPA catalogues other episodes in which Och-Ziff made dubious investments with questionable middlemen in countries with high risks of corruption.  (*Id.* ¶¶ 93–100.)  The common denominator is that—through incompetence or malevolence—Och-Ziff did not have proper internal controls to ensure that it was not a party to bribery.

Och-Ziff agreed that all of the above was true and that it was legally responsible for the illegal actions of its employees.  (DPA ¶ 2.)  Och-Ziff agreed to pay a fine of $213,055,689 and institute a long-term monitoring and compliance program.  (*Id.* ¶¶ 7, 9–13.)  An Och-Ziff subsidiary, OZ Africa Management GP, LLC, which had funneled the money to Ajami, pleaded guilty to one count of conspiracy to violate the FCPA.  (*Id.* ¶ 7.)  Importantly, however, the DPA—and the admissions therein—covered only Och-Ziff, and not any of the individual Defendants in this case.

### D. The SEC Settlement

On the same day that the DPA was filed, Och-Ziff, Och, and Frank entered into an Administrative Cease-and-Desist Order and settlement agreement with the SEC.  (Dkt. No. 76

Ex. A (the "SEC Settlement").)  The SEC Settlement reiterated the allegations in the DPA.[2]

However, unlike Och-Ziff, the individual Defendants Och and Frank did not admit (or deny) the

SEC Settlement's factual allegations.  (SEC Settlement at 2.)

The SEC Settlement heaps the lion's share of the blame onto Cohen, who allegedly knew

from the start that bribery was Gertler's competitive edge.  (*Id.* ¶ 43.)  It also says, however, that

"[o]thers within Och-Ziff, including Och and Frank, were aware of corruption accusations

against [Gertler] as well as the high corruption risk when doing business in the DRC."  (*Id.* ¶ 45.)

It recounts an Och-Ziff due-diligence report, received by Frank and other high-ranking Och-Ziff

employees, containing a laundry list of bribery accusations against Gertler.  (*Id.* ¶ 46.)  Frank and

a senior Och-Ziff attorney went to Och with their concerns.  (*Id.* ¶ 47.)  "Och was told that

although it was not illegal to transact with [Gertler], nonetheless both Frank and the senior Och-

Ziff attorney expressed the view that Och-Ziff should not enter into any transaction with him

because of the significant corruption risk."  (*Id.*)  Och decided to move forward anyway.  (*Id.*)

The SEC Settlement concluded that although Och-Ziff had a formal anti-corruption

policy since 2008, it failed to follow its own guidelines and entered into transactions and

business relationships without proper due diligence.  (*Id.* ¶¶ 94–101.)  It also concluded that

Och-Ziff violated the books and records provisions and the accounting provisions of the FCPA.

(*Id.* ¶¶ 102–03.)

As to the individual Defendants, the SEC settlement concluded that "Och was aware of

the risk of corruption in the transactions with [Gertler], and contrary to the recommendation of

his legal and compliance team, he approved the use of Och-Ziff investor funds in those

---

[2]        The naming structure, however, is different.  Thus, "Och-Ziff Employee A" in the
SEC Settlement is Cohen.

transactions. As a consequence, Och caused Och-Ziff's [FCPA books and records violations]." (*Id.* ¶ 104.) As to Frank, it concluded that he had ultimate responsibility for maintaining Och-Ziff's books and records, for authorizing all uses of Och-Ziff funds, and for overseeing Och-Ziff's legal and compliance departments. As such, "Frank was responsible for ensuring that all transactions were recorded accurately and in accordance with generally acceptable accounting procedures and was likewise responsible for devising and maintaining Och-Ziff's internal accounting controls." (*Id.* ¶ 105.)

As part of the SEC Settlement, Och-Ziff agreed to disgorge an additional $199,045,167.00, and Och agreed to disgorge $2,173,718.00. (*Id.* at 35.) The SEC Settlement did not impose a monetary penalty on Frank, but he agreed that penalties may be imposed against him at a later date. (*Id.* at 34.)

Cohen was not a party to the DOJ or SEC agreements. On January 26, 2017—after the New Complaint was filed—the SEC filed a civil suit against Cohen and another Och-Ziff employee in the Eastern District of New York. (*See* Dkt. No. 117.) The SEC complaint alleges FCPA violations and securities fraud.[3]

### E. The New Complaint

The New Complaint was filed on November 18, 2016. (Dkt. No. 76.) The key difference between the factual allegations in the Old Complaint and those in the New Complaint is the level of detail regarding Och-Ziff's dubious dealings in Africa. Of great help are the DPA and the SEC Settlement, both of which are incorporated into the New Complaint.

