UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARTHUR MENALDI, individually and on
behalf of all others similarly situated,

                                    Plaintiff,                          14-CV-3251 (JPO)

                    -v-                                                 OPINION AND ORDER

OCH-ZIFF CAPITAL MANAGEMENT
GROUP LLC, DANIEL S. OCH, and
JOEL M. FRANK,

                                    Defendants.

J. PAUL OETKEN, District Judge:

       This is a motion to certify a securities fraud class action.  The putative class consists of

shareholders of Och-Ziff Capital Management Group.  Plaintiffs claim that Och-Ziff

misrepresented the impact of a federal investigation into its bribery of African officials.  For the

reasons that follow, the motion to certify is granted.

**I.       Background**

       For the purposes of this motion, Plaintiffs' allegations can be summed up as follows:

Beginning in 2007, Och-Ziff employees allegedly bribed various African officials.  The federal

government subsequently launched an investigation.  In 2012 and 2013, while the investigation

was ongoing, Och-Ziff's public filings suggested that it was not facing any investigations that

could have a material impact on the company.  Plaintiffs allege that these statements violated

securities laws.

       The key factual issues relate mostly to dueling experts: Dr. Zachary Nye for Plaintiffs,

and Dr. Allan Kleidon for Och-Ziff.  (*See* Dkt. Nos. 62-1, 144-18 & 153-2.)  Familiarity with the

procedural background of this case, as discussed in this Court's prior opinions, is presumed.  *See*

*Menaldi v. Och-Ziff Capital Mgmt. Grp.*, 277 F. Supp. 3d 500 (S.D.N.Y. 2017); *Menaldi v. Och-Ziff Capital Mgmt. Grp.*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016).

After the last motion to dismiss, two claims remain: (1) a Rule 10b–5 claim against Och-Ziff and two of its executives based on allegedly misleading statements regarding the government investigation, and (2) a § 20(a) control-person claim against the two executives, also based on those statements.  For simplicity, "Och-Ziff" refers to all Defendants.

Plaintiffs seek to certify the following class:

> All persons other than defendants who purchased Och-Ziff securities between February 9, 2012 and August 22, 2014, both dates inclusive (the "Class Period"), excluding Defendants, current and former officers and directors of Och-Ziff, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

(Dkt. No. 61 at 1.)

## II.    Legal Standard

Federal Rule of Civil Procedure 23(a) sets four prerequisites to class certification, each of which Plaintiffs must prove by a preponderance of the evidence:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

In addition to these prerequisites, a class action under Federal Rule of Civil Procedure 23(b)(3) requires Plaintiffs to prove:

> (1) predominance—"that the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) superiority—"that a class action is

> superior to other available methods for fairly and efficiently
> adjudicating the controversy."

*Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

Courts must conduct a "rigorous analysis" of the facts, sometimes looking behind the pleadings, to ensure that a plaintiff has shown that each Rule 23 requirement has been satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). This analysis frequently overlaps with the merits of the plaintiff's underlying claim, because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart*, 564 U.S. at 351 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

## III. Discussion

Many of the Rule 23 requirements are not in dispute. Below, the Court reviews each requirement and addresses the parties' arguments where applicable. The key issues are (1) whether the gradual trickle of corrective information creates class conflicts, (2) whether reliance can be proven on a classwide basis, (3) whether damages can be calculated on a classwide basis, and (4) the end-date for the class period.

### A. Numerosity

This requirement is clearly met, as Och-Ziff had more than a hundred million shares outstanding during the class period (*see* Dkt. No. 62-1 ("Nye Report") ¶ 20), likely held by thousands of investors. Och-Ziff does not dispute this requirement.

### B. Commonality

This requirement is also met. The legal questions turn almost exclusively on Och-Ziff's conduct and are therefore common across the class. They include, for example, whether Och-

Ziff's statements were misleading and whether they were material.  Och-Ziff does not dispute this requirement either.

### C.      Typicality and Adequacy

These two requirements overlap.  Typicality focuses on the lead plaintiff; adequacy focuses on class counsel.  "The focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  "In order to defeat a motion for certification, however, the conflict 'must be fundamental.'"  *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)).