---

[3]     The SEC complaint was filed after the New Complaint, but Plaintiffs ask the court to take judicial notice of it. (Dkt. Nos. 117, 119.) Cohen opposes this request. (Dkt. No. 118.) Ultimately, however, the SEC complaint adds little, if anything, of relevance to the allegations in the New Complaint, and does not affect the outcome of the pending motions.

The New Complaint restates the claims dismissed in *Menaldi I* and adds three new theories of liability: (1) that Och-Ziff made misleading statements when it described its FCPA compliance program; (2) that Och-Ziff filed false financial statements by failing to comply with Generally Accepted Accounting Principles, and (3) that Och's and Frank's Sarbanes-Oxley certifications were misleading. It also seeks to renew the dismissed claims against Cohen.

Before the Court now are four motions: Plaintiffs' motion seeking to renew claims against Cohen, and three separate motions to dismiss—one each by Och-Ziff, Och, and Frank. (Dkt. Nos. 86, 96, 100, 103.)

## II. Legal Standard

In general, to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Wilson v. Merrill Lynch & Co*, *Inc.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In assessing a motion to dismiss, courts assume that all "factual allegations contained in the complaint" are true, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and draw "all inferences in the light most favorable to the non-moving party[]." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).

Claims for securities fraud, however, are subject to the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure Rule 9(b). Under the PSLRA, securities fraud complainants must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15

U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).  Rule 9(b) "imposes a comparable requirement" on securities fraud plaintiffs.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.") (quoting Fed. R. Civ. P. 9(b)).

## III.  Discussion

### A.  Och's and Ziff's Knowledge of Bribery

As a threshold matter, the Court analyzes the effect of the SEC's finding that "neither Och nor Frank knew that bribes would be paid."  (SEC Settlement ¶ 6.)  Defendants argue that Plaintiffs cannot adopt the SEC's allegations as their own without also incorporating this exculpatory finding.  (*See, e.g.*, Dkt. No. 102 at 6–7.)

When deciding a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . ."  *Tellabs*, 551 U.S. at 322.  "If the allegations of a pleading 'are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading].'"  *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) (quoting *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994)).

Accordingly, the Court considers the SEC's exculpatory finding as if it were in the complaint itself, and accepts it as true.  Of course, this is not the end of the story.  As Plaintiffs point out, even if Och and Ziff did not know of actual bribery, Defendants could still be liable if their conduct was reckless.  Defendants could also be liable for claims that do not hinge on actual

knowledge of bribery.  Nevertheless, as discussed below, the lack of actual knowledge of bribery weighs down the New Complaint's allegations, particularly when it comes to scienter.

### B.     The Previously Upheld Claims

As another preliminary matter, the Court holds that the New Complaint does not affect the claims that survived *Menaldi I*.  Those claims are the 10b-5(b) claim against Och-Ziff, Och, and Frank based on allegedly misleading statements regarding the SEC-DOJ investigation, and the § 20(a) control person claim against Och and Frank, also based on the filings relating to the SEC investigation.

While Och-Ziff seeks to dismiss only the revived and newly asserted claims, Frank and Och style their briefs as motions to dismiss the New Complaint in its entirety—presumably including those claims that survived *Menaldi I*.  Och and Frank also argue that that the SEC Settlement specifically says that neither of them knew of the bribery, and that, as a result, they lacked scienter for the statements about the SEC-DOJ investigation.

The Court is unconvinced.  The holding in *Menaldi I* did not hinge on whether Och and Frank knew of the underlying bribery.  Instead, *Menaldi I* noted that "[Och and Frank] knew about the SEC-DOJ Investigation from 2011 onward, but waited to disclose its potential impact, which Och-Ziff later described as material, until after the *Wall Street Journal* published an article about the African Transactions.  With these allegations assumed to be true, Plaintiffs have plausibly alleged that [Och and Frank] were reckless in opting to misrepresent their exposure to civil and criminal liability."  *Menaldi I*, 164 F. Supp. 3d at 585 (citations omitted).  The SEC's finding that Och and Frank lacked actual knowledge of bribes does not change that conclusion.  Indeed, the SEC-DOJ investigation could have had a materially adverse outcome even if there were no bribery at all—for instance if it uncovered books and records violations (as it did).

Accordingly, the 10b-5(b) and § 20(a) claims upheld in *Menaldi I* remain viable.