Although the parties did not focus on these two requirements in their briefs, the Court raised a potential class conflict and called for supplemental briefing.  The potential conflict arises out of the gradual way in which the government investigation was revealed to the public and the buying patterns of the two lead plaintiffs, Julie Lemond and Ralph Langstadt.  The relevant events are most effectively conveyed chronologically:

- <u>2012–2013</u>:  Och-Ziff makes the allegedly misleading statements.

- <u>November 2013</u>:  Lemond buys Och-Ziff stock and sells it four days later, after a dividend is paid.  (Dkt. No. 173 at 1.)

- <u>January 2014</u>:  Lemond buys more Och-Ziff stock.  (Dkt. No. 11-2.)

- <u>February 2014</u>:  The Wall Street Journal reveals that the government is looking into Och-Ziff's dealings in Libya.  (Dkt. No. 144-10.)

- <u>March 11, 2014</u>:  Langstadt buys Och-Ziff stock.  (Dkt. No. 11-2.)

- <u>March 21, 2014</u>:  Lemond buys more Och-Ziff stock.  (*Id.*)

- <u>March 18, 2014</u>:  Och-Ziff reveals that it has received subpoenas relating to dealings in Africa, but it does not indicate the expected impact of the investigation.  (Dkt. No. 144-11 at 4.)

- <u>April 2014</u>:  Lemond buys more Och-Ziff stock.  (Dkt. No. 11-2 at 7.)

- <u>August 2014</u>: Bloomberg publishes a story describing Och-Ziff's misadventures in Africa. (Dkt. No. 144-21.)

The Court's key concern was that the lead plaintiffs might be subject to unique defenses because both bought stock after the Wall Street Journal revealed that there was an active government investigation into Och-Ziff. Since Och-Ziff contends that the Wall Street Journal article fully corrected any prior misstatements, there is a risk that lead plaintiffs—and class counsel—would be preoccupied with the partial-disclosure issue to the detriment of class members who bought their stock before any corrective disclosure. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 472–73 (2013) ("[A] plaintiff whose relevant transactions were not executed between the time the misrepresentation was made and the time the truth was revealed . . . . would not be 'typical' of the claims of investors who did trade during the window between misrepresentation and truth revelation."); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("Regardless of whether the issue is framed in terms of . . . typicality . . . or . . . adequacy . . . , there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").

But with the benefit of the parties' supplemental briefs, the Court is satisfied that there are no class conflicts precluding certification.

First, a peek at the merits suggests that the Wall Street Journal article may have been only a partial disclosure rather than a full correction. For example, one reason why the Court denied Och-Ziff's previous motion to dismiss was that "Plaintiffs have plausibly alleged that Och-Ziff misled investors by suggesting that the company was not facing an investigation *that could have a material impact on its business*, when, in fact, it was facing such an investigation." *Menaldi*, 164 F. Supp. 3d at 584 (emphasis added). The Wall Street Journal merely revealed that Och-Ziff

was facing an investigation; it arguably did nothing to correct Och-Ziff's statements about material impact.  *See In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 345–46 (S.D.N.Y. 2009) (holding that a stockholder who bought stock after a partial corrective disclosure was an adequate lead plaintiff because the corrective disclosure left out some key details).

Second, Lemond is a typical plaintiff because she bought stock before the first corrective disclosure and held some of it throughout the remainder of the class period.  Though Lemond bought and sold stock at several different times, the key facts are (1) that she bought stock in January of 2014, before the Wall Street Journal article was published, and (2) that she continued to hold at least some of that stock throughout the class period.  (*See* Dkt. No. 173 at 1.) Lemond's claims are therefore typical of class members who bought stock before the Wall Street Journal article, including anyone who bought stock in 2012 and 2013.  Thus, even if the Wall Street Journal article is deemed a corrective disclosure, Lemond would still make an adequate lead plaintiff based on her pre-disclosure purchases.

Third, the fact that Lemond bought and sold stock in 2013 does not create a conflict. While "in-and-out" stockholders—those who bought and sold before the truth came out—may be subject to unique defenses, Lemond could still represent the class based on her 2014 stock purchases.  *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (noting that "'in-and-out' trading is not atypical in a class that contains . . . numerous sophisticated institutional investors"), *vacated in part on other grounds*, 862 F.3d 250 (2d Cir. 2017).