**C.     The Renewed Claim for Failure to Disclose The Illegal Conduct**

*Menaldi I* also held that Och-Ziff's failure to disclose the FCPA violations was not actionable because (1) the Old Complaint did not plausibly allege that federal laws were actually violated, and, alternatively, (2) there was no duty to disclose the then-uncharged illegal conduct. The first part of the *Menaldi I* holding is clearly obsolete, as it is now clear that laws were indeed broken. The second part of that holding, however, still stands.

*Menaldi I* discussed a line of cases holding that "a corporation may be compelled to disclose uncharged wrongdoing if its statements are or become materially misleading in the absence of disclosure." *Menaldi I*, 164 F. Supp. 3d at 581. "For such a duty to arise, however, there must be a connection between the illegal conduct and the misleading statements 'beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line.'" *Id.* (citing *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008). Three situations can create such a connection: (1) "when a corporation puts the reasons for its success at issue but fails to disclose that a material source of its success is the use of improper or illegal business practices"; (2) "when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring"; or (3) "when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *Id.* (collecting cases) (citations omitted).

Nothing in the New Complaint changes *Menaldi I*'s conclusion that the connection between Och-Ziff's public statements and the criminal conduct is "too tenuous to give rise to a duty to disclose criminal wrongdoing." *Id.* at 582. This holding was based on the same statements at issue in the New Complaint—i.e., statements about Och-Ziff's not being subject to

proceedings expected to have a material impact, and statements about being subject to government investigations from time to time. "These statements do not address the sources of Och-Ziff's success, nor do they deny illegal conduct that has been charged, admitted, or adequately pleaded. And while Och-Ziff made projections about the impact of pending regulatory proceedings, those projections required, at most, that Och-Ziff disclose material information about the investigation. To hold otherwise would be to subject corporations to a preemptive duty to 'confess' as soon as a regulatory agency begins an investigation." *Id.* (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession . . . .")).

Accordingly, the holding in *Menaldi I* still stands: There was no duty to disclose the then-uncharged illegal conduct.

### D. The New Claim for Statements about Och-Ziff's Compliance Program

*Menaldi I* also held that Och-Ziff's statements touting its compliance program were not actionable. 164 F. Supp. 3d at 580. These included Och-Ziff statements that its "transparency" was a "competitive strength" and that it actively managed "reputational risks." *Id.*; *see also City of Pontiac*, 752 F.3d at 183 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'. . . .").

The New Complaint doubles down on this claim. It points to two statements made in Och-Ziff's SEC filings and which were not included in the Old Complaint. The first one, made in a 10-K filing on February 27, 2012, reads:

> We have implemented a global compliance program to address the legal and regulatory requirements that apply to our company-wide operations . . . . Our compliance program includes comprehensive policies and supervisory procedures that have been implemented to monitor compliance with these requirements. All employees attend mandatory compliance

> training to remain informed of our policies related to matters
> such as the handling of material non-public information and
> employee securities trading.  In addition to a robust internal
> compliance framework, we have strong relationships with a
> global network of local attorneys specializing in compliance
> matters to help us quickly identify and address compliance
> issues as they arise.

(Compl. ¶ 177.)  The second one, made in a 10-K filing on February 28, 2013, reads:

> In recent years, the U.S. Department of Justice (the "DOJ")
> and the SEC have devoted greater resources to enforcement
> of the FCPA. . . .  While we have developed and implemented
> policies and procedures designed to ensure strict compliance
> by us and our personnel with the FCPA, such policies and
> procedures may not be effective in all instances to prevent
> violations.  Any determination that we have violated the
> FCPA or other applicable anti-bribery laws could subject us
> to, among other things, civil and criminal penalties, material
> fines, profit disgorgement, injunctions on future conduct,
> securities litigation and a general loss of investor confidence,
> any one of which could adversely affect our business
> prospects, financial position or the market value of our Class
> A Shares.

(Compl. ¶ 190).

In analyzing this new claim, the key issues are (1) whether these statements were

misleading and (2) if so, whether Defendants acted with scienter.

Plaintiffs argue that "Defendants' statements that adequate controls were in place were

explicitly intended to allay investor concerns regarding increased regulatory scrutiny and the

Company's exposure to regulatory risk" while, at the same time, "Defendants were not only

aware of rampant corruption and the lack of any meaningful compliance function, but they

themselves had circumvented and/or ignored the Company's internal controls and approved

illicit transactions despite warnings that bribes would likely be paid."  (Dkt. No. 126 at 42–43.)

In response, Och-Ziff argues that these statements are too generalized to be actionable.