Fourth, the fact that Lemond bought more stock even after the Wall Street Journal article was published does not create a conflict.  *See id.* (holding that the lead plaintiff was typical and adequate despite having bought stock after a partial corrective disclosure); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 3852, 2015 WL 10433433, at *4 (S.D.N.Y. Sept. 29, 2015)

(same).  And even if those additional purchases are later excluded from her recovery, Lemond

could still represent the class based on her pre-Wall Street Journal article purchases.  *See Pirnik*

*v. Fiat Chrysler Autos., N.V.*, No. 15 Civ. 7199, 2018 WL 3130596, at \*2 n.2 ("[T]he fact that a

putative class representative purchased additional shares in reliance on the integrity of the market

after the disclosure of corrective information has no bearing on whether or not the representative

relied on the integrity of the market during the class period[ for purposes of Rule 23(a)

typicality.]"  (internal quotation marks and citations omitted)).

      Fifth, it does not matter that Lemond was primarily motivated by dividend payments

rather than stock price:  All that matters is that the value of her shares fell after the truth came

out.  *See Petrobras*, 312 F.R.D. at 360−61 (rejecting the argument that the proposed lead

plaintiff's "trading decisions were based on atypical considerations" because "it is common

practice for money managers to claim they have some special strategy that will deliver insights—

and returns—superior to the wider market").

      Finally, an overview of this case suggests that any conflict would be minor.  This is a

relatively standard securities class action.  Plaintiffs will obviously argue for the broadest class

definition, for the widest class period, and for liability to extend to even those who bought stock

after the partial disclosures.  Defendants will obviously argue for the most restrictive class

definition, for the narrowest class period, and for liability to end with the first partial disclosure.

It will be the job of the Court and the factfinder to draw these lines, and the Court will be on

guard if a conflict crops up.  But the need to draw lines does not create a fundamental conflict.  If

it did, few securities class actions could be certified, if any.  *See In re Parmalat Sec. Litig.*, No.

04 MD 1653, 2008 WL 3895539, at \*5 (S.D.N.Y. Aug. 21, 2008) (noting that the unique-defense

rule is not rigidly applied in the Second Circuit, and it is generally applied only where a full

defense is available against an individual plaintiff's action).

### D.    Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  Except for two

issues raised by Och-Ziff and discussed below, common issues clearly predominate.  *See id.* at

625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud

. . . .").  These two issues are (1) whether reliance can be presumed, and (2) whether damages

can be calculated classwide.

### 1.    Presumption of Reliance

To succeed on their Rule 10b–5 claim, each plaintiff must have relied on Och-Ziff's

alleged misrepresentations.  Because of that, classwide adjudication is possible only if reliance

can be presumed.  Otherwise, the individualized reliance determinations would overwhelm

common issues, hopelessly splintering the class.  *See In re Petrobras Sec.*, 862 F.3d 250, 275 (2d

Cir. 2017) (noting that unless reliance is presumed, "the reliance element would appear to

preclude class certification on predominance grounds").

There are two relevant ways in which classwide reliance can be presumed: the *Affiliated*

*Ute* presumption and the *Basic* presumption.  Plaintiffs argue that both apply.  Defendants argue

that neither applies.

**Affiliated Ute Presumption.**  The *Affiliated Ute* presumption applies in cases "involving

primarily a failure to disclose."  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128,

153 (1972).  This presumption holds that if the fraudulent act is an omission rather than an

affirmative misrepresentation, "positive proof of reliance is not a prerequisite to recovery."  *Id.*

As the Second Circuit explained, the reason for the *Affiliated Ute* presumption is that, in cases in

which there was no affirmative misrepresentation, "reliance as a practical matter is impossible to prove." *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981). Thus, the question here is whether the claims primarily involve misrepresentations or omissions.

Defendants are correct on this front: The claims here do not "involve[e] primarily a failure to disclose." *Affiliated Ute*, 406 U.S. at 153. It is not enough that Plaintiffs allege that Och-Ziff omitted something. The Second Circuit has cautioned that the raw labels "omission" and "misrepresentation" are of little help. *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017), *cert. denied*, No. 17-1209, 2018 WL 1116150 (U.S. Apr. 30, 2018). Instead of focusing on whether someone did or did not speak, courts must ask whether the facts fit the rationale of *Affiliated Ute—i.e.*, whether reliance would be impossible to prove. *Id.* Thus, "[i]n many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation." *Wilson*, 648 F.2d at 93. The same is true even if the subsequent omission "exacerbated the misleading nature of the affirmative statements." *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005).