(Dkt. No. 99 at 22–23.)  It also argues that they were not misleading because "Och-Ziff

specifically cautioned investors that its FCPA compliance controls 'may not be effective in all instances to prevent violations' and that '[a]ny determination that we have violated the FCPA or other applicable anti-bribery laws could subject us to, among other things, civil and criminal penalties.'" (*Id.* at 23.) Och and Frank also argue that the complaint inadequately pleads scienter as to them.

The Court concludes that the New Complaint does not adequately plead that the two statements were misleading. To begin with, the New Complaint does not allege that the statements contain literal untruths. Och-Ziff had indeed implemented a compliance program and issued policies and procedures aiming to ensure FCPA compliance. Also important is that these statements do not profess an opinion on the efficacy of Och-Ziff's compliance program. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e., the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty.").[4]

Nor does the New Complaint adequately allege that the statements were misleading because they described Och-Ziff's compliance program while omitting the FCPA violations. It is true that "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *In re Morgan Stanley Info. Fund Sec. Litig.*,

---

[4]    While the description of the compliance program as "robust" (Compl. ¶ 177), arguably constitutes an opinion, Plaintiffs do not make that argument. In any event, this one adjective—and a vague one at that—is not enough to constitute a false opinion.

592 F.3d 347, 366 (2d Cir. 2010) (internal citations and quotation marks omitted). The Court nevertheless concludes that the above two statements were not so incomplete as to be misleading.

The case most favorable to Plaintiffs is *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), in which the Second Circuit held that a Chinese company's description of a compliance program could be misleading if it omits known pollution problems. The court reasoned that "the description of pollution-preventing equipment and 24-hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations." *Id.* at 251. And even though "these descriptions did not guarantee 100% compliance 100% of the time," investors would be misled by a statement describing the company's compliance efforts "if in fact the equipment and 24-hour team were then failing to prevent substantial violations of the Chinese regulations." *Id.*

But, crucially, Och-Ziff's statements are far more generalized. The company in *Jinkosolar* described, for example, specific "pollution abatement equipment . . . to process, reduce, treat, and where feasible, recycle the waste materials before disposal" and "environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that [these] waste emissions comply with [Chinese law]." *Jinkosolar*, 761 F.3d at 247. Given these statements, the court held, "the failure to disclose that the prophylactic steps were then failing to prevent serious ongoing pollution problems rendered that description misleading." *Id.* at 250.

In contrast, Och-Ziff's 2012 statement described a "global compliance program," "comprehensive policies and supervisory procedures," "mandatory compliance training," and "strong relationships with a global network of local attorneys." (Compl. ¶ 177.) It did not

describe specific regions, specific initiatives, or make any assurances of efficacy.  If this type of

milquetoast corporate-speak required disclosure of all potential FCPA violations then known to

the company, then "any company that has a compliance program and discloses that program in

even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that

came to its attention."  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008).

The *FBR* court—in evaluating similarly generalized statements—reached the same result.

The 2013 Och-Ziff statement likewise differs significantly from those in *Jinkosolar*

because it explicitly says that "[Och-Ziff's] policies and procedures may not be effective in all

instances to prevent violations."  (Compl. ¶ 190.)  By comparison, the statement in *Jinkosolar*

does not appear to have had such a disclaimer.  Notably, one of the few cases in this district

discussing *Jinkosolar* likewise distinguished the facts of that case because "[u]nlike the company

in *Jinkosolar*, [defendant] did not represent that its efforts to comply with the law were

particularly effective, let alone foolproof."  *Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192

F. Supp. 3d 456, 474 (S.D.N.Y. 2016).

Accordingly, the holding in *Menaldi I* still stands:  The statements about Och-Ziff's

compliance program are not actionable.

### E.      The New Claim for Fraudulent Financial Statements

The New Complaint asserts another new claim: that Och-Ziff committed "fraudulent

financial reporting" because it did not disclose the potential financial impact of the SEC-DOJ

investigation, in violation of Generally Accepted Accounting Principles ("GAAP").

(Compl. ¶¶ 111–60.)  "SEC regulations dictate that where financial statements are not prepared

in compliance with GAAP, they are presumed to be misleading."  *Pennsylvania Pub. Sch.*

*Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 356 (S.D.N.Y. 2012) (citing 17

C.F.R. § 210.4–01(a)(1)).

### 1.     The ASC 450 Standard

The relevant accounting principle is Accounting Standards Codification 450 ("ASC

450"), which replaced the older FAS 5 rules.  (*See* Dkt. No. 97-22.)  ASC 450 governs

contingencies—essentially, situations involving uncertainty as to a possible gain or loss.  *See*

ASC 450-05-10; ASC 450-20-20.  A loss contingency is defined as "[a]n existing condition or

situation involving uncertainty as to possible loss to an enterprise that will ultimately be resolved

when one or more future events occur or fail to occur."  ASC 450-20-20.  Under certain

circumstances, ASC 450 requires that a company disclose a loss contingency.  In other

circumstances, ASC 450 also requires that a company accrue a loss on its financial statements.