For the same reasons the Second Circuit gave in *Wilson*, *Starr*, and *Waggoner*, Plaintiffs' allegations are not primarily based on omissions. For one, as in *Waggoner*, "Plaintiffs' complaint alleges numerous affirmative misstatements by the Defendants. The Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements." 875 F.3d at 96. Second, as in *Waggoner*, "Plaintiffs focus their claims on those affirmative misstatements." *Id.* Indeed, this Court has previously dismissed Plaintiffs' claims that were based purely on Och-Ziff's failure to disclose the alleged bribery. It held that the only remaining claim is that "Och-Ziff *made actionable misstatements* about the existence and risks

of regulatory proceedings." *Menaldi*, 164 F. Supp. 3d at 584 (emphasis added). *Affiliated Ute*

does not attach to such a claim.

      ***Basic* Presumption.**  The *Basic* presumption essentially holds that when a stock trades

on an efficient market, courts can presume that a material misrepresentation affected investor

behavior.

      The *Basic* presumption applies if Plaintiffs prove that:

> (1) the alleged misrepresentations were publicly known, (2) they
> were material, (3) the stock traded in an efficient market, and (4) the
> plaintiff traded the stock between when the misrepresentations were
> made and when the truth was revealed.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014).  If these elements are

met, courts presume (a) that the misrepresentation affected the stock price, and (b) that the

plaintiff bought the stock in reliance on the defendant's misrepresentation. *Id.* at 2414.  A

defendant can rebut this presumption by showing that the misrepresentation "did not actually

affect the stock's price." *Id.* at 2405.

      Only one element is in dispute here: whether Och-Ziff stock traded in an efficient market.

An efficient market is "one in which the prices of the [stock] incorporate most public

information rapidly." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546

F.3d 196, 204 (2d Cir. 2008).  Neither the Supreme Court nor the Second Circuit has adopted a

particular test for market efficiency.  Indeed, the Second Circuit has explicitly declined to do so.

*See Waggoner*, 875 F.3d at 94.  But at the same time, the Second Circuit has nodded approvingly

at the *Cammer* and *Krogman* factors, so named after the district court cases expounding them.

*Id.* at 94–95.

      The five *Cammer* factors are:

> (1) the average weekly trading volume of the stock, (2) the number
> of securities analysts following and reporting on it, (3) the extent to

> which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price.

*Id.* at 94 (quoting *Bombardier*, 546 F.3d at 200) (alterations omitted).

The three *Krogman* factors are:

> (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders.

*Id.* at 95 (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)).

All eight factors are discussed below. Seven of them are not disputed, and all seven point to market efficiency. One of them—the fifth *Cammer* factor—is discussed separately below.

*Cammer* one—the average weekly trading volume of the stock: Dr. Nye reports that the average weekly turnover of Och-Ziff stock was 3.2 percent of outstanding shares. (Nye Report ¶ 20.) The *Cammer* court concluded that weekly turnover of at least 2 percent justifies a strong presumption of market efficiency. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (noting that trading volume implies significant investor interest, which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information").

*Cammer* two—the number of securities analysts following and reporting on the stock: Dr. Nye lists many investment firms that followed Och-Ziff's comings and goings. Dr. Nye points to 400 analyst reports during the class period and routine coverage in the financial press. (Nye Report ¶¶ 26–27.) This, too, weighs in favor of market efficiency. *See Cammer*, 711 F. Supp. at 1286 ("The existence of such analysts would imply, for example, the [the allegedly misleading statements] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.").

11

_Cammer_ three—the extent to which market makers traded in the stock:  Dr. Nye reports that Och-Ziff stock traded on the New York Stock Exchange during the class period and that short trading was not constrained.  (Nye Report ¶¶ 33–35.)  Dr. Nye also analyzed the level of institutional ownership, bid-to-ask spreads, and overall arbitrage opportunities.  (Nye Report ¶¶ 35–38.)  *See Cammer*, 711 F. Supp. at 1286–87 ("The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.").

_Cammer_ four—the issuer's eligibility to file an SEC registration Form S–3:  Dr. Nye reports that Och-Ziff could, and did, file S–3 reports during the class period.  (Nye Report ¶ 43.)  This, too, points to market efficiency.