ASC 450 classifies future events into three categories: probable, reasonably possible, and

remote.[5]

There are three relevant ways GAAP could have required action by Och-Ziff:

- If the government had manifested an awareness of a potential claim, *and* there was a reasonable possibility that a loss had occurred.

- If the government had not manifested an awareness of a potential claim, but it was probable that the government would assert a claim, *and* there was a reasonable possibility that the outcome would be unfavorable.

- If it was probable that a liability had been incurred, *and* the amount of loss could be reasonably estimated.

In the first two scenarios, Och-Ziff would have had to disclose the nature of the

contingency and an estimate of the possible loss.  *See* ASC 450-50-3; ASC 450-50-4; ASC 450-

---

[5]       A future event is "probable" if it is "likely to occur."  A future event is "reasonably possible" when it "is more than remote but less than likely."  A future event is "remote" if the chance of its occurring is "slight."  ASC 450-20-20.

50-6. In the third scenario, Och-Ziff would have had to accrue the reasonably estimated amount of the loss. *See* ASC 450-25-2; *see generally Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93–94 (2d Cir. 2016) (discussing analogous FAS 5 requirements).

Och-Ziff did not disclose the loss contingency relating to the FCPA investigation until March 18, 2014, and it did not accrue a loss relating to the investigation until May 3, 2016. (Compl. ¶¶ 103, 254.) The New Complaint alleges that Och-Ziff was obliged to do both things beginning from 2011, when the investigation was still in its early stages. (Compl. ¶¶ 122, 158.) It alleges that Och-Ziff knew it had violated the FCPA, knew the profits it made off those violations, knew that there was an ongoing FCPA investigation that might end badly, and thus could have reasonably estimated the loss it would incur. (Compl. ¶ 122.)

The question before the Court now is whether the New Complaint adequately alleges a violation of ASC 450, and, if so, whether it adequately alleges scienter.

## 2. Government Awareness of Potential Claim

The threshold question is whether there was a "manifestation by [the government] of an awareness of a possible claim." ASC 450-50-6. The answer to this question dictates the stringency of the applicable standard. If the government was not aware of the potential claim against Och-Ziff, "[t]he 'probability' standard applies in lieu of the 'reasonable possibility' standard." *SAIC*, 818 F.3d at 93.

Like the Second Circuit in *SAIC*, the Court concludes that the government had manifested an awareness of a potential claim in this case. The manifestation here was not as strong as that in *SAIC* where, among other things, a criminal complaint had been filed against individual employees. Nevertheless, the New Complaint adequately alleges that Och-Ziff received a series of detailed subpoenas concerning its African ventures. As such, Och-Ziff was well aware that

there was an active investigation that could—and did—lead to the government's filing of a claim against the company.

### 3. Reasonable Possibility of Loss

Since the New Complaint adequately alleges that the government was aware of the potential claim against Och-Ziff, the question becomes whether there was a reasonable possibility of a loss. *See SAIC*, 818 F.3d at 93. Here, the relevant facts are that (1) Och and Frank knew that Och-Ziff did business with dodgy partners in Africa, (2) neither Och nor Frank had knowledge of actual bribes, and (3) Och-Ziff had received subpoenas from the SEC indicating that the government was investigating it for possible FCPA violations in Africa. On these facts, the question is whether it was "more than remote" that a loss could be incurred. ASC 450-20-20.

This is a close call, but the Court concludes that the New Complaint adequately alleges that a loss was reasonably possible. Here, too, the facts are not as damning as in *SAIC*, where the Second Circuit held that the company should have disclosed a loss contingency. *See SAIC*, 818 F.3d at 93–94. Nevertheless, the SEC subpoenas had enough details to suggest that the government was on Och-Ziff's trail, and both Och and Frank were aware that Och-Ziff did extensive business with problematic partners like Gertler. On these facts, the New Complaint adequately alleges that the likelihood of an adverse outcome was "more than remote." ASC 450-20-20.[6]

_____

[6] Because the New Complaint just barely alleges that a loss was *reasonably possible*, it does not adequately allege the more ambitious claim that a loss was *probable*. For that reason (as well as the failure to adequately plead scienter), the New Complaint's allegation that Och-Ziff should have accrued for a loss fails.