_Krogman_ one—the capitalization of the company:  Dr. Nye reports that Och-Ziff's market capitalization was as high as $7.35 billion.  (Nye Report ¶ 10.)  While the report does not compare this number to other companies, it nevertheless appears to be high enough to indicate market efficiency.  *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (holding that quarterly market capitalization of ranging from $0.5 to $3.2 billion indicated market efficiency).

_Krogman_ two—the bid-ask spreads of the stock:  Although Plaintiffs do not explicitly address this factor, Dr. Nye concluded that "the average and median bid/ask spreads on Och-Ziff stock during the Class Period were comparable to those of a random sample of stocks listed on the [New York Stock Exchange]."  (Nye Report ¶ 38.)  This factor weighs in favor of market efficiency.  *Cf. Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").

*Krogman* three—the percentage of stock not held by insiders:  Neither party addresses this point, although Dr. Nye does note that institutional investors held between 70.2% and 85.7% of available Och-Ziff shares during the class period.  (Nye Report ¶ 37.)  But since no context is provided for these figures, it weighs only slightly for market efficiency.

In sum, the first four *Cammer* factors weigh strongly in favor of market efficiency.  The three *Krogman* factors also point towards market efficiency, but their weight is lighter given that Dr. Nye did not fully analyze them.

*Cammer* five—cause and effect relationship between news and price movement:  The main point of contention is the fifth *Cammer* factor: "the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price." *Waggoner*, 875 F.3d at 94 (alterations omitted) (quoting *Bombardier*, 546 F.3d at 200). "Plaintiffs generally attempt to satisfy *Cammer* 5 by submitting an event study."  *Id.*  Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  *Erica P. John Fund*, 134 S. Ct. at 2415. It is important to note, however, that plaintiffs "need not always present direct evidence of price impact through event studies."  *Waggoner*, 875 F.3d at 97.

Plaintiffs present an event study by their expert, Dr. Nye.  Dr. Nye's report sets out to determine "whether unexpected corporate events or financial releases promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects."  (Nye Report ¶ 46.)  To perform this analysis, Dr. Nye compiled a dataset of seventeen Och-Ziff news events such as earnings reports and news stories.  (Nye Report ¶ 47; *see also id.* at 222 (listing the seventeen events).)  Dr. Nye concluded that Och-Ziff stock reacted more strongly in the days following those news events than it did on normal days.  (Nye Report ¶ 48.)

13

Dr. Nye also concluded that when the news was good, the stock price generally went up, and

vice versa.  In sum, he concluded that "[the] event study clearly demonstrates a cause-and-effect

relationship between unexpected [Och-Ziff] disclosures and resulting movements in Och-Ziff's

stock price during the Class Period."  (Nye Report ¶ 46.)

In opposition, Och-Ziff points to its expert report by Dr. Kleidon.  (See Dkt. No. 144-18

("Kleidon Report").)  Dr. Kleidon did not perform an event study of his own, but his report

points out purported deficiencies in Dr. Nye's event study and his disagreements with Dr. Nye's

methodology.

First, Och-Ziff attacks Dr. Nye's choice of the seventeen news events.  Och-Ziff does not

appear to quibble with the inclusion of Och-Ziff's quarterly and annual earnings releases, which

compose eleven of the seventeen events.  But Och-Ziff argues that the four news events that

relate to the corrective disclosures—*i.e.*, the four revelations of the bribery allegations and the

investigation—were selectively inserted into the dataset.  Och-Ziff also argues that the remaining

two events were added without explanation.

Och-Ziff has a point here.  Dr. Nye did not fully explain how he chose these events and

why he chose some events but not others.  Still, as one court in this district held, "[t]he dispute

over the inclusion of event dates is essentially about the role of subjectivity in such analysis."

*Petrobras*, 312 F.R.D. at 368.   As in *Petrobras*, "[t]he Court concludes that [the expert's]

selection of event dates displays only that—a modest level of subjectivity—and that this is not

fatal to his conclusions."  *Id.*  Plaintiffs also cite many cases crediting event studies that included

the corrective disclosures at issue in the case.  (*See* Dkt. No. 153-1 ¶ 102 & nn. 293–94.)  Also

noteworthy is that in *Erica P. John Fund*, the Supreme Court observed, without expressing any

concern, that "[t]he episodes examined by [the plaintiff's] event study included one of the alleged misrepresentations that form the basis of the [plaintiff's] suit."  134 S. Ct. at 2415.