**4. Scienter**

Having concluded that the New Complaint adequately alleges that GAAP mandated a disclosure, the Court now turns to the question whether the New Complaint adequately pleads scienter. "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citations omitted) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)). "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). Therefore, the question is: "does the [New Complaint] allege 'facts to show . . . strong circumstantial evidence of conscious misbehavior or recklessness' on [Och-Ziff's] part?" *SAIC*, 818 F.3d at 96 (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).

The Court concludes that the New Complaint does not adequately plead scienter. Again, the Second Circuit's opinion in *SAIC* serves as the Court's North Star. In that case, the defendant company "received the results of its internal investigation," "knew about [an employee's] kickback scheme," and was well aware that "it risked civil and criminal fines and penalties, let alone losing a significant number of current and future government contracts." *SAIC*, 818 F.3d at 96. Given this knowledge, the Second Circuit concluded that the complaint "support[ed] the inference that SAIC acted with at least a reckless disregard of a known or obvious duty to disclose." *Id.* at 96. *See also Godinez v. Alere Inc.*, 16 Civ. 10766, 2017 WL 3623160, at *10 (D. Mass. Aug. 23, 2017) (holding that plaintiffs adequately pleaded scienter for

an ASC 450 violation because the complaint alleged that defendants knew or should have known that products would be recalled).

By comparison, Och and Frank did not know of actual bribery, and the New Complaint does not allege any contemporaneous events besides the subpoenas showing what Och and Frank knew about the extent of the scheme. "[T]he existence of a subpoena does not, without more, give rise to a strong inference of scienter on the part of senior management." *Godinez*, 2017 WL 3623160, at *1. While Cohen may very well have known about bribery, his state of mind is not relevant to the question of scienter for GAAP omissions, as he was not involved in any filings.

Nor does the New Complaint adequately allege that Defendants exhibited "reckless disregard for a known or obvious duty." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). Contrary to Plaintiffs' argument, ASC 450 is not a "reasonably simple and straightforward accounting rule." (Dkt. No. 126 at 39.) The rule requires many judgment calls in deciding how to respond to contingencies. And unlike Och-Ziff's statements about the SEC-DOJ investigation—for which the Court concluded that Plaintiffs adequately alleged scienter—this claim involves an omission that is based on a qualitative accounting rule rather than an affirmative misstatement about a pending investigation. "[R]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 2017 WL 1157138, at *10 (S.D.N.Y. 2017) (quoting *Chill*, 101 F.3d at 269) (quotation marks omitted). Given the heightened pleading standards of Rule 9(b) and the PSLRA, Plaintiffs' allegations fall short of adequately pleading scienter.

Accordingly, the New Complaint fails to state a claim relating to ASC 450.

### F.     The New Claims Regarding the Sarbanes-Oxley Certifications

The New Complaint also alleges that some of Och-Ziff's 10-K and 10-Q filings contained Sarbanes-Oxley ("SOX") certifications by Och and Frank certifying that the report "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading." (Dkt. No. 126 at 16.) Plaintiffs argue that these certifications were materially false and misleading because Och and Frank knew that Och-Ziff committed FCPA violations and knew that its financial statements did not accurately reflect the bribes paid. (*Id.*)

But while signing the SOX certifications might be indicative of scienter, *see In re Eletrobras Sec. Litig.*, 2017 WL 1157138, at *11, the New Complaint does not state a standalone claim based on the SOX certifications. To the extent that it alleges that Och and Frank misrepresented Och-Ziff's compliance with GAAP, the Court has already held that the New Complaint inadequately alleges scienter. To the extent that it alleges that Och and Frank misrepresented their knowledge of the then-uncharged conduct, the Court has likewise held that there was no affirmative duty to disclose that conduct. And to the extent that the New Complaint alleges that Och and Frank misrepresented the potential impact of the SEC-DOJ investigation or constituted "control persons" for § 20(a) liability, the Court has already held in *Menaldi I* that Plaintiffs have adequately stated those claims.

Moreover, the SOX certifications contained an important qualification that the certifying officer's statements are true "based on [his] knowledge." (Compl. ¶ 171.) And since, as discussed above, the New Complaint does not adequately allege that Och and Frank had actual knowledge of bribery, it undermines the allegations that they knew that the SOX certifications

were false.  *Cf. Eletrobras*, 2017 WL 1157138, at *11 (concluding that SOX certifications were indicative of scienter because the signing officers knew that an internal audit contradicted the certifications).

Accordingly, while the SOX certifications remain relevant to this action, they do not constitute a standalone basis for liability.

### G.    The Renewed Claim for Scheme Liability

To state a claim for scheme liability, a plaintiff must present facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005).  Moreover, the alleged scheme must be "in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5.