Second, Och-Ziff argues that Dr. Nye's data failed to show that the stock price actually reacted to news events.  Whereas only 5% of a random sampling of days is expected to produce statistically significant price movement, Dr. Nye found statistically significant price movement in the days following eight of the seventeen news events—or 47.1%.  (Nye Report ¶ 48.)  Och-Ziff argues that this is too low a percentage.

This is perhaps Och-Ziff's strongest argument.  *See George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("[S]howing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency").  While Nye's event study still shows a significant cause-and-effect relationship between news events and price movement, this objection nevertheless weakens the Nye Report's persuasive force.

Finally, Och-Ziff argues that Dr. Nye's report actually shows market *inefficiency* because it shows that the market had reacted to old news.  Och-Ziff points to the four corrective disclosures—all of which caused price movement—and argues that they were all describing previously disclosed information.  And because the efficient market hypothesis is based on the notion that new information is immediately absorbed into the stock price, Och-Ziff argues that a price movement based on old news shows that the news was not immediately absorbed.

This argument is not convincing because all four events appear to have revealed new information.  Och-Ziff hangs its hat on a news report from 2011 which said (a) that the government was investigating financial firms' dealings with Libya's sovereign-wealth fund, and (b) that Och-Ziff and several other companies did business with that fund.  (*See* Dkt. No. 144-2.)

15

But each of the four later disclosures seemingly added to this story:  The first disclosure revealed that Och-Ziff was actually under investigation, that the investigation was criminal, and that Och-Ziff was being investigated for a $120 million hotel venture with Libya.  (*See* Dkt. No. 144-10.)  The second disclosure—Och-Ziff's admission of the investigation in a public filing—was also new information because it was the first time Och-Ziff acknowledged the investigation.  (*See* Dkt. No. 144-11 at 4.)  The final two disclosures—two news articles—added a lot more color and detail to Och-Ziff's actions in Africa.  (*See* Nye Report at 278–80; Dkt. No. 144-21.)  It would be quite a stretch to say that a single story about a possible investigation renders all subsequent revelations old news.

In the end, this would be a much closer call if Plaintiffs' case rested solely on *Cammer* 5.  But Plaintiffs are aided by the fact that the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency.  Plaintiffs are also aided by recent circuit precedent, which holds that if those seven factors point to market efficiency, a court can dispose with *Cammer* 5 completely:

> [W]e conclude that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies.  In so concluding, we do not imply that direct evidence of price impact under *Cammer* 5 is never important. . . . Direct evidence of an efficient market may be more critical, for example, in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market. . . .  The *Cammer* and *Krogman* factors are simply tools to help district courts analyze market efficiency in determining whether the *Basic* presumption of reliance applies in class certification decision–making.  But they are no more than tools in arriving at that conclusion, and certain factors will be more helpful than others in assessing particular securities and particular markets for efficiency.

*Waggoner*, 875 F.3d at 97–98.

The Second Circuit then applied this rule to the facts of that case:

> [W]e conclude that the district court's decision not to rely on direct evidence of price impact under *Cammer* 5 in this case fell comfortably within the range of permissible decisions. All seven of the indirect factors considered by the district court (the first four *Cammer* factors and the three *Krogman* factors) weighed so clearly in favor of concluding that the market for [the defendant's securities] was efficient that the Defendants did not even challenge them. . . . Because [the defendant] is one of the largest financial institutions in the world, it is unsurprising that the market for [its securities] is efficient. Indeed, this conclusion is so clear that the Defendants failed to challenge such efficiency—based on seven other factors—apart from their attack on [plaintiffs' expert's] *Cammer* 5 event study. . . . Under the circumstances here, the district court was not required to reach a conclusion concerning direct evidence of market efficiency.

*Id.* at 98−99.

This case fits comfortably within the *Waggoner* framework. It is true that Dr. Nye's study is flawed. Och-Ziff assiduously points out some gaps and inconsistencies. (*See, e.g.*, Dkt. No. 143 at 13−14; Dkt. No. 157 at 2–5.) Och-Ziff also points to contemporaneous analyst chatter that undercuts some of Dr. Nye's assumptions. (*See, e.g.*, Dkt. No. 157 at 4.) Still, the event study goes to the basic premise of *Cammer* 5—*i.e.*, it shows that when news came out, Och-Ziff's stock price moved more than it otherwise would have. Dr. Kleidon does not do an event study of his own, nor does he conclude that Och-Ziff traded on an inefficient market.[1] He pokes some holes in Dr. Nye's conclusions. But while Dr. Nye's theory takes in some water, his