Scheme liability claims are subject to the PSLRA pleading standard with respect to scienter.  Thus, to state a scheme liability claim, a plaintiff must plead facts demonstrating "a strong inference that the defendant acted with the required state of mind."  *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(2)).  Rule 9(b) also requires that plaintiffs state with particularity "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005).

In *Menaldi I*, the Court dismissed the scheme liability claim because (1) the underlying FCPA violations happened years before the class period, and (2) the Old Complaint did not point to an additional "deceptive act" as required for scheme liability.  *Menaldi I*, 164 F. Supp. 3d at 586.  In an effort to salvage the scheme liability claim, the New Complaint extends the class period and points to new deceptive acts.  Here, it is useful to separate the analysis into two parts:

the claim against Cohen, and the claim against Och, Frank, and Och-Ziff.

### 1. Scheme Liability as to Cohen

As to Cohen, Plaintiffs argue for scheme liability because he (1) "was directly involved in the payment of bribes," (2) "ignored warnings indicating a high risk of corruption," (3) "withheld information from legal and compliance functions," (4) "structured deals with the purpose and intent of circumventing internal policies and controls," (5) "engaged in self-dealing transactions to personally profit from the fraud," and (6) "conceal[ed] . . . his knowledge and participation in Defendants' fraud . . . thereby extending the SEC-DOJ Investigation and the Company's exposure to regulatory risk." (Dkt. No. 87 at 16.)

The New Complaint also adds one new allegation against Cohen that falls inside the class period: that "Cohen personally loaned funds to [a] Libyan agent and then took security interests over several assets to secure the loan," and that "[i]n 2012, after the SEC and DOJ investigation commenced, Defendant Cohen and a Libyan agent created a false document regarding these transactions and Defendant Cohen's self-dealing in order to hinder the SEC and DOJ's investigation." (Compl. ¶¶ 233–34.)

To begin with, as held in *Menaldi I*, the bribery itself occurred years before the class period, and is far too remote to be "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. "Not all conduct that negatively affects a company's stock price is actionable as a federal securities fraud. The scheme to defraud must coincide with the sale of securities. In other words, the fraud itself must be 'integral to the purchase and sale of the securities in question.'" *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006) (quoting *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986) (citation omitted)). Cohen may have engaged in extensive bribery, but this case is not about bribery—it is about Och-Ziff's conduct in the aftermath to that bribery. Likewise, the mere possibility that Cohen's cover-up may have

delayed the SEC's investigation does not furnish the necessary link between his deceptive act and the purchase or sale of securities.

Moreover, the New Complaint does not adequately allege that Plaintiffs relied on Cohen's alleged cover-up. Section 10(b) "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 162 (2008). "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element" of a scheme liability claim. *Id.* at 159. In *Stoneridge*, the Supreme Court denied a scheme liability claim against entities that colluded with the investors' company to mislead its auditor and issue a misleading financial statement, holding that the entities' "deceptive acts . . . [were] too remote to satisfy the requirement of reliance" and "nothing [the entities] did made it necessary or inevitable for [the investors' company] to record the transactions as it did." *Id.* at 159, 161; *see also Eletrobras*, 2017 WL 1157138, at *13 (holding that plaintiffs "adequately pleaded scheme liability reliance because [defendant's] alleged participation in this deceptive scheme made it 'necessary or inevitable' that falsehoods on the part of [the company] would result.") The New Complaint fails to allege that investors knew of, or relied upon, Cohen's attempt to cover up his alleged self-dealing. *See Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) (rejecting scheme liability against defendant who enabled sham transactions which were not communicated to the public). The mere fact that Cohen tried to avoid detection by the authorities does not transform bribery into securities fraud.

Accordingly, the New Complaint fails to state a scheme liability claim against Cohen.

### 2. Scheme Liability as to Och, Frank, and Och-Ziff

As to the other Defendants, Plaintiffs argue that the New Complaint remedies the Old Complaint's failure to identify an independent deceptive act. Plaintiffs point to allegations that

Och-Ziff (1) covered up its bribe payments by categorizing them as "investments" or "convertible loans"; (2) "falsified documents related to bribery payments and personal benefits derived from the illicit transactions"; (3) "withheld documents requested by regulators"; (4) "allowed [Och-Ziff's] financial statements to continue to reflect improper entries throughout the Class Period intended to disguise Defendants' illegal conduct"; (5) "continued to record and personally benefit from profits derived from the illegal transactions"; and (6) "failed to take a loss contingency that would have alerted investors to the existence of and risks posed by the initiation of a regulatory investigation." (Dkt. No. 126 at 65–66.)