---

[1]    The mere fact that Dr. Kleidon failed to conduct an event study of his own by itself "arguably supports rejection of Defendants' [reliance on his] arguments at this stage." *Pirnik*, 2018 WL 3130596 at *3 (rejecting criticisms of a Dr. Nye study demonstrating market efficiency for purposes of establishing classwide reliance where defendants "did not conduct, or submit, their own event study" but "instead [only relied] on, and criticize[d], the event study conducted by Plaintiffs' expert, Dr. Zachart Nye.").

basic premise mostly stays afloat.  And even if it had not, the other seven *Cammer* and *Krogman*

factors would likely suffice.[2]

It is easy to get sidetracked among the reams of expert materials, but it is important to

keep in mind that the *Basic* presumption is "based . . . on the fairly modest premise that 'market

professionals generally consider most publicly announced material statements about companies,

thereby affecting stock market prices.'"  *Erica P. John Fund*, 134 S. Ct. at 2410 (quoting *Basic*

*Inc. v. Levinson*, 485 U.S. 224, 246 n.24 (1988)); *see also id.* at 2417 (Ginsburg, J., concurring)

(noting that fraud-on-the-market standards "should impose no heavy toll on securities-fraud

plaintiffs with tenable claims").  Given that seven factors weigh in Plaintiffs' favor, and given

that Plaintiffs have presented a marginally convincing event study, the Court concludes that it is

more likely than not that Och-Ziff stock traded on an efficient market.

Accordingly, the *Basic* presumption applies.  While a party may rebut the *Basic*

presumption by showing that the misrepresentation did not actually affect the stock's price, Och-

Ziff does not try to do so.  And since reliance is presumed, there is no risk of individual reliance

issues predominating over common ones.

## 2. Calculation of Damages on a Classwide Basis

The next issue is whether damages can be calculated on a classwide basis.   Here,

Plaintiffs rely on Dr. Nye's calculation method, which computes damages as the differential

between the pre-disclosure and post-disclosure stock prices.  (Nye Report ¶¶ 50–54.)

---

[2]      *See Pirnik*, 2018 WL 3130596 at *3 ("As Plaintiffs easily satisfy the first four
*Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor. . . ."  (citing
*Waggoner*, 875 F.3d at 97–98)).  The contrary case most favorable to Och-Ziff, *George v. China*
*Automotive Systems, Inc.*, No. 11 Civ. 7533, 2013 WL 3357170 (S.D.N.Y. July 3, 2013),
predates the Second Circuit's opinions in *Petrobras* and *Waggoner*, and is therefore less
persuasive.

Och-Ziff has one objection on this front: that Nye's approach does not account for the fact that some theories of liability have been dismissed.  This Court had previously dismissed the claim that Och-Ziff's failure to disclose the illegal acts themselves—as opposed to its alleged lies about the impact of the government's investigation—was an actionable omission.  Accordingly, Och-Ziff argues, any damages model must differentiate between the price decline that resulted from the actual illegal activity—which is not actionable—and the price decline that resulted from Och-Ziff's lying about the impact of the investigation.  And since Dr. Nye does not discuss this distinction, Och-Ziff argues that his model is deficient.

This is an interesting argument, and one this Court might have to deal with eventually. But it does not impede class certification.  First, the problem Och-Ziff identifies is not unique to aggregated litigation.  Even if this case had only one plaintiff who bought only one share, we would still have to figure out the same issue: whether there is a quantifiable difference between the two theories of liability, and if so, how much of the price drop is attributable to the alleged cover-up as opposed to the actual illegality.  Litigating this case on a classwide basis does not make this problem more or less difficult to solve.  The answer for the class will be the same as the answer for the hypothetical lone plaintiff.  Thus "to the extent Defendants' argument is that Plaintiffs' model fails to account for factual evidence of varied [sources of price decline], that is an argument that goes to the merits of whether Plaintiffs can accurately demonstrate price impact and goes beyond the Rule 23 inquiry."  *See Pirnik*, 2018 WL 3130596, at *5 ("[Q]uestion of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors) . . . '[is a] common question[ ] that need not be adjudicated before a class is certified.'" (quoting *Amgen*, 568 U.S. at 475).