None of these allegations, however, furnish the necessary deceptive act. First, the underlying bribery is not a proper basis for a scheme liability claim. As the Court concluded in *Menaldi I*, "those legal violations . . . occurred years before the putative class period. The [Old] Complaint thus fails to explain how the 'proscribed schemes or acts [were] done in connection with the purchase or sale of any security.'" 164 F. Supp. 3d at 586 (quoting *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013)).

 Second, Och-Ziff's misrepresentations or omissions in its public filings are not a proper basis for a scheme liability claim. "[T]he three subsections of Rule 10b–5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012). Therefore, Och-Ziff's statements about the investigation, Och-Ziff's failure to disclose the then-uncharged conduct, and Och-Ziff's failure to disclose or accrue a loss contingency do not constitute deceptive acts for the purpose of scheme liability. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for [scheme liability] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market

manipulation claim under Rule 10b–5(a) and (c).”); *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (“[W]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC’s attempt to bypass the elements necessary to impose ‘misstatement’ liability under subsection (b) by labeling the alleged misconduct a ‘scheme’ rather than a ‘misstatement.’”) (citations omitted)).

Finally, Plaintiffs argue that Defendants engaged in a general, “multi-faceted cover-up to conceal the illegal bribery scheme.” (Dkt. No. 126 at 66.) However, the New Complaint does not contain plausible allegations of a deceptive cover-up aside from the underlying bribery and the alleged misrepresentations. Plaintiffs point to the Eighth Circuit’s decision in *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016), but the deceptive act in that case was pleaded in far more detail than those pleaded in the New Complaint. There, the court held that the company’s management “allege[d] conduct beyond mere misrepresentations or omissions actionable under Rule 10b-5(b)”—namely, that the company paid doctors to manipulate medical data. *Id.* at 393. That is not the case here, however, where the scheme-liability allegations merely repackage the misrepresentation allegations.

Accordingly, the New Complaint does not adequately plead a scheme liability claim against Och-Ziff, Och, and Frank.

### H.    The Renewed Claim for Control Person Liability

The final claim in this suit arises under § 20(a) of the Exchange Act. To state a § 20(a) claim, a Plaintiff must allege facts showing “(1) an underlying primary violation of the securities laws by the controlled person; (2) control over the controlled person; and (3) that the controlling person was, in some meaningful sense, a culpable participant in the controlled person’s primary

violation." *In re Deutsche Telekom AG Sec. Litig.*, No 00 Civ. 9475, 2002 WL 244597, at *6 (S.D.N.Y Feb. 20, 2002) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000)).

As to Och and Frank, the New Complaint does not adequately allege any new primary violations on which to base a § 20(a) claim. Accordingly, the sole viable § 20(a) claim against them is the one that survived *Menaldi I.*

As to Cohen, the control person claim against him fails for the same reasons discussed in *Menaldi I*—namely, the lack of a primary violation. Since the New Complaint fails to state a primary violation—scheme liability—against Cohen, the control person claim fails too. And since both claims against Cohen fail, the Court concludes that renewing the claims against him would be futile. Accordingly, Cohen is dismissed from this suit.[7]

## I.     Leave to Amend

Plaintiffs ask for leave to amend the New Complaint in the event any of its claims fail. (Dkt. No. 126 at 69 n.43.) That request is denied. Plaintiff have already had the opportunity to amend their complaint after *Menaldi I.* After three years, multiple amendments, and a forest's worth of briefing, it is time to move past the pleading stage.

## IV.    Conclusion

For the foregoing reasons, the claims that survived *Menaldi I* remain; the others are dismissed. Accordingly, Plaintiffs' motion to renew claims against Cohen is DENIED. The motions to dismiss by Och-Ziff, Och, and Frank are GRANTED insofar as they seek to dismiss the new or renewed claims in the New Complaint. The Clerk of Court is directed to dismiss Cohen from this suit and close the motions at Docket Numbers 86, 96, 100, and 103.

---

[7]      Since the claims against Cohen are dismissed on futility grounds, the Court need not express an opinion on the remaining arguments made in the parties' briefs on the issue of adding Cohen.

The parties shall comply with the deadlines set forth in the Stipulation and Order at

Docket Number 71.  The remaining Defendants shall file answers to the surviving claims of the

Consolidated Second Amended Class Action Complaint within 30 days of the date of this

Opinion and Order.

SO ORDERED.

Dated:  September 29, 2017
        New York, New York

_____
J. PAUL OETKEN
United States District Judge