Second, the Second Circuit in *Waggoner* evaluated a similar report by Dr. Nye, and it concluded that the report was good enough for the class certification stage. That report similarly failed to disaggregate the stock drop caused by the alleged misstatements from the stock drop caused by government fines. Still, the Second Circuit held that "the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification." *Waggoner*, 875 F.3d at 106.

Och-Ziff relies on the Supreme Court's opinion in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). There, the plaintiffs posited four theories of antitrust liability, but the district court held three theories incapable of class adjudication. The district court certified a class for the fourth theory, based on a damages model that did not disaggregate the damages attributable to the first three theories. The Supreme Court reversed, holding that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 35. Och-Ziff seizes on this language to argue that Dr. Nye's model does not disaggregate the damages caused by the dismissed theories of liability.

But the Second Circuit, like other courts of appeals, has held that *Comcast*'s impact is more muted than it first appears. Specifically, the Second Circuit held that:

> *Comcast* . . . did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis. *Comcast*'s holding was narrower. *Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance.

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citations omitted).

Dr. Nye's model fits comfortably within this interpretation of *Comcast* because it calculates the damages caused by the alleged cover-up.  Even though the model does not eliminate any alternative causes or contributing factors, that does not defeat the predominance requirement.  *See Waggoner*, 875 F.3d at 106 ("The *Comcast* standard is met notwithstanding that some of the decline in the price of [the securities] may have been the result of the New York Attorney General's action and potential fines."); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("*Comcast* did not rewrite the standards governing individualized damage considerations . . . .  All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'") (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

Accordingly, the damages calculation does not undermine the predominance requirement.

### E.      Superiority

The superiority requirement is met as well.  Given the dispersed nature of the class, aggregate adjudication is superior to piecemeal litigation.  *See Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 WL 622811, at *5 (S.D.N.Y. Mar. 6, 2008) ("Securities suits easily satisfy the superiority requirement [because] [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.").

### F.      The Appropriate Class Period

The final dispute about class certification concerns the end-date of the class period.  As with typicality and adequacy, this disagreement relates to the trickle of news about the investigation, which is again conveyed chronologically:

- 2012–2013:  Och-Ziff makes the allegedly misleading statements.

- <u>February 2014</u>:  The Wall Street Journal reveals that the government is looking into Och-Ziff's dealings in Libya.  (Dkt. No. 144-10.)

- <u>March 2014</u>:  Och-Ziff reveals that it has received subpoenas relating to dealings in Africa, but it does not indicate the expected impact of the investigation.  (Dkt. No. 144-11 at 4.)

- <u>August 2014</u>:  Bloomberg publishes a story describing Och-Ziff's misadventures in Africa.  (Dkt. No. 144-21.)

Defendants insist that the class period should end in February; Plaintiffs insist that it should extend into August.  The nub of the dispute is whether the February or March disclosures fully cured any prior misstatements.

Plaintiffs are correct on this front.  Whether the February or March disclosures cured the prior misstatements is a merits issue.  Och-Ziff will certainly have the opportunity to argue that those disclosures cured any prior misstatement, but that question does not have to be resolved at the class certification stage.  This issue is better suited for summary judgment or trial.  *See Amgen*, 568 U.S. at 482; *Strougo v. Barclays PLC*, 312 F.R.D. 307, 328 (S.D.N.Y. 2016) ("While defendants will have the opportunity to require plaintiffs to prove materiality—including the relevant time period—they have not shown that there is a reason to circumscribe the Class Period now."), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).  Accordingly, the class period will end on August 22, 2014, the day after the final alleged corrective disclosure.

### G.     Class Counsel

Both of the law firms representing the proposed class are experienced securities litigators.  Pursuant to Federal Rule of Civil Procedure 23(g), the Court finds that Pomerantz LLP and The Rosen Law Firm, P.A. would adequately represent the class.

**IV.      Conclusion**

  For the foregoing reasons, the motion for class certification is GRANTED.  The motions at Docket Numbers 157 and 175 are also GRANTED.  Ralph Langstandt and Julie Lemond are appointed lead plaintiffs, and Pomerantz LLP and The Rosen Law Firm, P.A. are appointed class counsel.

  The Clerk of Court is directed to close the motions at Docket Numbers 60, 157, and 175.

  SO ORDERED.

Dated: September 14, 2018
   New York, New York

                 J. PAUL OETKEN
               United States District Judge